**EXHIBIT 1**

1  Michael C. Manning (#016255)
   Larry J. Wulkan (#021404)
2  **STINSON MORRISON HECKER LLP**
   1850 North Central Avenue, Suite 2100
3  Phoenix, Arizona 85004-4584
   Tel: (602) 279-1600
4  Fax: (602) 240-6925
   Email: mmanning@stinson.com
5  Email: lwulkan@stinson.com

6  Attorneys for Plaintiffs





OCT 2 3 2012

MICHAEL K. JEANES, CLERK
M. DE LA CRUZ
DEPUTY CLERK

7

8              **SUPERIOR COURT OF ARIZONA**

9                **MARICOPA COUNTY**   CV2012 016047

10  ERNEST JOSEPH ATENCIO, surviving     NO.
    father of Ernest Marty Atencio, individually
11  and on behalf of the following statutory    **PLAINTIFFS' COMPLAINT AND**
    beneficiaries of Ernest Marty Atencio:      **DEMAND FOR JURY TRIAL**
12  Rosemary Atencio, surviving mother of
    Ernest Marty Atencio; Joshua Atencio,
13  surviving son of Ernest Marty Atencio;
    Joseph Atencio, surviving son of Ernest
14  Marty Atencio; M.A., a minor and surviving
    son of Ernest Marty Atencio; and MICHAEL
15  ATENCIO, Personal Representative of the
    Estate of Ernest Marty Atencio; and
16  ROSEMARY ATENCIO, individually;
    JOSHUA ATENCIO, individually; JOSEPH
17  ATENCIO, individually; and
    M.A., through his Next Friend, Eric Atencio,

18                 Plaintiffs,

19  v.

20  SHERIFF JOSEPH ARPAIO and AVA
    ARPAIO, husband and wife; MARICOPA
21  COUNTY, a public entity; JAIME
    CARRASCO and JANE DOE CARRASCO,
22  husband and wife; ADRIAN DOMINGUEZ
    and JANE DOE DOMINGUEZ, husband and
23  wife; CHRISTOPHER FOSTER and JANE
    DOE FOSTER, husband and wife;
24  ANTHONY HATTON and JANE DOE
    HATTON, husband and wife; CRAIG
25  KAISER and JANE DOE KAISER, husband
    and wife; ANTHONY SCHEFFNER and
26  JANE DOE SCHEFFNER, husband and wife;
    JOSE VAZQUEZ and JANE DOE
27  VAZQUEZ, husband and wife; JASON
    WEIERS and JANE DOE WEIERS, husband

28

and wife; IAN CRANMER and JANE DOE CRANMER, husband and wife; WILLIAM MCLEAN and JANE DOE MCLEAN, husband and wife; MONICA SCARPATI and JOHN DOE SCARPATI, wife and husband; CITY OF PHOENIX, a public entity; PATRICK HANLON and JANE DOE HANLON, husband and wife; NICHOLAS FRENCH and JANE DOE FRENCH, husband and wife.

Defendants.

Plaintiffs, for their Complaint against Defendants, allege as follows:

## JURISDICTION AND VENUE

1. Plaintiffs bring this action, pursuant to 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments of the United States Constitution, and pendent state common and statutory laws including A.R.S. § 12-611, *et seq.*

2. Jurisdiction and venue are proper in this Court pursuant to A.R.S. §§ 12-123 and 12-401, as the majority of parties are residents of Maricopa County, Arizona, and the events underlying this lawsuit occurred in Maricopa County.

## PARTIES

3. Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully herein.

4. For all material times, Ernest Joseph Atencio ("Joe") was an individual residing in Maricopa County, Arizona.

5. Joe survives his son, Ernest Marty Atencio ("Marty"), who also was an individual residing in Maricopa County, Arizona, at all times relevant to this Complaint.

6. Rosemary Atencio is Marty's mother and, for all material times, was an individual residing in Maricopa County, Arizona.

7. Joshua Atencio is Marty's son and, for all material times, was an individual residing in Sherburne County, Minnesota.

2

8.     Joseph Atencio is Marty's son and, for all material times, was an individual residing in Sherburne County, Minnesota.

9.     M.A. is a minor and Marty's son. For all material times, M.A. was an individual residing in Maricopa County, Arizona. This action is brought on his behalf by Eric Atencio, M.A.'s Next Friend.

