Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
**STRUCK WIENEKE & LOVE, P.L.C.**
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
kwieneke@swlfirm.com
cretts@swlfirm.com

*Attorneys for Defendants City of Phoenix,
Patrick Hanlon and Nicholas French*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest Joseph Atencio, et al, <br><br> Plaintiffs, <br><br> v. <br><br> Sheriff Joseph Arpaio, et al, <br><br> Defendants. | NO. 2:12-cv-02376-PHX-PGR <br><br> **STATEMENT OF FACTS IN SUPPORT OF CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants Hanlon, French and the City of Phoenix, through counsel and pursuant to Local Rule 56.1, submit the following Statement of Facts in support of their Motion for Summary Judgment. These facts are to be assumed true for the purpose of this Motion only.

**Atencio's December 15-16, 2011 Confrontation with Law Enforcement**

1. Shortly after 9 pm on December 15, 2011, Marty Atencio ("Atencio") was arrested by two City of Phoenix police officers (Officers Roberts and James) for Assault arising from an incident earlier that evening in which he acted aggressively toward a female near her apartment—who reported feeling threatened and afraid that Atencio would harm her and requested prosecution. Doc. 50 at ¶¶ 33-36; Ex. 1, James Depo. at 35, 95-96, 99. The female victim reported that Atencio had gotten into her face, yelling at her from an inch away, and she felt he was going to punch her. *Id*. at 95-96; Ex. 2, Roberts Depo. at 67-68, 97-98.

2. This arrest was about 30 minutes to an hour after the same officers had been dispatched to a 7-11 convenience store in the area by a store clerk in reference to Atencio, who had been aggressively panhandling and pointing his hand in the shape of a gun toward people in the parking lot, and had been ushered off the property by the officers. Ex. 1, James Depo. at 97-98.

3. Before this interaction and based upon his own self-report, Atencio had used methamphetamine. Ex. 3, Hanlon Depo. at 74-75; Ex. 4, Hanlon Aff. at ¶ 19; and Ex. 5, Intake Screening Report at question #48 (CHSPR00021).

4. Once Atencio was arrested, the officers transported him to the Cactus Park Precinct, and thereafter he was taken to the Central Booking facility of the Phoenix Police Department. Ex. 1, James Depo. at 74, 77, 79-80, 85; Ex. 2, Roberts Depo. at 68, 74, 85. Atencio was not cooperative when placed into the wagon for transport from Cactus Park Precinct to Central Booking, screaming at officers, not physically doing what they instructed, with the officers having to "coax him and bend him" to get him into the wagon. Ex. 1, James Depo. at 88-89, 101-02.

5. Atencio was transported by a different set of Phoenix officers to the Maricopa County Sheriff's Office ("MCSO") Fourth Avenue Jail after midnight and, following a medical screening, it was determined by MCSO medical staff that Atencio would be placed in a safe cell. Doc. 50 at ¶¶ 39-40; Ex. 6, Walston Depo. at 11, 15-16, 37-38; Ex. 3, Hanlon Depo. at 91-92; Ex. 7, McLean Depo. at 52-54, 70, 74; Ex. 8, CHS Order Form for safe cell placement of Atencio.

6. Officers Patrick Hanlon and Nicholas French occupy positions within the Central Booking area of the jail—positions that were designed to reduce the burden on arresting City of Phoenix officers related to paperwork/booking of suspects to enable those officers to quickly return to patrol duties for their respective shifts. Ex. 4, Hanlon Aff. at ¶ 3; Ex. 9, French Aff. at ¶ 2. The function of a City officer at the County Jail is to provide the initial paperwork and processing of Phoenix detainees. Ex. 3, Hanlon Depo. at 34.

7. The City officers who work at the Jail, unlike the MCSO detention officers, are not armed in any way. Ex. 4, Hanlon Aff. at ¶ 4; Ex. 9, French Aff. at ¶ 3. They do not have Tasers, pepper spray, or any other weapon to protect themselves or others. *Id*. Because the Phoenix Officers are not armed, they must rely on verbal and other techniques to address non-compliant subjects. *Id.*

8. Atencio was originally handcuffed to a bench in the U-shaped acceptance area of the jail due to his continuing to stand up despite being repeatedly instructed to sit down. Ex. 3, Hanlon Depo. at 26-28. The video of the December 15, 2011 jail encounter depicts Phoenix Officer Patrick Hanlon with his hands on Atencio's back by his shoulders, escorting him from mug-shot area into the search area. Ex. 10, Videos of Escort [11214875 0139-0233 Prebooking N View 197 at 2:32:32 to 2:33:10 am and 11214875 0139-0233 Prebooking S View 196 at 1:40:36 to 1:40:40 am & at 2:32:32 to 2:42:00 am]; Ex. 3, Hanlon Depo. at 87. At no time does video of the escort show Officer Hanlon bending or even touching Atencio's arms. *Id*.

