Michael C. Manning (#016255)
Larry J. Wulkan (#021404)
Stefan M. Palys (#024752)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: michael.manning@stinsonleonard.com
   larry.wulkan@stinsonleonard.com
   stefan.palys@stinsonleonard.com
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest Joseph Atencio, surviving father of Ernest Marty Atencio, individually and on behalf of the following statutory beneficiaries of Ernest Marty Atencio: Rosemary Atencio, surviving mother of Ernest Marty Atencio; Joshua Atencio, surviving son of Ernest Marty Atencio; Joseph Atencio, surviving son of Ernest Marty Atencio; M.A., a minor and surviving son of Ernest Marty Atencio; and Michael Atencio, Personal Representative of the Estate of Ernest Marty Atencio; and Rosemary Atencio, individually; Joshua Atencio, individually; Joseph Atencio, individually; and M.A., through his Next Friend, Eric Atencio,<br><br>Plaintiffs,<br>v.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County, a public entity; Jaime Carrasco and Olivia Carrasco, husband and wife; Adrian Dominguez and Samantha Dominguez, husband and wife; Christopher Foster and Michelle Foster, husband and wife; Anthony Hatton and Jaclyn Hatton, husband and wife; Craig Kaiser and Karen Kaiser, husband and wife; Anthony Scheffner and Rhealea Scheffner, husband and wife; Jose Vazquez and Alma Vazquez, husband and wife; Jason Weiers and Melissa Weiers, husband and wife; Ian Cramner, an unmarried man; William McLean and Kelly Clark, husband and wife; Monica Scarpati and Ariel Scarpati, wife and husband; City of Phoenix, a public entity; Patrick Hanlon, an unmarried man; Nicholas French, an unmarried man,<br><br>Defendants. | No. 2:12-cv-02376-PHX-PGR<br><br>**PLAINTIFFS' STATEMENT OF FACTS APPLICABLE TO ALL DEFENDANTS** |

1. On December 15, 2011, City of Phoenix Police Officers Roberts, James, and Fiola met Marty Atencio at a 7-Eleven. *See* Roberts Dep. 25:20-24, June 26, 2013, attached hereto as **Exhibit A**.

2. When the officers arrived, they spoke with an individual who was concerned that Marty appeared to be experiencing mental health problems which were uncontrolled by medication. *See* **Exhibit A** at 30:13-22. A true and correct copy of the police report documenting the officers' contact with Marty is attached hereto as **Exhibit B**. The report accurately describes the officers' interaction with Marty. *See* **Exhibit A** at 20:4-21:12; *see also* James Dep. 15:11-17: 8, April 8, 2013, attached hereto as **Exhibit C**.

3. The officers described Marty as clean-cut, wearing a nice jacket and not having any unusual odor. *See* **Exhibit A** at 31:24-32:12; *see also* **Exhibit C** at 44:20:45:7.

4. Law enforcement officers are trained to detect the signs and symptoms of those who are suspected to be under the influence of drugs or alcohol. *See* **Exhibit C** at 50:6-19.

5. Although the officers observed Marty acting erratically, they concluded that the cause of his behavior was mental illness, not drugs or alcohol. Marty's eyes, speech and complexion appeared normal. He was not sweating profusely or twitching. He was able to walk without trouble and was alert and responsive to questions. But he would easily become distracted and would speak of random odd things. Marty showed no signs of being a danger to himself or others, he simply acted "goofy" and appeared to be off medication. He was told to return home, which he did. *See* **Exhibit B** at PPDPR00004; *see also* Fiola Dep. 23:4-10, 27:6-30:14, April 17, 2013, attached hereto as **Exhibit D**; *see also* **Exhibit A** at 36:11-18, 44:22-47:5, 51:23-52:24, 53:8-54:9, 58:25-60:4, 61:25-62:8; *see also* **Exhibit C** at 43:8-10, 50:6-19, 51:11-18, 53:2-8, 55:10-56:14, 58:1-59:20, 60:4-23, 98:2-10.

6. A short time later, a woman reported that Marty was kicking an apartment door and then approached her. So the same officers were called to the apartment complex where Marty lived. *See* **Exhibit B** at PPDPR00002; *see also* **Exhibit A** at 62:17-20; 65:12-14; 66:10-17.

DB04/0832418.0002/10651496.1 DD02

7.  As with their contact with Marty at the 7-Eleven, the officers noted that Marty's demeanor was inconsistent with someone who was intoxicated by drugs or alcohol. *See* **Exhibit D** at 28:3-29:9, 29:25-30:14; *see also* **Exhibit C** at 53:13-18.

8.  Rather, Marty appeared to be in a psychotic state consistent with a person experiencing a mental crisis. Marty was easily distracted and, at one point, Marty pretended to be a dog and began chasing cars. *See* **Exhibit A** at 99:12-15; *see also* **Exhibit C** at 72:13-73:11, 96:6-17; *see also* **Exhibit D** at 26:20-23, 27:6-21, 35:13-23, 41:1-6.

