**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
Telephone 602.440.4800
Fax 602.257.9582

Lisa S. Wahlin (Bar No. 013979)
lwahlin@rcalaw.com
Andrew M. Kvesic (Bar No. 024923)
akvesic@rcalaw.com

*Attorneys for Defendants Arpaio,
Carrasco, Dominguez, Foster, Kaiser, Scheffner,
Vazquez, and Weiers*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| Ernest Joseph Atencio, et al., | Case No. 2:12-CV-02376-PHX-PGR |
|---|---|
| Plaintiffs, | **DEFENDANTS ARPAIO, CARRASCO DOMINGUEZ, FOSTER, KAISER, SCHEFFNER, WEIERS AND VAZQUEZ'S STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Sheriff Joseph Arpaio, et al., | |
| Defendants. | |

Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser, Scheffner, Weiers and Vazquez submit the following Statement of Facts in support of their summary judgment motion.

### Atencio's Arrival at the Jail on December 16, 2011

1. Ernest Marty Atencio ("Atencio") was placed in a medical holding area after he came into the jail with other detainees. Atencio repeatedly ignored orders to sit down and eventually had to be handcuffed to the bench. [September 9, 2013 Deposition of Patrick Hanlon ("Hanlon Depo."), attached as Ex. 1, at 28; Declaration of Jason Weiers ("Weiers' Decl.") attached as Ex. 4, at ¶ 4; CD containing video clips of Atencio in Central Intake ("Intake Video"), attached as Ex. 11, N Hold Area NE.]

2. Phoenix Police Officer ("PPO") Hanlon removed Atencio from a cell with other prisoners after observing Atencio get face-to-face with another prisoner. PPO

3610771.2
09/26/14

1 Hanlon got the impression from Atencio's body language that he was trying to agitate the
2 other prisoners. [Hanlon Depo., Ex. 1, at 76-77].

3     3.     During the intake process, Atencio was held in an isolation cell. [Weiers
4 Decl., Ex. 4, at ¶ 6; Hanlon Depo., Ex. 1, at 77-78.]

5     4.     It is typical to have a supervisor present if a detainee is causing problems
6 during intake. Atencio had demonstrated behavior that made Weiers more worried about
7 him doing something than the average inmate. For instance, he broke an outlet in the wall
8 at the medical screening with his foot, and he was yelling constantly and failing to follow
9 orders. [October 23, 2013 Deposition of Jason Weiers ("Weiers Depo."), attached as Ex.
10 6, at 57, 71-72.]

11     5.     Atencio seemed to intentionally break the wall outlet. He seemed agitated,
12 turned toward the wall, and then directly kicked the outlet. [Weiers Depo., Ex. 6, at 72.]

13     6.     During the medical intake screening in the jail, Ernest Marty Atencio
14 ("Atencio") was asked, "Are you thinking of hurting yourself?" and he answered, "Yes."
15 [December 4, 2013 Deposition of William McLean ("McLean Depo.") attached as Ex. 2,
16 at 53; Hanlon Depo., Ex. 1, at 70.]

17     7.     Correctional Health Services ("CHS") Nurse McLean determined that
18 Atencio should be placed in a safe cell for his own safety. Defendant Scheffner did not
19 order that Atencio be placed into a safe cell. [McLean Depo., Ex. 2, at 54; October 21,
20 2013 Deposition of Monica Scarpati, attached as Ex. 3, at 77; May 13, 2014 Deposition
21 of Anthony Scheffner ("Scheffner Depo."), attached as Ex. 13, at 65.]

22     8.     Detention supervisors Defendant Weiers and Defendant Kaiser were aware
23 that CHS staff had determined that Atencio was to be placed into a safe cell. Defendant
24 Weiers was aware that it was because Atencio had made suicidal comments. [Weiers
25 Decl., Ex. 4, at ¶ 5; Declaration of Craig Kaiser ("Kaiser Decl."), attached as Ex. 5, at
26 ¶ 8.]

27     9.     When a detainee is to be placed in a safe cell, medical staff writes "safe
28 cell" on the booking slip so that detention staff knows that after the detainee is searched

and accepted into the jail, he or she should be placed in a safe cell. The reason for the placement is not usually written there. [Weiers Depo., Ex. 6, at 78.]

10.    Typically more officers are present during the booking process when someone is going into a safe cell because the inmate has to be placed into the safe cell at the end of the process. Officers never know how strong someone is going to be, what their actions will be, or how unpredictable they will be. [Weiers Depo., Ex. 6, at 26-27, 79.]

**Events in the Line Scan Room/Search Area**

11.    The search area of Central Intake is where detainees are searched before they are accepted into the jail. The search is the last step in the intake procedure and is done to check for weapons and other contraband, such as drugs. [Declaration of Adrian Dominguez ("Dominguez Decl."), attached as Ex. 7, at ¶ 5.]

12.    As part of the search process, detainees are required to remove their jackets, shoes, and socks, so that these articles of clothing can be run through an x-ray machine. The detainee is also physically searched. [Dominguez Decl., Ex. 7, at ¶ 5.]

13.    It is a standard corrections practice to search all detainees that are processed into a jail facility, including a search of their shoes and clothing, to ensure that they do not bring any contraband into the facility, such as drugs or weapons. Such a search is done for the safety of the detainee, other detainees, and detention staff, and for the security of the facility. [Declaration of Roy T. Gravette ("Gravette Decl."), attached as Ex. 8, at ¶ 7.]

14.    The importance of searching shoes and other clothing worn into the jail is paramount to having a safe and secure jail. Shoes have been used to hide razor blades, knives, other weapons, handcuff keys, and drugs. [Gravette Decl., Ex. 8, at ¶ 8].

15.    PPO Patrick Hanlon escorted Atencio to the search area, line scan room. [Hanlon Depo., Ex. 1, at 45.]

16.    Atencio was not cooperative. The Phoenix officers were trying to move Atencio toward the search area and he didn't want to walk. PPO Hanlon had to push him

along. There were at least eight other detainees seated on the bench just outside the search area. [Hanlon Depo., Ex. 1, at 78; Declaration of Christopher Foster ("Foster Decl."), attached as Ex. 9, ¶ 5; Intake Video, Ex. 11, clips Prebooking S View from 2:32:16 – 2:33:11, Prebooking N View from 2:32:16 – 2:33:05, Acceptance Door.]

