Michael C. Manning (#016255)
Larry J. Wulkan (#021404)
Stefan M. Palys (#024752)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: Michael.Manning@stinsonleonard.com
Email: Larry.Wulkan@stinsonleonard.com
Email: Stefan.Palys@stinsonleonard.com
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Ernest Joseph Atencio, surviving father of Ernest Marty Atencio, individually and on behalf of the following statutory beneficiaries of Ernest Marty Atencio: Rosemary Atencio, surviving mother of Ernest Marty Atencio; Joshua Atencio, surviving son of Ernest Marty Atencio; Joseph Atencio, surviving son of Ernest Marty Atencio; M.A., a minor and surviving son of Ernest Marty Atencio; and Michael Atencio, Personal Representative of the Estate of Ernest Marty Atencio; and Rosemary Atencio, individually; Joshua Atencio, individually; Joseph Atencio, individually; and M.A., through his Next Friend, Eric Atencio,<br><br>Plaintiffs,<br>v.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County, a public entity; Jaime Carrasco and Olivia Carrasco, husband and wife; Adrian Dominguez and Samantha Dominguez, husband and wife; Christopher Foster and Michelle Foster, husband and wife; Anthony Hatton and Jaclyn Hatton, husband and wife; Craig Kaiser and Karen Kaiser, husband and wife; Anthony Scheffner and Rhealea Scheffner, husband and wife; Jose Vazquez and Alma Vazquez, husband and wife; Jason Weiers and Melissa Weiers, husband and wife; Ian Cramner, an unmarried man; William McLean and Kelly Clark, husband and wife; Monica Scarpati and Ariel Scarpati, wife and husband; City of Phoenix, a public entity; Patrick Hanlon, an unmarried man; Nicholas French, an unmarried man,<br><br>Defendants. | No. 2:12-cv-02376-PHX-PGR<br><br>**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST MARICOPA COUNTY** |

Pursuant to Arizona Rule of Civil Procedure 56, Plaintiffs submit this Statement of Facts in Support of their Motion for Partial Summary Judgment on Count 8 of Plaintiffs' Complaint Against Maricopa County.

1. In 1977, a class action (*Hart v. Hill*) was brought against Maricopa County and others in a matter now captioned *Graves v. Arpaio, et al.*, No. CV-77-0479-PHX-NVW.[1] The lawsuit alleges the existence of unconstitutional conditions in the Maricopa County jails, including issues with grossly inadequate medical assessments and care. *See* Second Amended Judgment, p. 1, attached as **Exhibit A**.

2. "A consent Judgment was entered in [the *Graves*] action on March 27, 1981, which was later amended or supplemented. On January 10, 1995, an Amended Judgment (Doc. #705) was entered by stipulation that superseded the earlier judgments, as amended." *See* **Exhibit A** at p. 1.

3. In paragraph 56 of the Amended Judgment, the Court ordered Sheriff Arpaio and Maricopa County to provide screening of each pretrial detainee sufficient to identify those with mental or physical illness before their placement in the jail's general population. *See* **Exhibit A** at p. 2-3.

4. Alerted to the unconstitutional conditions in Maricopa County jails regarding, among other things, assessments and handling of medical and mental health services, the U.S. Department of Justice (the "DOJ") initiated an investigation on August 8, 1995. *See* DOJ letter to King, p. 1, attached as **Exhibit B**.

5. Pursuant to its investigation, the DOJ asked Dr. Michael Puisis to review health care provided at the jails, and he submitted a report on his findings in January 1996. *See* Puisis Report, attached as **Exhibit C**.

6. In that report, Dr. Puisis outlined many deficiencies, including several that are directly related to the treatment of Marty Atencio:

- "[C]orrectional staff are supervising the monitoring of mentally ill detainees in intake," which "is clinically dangerous." (*See* **Exhibit C** at p. 13.)

---
[1] *See Graves v. Arpaio*, 2008 WL 4699770 (D. Ariz. Oct. 22, 2008).