10.     Michael Atencio is the Personal Representative of the Estate of Ernest Marty Atencio.

11.     Defendants Joseph Arpaio ("Sheriff Arpaio") and Ava Arpaio are a married couple residing in Maricopa County, Arizona. All of Sheriff Arpaio's alleged acts were done for the benefit and furtherance of the Arpaios' marital community.

12.     At all material times, Sheriff Arpaio was the duly-elected Sheriff of Maricopa County, acting under color of law, and in charge of the Maricopa County Sheriff's Office ("MCSO"). Sheriff Arpaio is named in both his official capacity, for purposes of Plaintiffs' state law vicarious liability and federal municipal liability claims, and in his individual capacity, for purposes of Plaintiffs' claims against him individually under 42 U.S.C. § 1983.

13.     Defendant Maricopa County (the "County") is a public entity, formed and designated as such pursuant to Title 11 of the Arizona Revised Statutes and, as permitted by state and federal law, may be held independently or vicariously liable, or otherwise responsible, for the wrongful conduct of its divisions, agents, officers, and employees.

14.     Defendants Jaime Carrasco ("Carrasco"), Adrian Dominguez ("Dominguez"), Christopher Foster ("Foster"), Anthony Hatton ("Hatton"), Craig Kaiser ("Kaiser"), Anthony Scheffner ("Scheffner"), Jose Vazquez ("Vazquez"), Jason Weiers ("Weiers"), Ian Cranmer ("Cranmer"), William McLean ("McLean"), and Monica Scarpati ("Scarpati") were agents and employees of Maricopa County who, at the time of the events complained of herein, were acting within the course and scope of their employment and under color of law.

15.     Defendant City of Phoenix ("the City") is a public municipal corporation formed and designated as such pursuant to Title 9 of the Arizona Revised Statutes is a public entity and, as permitted by state and federal law, may be held independently or vicariously liable, or

3

1  otherwise responsible, for the wrongful conduct of its divisions, agents, officers, and
2  employees.

3      16.    Defendants Patrick Hanlon ("Hanlon") and Nicholas French ("French") were
4  agents and employees of the City of Phoenix who, at the time of the events complained of
5  herein, was acting within the course and scope of their employment and under color of law.

6      17.    All of the individually named defendants' acts and omissions were done for the
7  benefit and furtherance of their marital community. Except where specifically alleged,
8  Plaintiffs are unaware of the true names of the individually named defendants' spouses and
9  have designated them as Jane and John Does in the caption of this matter. The true names of
10 these defendants will be substituted upon discovery of the same.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS OF THIS COMPLAINT

13     18.    Pursuant to A.R.S. §§ 11-441(A)(5) and 31-101, Sheriff Arpaio's duty is to take
14 charge of and keep the County jail and the inmates in the County jail.

15     19.    Sheriff Arpaio is a final policymaker for Maricopa County and, therefore,
16 Maricopa County is liable, under 42 U.S.C. § 1983, for Sheriff Arpaio's unconstitutional
17 policies, procedures, and/or customs.

18     20.    Notwithstanding Sheriff Arpaio's constitutional duties, Maricopa County assists
19 Sheriff Arpaio's responsibility to provide adequate medical care for the inmates of the
20 Maricopa County jail through a division of the County known as Correctional Health Services
21 ("CHS").

## Inhumane and Unconstitutional Health Conditions

23     21.    Prior to December 15, 2011, both Maricopa County and Sheriff Arpaio were
24 aware of a long history of deliberate indifference to the provision of medical care to those in
25 the County's jails and "long-overdue, constitutionally required corrections that needed to be
26 made as quickly as possible." This allegation is supported by the following facts:

27         a.    In 1977, a class action (*Hart v. Hill*) was brought against Maricopa
28 County in a matter now captioned *Graves v. Arpaio, et al.*, related to unconstitutional

4

1 | conditions in the Maricopa County jails. An Amended Judgment was filed in that case on
2 | January 10, 1995, which states that "Defendants shall provide a screening of each pretrial
3 | detainee prior to placement of any pretrial detainee in the general population. The screening
4 | will be sufficient to identify and begin necessary segregation, and treatment of those with
5 | mental or physical illness. . . . All pretrial detainees confined in the jails shall have access to
6 | medical services and facilities which conform to the standards designated as 'essential' by the
7 | National Commission on Correctional Health Care ('NCCHC') *Standards for Health Services*
8 | as amended from time to time. When necessary, pretrial detainees confined in jail facilities
9 | which lack such services shall be transferred to another jail or other location where such
10 | services or health care facilities can be provided or shall otherwise be provided with
11 | appropriate alternative on-site medical services. . . . Defendants shall provide emergency
12 | transportation services to an appropriate hospital or medical facility, without unreasonable
13 | delay, when needed." Notwithstanding this order, Defendants' deliberate indifference to the
14 | medical needs of its prisoners continued.