9. The intake and search areas of the Fourth Avenue Jail are considered unsecure because other detainees are present while undergoing the booking process, many of whom are sitting on nearby benches. Ex. 4, Hanlon Aff. at ¶¶ 5-6, 10; Ex. 9, French Aff. at ¶¶ 4, 8. Law enforcement officers are aware of the security risk that detainees may exchange contraband, injure others, or incite other detainees simply by virtue of their proximity to one another. Ex.4, Hanlon Aff. at ¶¶ 8, 14, 16; Ex. 9, French Aff. at ¶¶ 6-8, 10 & 12; Ex. 11, Video stills of Atencio escort.

10. In 2011, the Fourth Avenue Jail's intake process was governed by MCSO Policy DO-1. Ex. 12. Pursuant to that policy, Atencio was fingerprinted (Doc. 50 at ¶ 56; Ex. 3, Hanlon Depo. at 45-46) and Officer Hanlon instructed him, repeatedly, to remove his shoes for x-ray scanning. Doc. 50 at ¶¶ 58-59; Ex. 4, Hanlon Aff. at ¶ 5.

11. The MCSO intake policy required a detainee's shoes to be scanned for contraband via a digital x-ray: "***Line Scan Search****:* The outer layer of a prisoner's clothing, which includes shoes and socks, are placed onto a conveyer belt within the Line

3

Scan Machine. The operator of the machine then inspects the articles of clothing utilizing a digital X-ray which distinguishes, by color, between metals, organic materials, and synthetic materials." Ex. 12 at Arpaio-RFP1 054.

12. The MCSO policy requiring the removal and scanning of shoes was mandatory, regardless of whether the detainee had been searched previously. Ex. 9, French Aff. at 5; Ex. 4, Hanlon Aff. at ¶¶ 7-8. Plaintiffs' corrections expert, Eldon Vail, acknowledged that the reception center in Washington state subjected all newly admitted inmates to a strip-search, regardless of the fact such inmates had been previously detained and searched in county jails. Ex. 13, Vail Depo. at 26.

13. For 30 seconds, Atencio refused to remove his other shoe (he took it off and then put it back on), clenched his fists, tensed up and assumed a position of defiance toward the officers. Doc. 50 at ¶¶ 58-60 ("when asked to remove his left shoe, Marty refused to do so."); Ex. 3, Hanlon Depo. at 48-49; Ex. 14, French Depo. at 57 ("you can see it on the tape, initially, casually standing there, and then you see me take a, I guess, defensive stance almost because he was clenching his fists and tensing up.") & 68. Ex. 15, Weiers Depo. at 82-83. Ex. 16, Video in LineScan Room.

14. According to Officer Hanlon's testimony:

> After he refused my directions, I tried talking with him as best I could and asking him politely if he could take his shoes off, which is the common practice at that point as the clothing needs to go through the x-ray machine. So I had asked him several times if he could take his shoes off. Initially he agreed. He took a shoe off. I can't recall which one. And I asked him to take the other shoe off, and instead of taking it off, he put the shoe that he had removed back on his foot. So I asked him again if he would take his shoes off, and he responded by telling me to take my shoes off, and several more requests, and he made basically the same statement to take my shoes off, and I -- I observed him to tense up his arms at that point. As he was uncuffed now, I took control of one of his wrists to grab hold of his arm, and I – my plan was to take his shoes off at that point.

Ex. 3, Hanlon Depo. at 48.

4

15. Officer Hanlon believed the sooner Atencio was in a safe cell, the sooner he would be safe, and applied a wrist-lock because the officer did not believe it would be safe to bend down and attempt to remove Atencio's shoes because it presented a risk of being kick, hit or kneed in the face or head. Ex. 4, Hanlon Aff. at ¶¶ 15-17.

16. Unable to obtain Atencio's voluntary cooperation, Officer Hanlon placed Atencio's wrist into a wrist-lock as Officer French assisted in an effort to force Atencio to remove his shoes. Ex. 3, Hanlon Depo. at 79-80. This technique was unsuccessful in controlling Atencio, as he broke away and fought off attempts to control him. *Id.* Ex. 16, Video.

17. With other MCSO officers assisting, Officer French grabbed Atencio from behind in a wrestling maneuver with his arm across his chest and neck area on the MCSO video; Officer French was not attempting a carotid hold. Ex. 14, French Depo. at 60, 84. While Officer French grabbed Atencio across his chest in an effort to gain control of him, their legs were swept out from under them by another officer and Officer French landed on his back with Atencio landing on top of him. *Id*; Ex. 16, Video.