9.  Although Marty did not threaten or touch the woman who called the police, she reported that he scared her. *See* Boyd Aff. ¶¶ 7, 15, attached hereto as **Exhibit E**; *see also* **Exhibit A** at 68:11-18.

10. Therefore, the officers arrested Marty. *See* **Exhibit A** at 67:3-13.

11. While Marty was apprehensive about being arrested, he did not resist. *See* **Exhibit A** at 69:9-11; 69:21-23; *see also* **Exhibit C** at 73:13-74:3.

12. After placing Marty in handcuffs, the officers searched him to make sure he did not have any weapons. *See* **Exhibit A** at 69:24-70-18.

13. Although he was "carrying on" consistent with someone in a mental crisis, with "a little coaxing," the officers were able to put Marty in their car. *See* **Exhibit C** at 74:17-76:10.

14. Ofcs. Roberts and James drove Marty to Phoenix's Cactus Precinct. *See* **Exhibit A** at 68:23-25.

15. When Marty arrived, he was searched, which included the removal and replacement of his shoes, for the second time that day. *See* **Exhibit A** at 78:4-21.

16. Marty was not physically aggressive or combative, at any time, at the Cactus Precinct. *See* **Exhibit C** at 87:15-19.

17. Marty was then turned over to a transport officer so that he could be brought, in a "wagon," to Phoenix's Central Booking station. When that transfer occurred, Marty was searched again; typically, his shoes would be searched during that process. *See* **Exhibit A** at 81:19-83:5; *see also* **Exhibit D** at 35:13-36:14.

3

18. Due to what the officers concluded was mental illness, Marty had difficulty getting into the wagon. However, after about 10 minutes of talking to Marty, the officers were able to successfully put him into the vehicle without incident. *See* **Exhibit C** at 88:21-89:23; Conn Dep. 12:18-13:10, May 19, 2014, attached as **Exhibit G**.

19. Then, they transported Marty to the City's Central Booking station. By this time, Marty had been searched three times without incident. *See* **Exhibit A** at 83:24-84:9.

20. After he arrived at Phoenix's Central Booking station, Marty was searched again. And again, his shoes were removed without the need to use any unusual force. *See* Walston Dep. 22:8-10, 23:7-21, May 19, 2014, attached as **Exhibit F**.

21. From Phoenix's Central Booking station, Marty was brought to Maricopa County's Fourth Avenue Jail. *See* **Exhibit F** at 38:21-24.

22. When he arrived, Marty was turned over to Defendant Hanlon, a Phoenix Police Officer who was in charge of processing Phoenix detainees through the booking process into the jail. *See* Hanlon Dep. 72:23-73:17, September 9, 2013, attached as **Exhibit H**.

23. Ofc. Hanlon observed Marty acting strange and babbling incoherently. *See* **Exhibit H** at 24:2-9.

24. Ofc. Hanlon knew that Marty had an altered state of mind. He observed Marty having difficulty focusing on questions and displaying confused and inconsistent behavior. *See* **Exhibit H** at 37:7-14, 38:7-18, 39:2-11, 41:13-24.

25. Phoenix Police Officer Legere also observed that Marty was having difficulty following directions at the jail. *See* Legere Dep. 65:12-14, April 9, 2013, attached as **Exhibit I**.

26. It did not appear that Marty was intentionally disobeying anyone's commands, but rather that Marty appeared very confused or "lost." *See* **Exhibit I** at 68:24-69:3, 69:15-70:21.

27. Marty was taken to a holding cell with other detainees. Despite being told to sit on a bench, Marty kept standing up. So Ofc. Hanlon handcuffed Marty to the bench. *See* **Exhibit H** at 28:4-12.

4

28. While Marty was in the holding cell, Ofc. Legere observed Marty having a discussion with an empty container of peanut butter, as if it were a person. *See* **Exhibit I** at 60:24-61:5.

29. Phoenix Ofcs. Hanlon and French also overheard Marty's conversation with the peanut butter, although Ofc. French does not remember exactly when that psychotic conversation took place. *See* **Exhibit H** at 24:17-23, 26:9-21, 28:17-29:4; *See* French Dep. 30:18-31:3, August 6, 2013, attached as **Exhibit J**.

30. When detainees are brought to the jail, they are asked a series of questions that are included in a receiving screening form. This is a tool to determine whether the detainee is medically fit to be accepted into the jail. *See* **Exhibit I** at 49:15-50:7.

31. Ofc. Hanlon witnessed Marty during his receiving screening and observed that he was unable to focus on questions and did not appear to give thought to his answers. *See* **Exhibit H** at 38:15-18, 39:2-11, 75:7-76:3.