17.     Defendant Weiers followed the Phoenix officers and Atencio through the pre-booking area. It appeared that Atencio was resisting walking by leaning back. On the way to the search area, Atencio also dropped his jacket on the floor. Weiers picked it up and carried it into the search area. [Weiers Decl., Ex. 4, at ¶¶ 6, 7; Intake Video, Ex. 11, Prebooking S View from 2:32:16 – 2:33:11, Prebooking N View from 2:32:16 – 2:33:05, Acceptance Door.].

18.     In the line scan room, PPO Hanlon instructed Atencio to take his shoes off. Atencio initially cooperated, but when they told him to take his socks off, he turned to one of the Phoenix officers and said, "You take my socks off." The Phoenix officers again instructed Atencio to take his shoes off, and instead Atencio put his shoe back on. [Hanlon Depo., Ex. 1, at 48; Kaiser Decl., Ex. 5, at ¶ 11; Weiers Decl., Ex. 4, at ¶ 9; Declaration of Jaime Carrasco ("Carrasco Decl."), attached as Ex. 10, at ¶ 8; Foster Decl., Ex. 9, at ¶ 6.]

19.     After several requests to take his shoes off, Atencio tensed his arms. PPO Hanlon was concerned that Atencio was becoming aggressive. At approximately 2:34:39 a.m., PPO Hanlon took control of one of Atencio's wrists. [Hanlon Depo., Ex. 1, at 48, 78; Intake Video, Ex. 11, clip Linescan SW from 2:34:24 - 2:34:44.]

20.     Atencio began actively resisting as soon as the Phoenix officers went hands on. [Dominguez Decl., Ex. 7, at ¶ 9; Intake Video, Ex. 11, Linescan SW from 2:34:40 – 2:34:46.]

21.     The Phoenix officers tried to get Atencio's arms behind his back. Atencio was forcibly resisting to the point that even though there was one officer on each of Atencio's arms, they were not able to get his arms behind his back. Atencio was

overpowering the Phoenix officers. [Weiers Decl., Ex. 4, at ¶ 10; Foster Decl., Ex. 9, at ¶¶ 7, 8; Intake Video, Ex. 11, Linescan SW from 2:34:40 – 2:34:46.]

22.     When the Phoenix officers grabbed Atencio and tried to get his arms behind his back, Atencio was resisting to the point that, even though there was one officer on each of Atencio's arms, they were not able to get his arms behind his back. Atencio was overpowering the Phoenix officers so Weiers took Atencio's left arm to help them get his arms behind his back. [Weiers Decl., Ex. 4, ¶ 10; Intake Video, Ex. 11, Linescan SW from 2:34:40 – 2:34:46.]

23.     After the Phoenix police officers went hands-on, and had Atencio against the wall, Defendant Foster was able to remove Atencio's right shoe and right sock. He then tried to remove Atencio's left shoe but couldn't get it off because Atencio was overpowering the officers who were trying to control him. [Foster Decl., Ex. 9, at ¶¶ 7-8; Kaiser Decl., Ex. 5, at ¶ 13; Intake Video, Ex. 11, Linescan SW from 2:34:48 – 2:35:11.]

24.     PPO Hanlon made the decision to try to take Atencio to the ground. [Hanlon Depo., Ex. 1, at 80.]

25.     Even with several officers helping, they had difficulty taking him to the ground. It was not a hard takedown. [Carrasco Decl., Ex. 10, at ¶¶ 10-11; Foster Decl., Ex. 9, at ¶ 9; Kaiser Decl., Ex. 5, at ¶ 15; Intake Video, Ex. 11, Linescan SW from 2:35:17 – 2:35:25.]

26.     Atencio ended up partially on his right side on the floor. The officers were unable to get Atencio flat on his stomach because he was fighting. [Carrasco Decl., Ex. 10, at ¶¶ 10-11; Foster Decl., Ex. 9, at ¶ 9; Intake Video, Ex. 11, Linescan SW from 2:35:17 – 2:35:25.]

27.     Once Atencio was on the ground, one of Atencio's arms was under his body. Defendant Weiers knelt down on the floor next to Atencio and leaned over, trying to hold onto Atencio's arm. Atencio clawed at Defendant Weiers, trying to grab Weiers' hand. Atencio scratched Weiers. [Weiers Decl., Ex. 4, ¶ 12.]

28. Once Atencio was on the ground, Defendant Foster removed Atencio's left shoe and left sock. Atencio continued to fight. Defendant Foster and Defendant Kaiser were trying to control Atencio's legs but Atencio pushed them off like they were paper weight. [Foster Decl., Ex. 9, at ¶ 11.]

29. Once Atencio was on the ground, Defendant Kaiser knelt beside him and used his hands to control Atencio's right leg and foot, and get Atencio's legs crossed to better control them. [Kaiser Decl., Ex.5, at ¶¶ 16, 21, Att. C. ]

30. Defendant Kaiser was trying to hold Atencio's legs but he was unable to because Atencio kept pushing him off. So, Defendant Carrasco knelt down on the floor and assisted Defendant Kaiser with holding Atencio's legs. [Carrasco Decl., Ex. 10, ¶¶ 12, 24, Att. E; Kaiser Decl., Ex. 5, ¶¶ 16, 17.]

31. Defendant Foster yelled that they should get Atencio handcuffed, and he removed his handcuffs from his duty belt. He stood next to Atencio and reached in to try to handcuff him. The detention officers collectively tried to get Atencio handcuffed. [Foster Decl., Ex. 9, at ¶¶ 12, 29, Att. C; Hanlon Depo., Ex. 1, at 80; Intake Video, Ex. 11, Linescan SW from 2:35:45 – 2:35:55.]