2

DB04/0832418.0002/11197125.3 DD02

- The practice of holding psychotic inmates in the intake area in observation rooms where they are monitored by correctional officers, instead of moving them to the infirmary or to the acute psychiatric unit, is clinically dangerous. (*Id.* at p. 12-13.)
- The entire report makes it clear that nurses and physician assistants were managing patients who should be referred to a physician. (*See generally* **Exhibit C**.)

7. Following the completion of the first stage of its investigation into the complaints of civil rights violations in the Maricopa County jails, which focused on "allegations of excessive force and denial of adequate medical care," the DOJ reported its findings to the County in a letter dated March 25, 1996. *See* **Exhibit B** at p. 1.

8. Among other things, the March 25 letter informed the County about a pattern and practice of "deliberate indifference to inmates' serious medical needs." *See* **Exhibit B** at p. 1.

9. Noting that officials have a duty to ensure that inmates receive adequate medical care in the jails (DB00475), the DOJ explained that "[i]dentifying serious medical and psychiatric problems . . . [,] a vital component of the process of admitting a new prisoner into the Jails[,] . . . is seriously deficient." *See* **Exhibit B** at p. 8.

10. The DOJ also detailed the following issues, among others, in its letter:
- Inmates seen by medical personnel "are frequently assessed by persons without sufficient medical training to make sound medical judgments." (*See* **Exhibit B** at p. 7.)
- "Intake nurses appear to be inadequately trained in dealing with new admissions with psychiatric problems." (*Id.* at p. 8.)

11. On February 25, 1997, at the request of the DOJ's Civil Rights Division, Dr. Joel Dvoskin provided a report[2] of his inspection tour of the Maricopa County jails, during which he found "that the Maricopa County Jail is currently failing to meet its minimal constitutional obligations to provide necessary medical (psychiatric) care to its inmates and detainees." *See* Dvoskin Report, at DB00214, DB00246, attached as **Exhibit D**.

---

[2] This report was obtained from the DOJ's Civil Rights Division under the Freedom of Information Act in 2001. The cover letter for the report states that "although the report is captioned 'draft,' this is in fact the final document, indeed the only extant version of the document in our file. My understanding is that the report was accepted by our office as a completed product without need for revision or corrections." *See* **Exhibit D** at DB00214.

3

12. Through Dr. Dvoskin's 1997 report, and later, through the Court and reports made by several experts and investigators, the County was given notice that "[c]linicians at the Maricopa County Jails often cannot provide a professional medical judgment because Correctional Health Services does not have a medical record and information system capable of timely providing health care professionals with the information they need to diagnose and treat pretrial detainees appropriately." *See* Findings of Fact Conclusions of Law and Order, at ¶ 194, attached as **Exhibit E**; *see also* **Exhibit D** at DB00227; *see also* Stewart Report, p. 1-12, attached as **Exhibit F**; *see also* Moore Audit, DB00088-109, attached as **Exhibit G**; *see also* Wilcox letter to Maricopa County Board of Supervisors, at ATENCIOS00312, attached as **Exhibit H**.

13. To address the County's deficiencies in "quickly retriev[ing] old charts when an inmate is rearrested," Dr. Dvoskin recommended that the County "should look into a computerized record keeping system, or at least a computerized tracking system which would assist in locating charts when inmates are re-arrested." *See* **Exhibit D** at DB00227.

14. Remarkably, with notice and knowledge of a profound need to take action on providing timely access to medical records from as far back as 1997, not only had the County failed to implement electronic medical records by December 2011, but also the County **deliberately and consciously** chose "to scuttle the electronic health information project." *See* **Exhibit H** at ATENCIOS00312 (emphasis added); *see also* Scarpati Dep. 98:20-99:14, October 21, 2013, attached as **Exhibit I**.

15. Like the *Graves* court's Amended Judgment and Dr. Puisis' report, Dr. Dvoskin also reported that the intake screening process "is widely seen as inefficient and likely to miss too many inmates in need of mental health services." *See* **Exhibit D** at DB00236.