15 |        b.      On March 25, 1996, the United States Department of Justice ("DOJ")
16 | sent a letter to Maricopa County Board of Supervisor Chairman Ed King and Sheriff Arpaio
17 | documenting its findings from an investigation that began on August 8, 1995. That
18 | investigation concluded that there is "insufficient access to medical care" in the Maricopa
19 | County jails. The DOJ specifically found that there is "[i]nadequate medical screening in
20 | [i]ntake. Identifying serious medical and psychiatric problems is a vital component of the
21 | process of admitting a new prisoner into the jails. That process, however, is seriously
22 | deficient." The DOJ's findings also include the determination that "mental health services at
23 | the jails suffer from a lack of quality control" and medical providers at the jails lack of access
24 | to inmates' medical records.

25 |        c.      Following the DOJ's letter and investigation, the DOJ filed an action
26 | against Maricopa County captioned *United States of America v. County of Maricopa, et al.*,
27 | CV99-2137-PHX-SLV. A Settlement Agreement in that matter was executed by both Sheriff
28 | Arpaio and the then-Chairman of the Maricopa County Board of Supervisors. That agreement

5

1 states its intention to "resolve the United States' allegations of constitutionally inadequate
2 medical care for inmates at the Maricopa County Jails" identified by the "investigation [that]
3 was commenced on August 8, 1995, under the Civil Rights of Institutionalized Persons Act."

4          d.      On October 22, 2008, the Court in *Graves* entered its Findings of Fact and
5 Conclusions of Law and Order. Those Findings of Facts and Conclusions of Law related to
6 conditions existing in the jails as of May 31, 2008. The Court found that "[i]t is estimated that
7 twenty percent of the pretrial detainees housed in the Maricopa County Jails are seriously
8 mentally ill. . . . Often people with serious mental illness, who are untreated or undertreated,
9 commit minor crimes and end up in the Maricopa County Jails. . . . Although many pretrial
10 detainees' medical and mental health care needs could be addressed more effectively and
11 efficiently through public services outside of criminal justice institutions, they frequently are
12 not, and the responsibility for doing so falls upon the Maricopa County Jails." The Court
13 further found that, "the intake screening [at the jails] often does not capture basic and
14 necessary information from detainees, including an adequate history from those suffering from
15 chronic diseases." The Court further found and ordered, "many pretrial detainees with serious
16 mental illness are not identified and assessed by a mental health clinician during the intake
17 process. Pretrial detainees are to be provided immediate care, if needed, at the time of
18 screening. If appropriate, pretrial detainees are to be transported to the hospital for further
19 analysis and care not available on-site either to be returned later for booking or booked in
20 Ward 41 at the Maricopa Medical Center." The Court further found that "systemic
21 deficiencies in the screening process" exist and, as a result, there "are continuing and ongoing
22 violations of pretrial detainees' constitutional rights" and "pretrial detainees frequently are
23 denied access to adequate medical, mental health, and dental care because they do not receive a
24 timely in-person assessment of the urgency of their need for treatment."

25          e.      On October 22, 2008, the Court in *Graves* also filed its Second Amended
26 Judgment which restated that "Defendants shall provide a receiving screening of each pretrial
27 detainee, prior to placement of any pretrial detainee in the general population. The screening
28 will be sufficient to identify and begin necessary segregation, and treatment of those with

6

mental or physical illness and injury; to provide necessary medication without interruption . . . All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services."

f. On January 28, 2009, the Court in *Graves* ordered "that medical expert Dr. Lambert King and mental health expert Dr. Kathryn Burns are appointed to serve as independent evaluators of the Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment and to be compensated by Defendants for their services."