18. Once on the ground, Atencio continued to struggle with the City of Phoenix and MCSO officers. Ex. 14, French Depo. at 88-90; Ex. 3, Hanlon Depo. at 81. A detention officer from the MCSO was able to get one handcuff on Atencio, and Officer Hanlon at that point disengaged from the struggle in recognition of the number of MCSO officers, the limited space and seeing that MCSO Sergeant Weiers was about to deploy his Taser. Ex. 3, Hanlon Depo. at 80-84, 88-90 & 92-93. Officer French also moved away from the struggle as MCSO officers took control of the situation. Ex. 14, French Depo. at 65 & 72 ("That's why I got out of the ordeal."). Ex. 16, Video.

19. Officers Hanlon and French were unarmed with any weapons, and did not strike Atencio or otherwise use any force against other than the wrist-lock and wrestling maneuver described above. Ex. 4, Hanlon Aff. at ¶ 4; Ex. 9, French Aff. at ¶ 3; and Ex. 16, Video.

20. The tasing and punches of Atencio by MCSO officers in the LineScan room, and the knee to Atencio's back by MCSO Detention Officer Hatton in the safe cell, are all alleged to have occurred after the two Phoenix officers disengaged or moved away from the struggle, with Atencio continuing to kick and pull away from the officers even while he was on the ground. Ex. 3, Hanlon Depo. at 84-85, 88-89; Ex. 14, French Depo. at 71-72; Ex. 17, Bruno Depo. at 105-06; and Amended Complaint at ¶¶ 64, 70-71.

21. Even after he was tased, Atencio pulled the probes out, Ex. 14, French Depo. at 90, 97-98, and he continued kicking after he was handcuffed. Ex. 3, Hanlon Depo. at 56.

22. Plaintiffs allege Atencio was carried by MCSO detention officers from the LineScan room into Safe Cell 4, where MCSO officers held Atencio down on the floor while MCSO Detention Officer Hatton struck Atencio several more times, with his knee. Amended Complaint at ¶¶ 68-70. Plaintiffs claim Atencio "died a few minutes later." Doc. 23 at 4. Plaintiffs contend that "Marty died as a result of a beating, electrocution, and failure to receive adequate medical care in the Maricopa County Jail." *Id*. at 1.

**Expert Testimony**

23. Plaintiffs' expert on law enforcement and corrections, Ken Katsaris, has no opinions relative to the two Phoenix officers. Ex. 18, Katsaris Depo. at 165-66. Mr. Katsaris holds the opinion that the Phoenix Police Department officers are well trained, that their training exceeds national standards, and that their use of force polices exceed national standards, as reflected by their CALEA accreditation. *Id*. at 166-67.

24. Plaintiffs' other law enforcement expert, Ron Bruno, has no opinions relative to Phoenix Officer French's use of force on Atencio. Ex. 17, Bruno Depo. at 74. Mr. Bruno also has no opinions regarding Officer Hanlon's escort of Atencio from the booking room to the LineScan room, despite reviewing the video of this escort. *Id*. at 87-89.

25. Mr. Bruno's report criticized Officer Hanlon: (1) for not realizing Atencio's alleged compromised ability to understand; (2) for not affording "more verbal interaction

6

to assist in overcoming Mr. Atencio's disability" than the 30 seconds of verbal commands Officer Hanlon admittedly gave him; (3) for not realizing Atencio was in a contained position, with "no indication that immediate physical intervention was needed"; (4) for not affording "[m]ore time utilizing verbal tactics to gain voluntary compliance"; and (5) for not being aware that his initiation of physical force could have trigger a "flight or fight response," causing an increase in Atencio's adrenaline, a reduction in his pain receptors, and an increase in his strength. Ex. 19, Bruno Report.

26. These criticisms do not concern the reasonableness of the force used by Officer Hanlon, but of tactical decisions—not recognizing Atencio's alleged compromised ability to understand, not spending more time on "verbal de-escalation tactics," not developing a plan—leading up to the use of force. Ex. 17, Bruno Depo. at 75-85, 112, 116-17.

27. When asked what force Officer Hanlon used on Atencio, Mr. Bruno opined that Officer Hanlon "took it from verbal interaction into physical force." Ex. 17, Bruno Depo. at 75. When asked again for the type of force used, Mr. Bruno acknowledged it was "[o]pen hand control" or a wrist-lock. *Id*.