32. Maricopa County Sheriff Sergeant Weiers also observed Marty during his receiving screening. According to him, Marty said "a bunch of ridiculous stuff" during the process. *See* Weiers Dep. 36:23-37:3, October 23, 2013, attached as **Exhibit K**.

33. Marty was eventually seen by Nurse McLean. Although he performed a cursory evaluation of Marty, he did not follow the standard process used to determine if a person is alert and oriented. *See* McLean Dep. 61:15-20, 62:2-12, December 4, 2013, attached as **Exhibit L**.

34. And although Marty denied that he had any intention to hurt himself, this information was apparently inconsistent with a mention of suicide that Marty made during his receiving screening, which was performed by a correctional health technician. *See* **Exhibit L** at 67:11-18.

35. Nurse McLean asked Mental Health Professional ("MHP") Monica Scarpati to evaluate Marty. *See* Scarpati Dep. 63:23-64:14, October 21, 2013, attached as **Exhibit M**.

36. She stood behind Marty as she "observed" him. *See* **Exhibit M** at 63:23-64:14; *See* **Exhibit L** at 102:10-18.

5

37. Video of this "evaluation" shows that it lasted no more than 42 seconds; the expert hired by MHP Scarpati characterized it as "very quick." **Exhibit N** is a CD which contains clips of recordings from the Maricopa County Jail. **Exhibit N, Clip 1**, shows MHP Scarpati as she approaches Marty, "evaluates" him, and leaves. *See also* Cairns Dep. 86:25-87:19, July 21, 2014, attached as **Exhibit O**.

38. This was not the first time MHP Scarpati met Marty; in 2009, he was her patient; then she diagnosed him as being delusional. *See* **Exhibit M** at 24:11-25:4, 110:19-111:15 (referencing MHP Scarpati's medical record from 2009).

39. However, in December of 2011, Maricopa County did not have an electronic medical records system in place which would allow Nurse McLean or MHP Scarpati to timely obtain Marty's medical records during the intake process. *See* **Exhibit L** at 120:1-5; *see also* **Exhibit M** at 97:6-12, 99:9-25.

40. Had MHP Scarpati had access to those records, her memory would have been refreshed that Marty had previously been incarcerated and admitted to a psychiatric facility. She also would have learned that Marty had a history of psychosis, delusions, and loose thought, but was compliant in taking his medications. *See* **Exhibit M** at 108:3-11, 109:7-13, 100:1-4, 110:19-111:4-15, 112:6-10.

41. MHP Scarpati "asked [Marty] what was going on" and he did not respond appropriately. She observed Marty talking in "word salad" and yelling the words "spark plug" and "fire truck." *See* **Exhibit M** at 64:8-14; 65:1-21.

42. MHP Scarpati did not ask Marty any general knowledge questions, about his social, legal or criminal history, or if he was having any hallucinations or a plan to commit suicide. *See* **Exhibit M** at 92:23-93:25

43. MHP Scarpati recognized that Marty was psychotic and "in crisis at the time." *See* **Exhibit M** at 76:11-21, 80:16-18, 87:14-16.

44. She also knew that, because of his mental crisis, Marty may not have had the ability to make rational decisions or cooperate with her or law enforcement officers, or participate in safety planning. *See* **Exhibit M** at 82:9-14,129:12-130:7.

6

45. Notwithstanding MHP Scarpati's knowledge of Marty's condition, Nurse McLean did not know that Marty had been previously diagnosed as mentally ill while in the County's custody. Nor did he know that the County had records in its possession indicating that Marty suffered from hallucinations, had a history of demonstrating bizarre behavior, and took a psychiatric medication. *See* **Exhibit L** at 120:15-121:8.

46. Moreover, MHP Scarpati never told Nurse McLean that Marty was in a state of psychosis. *See* **Exhibit L** at 57:25-58:6.

47. It is not unusual for MCSO officers to communicate with mental health professionals when they believe the processing of an inmate may be difficult because of mental health issues. *See* Weiers Dep. 74:18-75:7, October 21, 2013, attached as **Exhibit Q**.

48. Despite her observations of Marty, MHP Scarpati did not inform any law enforcement officers of Marty's mental state or that Marty may have not had the ability to cooperate with them because of his psychosis. *See* **Exhibit M** at 95:12-96:1, 96:2-7.

49. Ofc. Hatton testified that it would have been helpful to know that Marty was in a state of psychosis. *See* Hatton Dep. (2) 23:14-18, January 27, 2014, attached as **Exhibit P**.

50. As the supervisor on scene, Sgt. Weiers testified he would have wanted to know if MHP Scarpati had come to the conclusion that Marty was in a state of psychosis while he was being processed through the jail. *See* **Exhibit Q** at 73:2-12.