32. Defendant Foster was able to get a handcuff on Atencio's left wrist, but then lost control of it. Atencio continued to struggle. Loose handcuffs are very dangerous and can be used as a weapon. [Foster Decl., Ex. 9, at ¶ 13; June 17, 2013 Deposition of Blas Gabriel, attached as Ex. 17, at 72, 73.]

33. Atencio was already on the ground on his stomach when Defendant Dominguez moved to assist in restraining him. Dominguez was at the right upper quadrant of Atencio's body. He grabbed Atencio's right arm and tried to control it while other officers tried to get Atencio handcuffed. [Dominguez Decl., Ex. 7, at ¶¶ 10, 21, Att. F.]

34. Defendant Dominguez used only soft hands in trying to control Atencio's right arm to get him handcuffed. [Dominguez Decl., Ex. 7, ¶ 11].

35. The officers were trying to get control of Atencio's hand but he kept getting free. The officers were trying to grab different parts of Atencio's wrists and hands, but Atencio was breaking away with no problem. [August 6, 2013 Deposition of Nicholas French ("French Depo."), attached as Ex. 42, at 89-90.]

36. Defendant Vazquez entered the search area after Atencio was already on the ground. Shortly after Vazquez entered, Vazquez heard Defendant Weiers say "Taser Taser" and then Weiers deployed the Taser. [Declaration of Jose Vazquez ("Vazquez Decl."), attached as Ex. 12, ¶¶ 6, 7 Intake Video, Ex. 11, Linescan SW from 2:35:35 – 2:36:15]

37. At approximately 2:36:10 a.m., Defendant Weiers straightened up, still on his knees, and deployed the Taser at Atencio's upper stomach. Defendant Weiers deployed the Taser in one of the only places he could safely do so without harming any of his fellow officers. [Weiers Decl., Ex. 4, at ¶ 14; Weiers Depo., Ex. 6, at 115; Intake Video, Ex. 11, Linescan SW from 2:36:05 – 2:36:18.]

38. Weiers deployed the Taser to try to get the situation resolved as quickly as possible and with the least amount of force possible. [Weiers Depo., Ex. 6, at 107-108.]

39. Weiers got a narrow or limited spread with the probes, which has reduced effectiveness. So Defendant Weiers leaned forward to attempt to drive stun Atencio's thigh. [Weiers Decl., Ex. 4, at ¶ 14; Intake Video, Ex. 11, Linescan SW from 2:36:12 – 2:36:16.]

40. At some point during Weiers' attempts to drive stun Atencio, Weiers received the effects of the Taser and fell backwards and away from Atencio. When Weiers regained his balance he again attempted to drive stun Atencio. At that point, other officers were able to handcuff Atencio. [Weiers Decl., Ex. 4, ¶ 15; Intake Video, Ex. 11, Linescan SW from 2:36:12 – 2:36:26.]

41. The Taser did not have any effect on Atencio. Atencio continued to struggle and kick and kept going like nothing had happened. It also didn't appear as

though the drive stun had any effect on Atencio. Indeed, it appeared to make Atencio mad. [Hanlon Depo., Ex. 1, at 85-86; French Depo., Ex. 44, at 72, 90.]

42. After Atencio was tased, Defendant Vazquez moved from Atencio's side to near his head and knelt on the floor beside him. Atencio was laying partially on his side with his arms underneath him. [Vazquez Decl., Ex. 12, at ¶¶ 8, 17, Att. E.]

43. There was already one handcuff on Atencio, and Defendant Vazquez was able to get a cuff on Atencio's other hand. Instead of handcuffing Atencio behind his back, Vazquez handcuffed him in front. [Vazquez Decl., Ex. 12, at ¶ 10.]

44. Once Atencio was handcuffed, Defendant Weiers stood up and other officers also disengaged. [Weiers Decl., Ex. 4, ¶ 15; Intake Video, Ex. 11, Linescan SW from 2:36:56 - 2:37:36.]

45. After Atencio was restrained, Defendant Foster stayed by Atencio's legs while he was checked by medical staff and photographs were taken of the Taser puncture wounds. Dominguez and Vazquez stayed by Atencio's upper body. [Foster Decl., Ex. 9, ¶¶ 16, 29, Att. E; Dominguez Decl., Ex. 7, ¶ 21, Att. H; Carrasco Decl., Ex. 10, ¶ 24, Att. F.]

46. After Atencio was restrained, Defendant Kaiser had no further contact with him. [Kaiser Decl., Ex. 5, ¶ 19.]

47. Atencio was fighting during the entire effort to restrain him in the search area. Atencio was holding his arm under his body. Officers were unable to get Atencio's arm out from under his body to get him handcuffed. Officers were giving Atencio commands like, "Give me your hand. Give me your arm." [Carrasco Decl., Ex. 10, ¶ 13.]

48. Atencio was not just resisting. He was combative and actively fighting. He was kicking and squirming. He was flailing, and trying to roll over. He was lifting himself up. [Dominguez Decl., Ex. 7, ¶ 12; Hanlon Depo., Ex. 1, at 82, 85-86.]

49. Atencio was 5 feet, 9 inches, weighed 208 pounds, and exhibited unusual strength. [Foster Decl., Ex. 9, ¶ 10; Carrasco Decl., Ex. 10, ¶ 11; Hanlon Depo., Ex.1, at

53; Dominguez Decl., Ex. 7, ¶ 12; Kaiser Decl., Ex. 5, ¶ 14; Medical Examiner's Report, attached as Ex. 41, at 5.]

50. Atencio had no appreciable response to pain compliance techniques that were used on December 16, 2011. [Hanlon Depo., Ex. 1, at 53.]

51. Atencio was not restrained and under control—he was not handcuffed and was still struggling—when Sergeant Weiers deployed the Taser. [Carrasco Decl., Ex. 10, ¶ 14; Dominguez Decl., Ex. 7, ¶ 13; Foster Decl., Ex. 9, ¶ 14; Kaiser Decl., Ex. 5, ¶ 18; Hanlon Depo., Ex. 1, at 51.]

52. Even when the Taser was deployed, the officers were unable to gain compliance from Atencio. Atencio rolled and was able to break the Taser leads. [Foster Decl., Ex. 9, ¶ 14.]