16. Dr. Dvoskin's recommendation, which he noted as essential, was that the mental health and custody officials form a task force to design a more effective system for identifying newly admitted inmates who may have a serious mental illness, psychiatric/emotional crisis, or otherwise require access to mental health services." *See* **Exhibit D** at DB00236-37.

4

17. Furthermore, Dr. Dvoskin believed that the policy of treating only inmates with serious mental illness and "keeping out behavioral problems" was "problematic," as "so-called 'behavioral problems' often include inmates with very real and severe mental illness, including personality disorders, that interfere with the inmate's ability to function in the correctional environment." *See* **Exhibit D** at DB00238.

18. To correct this deficiency, Dr. Dvoskin recommended: "Staff training and policy/procedure should clarify that: 1) eligibility for mental health treatment is based on need; 2) inmates have a constitutional right to treatment of their serious psychiatric needs . . . ; and 3) any inmate whose cognitive or emotional problems are interfering with their ability to function safely within the jail is eligible for treatment services." *See* **Exhibit D** at DB00238.

19. Ultimately, in 1999, the DOJ filed a lawsuit against the County captioned *United States of America v. County of Maricopa, et al.*, CV99-2137-PHX-SLV, arising out of the findings that the medical services in the jails were unconstitutional. *See* Joint Motion for Conditional Dismissal and Settlement Agreement, attached as **Exhibit J**.

20. The lawsuit was settled by the filing of a *Joint Motion for Conditional Dismissal/Settlement Agreement* ("the Settlement Agreement"), which was executed by the DOJ, Maricopa County and Sheriff Arpaio. *See* **Exhibit J** at DB00268-70.

21. The Settlement Agreement states its intention to "resolve the United States' allegations of constitutionally inadequate medical care for inmates at the Maricopa County Jails" by the completion of numerous required actions by the County. *See* **Exhibit J** at DB00271.

22. And again, just like the judgments and correctional expert reports preceding it, the Settlement Agreement required the County to provide "any authorized member of CHS's Department of Psychiatry reasonably timely access to an inmate's medical records" and at least eight hours of training on mental health issues and suicide prevention to all non-psychiatric detention officers. *See* **Exhibit J** at DB00302-03.

23. Moreover, the DOJ "mandate[s] that all correctional facilities obtain and maintain a [National Commission on Correctional Health Care] NCCHC accreditation" and, to

5

aid in maintaining accreditation, established "training in accordance to NCCHC" standards. *See* Seibert Declaration, at ATENCIOS02770, attached as **Exhibit K**.

24. But the County continued to disregard the unconstitutional conditions regarding mental health screening, training of county jail employees on mental health issues, and lack of access to previous records that were putting pretrial detainees at substantial risk of harm; this led the *Graves* court to file the Second Amended Judgment on October 22, 2008. *See* **Exhibit A** at p. 1.

25. The Second Amended Judgment terminated some portions of the Amended Judgment and restated those portions of the Amended Judgment that were continued in force or modified and continued in force as modified. *See* **Exhibit A** at p. 1-2.

26. The Second Amended Judgment yet again ordered the County to "provide a receiving screening of each pretrial detainee prior to placement of any pretrial detainee in the general population. The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness . . . . All pretrial detainees confined in the jails shall have access to care to meet their serious medical and mental health needs. When necessary, pretrial detainees confined in jail facilities which lack such services shall be transferred to another jail or other location where such services or health care facilities can be provided or shall otherwise be provided with appropriate alternative on-site medical services." *See* **Exhibit A** at p. 2-3.

27. The Second Amended Judgment required the defendants to "maintain records of their compliance . . . [and] provide quarterly summaries of those records to Plaintiffs' counsel" and the Court. *See* **Exhibit A** at p. 4.