g. On April 7, 2010, the Court in *Graves* held that, "[a]s of March 1, 2010—sixteen months after the Second Amended Judgment was entered—significant areas of failure to comply with the Second Amended Judgment's medical and mental health requirements remain. Although progress has been made, it appears as though most of the improvements made regarding medical and mental health services have been those imposing little or no additional cost on Defendants. Improvements appearing to be most critically needed, e.g., developing and implementing electronic medical records and medication management tools, increasing staffing, providing space for confidential mental health treatment, appear to have been disregarded or postponed to avoid expense . . . Previous orders and numerous court proceedings in this matter have emphasized Congress's intent that constitutional violations regarding conditions of confinement be corrected expeditiously and judicial oversight terminated as swiftly as possible. The Court has repeatedly informed the parties of the importance of implementing long-overdue, constitutionally required corrections as quickly as possible, both for the benefit of the Plaintiff class and to avoid expenses incurred by unnecessary delay. Because correction of constitutional violations has not proceeded expeditiously to date, the parties and counsel will be ordered to meet and confer to develop a

7

1  proposed procedure for achieving and demonstrating Defendants' complete compliance with
2  the Second Amended Judgment."

## Culture of Cruelty and Excessive Force

4  22.    In addition to having a history of deliberate indifference to the unconstitutional
5  and inadequate medical care in the County's jails, the County has turned a blind eye towards
6  the culture of cruelty and punishment Sheriff Arpaio has created in the County's jails. This
7  allegation is supported by the following facts:

8      a.    Shortly after he was elected Sheriff, Arpaio announced to his entire staff
9  that he wanted his jails to be "bad" jails and "places of punishment."

10     b.    Sheriff Arpaio has publically stated, "I believe it [jail] should be
11  punishment, period." Sheriff Arpaio has also said, "[i]f it sounds harsh, that's all right,
12  because jail is a harsh place. Jail is not a reward or an achievement, it is punishment." With
13  respect to his promise to make "jails places of punishment," Sheriff Arpaio has publically
14  stated, "I did what I said I'd do."

15     c.    Regarding the culture he has created for inmates, Sheriff Arpaio has
16  publically stated, "[t]he theme, 'Jail is an awful place, and I'm never coming back.' . . . Those
17  words were music to my ears. I *wanted* the inmates to hate my jail. I *wanted* them to hate
18  everything about it, from the heat to the food to the work to the drudgery. I *wanted* them to
19  remember for the rest of their days that this was a terrible experience. . ." Sheriff Arpaio has
20  further said, "[t]oday, maybe the Maricopa County jails have become the Alcatraz of Arizona.
21  That might not be such a bad thing."

22     23.    Prior to December 15, 2011, both Maricopa County and Sheriff Arpaio were
23  aware of a long history of the gratuitous and inhumane use of excessive force and physical
24  abuses that routinely occurred in the Maricopa County Jails. This allegation is supported by
25  the following facts:

26     a.    On March 25, 1996, DOJ sent a letter to Maricopa County Board of
27  Supervisor Chairman Ed King and Sheriff Arpaio documenting its findings from an
28  investigation that began on August 8, 1995.    That investigation concluded that

8

1   "unconstitutional conditions exist at the Jails with respect to [ ] the use of excessive force

2   against inmates." The DOJ further found that "the use of excessive force by Detention

3   Officers has been especially and unacceptably prevalent at . . . [i]ntake [and] . . . some Jail staff

4   apply force to prisoners without any initial justification. Examples include using force against

5   prisoners in Intake to hasten movement of prisoners when those prisoners were neither

6   combative nor resistant; use of a stun gun against a prisoner simply to see its effect; and use of

7   force to send a message (for example, to stop acting up verbally), rather than for control, self-

8   defense, or any other legitimate reason."

9           b.     Following the DOJ's letter and investigation, the DOJ filed an action

10   against Maricopa County captioned *United States of America v. County of Maricopa, et al.*,

11   CV97-2273-PHX-RGS alleging that "[j]ail inmates are subject to use of excessive force [and]

12   . . . Defendants have been consciously aware of, but deliberately indifferent to [this fact] for a

13   substantial period of time." A Settlement Agreement in that matter was executed by both

14   Sheriff Arpaio and the then-Chairman of the Maricopa County Board of Supervisors. That

15   agreement states its intention to "resolve the United States' investigation of allegations of use

16   of excessive force against inmates at the Maricopa County Jails" identified by the

17   "investigation [that] was commenced on August 8, 1995, under the Civil Rights of

18   Institutionalized Persons Act."

19           24.     Most of the Sheriff's inmates are pretrial detainees.