28. Mr. Bruno admitted that Atencio was able to respond appropriately to certain commands given by Officer Hanlon, such as removing his shoe. *Id*. at 75-77. He further admitted that before Atencio removed his shoe, "[i]t looked like there was some verbal discussion," and after Atencio put his shoe back on and folded his arms, it "[s]eemed like that there was some verbal interaction" between Officer Hanlon and Atencio. *Id*. at 78-79. Mr. Bruno further acknowledged that before using physical force, Officer Hanlon "spoke in a softer voice, a little slower…and repeated 'Remove the shoes' more than once," and Mr. Bruno has no criticisms of this communication method. *Id*. at 80-81.

29. Mr. Bruno did not review the Phoenix Police Department's use of force policy. *Id.* at 210. He also did not review any of the policies and procedures of the MCSO jail relative to the booking process, did not analyze how close the nearest

7

unrestrained detainee was from the LineScan room, has no understanding of whether detainees in the U-shaped jail entrance were restrained or unrestrained, and does not know how many detainees were being processed at the same time as Atencio. *Id*. at 86-89.

30. Mr. Bruno acknowledged that Phoenix Officer Hanlon "disengaged" before MCSO Sergeant Weiers deployed his Taser. *Id*. at 105-06.

31. According to the Maricopa County Medical Examiner performing an autopsy on Atencio, Dr. Stano, and after reviewing the video of the jail struggle, opined of an "apparent carotid" hold applied by one of the officers—"apparent" because it was "a very quick movement" that ended without Dr. Stano really able to definitely confirm that it was a carotid hold. Ex. 20, Stano Depo. at 110. Dr. Stano further testified that the "apparent carotid" he saw on the video was not successful, as Atencio did not lose consciousness following this "apparent" carotid hold. *Id*. at 108-10.

32. There are two types of neck restraint holds: vascular and respiratory. *City of Los Angeles v. Lyons*, 461 U.S. 95, 97, n.1 (1983). In the "carotid" hold, an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. *Id.* The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. *Id.* The "carotid" hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain. *Id.* The "bar arm" hold, by contrast, applies pressure at the front of the subject's neck. *Id.* "Bar arm" pressure causes pain, reduces the flow of oxygen to the lungs, and may render the subject unconscious. *Id*.

33. Officer French did not apply either a carotid (vascular) or bar arm/choke (respiratory) hold on Atencio. Ex. 9, French Aff. at ¶¶ 13-15; Ex. 4, Hanlon Aff. at ¶ 23. Atencio never lost consciousness in the LineScan room, and his legs continued flailing after he was on the ground. Ex. 9, French Aff. at 16; Ex. 17, Bruno Depo. at 123-24, 191-92; Ex. 20, Stano Depo. at 109-10; Ex. 16, Video.

34. Dr. Stano also could not say to a reasonable degree of medical probability that the focal soft tissue hemorrhage he found during the autopsy on the right side of

| | |
|---|---|
| 1 | Atencio's Adam's appel was caused by the apparent carotid hold. Ex. 20, Stano Depo. at |
| 2 | 111-12. Dr. Stano also looked to see if there was any evidence of injury to the carotid |
| 3 | artery, and could not find any. *Id*. at 113.  When testifying as to possible restraint |
| 4 | asphyxia, Dr. Stano was not and did not include the apparent carotid hold in this opinion. |
| 5 | *Id.* at 115-16. |

DATED this 3rd day of September, 2014.

**STRUCK WIENEKE & LOVE, P.L.C.**


By /s/ Christina Retts
   Kathleen L. Wieneke
   Christina Retts
   3100 West Ray Road, Suite 300
   Chandler, Arizona 85226
   *Attorneys for Defendants City of Phoenix,*
   *Patrick Hanlon and Nicholas French*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system:

Michael C. Manning
Larry J. Wulkan
STINSON LEONARD STREET, LLP
1850 North Central Avenue, Suite 2100
Phoenix, AZ 85004-4584
*Attorneys for Plaintiffs*

David J. Don
LAW OFFICE OF DAVID J. DON, PLLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
*Attorney for Co-Plaintiff Amber Funck*

Lisa S. Wahlin
Andrew M. Kvesic
RYLEY CARLOCK & APPLEWHITE
One N. Central Ave., Ste. 1200
Phoenix, AZ 85004
*Attorneys for Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers*

J. Daniel Campbell
Daniel J. O'Connor
Gary L. Popham, Jr.
O'CONNOR & CAMPBELL, P.C.
7955 South Priest Drive
Tempe, AZ 85284
*Attorneys for Defendants Maricopa County, Cranmer, Scarpati, and McLean*

Sarah L. Barnes, Esq.
BROENING, OBERG, WOODS & WILSON, PC
1122 E. Jefferson
Phoenix, AZ 85036
*Attorneys for Defendants Hatton*

By: /s/ Christina Retts

2912651.1