51. Indeed, Sgt. Weiers would not have accepted Marty into the jail had he known of Marty's medical condition. *See* **Exhibit Q** at 164:23-165:2.

52. This is consistent with Maricopa County's written policies which state that "[a]rriving arrestee[s] with medical problems may be refused admission to [the] Jail," *see* **Exhibit R,** and "[p]atients presenting at Intake with danger to self or others, or in an acute mental health state, are transferred to an Acute Mental Health Housing Unit (AMHU) for safety, continuous monitoring, and evaluation of appropriate treatment intervention." *See* **Exhibit S**.

53. Despite the County's policies, their procedure is to never refuse a detainee admittance into the jail based on a mental condition. *See* **Exhibit M** at 130:8-14; *see also*

7

Noggle Dep. 57:10 61:6, 88:12-90:5, March 31, 2014, attached as **Exhibit GG**; *see also* **Exhibit HH** at 35:22-37:6; *see also* **Exhibit L** at 133:6-25.

54. MHP Scarpati and Nurse McLean consulted with each other. Thereafter, Nurse McLean admitted Marty into the jail and set in motion the process to have him placed in a safe cell. *See* **Exhibit H** at 91:15-22; *see also* **Exhibit M** at 77:5-19.

55. As with any other detainee, Marty was taken to have his mug shot taken by MCSO detention officers. *See* **Exhibit J** at 38:9-16.

56. According to Ofc. Hatton, Marty was saying things that did not make any sense as he was having his mug shot taken and MCSO officers were "trying to have a sense of humor with him." *See* Hatton Dep. 43:11-23, May 30, 2013, attached as **Exhibit U**.

57. Although Ofc. Hatton testified that the officers were laughing "with" Marty rather than at him, another witness, Mathew Layman, who testified shortly after the incident, remembers the situation differently:

> Marty was then taken out of the holding tank to have his mug shot taken. While Marty was having his mug shot taken, the guards were taunting him, telling him to "turn left," "turn right," and making fun of Marty's inability to follow instructions. As the guards made fun of Marty, they encouraged him to make funny faces and the photographer, a female detention officer, kept saying "let's make this one the mug shot of the week." After they took his mug shot, the detention officers brought Marty back to the holding tank.

*See* **Exhibit U** at 14:22-23; *see also* Layman Aff. ¶ 9, attached hereto as **Exhibit T**.

58. Consistent with Mr. Layman's testimony, Ofc. French has heard MCSO detention officers refer to the "mug shot of the week" or "mug shot of the day" on several occasions. *See* **Exhibit J** at 40:2-12.

59. These references are to the Maricopa County Sheriff's Office's practice of publishing detainees' mug shots on the County's website to enable citizens to vote on their favorite one. *See* Pena Dep. 28:12-30:9, July 9, 2013, attached as **Exhibit V**; *see also* **Exhibit K** at 52:25-53:7.

60. In response to the officers' requests, Marty made strange faces as he was having his mug shot taken. *See* **Exhibit H** at 43:11-23.

8

61. **Exhibit W** contains Marty's mug shots, which was circulated in the media after being released by the County.

62. Sgt. Weiers testified that it would not surprise him if officers were laughing while Marty was having his mug shot taken because "we like to have a good time while we're at work and stuff." *See* **Exhibit Q** at 52:3-13.

63. Thereafter, Phoenix Ofc. Hanlon escorted Marty to a search area called the LineScan Room. *See* Hanlon Aff. ¶ 10, Doc. 300-2 (p. 54-59).

64. Although Ofc. Hanlon testified that he kept his hands on Marty's back to guide him to the LineScan Room, Mr. Layman testified:

> A very short time after I sat down near the room with the scanner, Marty was brought out of his holding tank and into the room with the scanner. The guards were escorting Marty by leading him with his hands and arms bent in what looked to be a very painful position. Marty said, "your making Tony angry, your making Tony angry." Marty was telling the guards that they were hurting him. At this point Marty looked right at me, like he was asking for help, but there was nothing I could do.

*See* **Exhibit T** at ¶ 11-12.

65. Mr. Layman is the man in the hooded sweat shirt who is photographed observing, with an excellent view, Ofc. Hanlon "escorting" Marty to the LineScan Room.



*See* Doc. 300-3 (p. 2).

66. Ofc. Walston, who transported Marty to the jail and was with him through the officers' use of force against him in the LineScan Room, testified that Marty's demeanor was

9

1  humorous and jovial while interacting with law enforcement and that demeanor did not change. *See* **Exhibit F** at 27:15-17, 34:11-20.

67. Similarly, Ofc. Legere testified that Marty was "jovial" when he was in the jail. *See* **Exhibit I** at 68:3-8.

68. Officers testified that Marty was neither threatening nor aggressive while being brought to the LineScan Room. *See* **Exhibit F** at 40:1-12; *see also* **Exhibit H** at 45:8-22.