53. After the Taser was deployed, Atencio wasn't complying with commands to give up his hands and let the officers handcuff him. Atencio was pushing with his legs and wouldn't let the officers pull his arms out to be handcuffed. Defendant Vazquez was eventually able to get a handcuff on Atencio's other hand. [Vazquez Decl., Ex. 12, at ¶¶ 9, 10; Foster Decl., Ex. 9, at ¶ 15.]

54. Atencio was under control and being handcuffed at approximately 2:37:07 p.m. [Scheffner Depo., Ex. 13, at 61.]

55. Approximately two and a half minutes passed from the time that Phoenix Officer Hanlon grabbed Atencio's wrist to the time that Atencio was under control and being handcuffed. [Intake Video, Ex. 11, Linescan SW from 2:34:36 - 2:37:09.]

56. Defendant Scheffner responded to the search area after hearing a commotion. He entered the line scan room at 2:36:37. [Declaration of Anthony Scheffner ("Scheffner Decl."), Ex. 16, at ¶¶ 5, 20. Att. A; Scheffner Depo., Ex. 13, at 50; Intake Video, Ex. 11, Linescan SW from 2:36:35 – 2:36:42.]

57. When he entered the room he saw Atencio on the ground, surrounded by a group of officers. He couldn't see much of what was going on. Atencio was struggling with the officers. [Scheffner Decl., Ex. 16, at ¶ 6; Scheffner Depo., Ex. 13, at 50.]

58.     Defendant Scheffner did not see Atencio being taken to the floor and he did not know how it occurred. [Scheffner Depo., Ex. 13, at 81.]

59.     Defendant Scheffner had no idea what was going on, or what had occurred prior to his arrival. He saw that two supervisors were already present, Sergeant Weiers and Lieutenant Kaiser. He stood by and observed. He noted that Atencio had been tased. Shortly after he entered the room, Atencio was handcuffed and under control. [Scheffner Decl., Ex. 16, at ¶¶ 7, 8.]

60.     After Atencio was handcuffed, he made comments to the effect of, "Don't mess with me. I'm an armed forces sniper." He also stated something like, "Wait until I catch my breath. I'm going to fuck you guys up." [Carrasco Decl., Ex. 10, ¶ 16; January 17, 2014 Deposition of Sergio Salinas ("Salinas Depo."), attached as Ex. 14, at 47.]

61.     When Physician Assistant Ian Cranmer asked Atencio if he was okay, Atencio responded, "Anybody that touches me, I'm going to fucking kill you." Cranmer heard a stream of profanities, and saw Atencio struggling. Cranmer was concerned for his safety. [November 21, 2013 Deposition of Ian Cranmer ("Cranmer Depo."), attached as Ex. 27, at 48-49.]

62.     In their efforts to gain control of Atencio in the search area, none of the MCSO detention officers were on top of Atencio. They did not lay on Atencio, sit on Atencio, kneel on Atencio, or press on Atencio's back. [Salinas Depo., Ex. 14, at 58; May 19, 2014 Deposition of Bradd Walston ("Walston Depo."), attached as Ex. 15, at 45; Scheffner Depo., Ex. 13, at 51; Intake Video, Ex. 11, Linescan SW.]

63.     After CHS staff responded and evaluated Atencio, Scheffner instructed officers to make sure Atencio was searched. During the pat down search before he was taken to the safe cell, Atencio was still struggling. He was kicking his feet out and not letting the officers roll him over to search him. [Scheffner Decl., Ex. 16, at ¶¶ 9, 11; Carrasco Decl., Ex. 10 at ¶ 17; Foster Decl., Ex. 9, at ¶ 17.]

## Events in the Safe Cell

64.    After the officers searched Atencio, he was carried into a safe cell and placed on the ground. [Carrasco Decl., Ex. 10, at ¶ 18; Intake Video, Ex. 11, E Hall Safe Cell View from 2:41:13 – 2:41:20, Safe Cell from 2:41:18- 2:41:24.]

65.    Using an escort team of five officers to carry a detainee is a widely accepted practice in the field of corrections for the safe and humane transport of a restrained inmate. Typically, each member controls a certain body part: one member is responsible for the head and upper torso area, and each of the other four members is responsible for controlling an arm or a leg. [Gravette Decl., Ex. 8, at ¶ 16.]

66.    Removing clothing in a safe cell is a standard corrections practice where a detainee has made statements that he is or may be suicidal. Anything that a detainee could use to harm himself, including his clothing, must be removed. In Maricopa County, the inmate is given a suicide blanket for modesty. [Gravette Decl., Ex. 8, at ¶ 18; Weiers Decl., Ex. 4, ¶ 18; June 17, 2013 Deposition of Blas Gabriel ("Gabriel Depo."), attached as Ex. 17, at 59.]

67.    The isolation cell in the pre-intake area where Atencio was held before he was brought to the search room had hard benches, a stainless steel toilet, and a concrete floor and walls. The safe cell where Atencio was placed was constructed of a soft cushion material, and no other objects are in the cell for an inmate to harm himself with. [Gravette Decl., Ex. 8, ¶ 14.]

68.    Defendants Dominguez and Foster assisted in carrying Atencio to the safe cell. [Dominguez Decl., Ex. 7, at ¶¶ 16-17; Foster Decl., Ex. 9, at ¶ 18].

69.    Defendant Scheffner followed the officers and Atencio to the safe cell. After they had entered the safe cell, Scheffner stood at the doorway of the safe cell and briefly stepped inside, but then stepped right back out again. Scheffner did not see what occurred inside the safe cell. [Scheffner Decl., Ex. 16, ¶ 12; Scheffner Depo., Ex. 13, at 67, 81.]

70.     Once the officers laid Atencio down in the safe cell and started removing his clothes, Atencio started wrestling with the officers. [Foster Decl., Ex. 9, at ¶ 18].

71.     Defendant Foster assisted in removing Atencio's pants and underwear and crossing his legs. [Foster Decl., Ex. 9, at ¶ 19].