28. On October 22, 2008, the *Graves* court also filed its Findings of Fact and Conclusions of Law associated with the Second Amended Judgment, in which it found "that prospective relief remain[ed] necessary to correct . . . current and ongoing violation[s] of the [f]ederal right[s]" of those detainees—specifically those with mental health issues—including the following:

DB04/0832418.0002/11197125.3 DD02

- "It is estimated that twenty percent of the pretrial detainees housed in the Maricopa County Jails are seriously mentally ill. Many of these have schizophrenia, bipolar disease, anxiety disorders, attention deficit disorder, and other serious chronic mental illnesses." (*See* **Exhibit E** at ¶ 149).
- "[T]he intake screening [at the jails] often does not capture basic and necessary information from detainees, including an adequate history from those suffering from chronic diseases," while "many pretrial detainees with serious mental illness are not identified and assessed by a mental health clinician during the intake process." (*Id.* at ¶¶ 164, 168).
- "[S]ystemic deficiencies in the screening process" exist and, as a result, there "are continuing and ongoing violations of pretrial detainees' constitutional rights." (*Id.* at ¶¶ 177-78).
- "Although [an] electronic record management is not constitutionally required, the volume of pretrial detainees housed in the Maricopa County Jails suggests that Correctional Health Services likely cannot manage medical records, track inmate locations for pretrial detainees with medical needs, and produce reports necessary for health care staff and detention officers to provide access to adequate health care without an electronic system." (*Id.* at ¶ 202).
- "[M]ental health clinical staff are not consulted about disciplinary actions against mentally ill detainees," resulting in some pretrial detainees being "punished for behavior related to serious mental illness." (*Id.* at ¶¶ 204-05).

29. The *Graves* court further found that "[p]retrial detainees are to be provided immediate care, if needed, at the time of screening. If appropriate, pretrial detainees are to be transported to the hospital for further analysis and care not available on-site . . . ." *See* **Exhibit E** at ¶ 169.

30. Maricopa County has been informed of the ongoing deficiencies related to the delivery of adequate mental healthcare to detainees in the Maricopa County jails by the DOJ

7

and its investigators and by the Court in *Graves*. Time and time again, numerous detention experts and investigators similarly concluded over the years that there is:

    1)    A lack of timely access to previous medical records. (*See* **Exhibit D** at DB00227; *see also* **Exhibit G** at DB00089, DB00098, DB00103-04, DB00108-09; *see also* **Exhibit H** at ATENCIOS00312-13).

    2)    Inadequate intake screening which fails to identify mentally ill individuals. (*See* **Exhibit D** at DB00236-37; *see also* **Exhibit F** at ATENCIOS00483; *see also* **Exhibit G** at DB00091-92).

    3)    Inadequate training of detention officers in recognizing and handling the mentally ill and their reluctance to make referrals "prior to a violent incident or crisis". (*See* **Exhibit D** at DB00237; *see also* **Exhibit F** at ATENCIOS00480, ATENCIOS00483; *see also* **Exhibit G** at DB00091, DB00093-94, DB00100).

    4)    Punishment of the mentally ill detainees or inmates for exhibiting psychiatric symptoms and behaviors that result from their mental illness and are not under their control. (*See* **Exhibit D** at DB00238; *see also* **Exhibit F** at ATENCIOS00481, ATENCIOS00483; *see also* **Exhibit G** at DB00099).

31. In 2008, the County's continued deliberate indifference to the grossly inadequate medical and mental health care at the Maricopa County Jails—even with the *Graves* court judgments in place and the County's promise to correct the deficiencies in a Settlement Agreement with the DOJ—eventually led to the "termination [of] the [NCCHC] accreditation of all Maricopa County Sheriff's Office jails for failure to maintain compliance with national standards and providing false information about such compliance." *See* NCCHC letter to Arpaio, attached as **Exhibit L**.