20           25.     The Sheriff and County knew that under the United States Constitution it is

21   illegal to "punish" pretrial detainees.

22           26.     The Court in *Graves* held that "[s]ome pretrial detainees have been punished for

23   behavior related to serious mental illness."

24           27.     Such punishment often comes in the form of Detention Officers' ("D.O.s")

25   excessive use of force against those in the jail. Examples of the deaths resulting from this

26   treatment include those of: Scott Norberg, Charles Agster, III, Brian Crenshaw, and Clint

27   Yarbrough.

28

9

28.     Marty Atencio was another pretrial detainee who died as a result of the conditions and culture created by Sheriff Arpaio and Maricopa County.

29.     On December 15, 2011, City of Phoenix Police Officers made their first contact with Marty at a 7-Eleven.

30.     Phoenix Officers observed Marty acting erratically, but concluded that the cause of his strange behavior was mental illness, as opposed to the use of drugs or alcohol, because the Officers observed that: Marty's eyes appeared normal, he was not sweating profusely, he was not twitching, his speech was normal, his complexion appeared normal, he was able to walk without any trouble, he was alert and would respond to questions, but he would easily become distracted and would speak of random odd things.

31.     Marty showed no signs of being a danger to himself or others, he simply appeared to be not medicated.

32.     Marty had not committed any crime and was instructed to return home.

33.     A short time later, Phoenix Police Officers were called to the apartment complex where Marty lived in response to a disturbance.

34.     Two Phoenix Police Officers made contact with a woman who reported that Marty was kicking an apartment door and then approached her.

35.     Although Marty did not threaten or make physical contact with the woman, she reported that he scared her because Marty came into very close proximity to her.

36.     The Officers arrested Marty.

37.     Marty was transported to City's Southern Command Station, also known as "Central Booking," where he was searched by Phoenix Police Officers.

38.     While at Central Booking, Phoenix Officers performed a search of Marty, without the need to use any unusual force, which included him taking off his shoes.

39.     Phoenix Police then transported Marty to MCSO's Fourth Avenue Jail, where Officer Hanlon was processing detainees brought in by other Phoenix Officers.

1    40.    Officer Hanlon's first contact with Marty was in an area where detainees are kept
2    while they wait to go through the medical screening process.  At that time, Officer Hanlon
3    knew of Marty's mental illness.

## COUNT ONE

### (Defendants Scarpati and McLean Violated Marty's Rights Under the Fourteenth Amendment and 42 U.S.C. § 1983)

7    41.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully
8    herein.

9    42.    Upon entering the jail, Marty was assessed by CHS employees Monica Scarpati,
10   and Nurse Bill McLean.

11   43.    Defendants Scarpati and McLean had a constitutional, statutory, and common
12   law duty to assure the safety and well-being of Marty while in their care and custody—a duty
13   that includes (without limitation) providing proper, appropriate, and timely care, and
14   monitoring Marty.

15   44.    Ms. Scarpati knew, or should have known, that Marty suffered from mental
16   illness based on her previous contact with him when she recognized the need for him to receive
17   psychological treatment at that time.

18   45.    Notwithstanding Ms. Scarpati's previous interactions with Marty, she recognized
19   that he appeared psychotic, based on his "word salad," when Marty presented to her on
20   December 15, 2011.

21   46.    Rather than get Marty to the treatment he obviously needed as a result of a
22   serious medical condition, Ms. Scarpati and Nurse McLean admitted Marty into the jail and
23   sent him to an isolation cell.  The fact that Marty did not receive immediate medical treatment,
24   in combination with the acts of violence committed on him as set forth below, was the
25   proximate cause of Marty's death.

26   47.    The wrongful conduct of Defendants Scarpati and McLean constitutes violations
27   of 42 U.S.C. § 1983 in that, with deliberate and callous indifference, they deprived Marty of
28   his Fourteenth Amendment Rights under the United States Constitution by denying Marty

11

1 proper medical treatment while under the care of these Defendants and the Estate of Ernest
2 Marty Atencio has suffered damages.

## COUNT TWO

### (Defendants Scarpati and McLean Are Liable for the Wrongful Death of Marty Pursuant to A.R.S. § 12-611)

6 48.    Plaintiffs re-allege and incorporate, by this reference, the claims, facts, and
7 allegations set forth in the paragraphs above, as if set forth fully herein.