69. Importantly during his entire time in the LineScan room, ***Marty did not***: "display violent or aggressive behavior" towards anyone (**Exhibit J** at 69:1-8); punch anyone (**Exhibit F** at 44:2-11; **Exhibit H** at 49:24-50:7); strike anyone (**Exhibit EE** 49:16-19); kick anyone (**Exhibit F** at 44:2-11); bite anyone (**Exhibit H** at 49:24-50:7); or spit on anyone (**Exhibit H** at 49:24-50:7).

70. After Marty entered the LineScan Room, he was fingerprinted; Ofc. Hanlon removed his handcuffs. *See* **Exhibit J** at 51:17-52:2.

71. Ofc. Hanlon would not have removed Marty's handcuffs if he believed Marty to be a threat to himself or other officers. *See* **Exhibit H** at 46:6-9.

72. At that time, Ofc. Hanlon did not feel any time pressure to get Marty booked into the jail. *See* **Exhibit H** at 69:20-70:16.

73. Ofc. Hanlon asked Marty to take off his shoes so they could be put through an x-ray machine. Although Marty took off his right shoe, he did not immediately take off his left shoe and said to Ofc. Hatton, "[y]ou can take my shoe off for me." In response, Ofc. Hanlon grabbed Marty. *See* **Exhibit F** at 41:1-22.

74. Other officers immediately joined in the use of force against Marty. The video of the entire use of force in the LineScan Room is contained on **Exhibit N, Clip 2.**

75. Ofc. French was the first officer to join Ofc. Hanlon's use of force against Marty.

76. While Ofc. French claims that he did not attempt to place Marty in a carotid choke hold, *see* French Aff. ¶ 13, Doc. 300-2 (p. 85-89), the physical evidence and video of his actions show that is exactly what he did.

10

77. Ofc. French's expert, Mr. Meyer, testified at his deposition that the first two pictures below demonstrate a person in the process of applying a carotid choke hold – the third picture is of Ofc. French using force against Marty. Mr. Meyer "concede[d] that one of the possibilities is that [Ofc. French's arm is] near his neck, around his neck, possibly compressing one or both carotid arteries."



Meyer Dep. 40:12-43:25, June 6, 2014, attached as **Exhibit X**.

78. Mr. Meyer's expert opinion is consistent with the medical examiner's Report of Autopsy, which concluded a "[h]istory of law enforcement subdual, including apparent carotid chokehold" was significant to the diagnoses pertaining to Marty's death. *See* Report of Autopsy p. 2, attached as **Exhibit Y**; *see also* Stano Dep. 30:11-17, November 27, 2013, attached hereto as **Exhibit Z** (Q. So when you referred to an apparent carotid chokehold, were you basing that purely on the bruising around the Adam's apple? A. No. Q. What other evidence did you have to support that? A. The – reviewing the video as well as the statements made by those involved.")

79. Phoenix's use of force policy prohibits the use of a carotid chokehold unless a subject is engaged in "active aggression, aggravated active aggression, or who are a threat to themselves or others." The policy specifically prohibits the use of this type force for "[a]dministrative reasons, such as obtaining fingerprints or photographs" or if "a suspect demonstrates passive resistance, such as refusing to enter a police vehicle or holding room." Indeed, Phoenix's policy sets forth force options in order of degree. In other words, the policy begins by addressing the lowest level of force (an officer's presence) and concludes with the

DB04/0832418.0002/10651496.1 DD02

highest level of force (deadly force). Importantly, the carotid chokehold is listed as so dangerous that it is followed only by deadly force. Put another way, Phoenix views the use of chemical agents, the M26 Advanced and X26 TASER, impact weapons (baton/flashlight), canines and stun-bag shotguns as a less severe uses of force than the carotid chokehold. *See* Operations Order 1.5, Use of Force, attached as **Exhibit AA** (p. 2-12).

80. At no time as Ofc. French applied the carotid chokehold, or at any time before or thereafter, was "Marty physically or verbally aggressive with the officers." *See* **Exhibit T** at ¶ 14.

81. Even Ofc. French's expert concedes that, at the time it appears that Ofc. French used a carotid chokehold, Marty was at most actively resisting the officers, not being actively aggressive, a level of force below active aggression which is required for the employment of the technique. *See* **Exhibit X** at 49:15-50:21.

82. Thereafter, MCSO Sgt. Weiers, Lieutenant Kaiser, and Detention Officers Foster, Carrasco, Dominguez, and Hatton "dog piled" on top of Marty. *See* Scheffner Dep. 50:21-51:13, 56:21-57:1, May 13, 2014, attached as **Exhibit BB**.