72.     Defendant Carrasco entered the safe cell after other officers carried Atencio in. Once Defendant Carrasco was in the safe cell, he was on Atencio's left side near his feet. He bent over and helped Detention Officer Foster remove Atencio's pants and underwear. [Carrasco Decl., Ex. 10, ¶¶ 19, 24, Att. F-G.]

73.     Defendant Carrasco then knelt on the floor beside and held Atencio's legs, which were crossed and bent at the knees, while other officers were removing the rest of his clothing. [Carrasco Decl., Ex. 10, at ¶¶ 20, 24, Att. F-G.]

74.     While Defendant Carrasco was holding Atencio's legs in the safe cell, he was pushing hard against Carrasco. Atencio had a lot of strength in his legs and moved Carrasco back more than once. At one point Atencio was pushing so hard that he almost completely straightened out his right leg even though Carrasco was trying to keep it bent. [Carrasco Decl., Ex. 10, at ¶ 21.]

75.     After helping to remove Atencio's pants and underwear, Foster moved to Atencio's upper torso to help with the handcuffs because Officer Salinas was having trouble removing the handcuffs. Foster took Officer Salinas's handcuff key and was able to get the handcuffs off. [Foster Decl., Ex. 9, at ¶¶ 19, 29, Att. K-L.]

76.     Defendant Vazquez was on Atencio's left side. Vazquez's knee was against Atencio's left side, to control him, but Vazquez's weight was not on him. Vazquez helped to remove Atencio's shirt. He lifted up Atencio's head so officers could get Atencio's shirt over his head. [Vazquez Decl., Ex. 12, at ¶¶ 14, 15, 17, Att. I-J.]

77.     Defendant Dominguez held Atencio's right arm while Atencio's clothes were being removed. Dominguez's right hand was on Atencio's wrist, and his left hand was on Atencio's arm near the biceps area. Dominguez had one knee on the floor of the safe cell and one knee up. [Dominguez Decl., Ex. 7, at ¶¶ 18, 21, Att. I-K.]

78.     Defendant Dominguez did not use any force other than soft hands to control Atencio's right arm in the safe cell while the officers removed Atencio's clothes and took off the handcuffs. [Dominguez Decl., Ex. 7, at ¶ 18.]

79.     Defendant Dominguez also assisted with removing Atencio's shirt. [Dominguez Decl., Ex. 7, at ¶ 19.]

80.     After the rest of Atencio's clothing and the handcuffs were removed, Defendant Carrasco and the rest of the detention officers exited the safe cell by backing out. [Carrasco Decl., Ex. 10, at ¶ 22; Intake Video, Ex. 11., Safe Cell from 2:42:46 – 2:43:17.]

81.     After exiting the safe cell, Defendant Carrasco had no further contact with Atencio. [Carrasco Decl., Ex. 10, at ¶ 23.]

82.     In the safe cell, the detention officers were telling Atencio to stay still, relax, and stop resisting. But Atencio was still moving around, squirming and not complying. Atencio was trying to get up, and rocking from side to side. [Dominguez Decl., Ex. 7, ¶ 17; Scheffner Decl., Ex. 16, at ¶ 13.]

83.     Atencio was still pretty strong even after he was in the safe cell. Defendant Vazquez saw Atencio was pushing Defendant Carrasco back as Carrasco was trying to cross Atencio's legs. Defendant Vazquez also felt it because he was kneeling by Atencio's side. [Vazquez Decl., Ex. 12, at ¶ 15.]

84.     The detention officers were having such a hard time removing Atencio's shirt in the safe cell that they asked Sergeant Weiers if they could cut it off. [Weiers Depo., Ex. 6, at 121, 124.]

85.     Atencio continued to fight throughout the time the officers were trying to undress him and take the handcuffs off. [Foster Decl., Ex. 9, at ¶ 20].

86.     As officers exited the safe cell, Atencio was still talking. [Foster Decl., Ex. 9, at ¶ 21.]

87. During Defendant Foster's entire contact with Atencio, he did not use any force other than soft empty hands in trying to control him, remove items of clothing, and get him handcuffed and un-handcuffed. [Foster Decl., Ex. 9, at ¶ 28.]

88. During Defendant Kaiser's entire contact with Atencio, he did not use any force other than soft empty hands. [Kaiser Decl., Ex. 5, at ¶ 20].

89. Defendant Scheffner had no physical contact with Atencio on December 16, 2011. [Scheffner Decl., Ex. 16, at ¶ 19; Scheffner Depo., Ex. 13, at 81; Plaintiffs' Responses to Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers' Requests for Admission ("Response to Officers' RFAs"), attached as Ex. 20, at 6].

90. During Weiers' contact with Atencio, the only force he used was the Taser and soft empty hands to try to control Atencio so that other officers could get him handcuffed. [Weiers Decl., Ex. 4, at ¶ 26.]

91. The actions of the individual detention officers, including Sergeant Weiers' use of the Taser, were justified and reasonable, and consistent with the policies of the Maricopa County Sheriff's Office, Arizona state law, and national standards of care as expressed by the American Correctional Association. The detention officers used only the force necessary, to control and secure Atencio. [Gravette Decl., Ex. 8, at ¶¶ 9-12.]

**Plaintiffs' Excessive Force Claims**

92. Plaintiffs contend that Defendants Carrasco, Dominguez, and Vazquez used excessive force and breached a duty of care to Atencio by "forming a 'dog pile' on top of Marty," in the line scan room and by holding Atencio down in the safe cell while another officer struck Atencio. [Plaintiffs' First Amended Complaint ("FAC") at ¶¶ 62, 70; Plaintiff Ernest Joseph Atencio's Response to Defendants Weiers, Vazquez, Scheffner, Kaiser, Foster, Dominguez and Carrasco's First Set of Interrogatories to Plaintiffs ("Responses to Officers' First Set of Interrogatories"), attached as Ex. 18, at 4-5, 7-9.]

93.     Plaintiffs contend that Defendant Kaiser used excessive force and breached a duty of care to Atencio by "forming a 'dog pile' on top of Marty." [Responses to Officers' First Set of Interrogatories, Ex. 18, at 6-7.]