32. Also in 2008, Dr. Wilcox, who served as the CHS Medical Director and as an expert witness defending CHS as to health care practices and the standard of care in correctional facilities, resigned, citing his realization "**that CHS is failing to deliver**

8

**healthcare that meets constitutional minimums**." *See* **Exhibit H** at ATENCIOS00312 (emphasis added).

33. Dr. Wilcox noted that "a compelling body of third-party evidence," as shown by the "historical record of CHS failures dating back ten years, the difficulty in passing accreditation from the NCCHC, and the abnormally high rate of significant lawsuits against CHS that the County is losing/settling," supports his assertion that the administrative oversight of CHS is ineffective. *See* **Exhibit H** at ATENCIOS00312.

34. He also alerted the County to the fact that the failing healthcare system in the Maricopa County jails was the product of a **conscious choice and decision by County officials** not to make certain necessary and recommended changes. *See* **Exhibit H** at ATENCIOS00312 (emphasis added).

35. And Pablo Stewart, Plaintiffs' expert in the *Graves* matter, opined in 2008 that still, "the mental health care provided to mentally ill detainees at [Maricopa County jails] is grossly inadequate and inconsistent with community standards. As a result, the serious mental health needs of mentally ill detainees are not being met, and mentally ill detainees are being unnecessarily subjected to great suffering, deterioration of their mental health, and significant risk of injury." *See* **Exhibit F** at ATENCIOS000479, ¶ 26.

36. On January 28, 2009, the parties in *Graves* stipulated to the Court's appointment of "Dr. Lambert King and Dr. Kathryn Burns as the Court's experts, to evaluate the delivery of medical and mental health care at the Maricopa County Jails, assist" with the development of a plan demonstrating compliance with the Second Amended Judgment, and report on the implementation of a plan. *See* Response to Motion to Terminate the Third Amended Judgment, at ATENCIOS03355, attached as **Exhibit M**.

37. Since that time, Dr. King and Dr. Burns evaluate conditions in the Maricopa County jails on a scheduled basis and have provided to the Court and the parties in *Graves* ten reports "regarding Defendants' compliance . . . with the medical and mental health provisions of the Second Amended Judgment." *See* **Exhibit M** at ATENCIOS03355.

DB04/0832418.0002/11197125.3 DD02

38. On April 7, 2010, based on the experts' most recent reports at that time, this Court entered an order finding that still:

> **sixteen months after the Second Amended Judgment** was entered—**significant areas of failure to comply** with the Second Amended Judgment's medical and mental health requirements remain. Although progress has been made, it appears as though most of the improvements made regarding medical and mental health services have been those imposing little or no additional cost on Defendants. **Improvements appearing to be most critically needed**, *e.g.*, developing and implementing electronic medical records and medication management tools, increasing staffing, providing space for confidential mental health treatment, **appear to have been disregarded** or postponed to avoid expense.

*See* **Exhibit M** at ATENCIOS03355-56 (emphasis added).

39. And two years later, in May 2012—commenting on the events that give rise to this case—Dr. King noted continued areas of concern after reviewing relevant polices and medical records related to Marty's abuse and death in December 2011. Dr. King stated "that major elements of the medical and mental health care provided to [Marty] are germane to the requirements of the [Second Amended Judgment]. Specifically, these elements include quality and scope of receiving screening, treatment of mental and physical illness and injury, and ready access to care for serious medical and mental health needs." *See* Ninth Report of Lambert King, at ATENCIOS00268-69, attached as **Exhibit N**.

40. The County's "Use of Force" policy and procedure contained "no provision for prior consultation with mental health professionals whose advice, experience and capabilities might [have been] utilized in an effort to avoid [the] use of force on [Marty,] a mentally disturbed detainee who [was] passively resisting control." *See* **Exhibit N** at ATENCIOS00269-70.

41. Dr. King concluded that "[t]o demonstrate full compliance with the Court's [Second Amended Judgment] requirements, [the County] needs to achieve further improvements in several specific dimensions of medical care. These dimensions include more timely and appropriate assessments and plans of care for new detainees who have serious acute or chronic medical conditions" and "convincing evidence of substantial progress" in the

10

"implementation of the [electronic health record] system." *See* **Exhibit N** at ATENCIOS00271-72.