8 49.    These Defendants breached their duties to Marty, as identified by the claims,
9 facts, and allegations set forth in the paragraphs above.

10 50.    As the result of these Defendants' negligence, Marty's survivors have been
11 deprived of the continued companionship and society of their son and father, and have suffered
12 and will continue to suffer in the future a loss of love, affection, companionship, care,
13 protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental
14 suffering, and have suffered damages in an amount to be proven at trial.

## COUNT THREE

### (Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, and Weiers Violated Marty's Rights Under the Fourth and Fourteenth Amendments to be Free From the Unreasonable Use of Force and Punishment and are Liable Pursuant 42 U.S.C. § 1983)

19 51.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully
20 herein.

21 52.    After going through the medical screening, Marty was taken to have his mug shot
22 taken.  While Marty was having his mug shot taken, the D.O.s were taunting him, asking him
23 to "clown" for them, telling him to "turn left," "turn right," and making fun of Marty's
24 inability to follow instructions.  As the guards made fun of Marty, they told him to make funny
25 faces and the photographer, and a female Detention Officer, kept saying "let's make this one
26 the Mug Shot of the week."  After they took a particularly humiliating mug shot, the D.O.s had
27 finished their fun with Marty and took him back to the holding tank.

28

12

1     53.    Then, Officer Hanlon escorted Marty to a room identified by MCSO video
2  recordings as the Linescan Room.

3     54.    The manner in which Officer Hanlon handled Marty, by leading him with his
4  hands and arms bent in a position which caused Marty pain, constituted an excessive use of
5  force.

6     55.    While Officer Hanlon was escorting Marty to the Linescan Room, Marty said
7  "you're making Tony angry, you're making Tony angry." Marty was telling Officer Hanlon
8  that the officer was hurting him.

9     56.    While in the Linescan Room, Officers Hanlon and French took Marty's
10  fingerprints. They then backed Marty into a corner. But, they were sure enough that Marty
11  posed no danger of danger to them that they removed his handcuffs.

12     57.    Despite not making sense, Marty was not threatening, resistive, nor combative.

13     58.    When asked to take off his shoes, which were to be put through a scanner with
14  his clothes, Marty removed his right shoe pursuant to the Officers' instructions.

15     59.    But, when asked to remove his left shoe, Marty refused to do so.

16     60.    In response to Marty's refusal to take his left shoe off, Officers Hanlon and
17  French immediately began a physical struggle with Marty.

18     61.    The force used by Officers Hanlon and French was gratuitous and unreasonable.
19  That unprovoked assault on Marty would lead to a Jailer's Riot which would soon cause
20  Marty's death.

21     62.    MCSO agents quickly joined the Jailers' Riot; D.O.s Carrasco, Dominguez,
22  Foster, Vazquez, and Lt. Kaiser used excessive force by forming a "dog pile" on top of Marty.

23     63.    At or about that time, Sgt. Weiers used excessive force on Marty by tasing him,
24  multiple times, including, at least one time, in a manner close to Marty's heart. Sgt. Weiers
25  knew, or should have known, that using a taser in this fashion posed an unreasonable risk of
26  harm.

27     64.    After Sgt. Weiers tased Marty, D.O. Hatton used excessive force on Marty by
28  striking Marty in the face, with a closed fist, multiple times.

13

1    65.    While he was being tased, punched, and manhandled, Marty cried out in pain.

2    66.    Detention Officers then placed handcuffs on Marty.

3    67.    Sgt. Scheffner observed the unreasonable use of force against Marty, as well as the events set forth in the following paragraphs, and failed to intervene.

68.    Sgt. Scheffner ordered Marty to be placed in MCSO's "safe" cell.

69.    Following Sgt. Scheffner's orders, D.O.s carried Marty into a room called Safe Cell 4.

70.    While Sgts. Scheffner and Weiers looked on, D.O.s Foster, Carrasco, Vazquez, Hatton, and Dominguez held Marty down, with Marty unable to move, and D.O. Hatton stuck Marty several more times, in this instance with his knee, while Marty laid on the floor unconscious and lifeless.

71.    One D.O. yelled out D.O. Hatton's name with a tone and sternness that made it clear to D.O. Hatton to stop using excessive, gratuitous, and unreasonable force.