83. Between 10 and 12 people engaged with Marty while he was on the ground. *See* **Exhibit J** at 62:1-5.

84. Then, Sgt. Weiers used his TASER on Marty multiple times. *See* **Exhibit K** at 105:14-21.

85. The first time, the TASER was in probe mode. This means that two probes, or fish-like hooks, deploy from the cartridge of the TASER and attached on to Marty. *See* **Exhibit K** at 99:13-100:23.

86. The purpose for using the TASER in probe mode is to cause neuromuscular incapacitation (*i.e.,* to stun a person's muscles). *See* Long Dep. 50:18-21, February 13, 2014, attached as **Exhibit CC**.

87. For neuromuscular incapacitation to occur, there must be a sufficient "spread" between the two probes. *See* **Exhibit CC** at 51:18-21.

12

88. The spread between the probes that attached to Marty was not sufficient to cause neuromuscular incapacitation. *See* **Exhibit CC** at 52:14-54:24.

89. However, as the photograph of the Marty's wounds produced by the hooks show, Marty was tased close to his heart. *See* **Exhibit DD**; *see also* **Exhibit Z** at 106:1-19 (laying foundation for picture and wounds being close to Marty's heart).

90. Sgt. Weiers was taught that he should avoid using the TASER, in probe mode, close to the heart because the "heart-to-dart distance" is the key factor in whether an electronic control device [*i.e.,* TASER] can affect the heart." *See* **Exhibit CC** at 59:1-61:20.

91. The remainder of the times that Sgt. Weiers tased Marty were "drive stuns." When the TASER is used in drive stun mode, its purpose is to cause pain. *See* **Exhibit CC** at 50:5-17.

92. Sgt. Weiers was taught that he should avoid extended or prolonged drive stuns because the use of the TASER causes physical and psychological stress. *See* **Exhibit CC** at 61:12-65:12.

93. In a training video shown to TASER instructors and users, the Chief Instructor for TASER International describes how he has been able to fight through the effects of being impacted by a grenade, but was unable to do so when impacted by a TASER. *See* **Exhibit CC** at 30:12-18.

94. Mr. Layman testified that:

> At least one of the officers began shocking Marty with what I think was a Taser. They kept shocking him over and over again for about 2-3 minutes. Monique, who told me she worked in a medical office, said, "if they tase him anymore, they are going to kill him." Marty was screaming in pain, in a deep voice.

*See* **Exhibit T** at ¶ 16.

95. Although Marty may have displayed active resistance to the force being used against him, he was not actively aggressive when he was tased. *See* **Exhibit X** at 63:13-24; *see also* ¶ 69.

96. Under Maricopa County Sheriff's Office Policy & Procedure GJ-30, which detention officers are expected to know, active resistance is defined as "physical actions which

13

1  attempt to prevent an officer's control, but never attempts to harm the officer such as a subject
2  tightening up or attempting to pull away." *See* **Exhibit CC** at 65:16-66:16; *see also* Maricopa
3  County Sheriff's Office Policy & Procedure GJ-30, attached as **Exhibit JJ**.

4      97.    MCSO officers are trained that the TASER should not be used in the jail setting
5  in cases in which the detainee is actively resisting, but not displaying active aggression. *See*
6  **Exhibit CC** at 67:6-15.

7      98.    In addition to shocking Marty, Sgt. Weiers accidentally tased Ofc. Hatton. *See*
8  **Exhibit U** at 149:13-24.

9      99.    Ofc. Hatton reacted by punching Marty. A video clip of Sgt. Weiers tasing
10 Marty, followed by Ofc. Hatton's punches, is contained on **Exhibit N, Clip 2.**

11     100.    Ofc. Hatton has changed his story regarding these punches. When he was
12 interviewed by detectives investigating Marty's death, Ofc. Hatton said he struck Marty twice
13 in the face and once in the shoulder. At his deposition, he testified that he struck Marty once in
14 the face and twice in the shoulder. *See* **Exhibit P** at 21:2-12.

15     101.    Ofc. Gabriel testified that he observed Ofc. Hatton beat Marty, punching him in
16 the face "pretty hard" with his fist. Ofc. Gabriel did not understand why Ofc. Hatton was using
17 this force, which he believed was "unreasonable" and "excessive," because Marty was
18 "defenseless" in the "Superman position" with his arms stretched out in front of him. *See*
19 Gabriel Dep. 54:10-55:3, 54:10-55:3, 56:5-19, 57:11-22, June 17, 2013, attached as **Exhibit**
20 **EE**.

21     102.    Ofc. Salinas, who also witnessed Ofc. Hatton punching Marty, was even more
22 disturbed. He testified that Officer Hatton unreasonably punched Marty in the face pretty hard
23 with a closed fist while Marty was "defenseless:"

> Q.    Is it your belief that Detention Officer Hatton used an unreasonable amount of force on Marty in the linescan room based on your training?
>
> A.    From what I saw at that very moment, based on my training, yes.
>
> Q.    Is it your belief that Detention Officer Hatton used an unreasonable amount of force on Marty in the linescan room based on your on-the-job experience?