94.     The term "dog pile" refers "to the time period where numerous individual defendants were on top of Marty Atencio in the line scan room." [Plaintiffs' Response to Defendant Arpaio's Second Set of Interrogatories to Plaintiffs, attached as Ex. 34, at 3.]

95.     Other than participation in the "dog pile," Plaintiffs cannot identify any use of force by Defendants Carrasco, Dominguez, Foster, Kaiser, and Vazquez but they contend that they cannot rule out these officers' possible use of additional types of excessive force in the line scan room such as "kicking, kneeing, punching, hitting, slapping, or crushing." [Responses to Officers RFAs, Ex. 20, at 2-4, 7; Plaintiffs' Second Amended Responses to Defendants Weiers, Vazquez, Scheffner, Kaiser, Foster, Dominguez and Carrasco's First Set of Interrogatories ("Second Amended Responses to Officers' First Set of Interrogatories"), attached as Ex. 21, at 4-10.]

96.     Plaintiffs contend that Defendant Scheffner violated Atencio's rights and the standard of care because he "observed the unreasonable use of force against Marty and failed to intervene." He also "ordered Marty to be placed in MCSO's 'safe' cell." [Responses to Officers' First Set of Interrogatories, Ex. 18, at 5-6; FAC at ¶¶ 67, 68.]

97.     Plaintiffs admit that Defendant Scheffner did not use force against Atencio. [Plaintiffs' Responses to Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers' Requests for Admission ("Responses to Officers' RFAs"), attached as Ex. 20, at 6.]

98.     Plaintiffs contend that Defendant Weiers used excessive force and breached a duty of care to Atencio "by tasing him, multiple times, including, at least one time, in a manner close to Marty's heart. Sergeant Weiers knew, or should have known, that using a taser in this fashion created an unreasonable risk of harm." Plaintiffs also contend that Defendant Weiers used excessive force by his "general involvement in the 'dogpile.'" [Responses to Officers' First Set of Interrogatories, Ex. 18, at 3-4; Plaintiffs' Responses

to Defendant Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers' Second Set of Interrogatories ("Responses to Officers' Second Set of Interrogatories"), attached as Ex. 19, at 8.]

99.     Plaintiffs admit that Defendant Weiers did not use force against Atencio after Atencio was carried out of the line scan room. [Responses to Officers' RFAs, Ex. 20, at 8.]

100.     Plaintiffs cannot identify any other use of force by Defendant Weiers in the line scan room but contend that they cannot rule out Defendant Weiers's possible use of additional types of excessive force in the line scan room such as "kicking, kneeing, punching, hitting, slapping, or crushing." [Plaintiff Ernest Joseph Atencio's Second Amended Response to Defendants Weiers, Vazquez, Scheffner, Kaiser, Foster, Dominguez, and Carrasco's First Set of Interrogatories to Plaintiffs ("Second Amended Responses to Officers' First Set of Interrogatories") attached as Ex. 21, at 4.]

**Taser Use**

101.     Dr. Stano verified that the marks depicted in the photograph labeled as Exhibit 3 to Dr. Stano's deposition are the Taser probe wounds. They were below Atencio's heart. [November 27, 2013 Deposition of William Stano, M.D. and Exhibit 63 ("Stano Depo."), attached as Ex. 38, at 106].

102.     Probe deployment of a TASER electronic control device is designed to induce neuromuscular incapacitation. Effectiveness increases as a function of the spread of the probes. [Declaration of Michael Brave ("Brave Decl."), attached as Ex. 25, ¶ 9.]

103.     Three-point deployment is a combination of use of the electronic control device in both probe-deployment mode followed up by a simultaneous drive stun. Three-point deployment is used to gain neuromuscular incapacitation when, for whatever reason, a deployed probe is not succeeding in achieving the desired neuromuscular incapacitation. A three-point deployment is used to try to create a wide electrode spread to significantly increase the probability of achieving neuromuscular incapacitation. [Brave Decl., Ex. 25, ¶ 10.]

104.    According to the literature, TASER electronic control devices have a lower probability of injury than other force options, including hands-on physical force. [Brave Decl., Ex. 25, ¶ 11.]

105.    The use of the electronic control device was the force option with the greater probability of being effective in controlling Atencio. [Brave Decl., Ex. 25, ¶ 12.]

106.    The TASER's quantum of force used on Atencio was very minimal due to the circumstances of the incident. Atencio was obese and had significant fat layers where the probes impacted. There was no risk of fall injury because Atencio was already on the ground. There was no risk of motion or momentum injury because Atencio was not in motion. [Brave Decl., Ex. 25, ¶ 13.]

107.    Defendant Weiers' three-four point deployment had the highest probability of achieving control of Atencio. Defendant Weiers deployed the cartridge with the probes striking Atencio in the abdomen. Atencio's obesity, the limited probe spread, and the location of the probe impacts were not sufficient to likely induce neuromuscular incapacitation. Defendant Weiers' application of the TASER in drive-stun to the back of Atencio's left thigh had an increased probability of creating a completed circuit and allowing for neuromuscular incapacitation to attempt to control Atencio.  [Brave Decl., Ex. 25, ¶ 15; Photographs of TASER probe marks, attached as Ex. 26.]

108.    ECD trigger pulls or discharges do not indicate delivered electrical charge to the person. Although the data downloaded from Sergeant Weiers' ECD showed a total ECD discharge of 22 seconds, there are statements that the probes were dislodged during the incident. Once the probes are dislodged, the ability to maintain an electrical circuit capable of delivering an electrical charge would be negatively affected. (Brave Decl., Ex. 25, ¶ 14).

109.    The ECD drive stun marks on the back of Atencio's left thigh are consistent with Atencio's struggling and movements, intermittent ECD contact, and EVD bouncing and skipping from the contact and control attempts. The marks indicate that the contact between the ECD and Atencio's thigh were not continuous. (Brave Decl., Ex. 25, ¶ 16).

**Defendant Arpaio**

110.    Defendant Scheffner has never heard that Sheriff Arpaio has a philosophy that the jail should be a place of punishment. He has never observed an MCSO deputy express to a detainee at the Fourth Avenue Jail or any jail that the jail is a place of punishment. [Scheffner Depo., Ex. 13, at 73-74.]