42. Sheriff Arpaio filed the stipulation attached hereto as **Exhibit W** in *Graves v. Arpaio, et al.,* No. CV-77-0479-PHX-NVW.

43. The Court granted the Stipulation and accordingly entered the Third Amended Judgment. *See* **Exhibit P.**

44. Due to the County's continued deliberate indifference to the excessive risk to pretrial detainees' health, in May 2012, it was necessary for the *Graves* court to **once again** order the defendants to 1) "provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population[,] . . . sufficient to identify and begin necessary segregation, and treatment of those with mental . . . illness" and 2) when necessary, transfer pretrial detainees confined in jail facilities that lack "ready access to care to meet their serious medical and mental health needs . . . to another jail or other location where such services or health care facilities can be provided . . . ." *See* Third Amended Judgment, at p. 2, attached as **Exhibit P**.

45. **And again**, Dr. King advised the *Graves* court and all parties in January 2013 that 1) "substantial compliance with Second Amended Judgment requirements will depend upon demonstrated meaningful use of an electronic health record system inclusive of practitioner order entry, medication management and administration" and that 2) the County should review "the need for its officers to receive additional critical incident education and training," to which CHS mental health personnel may be able to contribute. *See* Tenth Report of Lambert King, at ATENCIOS01512, ATENCIOS01523, attached as **Exhibit O**.

46. Maricopa County did not move to terminate the Court's oversight of its jails until August 8, 2013. *See generally* Defendants Motion to Terminate Third Amended Judgment, attached as **Exhibit Q**.

47. Notwithstanding any written policy, the County's procedure is to never refuse a detainee admittance into the jail based on psychiatric condition. *See* **Exhibit I** at 130:8-14; *see also* Noggle Dep. 57:10-61:6, 88:12-90:5, March 31, 2014, attached as **Exhibit R**; *see also*

11

| | |
|---|---|
| 1 | Cranmer Dep. 35:22-37:6, November 21, 2013, attached as **Exhibit S**; *see also* McLean Dep. |
| 2 | 133:6-25, December 4, 2013, attached as **Exhibit T**. |

3. 48. All detainees, including those who are seriously mentally ill and in a state of psychosis, who are "admitted" into the jail, must go through the booking process, which includes passing through the LineScan Room. *See* **Exhibit T** at 45:7-46:18; *see also* Sheridan Dep. 77-11-25, July 22, 2014, attached as **Exhibit U**. This includes all detainees who are assigned to a safe cell. *See* Weiers Dep. 78:24-79:15, October 23, 2013, attached as **Exhibit V**.

49. A safe cell is the highest level of care offered at the Fourth Avenue Facility. *See* **Exhibit I** at 129:12-16.

Dated this 25th day of September, 2014.

**STINSON LEONARD STREET LLP**

By: s/ Larry J. Wulkan
Michael C. Manning
Larry J. Wulkan
Stefan M. Palys
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

DB04/0832418.0002/11197125.3 DD02

# CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2014, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the District of Arizona by using the CM/ECF System. Participants in the case who are registered CM/ECF uses will be served by the CM/ECF system:

Kathleen L. Wieneke
Christina Retts
STRUCK WIENEKE & LOVE, P.L.C.
*Attorneys for Defendants City of Phoenix, Patrick Hanlon, and Nicholas French*

Lisa S. Wahlin
Andrew M. Kvesic
RYLEY CARLOCK & APPLEWHITE
*Attorneys for Defendants* Arpaio, Carrasco, *Dominquez, Foster, Kaiser, Scheffner, Vazquez, and Weiers*

Sarah L. Barnes, Esq.
Robert M. Moore
BROENING, WOODS & WILSON, PC
*Attorney for Defendant Hatton*

Gary L. Popham, Jr.
O'CONNOR & CAMPBELL, P.C.
*Attorneys for Defendants Maricopa County, Cranmer, Scarpati, and McLean*

By: s/ Kathleen Kaupke

DB04/0832418.0002/11197125.3 DD02