72.    After this event, the jail's surveillance video outside "Safe Cell 4" shows D.O. Hatton, with a smile on his face, talking to other Officers, while two MCSO women danced and bumped their buttocks together.

73.    As a direct and proximate result of these Defendants' wrongful conduct by using excessive, gratuitous, and unreasonable force against Marty, failing to stop others from using excessive, gratuitous, and unreasonable force against Marty, and punishing Marty, a pretrial detainee, Marty's rights under Fourth and Fourteenth Amendments were violated and the Estate of Ernest Marty Atencio has suffered damages.

74.    The wrongful conduct of these Defendants was in reckless disregard of Marty's constitutional rights and punitive damages in an amount to be determined by a jury should be awarded to deter and prevent others from acting in a similar manner in the future.

14

## COUNT FOUR

**(Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, Weiers, and Maricopa County and the City Are Liable for the Wrongful Death of Marty Pursuant to A.R.S. § 12-611)**

75. Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully herein.

76. Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, and Weiers had a duty to ensure the safety and well-being of persons in their care, custody, and control—a duty that includes (without limitation) using only necessary and reasonable force.

77. Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, and Weiers breached their duties, despite knowing or having reason to know that Marty was or would be inappropriately subjected to an unreasonable risk of serious harm, injury, and death as a result of their actions and/or inactions, as identified by the allegations set forth in the paragraphs above.

78. Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, Weiers, and Maricopa County's breaches of their duties caused and/or contributed to cause Marty's wrongful death.

79. All of the individually named defendants were, at all times material hereto, acting within the course and scope of their employment and the County and the City are vicariously liable for their actions.

80. Maricopa County has a duty to supervise all of its employees and agents and a duty to make ensure that its employees and agents satisfy all federal, state, and applicable standards. The County also has a duty to respond to known problems and/or improper customs, policies, practices, procedures, training, and/or conditions in its jails.

81. Maricopa County breached its duties, as identified by the allegations set forth in the paragraphs above, by (among others and without limitation): failing to supervise its employees and by ratifying improper conditions, customs, policies, procedures, and/or practices.

15

1    82.    As a result of Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton,

2 Kaiser, Scheffner, Vazquez, Weiers, and Maricopa County's actions and inactions, Marty's

3 survivors have been deprived of the continued companionship and society of their son and

4 father, and have suffered and will continue to suffer in the future a loss of love, affection,

5 companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress,

6 shock, and mental suffering, and have suffered damages in an amount to be proven at trial.

7 **COUNT FIVE**

8

9 **(Defendants Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, and Weiers, Violated Joe, Rosemary, Joshua, Joseph, and M.A.'s Rights Under the Fourteenth Amendment and 42 U.S.C. § 1983 to be Free From Interference With Their Right to Family Society and Companionship of Ernest Marty Atencio)**

10

11    83.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully

12 herein.

13    84.    The reckless, intentional and/or deliberate acts and omissions of Defendants

14 Hanlon, French, Carrasco, Dominguez, Foster, Hatton, Kaiser, Scheffner, Vazquez, and

15 Weiers, set forth above, were the direct and legal cause of the deprivation of Joe, Rosemary,

16 Joshua, Joseph, and M.A.'s constitutionally protected rights under the Fourteenth Amendment

17 to the care, companionship, and familial society of Marty, their son and father.

18    85.    As a direct and proximate result of these Defendants' wrongful conduct, Joe,

19 Rosemary, Joshua, Joseph, and M.A. have suffered damages.

20 **COUNT SIX**

21 **(Defendants McLean and Cranmer Violated Marty's Rights Under the Fourteenth Amendment)**

22

23    86.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully

24 herein.

25    87.    Nurse McLean and Physician Assistant Ian Cranmer evaluated Marty's wounds

26 after he was tased by Sgt. Weiers and subjected to the use of excessive, gratuitous, and

27 unreasonable force by the Detention Officers.

28

16

88.     Rather than recognizing the extreme danger resulting from the beating and the electrocution, they failed to meet the applicable standard of care, and did nothing to ensure that Marty received a proper medical evaluation and appropriate medical care.

89.     The wrongful conduct of Defendants McLean and Cranmer constitutes violations of 42 U.S.C. § 1983 in that, with deliberate and callous indifference, they deprived Marty of his Eighth and/or Fourteenth Amendment Rights under the United States Constitution in that he was denied proper medical treatment while under the care of these Defendants and the Estate of Ernest Marty Atencio has suffered damages.