14

|   |   |   |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Is it your belief that Detention Officer Hatton used an unreasonable amount of force on Marty in the linescan room based on your observations of Marty on December 16th, 2011? |
| 3 | | |
| 4 | A. | Yes. |
| 5 | Q. | Is it your belief that Detention Officer Hatton used an unreasonable amount of force on Marty in the linescan room based on your observations of Detention Officer Hatton on December 16th, 2011? |
| 6 | | |
| 7 | A. | Yes. |
| 8 | Q. | Is it your belief that Detention Officer Hatton used an unreasonable amount of force on Marty in the linescan room based on your observations of the position of Marty in relation to all of the other members of law enforcement in the room? |
| 9 | | |
| 10 | A. | Yes. |
| 11 | Q. | Is it your belief that Detention Officer Hatton used an unreasonable amount of force on Marty in the linscan room based on the totality of the circumstances that you observed on December 16th, 2011? |
| 12 | | |
| 13 | A. | Yes. |

See Salinas Dep. 25:20-27:16, 29:9-32:20, January 17, 2014, attached as **Exhibit FF**.

103. The reason Ofc. Salinas patted Ofc. Hatton on the back was to get him to calm down. See **Exhibit N, Clips 3 - 5** (MCSO detectives' interview with Ofc. Salinas).

104. After Marty was wrestled to the ground, tased and punched, Marty was handcuffed. The most senior officer in the LineScan Room, believed Marty was "under control." See **Exhibit BB** at 61:2-21.

105. After the officers used force on Marty, Nurse McLean entered the LineScan room. While there, he failed to: (a) determine how many times Marty had been shocked by the TASER, (b) take Marty's pulse, (c) listen to Marty's heart, (d) take Marty's blood pressure, (e) take Marty's temperature, or (f) test Marty's eyes to observe nystagmus (a fluttering of the eye indicative of neurological impairment). See **Exhibit L** at 92:20-23, 97:10-98:8.

106. Physician Assistant Cranmer was also present in the LineScan room to undertake Marty's care. See Cranmer Dep. 18:14-17, 31:23-25, November 21, 2013, attached as **Exhibit HH**.

15

107. PA Cranmer knew force had been used against Marty and that he had been tased. Yet PA Cranmer failed to: (a) take Marty's pulse; (b) listen to Marty's heart; (c) take Marty's temperature; (d) evaluate Marty's eyes for nystagmus; or (e) despite hearing Marty make bizarre statements, attempt to evaluate Marty's mental health. *See* **Exhibit HH** at 44:1-5; 44:18-25, 47:9-48:22, 117:6-9.

108. From the LineScan Room, Marty was carried, handcuffed in the "Superman position," into Safe Cell 4. *See* **Exhibit EE** at 58:2-4; *see also* **Exhibit HH** at 49:10-50:1).

109. While in the safe cell, Marty did not strike any of the officers. *See* **Exhibit EE** at 62:2-4.

110. Nevertheless, while in the safe cell Ofc. Hatton delivered a knee strike to Marty. In response, Ofc. Gabriel patted Ofc. Hatton on the back and called out Ofc. Hatton's name because he felt it was unreasonable for him to strike Marty with his knee while in the safe cell. *See* **Exhibit EE** at 62:12-24, 65:15-66:2.

111. Video showing Ofc. Hatton's knee strike, and Ofc. Gabriel's response, is contained on **Exhibit N, Clip 6.**

112. The reason Ofc. Gabriel yelled out Ofc. Hatton's name was to "catch his attention to let him know to chill out" and stop using force against Marty. *See* **Exhibit EE** at 63:19-64:2, 65:15-66:2.

113. Just as with Ofc. Hatton's punches in the LineScan Room, Ofc. Hatton has changed his story about the knee strike in Safe Cell 4. He told detectives that he dropped his "full" weight on Marty in Safe Cell 4. At his deposition, he testified that he did not drop his "full" weight on Marty and used less force. *See* **Exhibit P** at 35:24-37:15.

114. Regardless, Maricopa County's use of force expert testified:

Q. Well, my first question is, are you able to determine whether Officer Hatton's use of force in the safe cell was reasonable?

A. Yes.

Q. And then the second question, therefore, is, was Officer Hatton's use of force in the safe cell reasonable?

A. It was not necessary for Office Hatton to place his weight in the way that

16

|   | he did. |
|---|---|
| Q. | Was it reasonable for him to do so? |
| A. | No. |

Gravette Dep. 56:19-57:11, July 24, 2014, attached as **Exhibit II**.

115. Detention officers stripped Marty naked and left him unconscious and alone in Safe Cell 4. *See* **Exhibit N, Clip 6 (**video of officers' interaction with Marty, in Safe Cell 4).