111.    Defendant Weiers has never heard that Sheriff Arpaio has a philosophy that the jail should be a place of punishment. He has never observed an MCSO deputy express to a detainee in the Fourth Avenue facility that the jail is a place of punishment. [Weiers Depo., Ex. 6 at 161.]

112.    Detention Officer Gabriel has never heard that Sheriff Arpaio has a philosophy that jail should be a place of punishment. He has never observed MCSO deputies express to detainees that the jail is a place of punishment. [Gabriel Depo., Ex. 17, at 31.]

113.    Former Detention Officer Sergio Salinas never heard during his five years of working at Maricopa County that Sheriff Arpaio has a philosophy that the jail should be a place of punishment. He has not observed MCSO deputies express to detainees at the Fourth Avenue jail that the jail is a place of punishment. [Salinas Depo., Ex. 14, at 41-42.]

114.    Statistics from December 2008 to August 2010 show that only eight use of force reports were generated for Intake during that 21-month period. [June 8, 2011 Declaration of James P. Seibert, attached as Ex. 35, at ¶ 66, Exhibit O.]

115.    MCSO policy requires a use of force report when a force option is used that has a probability of causing injury, such as an intermediate control technique or an intermediate weapon. [MCSO Use of Force Policy, attached as Ex. 23, at p. 4, ¶ 9.]

116.    Intermediate control techniques include the use of joint locks, wristlocks, and come-alongs. Intermediate weapons include batons, and oleoresin capsicum spray, and electronic control devices such as a Taser. [MCSO Use of Force Policy, Ex. 23, at p. 3.]

117.    In 2011, on average, more than 300 detainees were booked each day in Intake. [Declaration of Gerard Sheridan ("Sheridan Decl."), attached as Ex. 36, at ¶ 5.]

118.    The Fourth Avenue Jail opened in April 2005. Central Intake, or Intake, is located in the Fourth Avenue Jail. [Sheridan Decl., Ex. 36, at ¶ 6.]

119.    Detention policies and procedures in general, including in Intake, have changed and evolved since 1999 when I became Chief of Custody. New procedures regarding booking have been put into place since Intake was moved from the Madison Street Jail to the Fourth Avenue Jail in 2005. [Sheridan Decl., Ex. 36, at ¶ 7.]

120.    MCSO's use of force policy has also changed and evolved since 1999. For example, in the early 2000s, MCSO policy authorized the use of restraint chairs. By 2011, restraint chairs were no longer allowed by policy, and they are no longer used in the Maricopa County jails. [Sheridan Decl., Ex. 36, at ¶ 8.]

121.    Jeffrey Alvarez, M.D., the Correctional Health Services ("CHS") medical director, is the responsible physician for the jail system in Maricopa County. [February 7, 2014 Deposition of Jeffrey Alvarez ("Alvarez Depo."), attached as Ex. 28, at 9].

122.    The CHS medical director supervises the medical providers in all the different jail facilities. [Alvarez Depo., Ex. 28, at 9.]

123.    The CHS Director is responsible for staffing of personnel, including medical doctors, psychiatrists, nurse practitioners, physician assistants, dentists, and psychologists. [September 18, 2013 Declaration of Thomas J. Tegeler, attached as Ex. 31, at ¶¶ 4, 5.]

124.    CHS's Mental Health Director is responsible for supervising mental health staff, including psychiatrists, midlevel psychiatric providers, psychologists, and mental health professionals. [September 23, 2013 Declaration of Dawn Noggle, Ph.D. ("Noggle Decl."), attached as Ex. 32, ¶ 5.]

125.    The Mental Health Director is also responsible for mental health programming across a range of settings including screening and intake, and acute and subacute mental health units. [Noggle Decl., Ex. 32, ¶ 3.]

126.    Dawn Noggle is the mental health director for Correctional Health Services. She is the final policymaker for Correctional Health Services with respect to mental health care. [March 31, 2014 Deposition of Dawn Noggle ("Noggle Depo."), attached as Ex. 30, at 10, 112, 114-115.]

127.    Sheriff Arpaio doesn't have the budget that manages healthcare in the jails. Maricopa County's budget covers medical care in the jails, and the County's budget doesn't mix with the Sheriff's budget.  [Alvarez Depo., Ex. 28, at 113-114.]

128.    In 2004, Sheriff Arpaio wrote to Maricopa County Administrator David Smith, requesting that Correctional Health Services be transferred to the Sheriff's Office. [October 7, 2004 letter to David Smith, attached as Ex. 29.]

129.    In 2010, Sheriff Arpaio unsuccessfully sued Maricopa County for control of Correctional Health Services. [April 6, 2010 Article from Arizona Republic, "Judge Denies Arpaio's Attempts to Take Over Jail Health Care," attached as Ex. 37]

130.    Sheriff Arpaio's statements about jails as places of punishment do no refer to the jail being a place of physical punishment. When he uses the word "punishment" it's in the sense of taking things away from people, not physically punishing people. [July 22, 2014 Deposition of Gerard Sheridan, attached as Ex. 33, at 26-28.

131.    Out of Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez, and Weiers, only Defendant Kaiser was employed with MCSO before 2000. The others were all hired in 2002 or later. [Carrasco Decl., Ex. 10 at ¶ 3; Dominguez Decl., Ex. 7, at ¶ 3; Foster Decl., Ex. 9, at ¶ 3; Kaiser Decl., Ex. 5, at ¶ 3; Scheffner Depo., Ex. 13, at 18-19; Vazquez Decl., Ex. 12, at ¶ 3; Weiers Decl., Ex. 4, at ¶ 3.]

132.    Plaintiffs contend that Defendant Arpaio is liable in his individual capacity because: (1) he was aware of a long history of deliberate indifference to the provision of medical care to those in the County jails; and (2) he stated that he wanted his jails to be "places of punishment." [Plaintiff Ernest Joseph Atencio's Amended Response to Arpaio's First Set of Interrogatories, attached as Ex. 22, at 4-9.]