## COUNT SEVEN

### (Defendants McLean and Cranmer Are Liable for the Wrongful Death of Marty Pursuant to A.R.S. § 12-611)

90.     Plaintiffs re-allege and incorporate, by this reference, the claims, facts, and allegations set forth in the paragraphs above, as if set forth fully herein.

91.     Defendants McLean and Cranmer had a constitutional, statutory, and common law duty to assure the safety and well-being of Marty while in their care and custody—a duty that includes (without limitation) providing proper, appropriate, and timely care and monitoring Marty after he was tased.

92.     These Defendants breached their duties to Marty, as identified by the claims, facts, and allegations set forth in the paragraphs above.

93.     As the result of these Defendants' negligence, Marty's survivors have been deprived of the continued companionship and society of their son and father, and have suffered and will continue to suffer in the future a loss of love, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental suffering, and have suffered both economic and non-economic damages in an amount to be proven at trial.

## COUNT EIGHT

**(Defendants Maricopa County and Sheriff Arpaio Are Deliberately Indifferent to the Medical Needs of Pretrial Detainees in the Maricopa County Jails While Subjecting them to Conditions Amounting to Punishment in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)**

94.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully herein.

95.    As the facts set forth above demonstrate, Sheriff Arpaio and Maricopa County have a policy, practice, or custom of punishing pretrial detainees, subjecting them to the unreasonable and excessive use of force, depriving them of constitutionally required care, and/or ratifying such constitutional deprivations.

96.    These policies, practices, or customs were the moving force behind Marty's death. In addition to those facts set forth above, this allegation is supported by the following additional facts:

a.    On August 9, 2011, Sheriff Arpaio and Maricopa County filed their Notice of Filing Seventh Report of Dr. Kathryn A. Burns. That report put Maricopa County on notice of the fact that although "many advances have been made [in the County's Mental Health Unit] serious problems persist." According to the report, "Chart reviews continued to illustrate problems with inadequate, incomplete admission assessments." The report concluded that, "although some progress has been made and there are plans for continued development, improved access to timely psychiatric hospitalization has not yet occurred."

b.    With respect to the specific treatment of Marty, on May 16, 2012, Dr. Burns reported to the Court in *Graves*, "it is apparent that major elements of the medical and mental health care provided to [Marty] are germane to the requirements of the SAJ [Second Amended Judgment]. Specifically, these elements include quality and scope of receiving screening, treatment of mental and physical illness and injury, and ready access to care for serious medical and mental health needs."

97.    Based on the facts set forth above, Sheriff Arpaio knew, or reasonably should have known, that his subordinates were engaging in conduct that would deprive Marty of his constitutional rights and he failed to act to prevent these deprivations, which were the moving

18

force behind Marty's death. Sheriff Arpaio is, therefore, personally liable as a supervisor of these individuals and punitive damages, in an amount to be determined by a jury, should be awarded to deter him, and others, from acting in a similar manner in the future. Sheriff Arpaio's actions also form the basis of municipal liability against the County as he is a final policymaker for Maricopa County.

98. Additionally, despite the knowledge and notice set forth above, the County was deliberately and callously indifferent to the constitutional rights of those in their care, custody, and control and has a custom of turning a blind eye towards its employees who depart from the County's policies and procedures and their training and/or ratifies the actions of its employees who violate the constitutional rights of those in their care, custody, and control.

99. The wrongful conduct of Sheriff Arpaio and the County, as described herein, constitutes violations of 42 U.S.C. § 1983 and as a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages.

## JURY TRIAL

100. Plaintiffs hereby request and demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages for judgment against Defendants as follows:

a) General damages in an amount to be proven at trial, as to the causes of action, claims, and theories of relief alleged herein;

b) Punitive damages against the individually named Defendants in an amount deemed just and reasonable as to the causes of action, claims, and theories of relief alleged herein;

c) Costs and attorneys' fees against all Defendants, pursuant to 42 U.S.C. §1988;

d) Such other and further relief which may seem just and reasonable under the circumstances.

RESPECTFULLY SUBMITTED this 23rd day of October, 2012.

**STINSON MORRISON HECKER LLP**

By: _____
Michael C. Manning
Larry J. Wulkan
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

20