116. Nurse McLean stood outside of the safe cell. He could not recall any specific movement of Marty in the safe cell that satisfied him Marty was medically stable and does not remember Marty responding to any of the officers' attempts to speak with Marty in the safe cell after he was placed in there. Nurse McLean did not do anything to assess Marty's body temperature, heart rate, breathing, cognitive abilities, or blood pressure after he was placed into the safe cell. *See* **Exhibit L** at 110:21-111:20.

117. Physician Assistant Cranmer did not perform any type of medical assessment of Marty after he was placed in Safe Cell 4. *See* **Exhibit HH** at 101:18-20.

118. Although Physician Assistant Cranmer testified that, while watching Marty through the window of the safe cell, he believed he saw Marty take a breath and move, the video of the incident shows that that is not an objectively reasonable conclusion. *See* **Exhibit HH** at 106:17-23; *see also* **Exhibit N, Clip 7** (showing a side by side view of PA Cranmer observing Marty).

119. As Marty lay motionless in Safe Cell 4, MHP Scarpati danced with, and bumped her rear-end against, an MCSO Lieutenant. *See* **Exhibit N, Clip 8** (showing MHP Scarpati dancing); *see also* **Exhibit U** at 148:16-149:2.

120. As Marty lay motionless, Ofcs. Hatton and Hanlon laughed with each other outside of the safe cell containing Marty as he died. *See* **Exhibit U** at 150:16-25.

121. Several minutes later, Physician Assistant Cranmer was told by a nurse that Marty was not breathing. PA Cranmer responded, "Yeah he is. He's just intoxicated. He's okay. They tased him. He's alright." The nurse said, "Um, no, I don't think so. He's not breathing." *See* **Exhibit HH** at 61:20-62:12.

17

122. PA Cranmer initially told detectives that he "ran" to the safe cell. However, when shown his movements at his deposition, PA Cranmer admitted that he simply "walked briskly." *See* **Exhibit HH** at 62:17-63:4. The video of his movement, attached as **Exhibit N, Clip 9**, shows he does not appear overly concerned at all.

123. Minutes after PA Cranmer came back to Safe Cell 4, he re-entered the cell. Nine minutes elapsed between the time that Marty was left in the safe cell and lifesaving efforts were attempted. *See* **Exhibit Z** at 66:18-67:14.

124. When the officers and medical personnel re-entered the safe cell, Marty did not have a pulse; he died. *Id*

125. With respect to Marty, PA Cranmer, MHP Scarpati and RN McLean each testified that they would not do anything different if they could go back in time and treat him again. *See* **Exhibit HH** at 99:22-24; *see also* **Exhibit M** at 141:14-142:3, *see also* **Exhibit L** at 123:7-9.

126. Similarly, Ofc. Hatton is not remorseful about any of his activities in connection with the events of December 16, 2011. *See* **Exhibit P** at 46:16-19.

127. Ofcs. Hanlon and French testified that they would not do anything differently if they could re-do the events of December 16, 2011. *See* **Exhibit H** at 72:5-10; *see also* **Exhibit J** at 77:1-78:4.

128. Maricopa County Chief Deputy Sheridan reviewed the allegations that Sgt. Weiers used unreasonable force against Marty and, as the final policymaker of Maricopa County, ratified Sgt. Weiers' actions. *See* Sheridan Dep. 66:2-68:16, July 22, 2014, **Exhibit KK**.

129. Deputy Chief Sheridan also ratified Ofc. Hatton's use of force against Marty in the LineScan Room. *See* **Exhibit KK** at 91:10-92:8.

18

Dated this 25th day of September, 2014.

**STINSON LEONARD STREET LLP**

By: s/ Larry J. Wulkan
Michael C. Manning
Larry J. Wulkan
Stefan M. Palys
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2014, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the District of Arizona by using the CM/ECF System. Participants in the case who are registered CM/ECF uses will be served by the CM/ECF system:

Kathleen L. Wieneke
Christina Retts
STRUCK WIENEKE & LOVE, P.L.C.
*Attorneys for Defendants City of Phoenix, Patrick Hanlon, and Nicholas French*

Lisa S. Wahlin
Andrew M. Kvesic
RYLEY CARLOCK & APPLEWHITE
*Attorneys for Defendants* Arpaio, Carrasco, *Dominquez, Foster, Kaiser, Scheffner, Vazquez, and Weiers*

Sarah L. Barnes, Esq.
Robert M. Moore
BROENING, WOODS & WILSON, PC
*Attorney for Defendant Hatton*

Gary L. Popham, Jr.
O'CONNOR & CAMPBELL, P.C.
*Attorneys for Defendants Maricopa County, Cranmer, Scarpati, and McLean*

By: s/ Kathleen Kaupke

DB04/0832418.0002/10651496.1  DD02