133.    Plaintiffs contend that Defendant Arpaio is liable in his official capacity because he is a policymaker and he ratified the acts of the individual defendants because he knew of and specifically approved of their acts. [Plaintiff Ernest Joseph Atencio's Amended Response to Arpaio's First Set of Interrogatories, Ex. 22, at 9.]

134.    Plaintiffs also contend that Defendant Arpaio created a custom, policy, or practice of excessive use of force in the Maricopa County jails. [Plaintiff Ernest Joseph Atencio's Amended Response to Arpaio's First Set of Interrogatories, Ex. 22, at 9-11.]

135.    Plaintiffs' Interrogatory Response cites to twenty-seven documents in support of their contention that Defendant Arpaio created a custom, policy, or practice of excessive use of force in the Maricopa County jails.  Two of them are duplicates. Eliminating the duplicates, nineteen of the twenty-five documents are dated before 2001, and thus reflect events and circumstances more than ten years prior to the events involving Atencio. Thirteen of them are dated between 1995 and 1997. Eleven documents are news articles. The most recent document cited is the Second Amended Judgment and Findings of Fact and Conclusions of Law and Order in Graves v. Arpaio, CV77-0479-PHX-NVW, dated October 22. 2008 (Docs. 1635 and 1634, respectively). [Atencio's Amended Response to Arpaio's First Set of Interrogatories, Ex. 22, at 10-11.]

## Causation

136.    In reaching his opinions, Todd Wilcox, M.D. reviewed only Atencio's medical records from December 16, 2011 from CHS and the Phoenix Fire Department, and his St. Joseph's Hospital Records from December 16-20, 2011. [Todd Wilcox's February 12, 2014 Expert Report ("Wilcox Report"), attached as Ex. 39, at 2-6.]

137.    Dr. Wilcox's Report expresses his causation opinion in one sentence of one paragraph :

> "The death of Mr. Atencio was completely preventable and unnecessary. He was a psychotic non-violent patient who was suffocated, beaten and shocked to death. He needed treatment and understanding, not punishment for being mentally ill. At the time of his admission into jail his vital signs were normal. But for his interaction with law enforcement and his subsequent violent subdual by law enforcement, there is no evidence that he

had any prodromal condition, symptom, or exam finding consistent with impending cardiac failure or anoxic brain injury."

[Wilcox Report, Ex. 39, at 22.]

138. Dr. Wilcox's February 12, 2014 report does not list the autopsy report as a material reviewed and considered in reaching his opinions. [Wilcox Report, Ex. 39, at 2-6.]

139. Dr. Wilcox did not review any of Atencio's extensive medical records from other providers prior to 2011. [Wilcox Depo., Ex. 40, at 246.]

140. Dr. Wilcox practices correctional health care medicine. He is not a medical examiner and he has never worked as one. [Wilcox Depo., Ex. 40, at 248, 251.]

141. Dr. Wilcox did not parse out each use of force. He did not consider whether Atencio would have died even if the TASER had not been used, or if Atencio would have submitted to being handcuffed. [Wilcox Depo., Ex. 40, at 252-253, 256.]

142. Dr. Wilcox ruled out causes of death that he believed were not relevant, such as diabetic ketoacidosis, subdural hematoma, and sepsis. [Wilcox Depo., Ex. 40, at 254.]

143. Dr. William Stano is the deputy chief medical examiner for the Maricopa County Medical Examiner's office and performed Atencio's autopsy and has been a medical examiner since August of 2006. Dr. Stano is board certified in anatomic pathology and forensic pathology. [Stano Depo., Ex. 38, at 7, 10-11.]

144. The cause of Atencio's death was cardiac arrest, but the reason why the cardiac arrest occurred is unknown. Atencio's psychosis, the law enforcement subdual, and Atencio's multiple medical problems are all risk factors, but not contributory causes. [Stano Depo., Ex. 38, at 54.]

145. The immediate electrical shock by the TASER did not have anything to do with Atencio's death. [Stano Depo., Ex. 38, at 57.]

146. Atencio had an enlarged heart and coronary artery disease, both of which can cause sudden cardiac arrest. [Stano Depo., Ex. 38, at 100.]

147.    Atencio had a clinical history of abuse and dependence on more than one substance, including alcohol, marijuana, and methamphetamine. Drug abuse is a risk factor for cardiac arrest. [Stano Depo., Ex. 38, at 100-101.]

148.    Of the medical problems listed in the autopsy report, any one of several of the problems listed under section 5 of page 2 in the autopsy report would be enough to cause Atencio's death. [Stano Depo., Ex. 38, at 102; Medical Examiner's Report, attached as Ex. 41, at page 2, section 5.]

149.    Atencio was diagnosed with schizoaffective disorder. Studies show that patients with schizophrenia have been reported to be three times more likely to experience sudden cardiac arrest than individuals from the general population. [Stano Depo., Ex. 38, at 103-104.]

DATED this 26th day of September, 2014.

**RYLEY CARLOCK & APPLEWHITE**

By  /s/ Lisa S. Wahlin
    Lisa S. Wahlin
    Andrew M. Kvesic
    One North Central Avenue, Suite 1200
    Phoenix, AZ 85004-4417
    *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 26, 2014, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants:

Michael C. Manning
Larry J. Wulkan
Stinson Morrison Hecker LLP
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004
*Attorneys for Plaintiffs*

Gary L. Popham, Jr.
J. Daniel Campbell
Daniel J. O'Connor
O'Connor & Campbell, P.C.
7955 South Priest Drive
Tempe, AZ 85284
*Attorneys for Defendants Maricopa County, Cranmer, Scarpati, and McLean*

Kathleen L. Wieneke
Struck Wieneke & Love PLC
3100 W. Ray Rd., Suite 300
Chandler, Arizona 85226-2473
*Attorneys for Defendants City of Phoenix, French, and Hanlon*

Sarah Barnes
Law Offices of Broening Oberg Woods & Wilson
1122 E. Jefferson St.
Phoenix, AZ 85034
*Attorneys for Defendant Anthony Hatton*


/s/ Darlene Dahl