Michael C. Manning (#016255)
Larry J. Wulkan (#021404)
Stefan M. Palys (#024752)
Jennifer L. Allen (#027941)
Blair H. Moses (#027991)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email:  Michael.Manning@stinsonleonard.com
Email:  Larry.Wulkan@stinsonleonard.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest Joseph Atencio, surviving father of Ernest Marty Atencio, individually and on behalf of the following statutory beneficiaries of Ernest Marty Atencio; Rosemary Atencio, surviving mother of Ernest Marty Atencio; Joshua Atencio, surviving son of Ernest Marty Atencio; Joseph Atencio, surviving son of Ernest Marty Atencio; M.A., a minor and surviving son of Ernest Marty Atencio; Michael Atencio, Personal Representative of the Estate of Ernest Marty Atencio; Rosemary Atencio, individually; Joshua Atencio, individually; Joseph Atencio, individually; and M.A., through his Next Friend, Eric Atencio, | NO. 2:12-CV-02376-PHX-PGR **RESPONSE TO STATEMENT OF FACTS IN SUPPORT OF CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

                    Plaintiffs,

v.

Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County, a public entity; Jaime Carrasco and Olivia Carrasco, husband and wife; Adrian Dominguez and Samantha Dominguez, husband and wife; Christopher Foster and Michelle Foster, husband and wife; Anthony Hatton and Jaclyn Hatton, husband and wife; Craig Kaiser and Karen Kaiser, husband and wife; Anthony Scheffner and Rhealea Scheffner, husband and wife; Jose Vazquez and Alma Vazquez, husband and wife; Jason Weiers and Melissa Weiers, husband and wife; Ian Cranmer, an unmarried man; William McLean and Kelly Clark, husband and wife; Monica Scarpati and Ariel Scarpati, wife and husband; City of Phoenix, a public entity; Patrick Hanlon, an unmarried man; Nicholas French, an unmarried man.

                    Defendants.

Pursuant to Local Rule of Civil Procedure 56.1, Plaintiffs controvert the Statement of Facts in Support of City Defendants' Motion for Summary Judgment (Doc 300) as follows:

### Atencio's December 15-16, 2011 Confrontation with Law Enforcement

1.     Shortly after 9 pm on December 15, 2011, Marty Atencio ("Atencio") was arrested by two City of Phoenix police officers (Officers Roberts and James) for Assault arising from an incident earlier that evening in which he acted aggressively toward a female near her apartment—who reported feeling threatened and afraid that Atencio would harm her and requested prosecution. Doc. 50 at ¶¶ 33-36; Ex. 1, James Depo. at 35, 95-96, 99. The female victim reported that Atencio had gotten into her face, yelling at her from an inch away, and she felt he was going to punch her. *Id*. at 95-96; Ex. 2, Roberts Depo. at 67-68, 97-98.

**DISPUTED**.  According to Ms. Boyd's testimony, "Marty did not physically threaten me at any time."  *See* Boyd Aff. ¶ 7, attached to Plaintiffs' Statement of Facts Applicable to All Defendants ("PSOF(AD)") as Exhibit E (Doc 359).  She further testified, "I realized Marty was not violent, just not quite right."  *Id*. at ¶ 12.  She further testified, "I had the feeling [the police] wanted me to say Marty was threatening me so they could arrest him, so he could get help when he went before the judge in the morning.  One of the male officers spent several minutes scrolling through his list of laws on his cell phone, trying to find something he could pick Marty up for and put him in jail.  He was saying, 'We can't take him downtown for 'this' because he didn't do 'that'.''  I understood the officer was looking for a reason to arrest Marty. All I wanted was take him downtown and get him some help.  The officer said he was going to arrest Marty for verbal assault due to the fact Marty scared me.  He asked if I was scared at any time.  I said yes, when Marty's face was close to mine.  My first thought was to push him away.  However, I knew if I didn't instigate a physical altercation, I would be okay."  *Id*. at ¶ 17-20.

2.     This arrest was about 30 minutes to an hour after the same officers had been dispatched to a 7-11 convenience store in the area by a store clerk in reference to Atencio, who had been aggressively panhandling and pointing his hand in the shape of a gun toward people

in the parking lot, and had been ushered off the property by the officers. Ex. 1, James Depo. at 97-98.

**DISPUTED**.  Ofc. James testified, "I don't recall what the call came out as, but I believe it said that it was an aggressive panhandler is what it came out as, but when we got there, that was not the fact."  *See* James Dep. 43:8-16, April 8, 2013, attached hereto as **Exhibit A**.

3.      Before this interaction and based upon his own self-report, Atencio had used methamphetamine.  Ex. 3, Hanlon Depo. at 74-75; Ex. 4, Hanlon Aff. at ¶ 19; and Ex. 5, Intake Screening Report at question #48 (CHSPR00021).

**DISPUTED**.  While Marty may have self-reported that he had used illicit drugs while he was in a psychotic state, in the words of one officer, he said "a bunch of ridiculous stuff." *See* PSOF(AD) ¶ 32.  The medical examiner concluded Marty had no illicit drugs in his system while in the jail.  *See* Stano Dep. 39:6-40:10, November 27, 2013, attached hereto as **Exhibit B**.

4.      Once Atencio was arrested, the officers transported him to the Cactus Park Precinct, and thereafter he was taken to the Central Booking facility of the Phoenix Police Department. Ex. 1, James Depo. at 74, 77, 79-80, 85; Ex. 2, Roberts Depo. at 68, 74, 85. Atencio was not cooperative when placed into the wagon for transport from Cactus Park Precinct to Central Booking, screaming at officers, not physically doing what they instructed, with the officers having to "coax him and bend him" to get him into the wagon. Ex. 1, James Depo. at 88-89, 101-02.

**DISPUTED**.  Marty was not intentionally disobeying anyone's commands, but rather Marty appeared very confused or "lost."  *See* POSF(AD) ¶ 26.

5.      Atencio was transported by a different set of Phoenix officers to the Maricopa County Sheriff's Office ("MCSO") Fourth Avenue Jail after midnight and, following a medical screening, it was determined by MCSO medical staff that Atencio would be placed in a safe cell. Doc. 50 at ¶¶ 39-40; Ex. 6, Walston Depo. at 11, 15-16, 3738; Ex. 3, Hanlon Depo. at 91-

3

92; Ex. 7, McLean Depo. at 52-54, 70, 74; Ex. 8, CHS Order Form for safe cell placement of Atencio.

**UNDISPUTED**.

6.     Officers Patrick Hanlon and Nicholas French occupy positions within the Central Booking area of the jail—positions that were designed to reduce the burden on arresting City of Phoenix officers related to paperwork/booking of suspects to enable those officers to quickly return to patrol duties for their respective shifts. Ex. 4, Hanlon Aff. at ¶ 3; Ex. 9, French Aff. at ¶ 2. The function of a City officer at the County Jail is to provide the initial paperwork and processing of Phoenix detainees. Ex. 3, Hanlon Depo. at 34.

**DISPUTED.**   Ofc. French no longer occupies any position with the Phoenix Police Department.  He was terminated for violating Phoenix's use of force policy prohibiting the use of excessive force.  *See* Discipline Notice at p. 3-4, attached as **Exhibit C.**

7.     The City officers who work at the Jail, unlike the MCSO detention officers, are not armed in any way. Ex. 4, Hanlon Aff. at ¶ 4; Ex. 9, French Aff. at ¶ 3. They do not have Tasers, pepper spray, or any other weapon to protect themselves or others. *Id*. Because the Phoenix Officers are not armed, they must rely on verbal and other techniques to address non-compliant subjects. *Id.*

**UNDISPUTED.**

8.     Atencio was originally handcuffed to a bench in the U-shaped acceptance area of the jail due to his continuing to stand up despite being repeatedly instructed to sit down. Ex. 3, Hanlon Depo. at 26-28. The video of the December 15, 2011 jail encounter depicts Phoenix Officer Patrick Hanlon with his hands on Atencio's back by his shoulders, escorting him from mug-shot area into the search area. Ex. 10, Videos of Escort [11214875 0139-0233 Prebooking N View 197 at 2:32:32 to 2:33:10 am and 11214875 0139-0233 Prebooking S View 196 at 1:40:36 to 1:40:40 am & at 2:32:32 to 2:42:00 am]; Ex. 3, Hanlon Depo. at 87. At no time does video of the escort show Officer Hanlon bending or even touching Atencio's arms. *Id.*

**DISPUTED.**  As set forth in PSOF(AD) ¶¶ 63-65, Ofc. Hanlon escorted Marty to a search area called the LineScan Room by leading him with his hands and arms bent in what looked to be a very painful position.  The video confirms this.

9.    The intake and search areas of the Fourth Avenue Jail are considered unsecure because other detainees are present while undergoing the booking process, many of whom are sitting on nearby benches. Ex. 4, Hanlon Aff. at ¶¶ 5-6, 10; Ex. 9, French Aff. at ¶¶ 4, 8. Law enforcement officers are aware of the security risk that detainees may exchange contraband, injure others, or incite other detainees simply by virtue of their proximity to one another. Ex.4, Hanlon Aff. at ¶¶ 8, 14, 16; Ex. 9, French Aff. at ¶¶ 6-8, 10 & 12; Ex. 11, Video stills of Atencio escort.

**DISPUTED.**  The LineScan Room is not "unsecure."  Only those permitted by the MCSO may enter the intake portion of the Fourth Avenue Jail.  *See* Sheridan Dep. 15:1-16:20, July 22, 2014, attached as **Exhibit D**.  This is part of the Fourth Avenue Jail that is not open to the public.

10.    In 2011, the Fourth Avenue Jail's intake process was governed by MCSO Policy DO-1. Ex. 12. Pursuant to that policy, Atencio was fingerprinted (Doc. 50 at ¶ 56; Ex. 3, Hanlon Depo. at 45-46) and Officer Hanlon instructed him, repeatedly, to remove his shoes for x-ray scanning. Doc. 50 at ¶¶ 58-59; Ex. 4, Hanlon Aff. at ¶ 5.

**UNDISPUTED.**

11.    The MCSO intake policy required a detainee's shoes to be scanned for contraband via a digital x-ray: "***Line Scan Search****:* The outer layer of a prisoner's clothing, which includes shoes and socks, are placed onto a conveyer belt within the Line Scan Machine. The operator of the machine then inspects the articles of clothing utilizing a digital X-ray which distinguishes, by color, between metals, organic materials, and synthetic materials." Ex. 12 at Arpaio-RFP1 054.

**UNDISPUTED.**

12.    The MCSO policy requiring the removal and scanning of shoes was mandatory, regardless of whether the detainee had been searched previously. Ex. 9, French Aff. at 5; Ex. 4,

Hanlon Aff. at ¶¶ 7-8. Plaintiffs' corrections expert, Eldon Vail, acknowledged that the reception center in Washington state subjected all newly admitted inmates to a strip-search, regardless of the fact such inmates had been previously detained and searched in county jails. Ex. 13, Vail Depo. at 26.

**UNDISPUTED.**

13.    For 30 seconds, Atencio refused to remove his other shoe (he took it off and then put it back on), clenched his fists, tensed up and assumed a position of defiance toward the officers. Doc. 50 at ¶¶ 58-60 ("when asked to remove his left shoe, Marty refused to do so."); Ex. 3, Hanlon Depo. at 48-49; Ex. 14, French Depo. at 57 ("you can see it on the tape, initially, casually standing there, and then you see me take a, I guess, defensive stance almost because he was clenching his fists and tensing up.") & 68. Ex. 15, Weiers Depo. at 82-83. Ex. 16, Video in LineScan Room.

**DISPUTED.**  Marty not was intentionally disobeying anyone's commands, but rather that Marty appeared very confused or "lost."  *See* PSOF(AD) ¶ 26.  Ofc. Walston, who transported Marty to the jail and was with him through the officers' use of force against him in the LineScan Room, testified that Marty's demeanor was humorous and jovial while interacting with law enforcement and that demeanor did not change.  Similarly, Ofc. Legere testified that Marty was "jovial" when he was in the jail.  Officers testified that Marty was neither threatening nor aggressive while being brought to the LineScan Room.  During his entire time in the LineScan Room, Marty did not: "display violent or aggressive behavior" towards anyone.  *Id.* at ¶¶ 66-69.

14.    According to Officer Hanlon's testimony:

After he refused my directions, I tried talking with him as best I could and asking him politely if he could take his shoes off, which is the common practice at that point as the clothing needs to go through the x-ray machine. So I had asked him several times if he could take his shoes off. Initially he agreed. He took a shoe off. I can't recall which one. And I asked him to take the other shoe off, and instead of taking it off, he put the shoe that he had removed back on his foot. So I asked him again if he would take his shoes off, and he responded by telling me to take my shoes off, and several more requests, and he made basically the same statement to take my shoes off, and I -- I observed him to

6

tense up his arms at that point. As he was uncuffed now, I took control of one of his wrists to grab hold of his arm, and I – my plan was to take his shoes off at that point.

Ex. 3, Hanlon Depo. at 48.

**DISPUTED**.  Officer Hanlon's testimony speaks for itself.  As set forth in the previous paragraph, the facts to which he testifies are controverted by other parts of the record.

15.    Officer Hanlon believed the sooner Atencio was in a safe cell, the sooner he would be safe, and applied a wrist-lock because the officer did not believe it would be safe to bend down and attempt to remove Atencio's shoes because it presented a risk of being kick, hit or kneed in the face or head. Ex. 4, Hanlon Aff. at ¶¶ 15-17.

**OBJECTION**, violates LRCiv 56.1(a).  What Officer Hanlon "believed" is immaterial. As set forth in Plaintiffs' response to Ofc. Hatton's motion for summary judgment, Ofc. Hatton's conduct was objectively unreasonable.

16.    Unable to obtain Atencio's voluntary cooperation, Officer Hanlon placed Atencio's wrist into a wrist-lock as Officer French assisted in an effort to force Atencio to remove his shoes. Ex. 3, Hanlon Depo. at 79-80. This technique was unsuccessful in controlling Atencio, as he broke away and fought off attempts to control him. *Id*. Ex. 16, Video.

**DISPUTED**.  During his entire time in the LineScan Room, Marty did not: "display violent or aggressive behavior" towards anyone; punch anyone; strike anyone; kick anyone; bite anyone; or spit on anyone. *See* PSOF(AD) ¶ 69.

17.    With other MCSO officers assisting, Officer French grabbed Atencio from behind in a wrestling maneuver with his arm across his chest and neck area on the MCSO video; Officer French was not attempting a carotid hold. Ex. 14, French Depo. at 60, 84. While Officer French grabbed Atencio across his chest in an effort to gain control of him, their legs were swept out from under them by another officer and Officer French landed on his back with Atencio landing on top of him. *Id*; Ex. 16, Video.

**DISPUTED**.   While Ofc. French claims that he did not attempt to place Marty in a carotid choke hold, the physical evidence, video of his actions, and medical examiner's report show that is exactly what he did.  *See* PSOF(AD) ¶¶ 76-78.

18.    Once on the ground, Atencio continued to struggle with the City of Phoenix and MCSO officers. Ex. 14, French Depo. at 88-90; Ex. 3, Hanlon Depo. at 81. A detention officer from the MCSO was able to get one handcuff on Atencio, and Officer Hanlon at that point disengaged from the struggle in recognition of the number of MCSO officers, the limited space and seeing that MCSO Sergeant Weiers was about to deploy his Taser. Ex. 3, Hanlon Depo. at 80-84, 88-90 & 92-93. Officer French also moved away from the struggle as MCSO officers took control of the situation. Ex. 14, French Depo. at 65 & 72 ("That's why I got out of the ordeal."). Ex. 16, Video.

**DISPUTED**.   Marty not was intentionally disobeying anyone's commands, but rather that Marty appeared very confused or "lost."   *See* PSOF(AD) ¶ 26.   Ofc. Walston, who transported Marty to the jail and was with him through the officers' use of force against him in the LineScan Room, testified that Marty's demeanor was humorous and jovial while interacting with law enforcement and that demeanor did not change.   Similarly, Ofc. Legere testified that Marty was "jovial" when he was in the jail.   Officers testified that Marty was neither threatening nor aggressive while being brought to the LineScan Room.   During his entire time in the LineScan Room, Marty did not: "display violent or aggressive behavior" towards anyone.  *Id.* at ¶¶ 66-69.

19.    Officers Hanlon and French were unarmed with any weapons, and did not strike Atencio or otherwise use any force against other than the wrist-lock and wrestling maneuver described above. Ex. 4, Hanlon Aff. at ¶ 4; Ex. 9, French Aff. at ¶ 3; and Ex. 16, Video.

**DISPUTED**.  *See* ¶ 17, above.

20.    The tasing and punches of Atencio by MCSO officers in the LineScan room, and the knee to Atencio's back by MCSO Detention Officer Hatton in the safe cell, are all alleged to have occurred after the two Phoenix officers disengaged or moved away from the struggle, with Atencio continuing to kick and pull away from the officers even while he was on the

ground. Ex. 3, Hanlon Depo. at 84-85, 88-89; Ex. 14, French Depo. at 7172; Ex. 17, Bruno Depo. at 105-06; and Amended Complaint at ¶¶ 64, 70-71.

**UNDISPUTED**.

21.     Even after he was tased, Atencio pulled the probes out, Ex. 14, French Depo. at 90, 97-98, and he continued kicking after he was handcuffed. Ex. 3, Hanlon Depo. at 56.

**DISPUTED**.  *See* ¶¶ 16 & 18, above.

22.     Plaintiffs allege Atencio was carried by MCSO detention officers from the LineScan room into Safe Cell 4, where MCSO officers held Atencio down on the floor while MCSO Detention Officer Hatton struck Atencio several more times, with his knee. Amended Complaint at ¶¶ 68-70. Plaintiffs claim Atencio "died a few minutes later." Doc. 23 at 4. Plaintiffs contend that "Marty died as a result of a beating, electrocution, and failure to receive adequate medical care in the Maricopa County Jail." *Id*. at 1.

**UNDISPUTED**.

### Expert Testimony

23.     Plaintiffs' expert on law enforcement and corrections, Ken Katsaris, has no opinions relative to the two Phoenix officers. Ex. 18, Katsaris Depo. at 165-66. Mr. Katsaris holds the opinion that the Phoenix Police Department officers are well trained, that their training exceeds national standards, and that their use of force polices exceed national standards, as reflected by their CALEA accreditation. *Id*. at 166-67.

**OBJECTION**, violates LRCiv 56.1(a).  It is immaterial what opinions an expert has not offered.

24.     Plaintiffs' other law enforcement expert, Ron Bruno, has no opinions relative to Phoenix Officer French's use of force on Atencio. Ex. 17, Bruno Depo. at 74. Mr. Bruno also has no opinions regarding Officer Hanlon's escort of Atencio from the booking room to the LineScan room, despite reviewing the video of this escort. *Id*. at 8789.

**OBJECTION**, violates LRCiv 56.1(a).  It is immaterial what opinions an expert has not offered.

25.    Mr. Bruno's report criticized Officer Hanlon: (1) for not realizing Atencio's alleged compromised ability to understand; (2) for not affording "more verbal interaction to assist in overcoming Mr. Atencio's disability" than the 30 seconds of verbal commands Officer Hanlon admittedly gave him; (3) for not realizing Atencio was in a contained position, with "no indication that immediate physical intervention was needed"; (4) for not affording "[m]ore time utilizing verbal tactics to gain voluntary compliance"; and (5) for not being aware that his initiation of physical force could have trigger a "flight or fight response," causing an increase in Atencio's adrenaline, a reduction in his pain receptors, and an increase in his strength. Ex. 19, Bruno Report.

**UNDISPUTED**.

26.    These criticisms do not concern the reasonableness of the force used by Officer Hanlon, but of tactical decisions—not recognizing Atencio's alleged compromised ability to understand, not spending more time on "verbal de-escalation tactics," not developing a plan—leading up to the use of force. Ex. 17, Bruno Depo. at 75-85, 112, 116-17.

**OBJECTION,** violates LRCiv 56.1(a).   This "statement of fact" is an argument. Expert Bruno's opinions are set forth in his report, which is attached to Defendants' statement of facts, and his testimony, which is only selectively reproduced above.

27.    When asked what force Officer Hanlon used on Atencio, Mr. Bruno opined that Officer Hanlon "took it from verbal interaction into physical force." Ex. 17, Bruno Depo. at 75. When asked again for the type of force used, Mr. Bruno acknowledged it was "[o]pen hand control" or a wrist-lock. *Id.*

**OBJECTION**, violates LRCiv 56.1(a).   This "statement of fact" is an argument. Expert Bruno's opinions are set forth in his report which is attached to Defendants' statement of facts, and his testimony, which is only selectively reproduced above.

28.    Mr. Bruno admitted that Atencio was able to respond appropriately to certain commands given by Officer Hanlon, such as removing his shoe. *Id.* at 75-77. He further admitted that before Atencio removed his shoe, "[i]t looked like there was some verbal discussion," and after Atencio put his shoe back on and folded his arms, it "[s]eemed like that

there was some verbal interaction" between Officer Hanlon and Atencio. *Id*. at 78-79. Mr. Bruno further acknowledged that before using physical force, Officer Hanlon "spoke in a softer voice, a little slower...and repeated 'Remove the shoes' more than once," and Mr. Bruno has no criticisms of this communication method. *Id*. at 80-81.

**OBJECTION**, violates LRCiv 56.1(a).  This "statement of fact" is an argument. Expert Bruno's opinions are set forth in his report, which is attached to Defendants' statement of facts, and his testimony, which is only selectively reproduced above.  Moreover, Expert Bruno did not "admit" or "deny," anything.  He has propounded his opinions in this case, not responded to legal allegations.

29.    Mr. Bruno did not review the Phoenix Police Department's use of force policy. *Id*. at 210. He also did not review any of the policies and procedures of the MCSO jail relative to the booking process, did not analyze how close the nearest unrestrained detainee was from the LineScan room, has no understanding of whether detainees in the U-shaped jail entrance were restrained or unrestrained, and does not know how many detainees were being processed at the same time as Atencio. *Id*. at 86-89.

**OBJECTION,** violates LRCiv 56.1(a).  This "statement of fact" is an argument and immaterial.   Expert Bruno's opinions are set forth in his report, which is attached to Defendants' statement of facts, and his testimony, which is only selectively reproduced above.

30.    Mr. Bruno acknowledged that Phoenix Officer Hanlon "disengaged" before MCSO Sergeant Weiers deployed his Taser. *Id*. at 105-06.

**UNDISPUTED**.

31.    According to the Maricopa County Medical Examiner performing an autopsy on Atencio, Dr. Stano, and after reviewing the video of the jail struggle, opined of an "apparent carotid" hold applied by one of the officers—"apparent" because it was "a very quick movement" that ended without Dr. Stano really able to definitely confirm that it was a carotid hold. Ex. 20, Stano Depo. at 110. Dr. Stano further testified that the "apparent carotid" he saw on the video was not successful, as Atencio did not lose consciousness following this "apparent" carotid hold. *Id*. at 108-10.

**UNDISPUTED**.

32.     There are two types of neck restraint holds: vascular and respiratory. *City of Los Angeles v. Lyons*, 461 U.S. 95, 97, n.1 (1983). In the "carotid" hold, an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. *Id.* The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. *Id.* The "carotid" hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain. *Id.* The "bar arm" hold, by contrast, applies pressure at the front of the subject's neck. *Id.* "Bar arm" pressure causes pain, reduces the flow of oxygen to the lungs, and may render the subject unconscious. *Id.*

**OBJECTION**, violates LRCiv 56.1(a).   This is not a "statement of fact;" it is a summary of findings of a case and is not proper.

33.     Officer French did not apply either a carotid (vascular) or bar arm/choke (respiratory) hold on Atencio. Ex. 9, French Aff. at ¶¶ 13-15; Ex. 4, Hanlon Aff. at ¶ 23. Atencio never lost consciousness in the LineScan room, and his legs continued flailing after he was on the ground. Ex. 9, French Aff. at 16; Ex. 17, Bruno Depo. at 123-24, 19192; Ex. 20, Stano Depo. at 109-10; Ex. 16, Video.

**DISPUTED**.  *See* ¶ 17, above.

34.     Dr. Stano also could not say to a reasonable degree of medical probability that the focal soft tissue hemorrhage he found during the autopsy on the right side of Atencio's Adam's appel [sic] was caused by the apparent carotid hold. Ex. 20, Stano Depo. at 111-12. Dr. Stano also looked to see if there was any evidence of injury to the carotid artery, and could not find any. *Id*. at 113. When testifying as to possible restraint asphyxia, Dr. Stano was not and did not include the apparent carotid hold in this opinion. *Id.* at 115-16.

**UNDISPUTED**.

RESPECTFULLY SUBMITTED this 6th day of November, 2014.

**STINSON LEONARD STREET LLP**

By:  /s/ Larry J. Wulkan
Michael C. Manning
Larry J. Wulkan
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2014, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the District of Arizona by using the CM/ECF System.   Participants in the case who are registered CM/ECF uses will be served by the CM/ECF system:

Kathleen L. Wieneke
Christina G. Retts
STRUCK WIENEKE & LOVE, P.L.C.
*Attorneys for Defendants City of Phoenix, Patrick Hanlon, and Nicholas French*

Lisa S. Wahlin
RYLEY CARLOCK & APPLEWHITE
*Attorneys for Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez, and Weiers*

Sarah L. Barnes, Esq.
BROENING, OBERG, WOODS & WILSON, PC
*Attorney for Defendant Hatton*

J. Daniel Campbell
Daniel J. O'Connor
Gary L. Popham, Jr.
O'CONNOR & CAMPBELL, P.C.
*Attorneys for Defendants Maricopa County, Cranmer, Scarpati, and McLean*

By:   /s/ Kathleen Kaupke

# Exhibit A

1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

    ERNEST JOSEPH ATENCIO,              )
4   surviving father of Ernest         )
    Marty Atencio, individually and    )
5   on behalf of the following         ) No.
    statutory beneficiaries of         ) 2:12-cv-02376-PHX-PGR
6   Ernest Marty Atencio: Rosemary     )
    Atencio, surviving mother of       )
7   Ernest Marty Atencio; Joshua       )
    Atencio, surviving son of          )
8   Ernest Marty Atencio; Joseph       )
    Atencio; surviving son of          )
9   Ernest Marty Atencio; M.A., a      ) VIDEOTAPED DEPOSITION
    minor and surviving son of         )     OF JOSH JAMES
10  Ernest Marty Atencio; and          )
    MICHAEL ATENCIO, Personal          )
11  Representative of the Estate of    )   Phoenix, Arizona
    Ernest Marty Atencio; and          )     April 8, 2013
12  ROSEMARY ATENCIO, individually;    )      1:37 p.m.
    JOSHUA ATENCIO, individually;      )
13  JOSEPH ATENCIO, individually;      )
    and M.A., through his Next         )
14  Friend, Eric Atencio,              )
                                       )
15             Plaintiffs,             ) REPORTED BY:
                                       ) MARISA L. MONTINI, RPR
16  vs.                                ) Certified Reporter
                                       ) Certificate Number
17  SHERIFF JOSEPH ARPAIO and AVA      ) 50176
    ARPAIO, husband and wife;          )
18  MARICOPA COUNTY, a public          ) PREPARED FOR:
    entity; JAIME CARRASCO and JANE    )
19  DOE CARRASCO, husband and wife;    )
    ADRIAN DOMINGUEZ and JANE DOE      ) (Certified Copy)
20  DOMINGUEZ, husband and wife;       )
    CHRISTOPHER FOSTER and JANE DOE    )
21  FOSTER, husband and wife;          )
    ANTHONY HATTON and JANE DOE        )
22  HATTON, husband and wife; CRAIG    )
    KAISER and JANE DOE KAISER,        )
23  husband and wife; ANTHONY          )
    SCHEFFNER and JANE DOE             )
24  SCHEFFNER, husband and wife;       )
    JOSE VAZQUEZ and JANE DOE          )
25  VAZQUEZ, husband and wife;         )
    JASON                              )

43

1      Q.   And look at the first paragraph, the second

2    sentence.  It says, "At that time, Atencio had committed

3    no crime and was asked to leave the property, which he did

4    without incident."

5      A.   Correct.

6      Q.   And that's true; correct?

7      A.   True.

8      Q.   You did not receive any reports of Marty being

9    aggressive at the 7-Eleven; true?

10     A.   Not when we arrived.

11     Q.   Did you receive reports of Marty being aggressive

12   at the 7-Eleven after you arrived?

13     A.   I don't recall what the call came out as, but I

14   believe it said that it was an aggressive panhandler is

15   what it came out as, but when we got there, that was not

16   the fact.

17     Q.   And it's not uncommon for you to be called to a

18   scene with an initial description of the suspected reason

19   why you're needed and that turns out to be not the case;

20   true?

21     A.   True.

22     Q.   So he -- you didn't believe that Marty was

23   panhandling at the 7-Eleven; correct?

24          MS. WIENEKE:  Form and foundation.

25          THE WITNESS:  I don't know.

# Exhibit B

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3
         Ernest Joseph Atencio,          )
 4       surviving father of Ernest      )
         Marty Atencio, individually and )
 5       on behalf of the following      ) No.
         statutory beneficiaries of      ) 2:12-cv-02376-PHX-PGR
 6       Ernest Marty Atencio: Rosemary  )
         Atencio, surviving mother of    )
 7       Ernest Marty Atencio; Joshua    )
         Atencio, surviving son of       )
 8       Ernest Marty Atencio; Joseph    )
         Atencio; surviving son of       )
 9       Ernest Marty Atencio; M.A., a   )
         minor and surviving son of      )
10       Ernest Marty Atencio; and       )  VIDEOTAPED DEPOSITION
         MICHAEL ATENCIO, Personal       )  OF DR. WILLIAM STANO
11       Representative of the Estate of )
         Ernest Marty Atencio; and       )
12       ROSEMARY ATENCIO, individually; )
         JOSHUA ATENCIO, individually;   )    Phoenix, Arizona
13       JOSEPH ATENCIO, individually;   )    November 27, 2013
         and M.A., through his Next      )       9:09 a.m.
14       Friend, Eric Atencio,           )
                                         )
15                    Plaintiffs,        )
                                         )
16       vs.                             )
                                         ) REPORTED BY:
17       Sheriff Joseph Arpaio and Ava   ) MARISA L. MONTINI, RPR
         Arpaio, husband and wife;       ) Certified Reporter
18       Maricopa County, a public       ) Certificate Number
         entity; Jaime Carrasco and Jane ) 50176
19       Doe Carrasco, husband and wife; )
         Adrian Dominguez and Jane Doe   ) PREPARED FOR:
20       Dominguez, husband and wife;    )
         Christopher Foster and Jane Doe )
21       Foster, husband and wife;       ) (Certified Copy)
         Anthony Hatton and Jane Doe     )
22       Hatton, husband and wife; Craig )
         Kaiser and Jane Doe Kaiser,     )
23       husband and wife; Anthony       )
         Scheffner and Jane Doe          )
24       Scheffner, husband and wife;    )
         Jose Vazquez and Jane Doe       )
25       Vazquez, husband and wife;      )
                                         )
```

39

1    did not play a roll in my cause and manner of death.

2        Q.    Let me hand you what's been previously marked as

3    Exhibit 58 -- sorry, not previously marked.  We just

4    marked it.  I'll give you a second to look at that.

5        A.    Okay.  I'm ready.  Sorry.

6        Q.    Do you recognize this as the report of

7    toxicological examination that was prepared on Marty?

8        A.    Yes.

9        Q.    And are the stamped letters WTS your -- your

10   initials?

11       A.    Yes.

12       Q.    It's signed by Norman A. Wade, laboratory

13   director; true?

14       A.    Yes.

15       Q.    Is this the report that would have formed your

16   findings in subsection 7 of your report of autopsy?

17       A.    Yes.

18       Q.    And would you agree with me that according to the

19   toxicological examination, Marty tested positive for

20   lidocaine, citalopram, acetaminophen and

21   desmethylcitalopram?

22       A.    Yes.

23       Q.    Did I say those correctly?

24       A.    Except for the last one, desmethylcitalopram, but

25   even I struggle with those.

1      Q.   And are those the drugs you were referring to

2    earlier as being drugs he would have received during his

3    time in the hospital?

4      A.   Yes.

5      Q.   So according to the toxicological screening, is

6    it your opinion that during his time in the jail, Marty

7    was -- didn't have other drugs present in his system?

8              MS. FLAGGMAN:  Object to form; foundation.

9              MS. BARNES:  Form; foundation.

10             THE WITNESS:  Yes.

11   BY MS. ALLEN:

12     Q.   On page 4 of your report about a third of the way

13   down, you say that "Marty also stated at that time that he

14   had used methamphetamine at approximately 1700 hours on

15   December 15, 2011."

16             Do you see where it says that?

17     A.   Yes.

18     Q.   Did I read that correctly?

19     A.   Yes.

20     Q.   Based on the toxicological examination -- strike

21   that.

22             Did the evidence from the toxicological

23   examination support what Marty had said?

24             MS. WAHLIN:  Form; foundation.

25             MS. FLAGGMAN:  Join.

# Exhibit C

☒ Original (to Human Res.)   ☐ Dept. File Copy   ☐ Employee Copy   ☐ Dept. Control Copy

## CITY OF PHOENIX
## HUMAN RESOURCES DEPARTMENT



### DISCIPLINE NOTICE
### (CLASSIFIED EMPLOYEE)

**Instructions:** Complete boxes 1 thorough 16. Leave shaded areas blank. Keep a copy for department control. Take original to Law Department and Human Resources Department for signatures in boxes 17 through 19. After serving employee, fill out boxes 20 through 22 and make two copies: one copy for department and one copy for employee. Send original and department copy to Human Resources Administration for processing.

### EMPLOYEE DATA

| 1. NAME (Last, First, Middle) | 2. Emp. ID | 3. CLASS CODE # | Incident |
|---|---|---|---|
| French, Nicholas I | ▆▆▆▆ | 62210 | |

| 4. FLSA STATUS | 5. CLASS TITLE | 6. DEPARTMENT # | 7. DEPARTMENT |
|---|---|---|---|
| Nonexempt | Police Officer | B2042 | Police Dept:Mountain View Prct |

### DISCIPLINARY ACTION

| 8. DATE APPOINTED TO PRESENT CLASS | 9. EMPLOYMENT DATE |
|---|---|
| 04/25/2005 | 04/25/2005 |

10. DISCIPLINE TYPE
Dismissal

11. EFFECTIVE DATE:
6/29/13

12. EMPLOYEE STATUS IN PRESENT CLASSIFICATION:
Regular (completed probation); ENTITLED TO APPEAL RIGHTS

13. EXPLANATION OF ACTION AND REASON(S) FOR DISCIPLINE (SEE ATTACHED)

Page 1 of 4

### ENDORSEMENTS

| 14. Supervisor | 15. Division Head | 16. Department Head |
|---|---|---|
| *[signature]* 4573 | Eric Hanby | *[signature]* |

| 17. Law Dept. | 18. Human Resources Dept. | 19. City Manager (Delegated to Dept. Head) |
|---|---|---|
| Barry Nurimar | *[signature] n change 10/1* | *[signature]* |

| 20. SERVICE OF NOTICE: Personally | 21. Employee Signature | 22. Certified Mail, return receipt requested |
|---|---|---|
| Date Served | | 7/1/13 |
| By Whom | | Date Mailed  7010 3090 0001 4371 4196  Certified Mail Receipt # |

23. APPEAL PROCEDURES: SEE PAGE 2

24. CIVIL SERVICE BOARD

058219

## *APPEAL PROCEDURES*

The requirements for filing a request for an appeal before the Civil Service Board are outlined in Personnel Rule 22 and are summarized here.

<u>Time Limit on Submitting and Requesting an Appeal</u>

If an eligible employee **is served in person** with a discipline notice regarding his/her suspension, demotion, or dismissal, the employee must submit a request for a hearing to the Civil Service Board no later than fourteen **(14)** <u>calendar</u> **days** (including weekends and holidays) from the date of service.

If an eligible employee is **not served in person** with a discipline notice, but instead the discipline notice is sent to the employee by certified mail, a request for a hearing must be submitted to the Civil Service Board no later than twenty-one **(21)** <u>calendar</u> **days** (including weekends and holidays) from the date the discipline notice was mailed to the employee.

Failure to submit a request for a hearing by the applicable deadline as set forth above shall result in the employee forfeiting his/her right to a hearing, and the disciplinary action taken shall be final with no further ability for the employee to appeal.

<u>How to Appeal and Request a Hearing</u>

A request for a hearing must be in <u>writing.</u>

The written request must be addressed to the Civil Service Board and be personally delivered to the Board or deposited in the United States mail, certified, return receipt requested, postage prepaid, addressed to the office of the Civil Service Board, Attention: Civil Service Board, 135 North 2nd Avenue, Phoenix, AZ 85003, within the time frame mentioned above. **Only appeal letters received at this address will be considered valid.**

<u>What should be included in a Written Request for a Hearing</u>

If the employee is obtaining a representative, the appeal letter must include name, address, e-mail, and telephone number of the employee's representative; and the employee's signature.
If the employee is NOT obtaining a representative, the appeal letter must include the employee's name, address, e-mail, and telephone number; and the employee's signature.
The appeal should state the employee's specific disagreements with the allegations in the discipline notice.
The appeal should also mention whether the employee would like the hearing to be conducted as a public or private hearing before the Civil Service Board.

<u>What happens next?</u>

The employee will be contacted within seven (7) days from receipt of his/her appeal letter to schedule the Civil Service Hearing.

*If you have questions on filing an appeal,*
*please call the office of the Civil Service Board at 602-262-6609*

Page 2 of 4

Page 3 of 4

**POLICE OFFICER, NICHOLAS FRENCH #8283**
**EXPLANATION OF ACTION**
**DISMISSAL 2013-28**

In accordance with Personnel Rule19c, you are hereby dismissed from City employment for violations of the following Personnel Rules: **21b1** - That the employee is incompetent or inefficient in the performance of his duties; **21b2** - That the employee has been abusive or threatening in his attitude, language, or conduct to his fellow employees, customers of the City, or the public; **21b3** - That the employee has violated any lawful or official regulation or order, or failed to obey any lawful and reasonable direction given him by his supervisor, when such violation or failure to obey amounts to insubordination or serious breach of discipline which may reasonably be expected to result in lower morale in the organization, or to result in loss, inconvenience, or injury to the City or the public; and **21b18** - That the employee has been guilty of any other conduct of equal gravity to the reasons enumerated in 21b1 through 21b17.

You are also in violation of **Operations Order 1.1.2 – The** Department Guiding Values, P.R.I.D.E; **Operations Order 1.1.2.C.(2) –** We demand the highest degree of integrity and professionalism from all members of the department; **Operations Order 1.1.2.C.(3) –** We aspire to the highest ideals of personal conduct in every word and deed, and our behavior should inspire and sustain the confidence of our community; **Operations Order 1.5.2** - Handcuffed/Restrained Persons- Employees will not strike persons who are restrained by hand, foot, leg or impact weapon, or use chemical weapons, Tasers, carotid control techniques or deadly force, unless such force is necessary to prevent imminent serious bodily injury or death, or unless such force is reasonable based on the totality of circumstances; **Operations Order 1.5.3.C** - All sworn employees will immediately report excessive force verbally to a supervisor; **Operations Order 3.13.2.D** - Employees will maintain a professional approach to their duties at all times; **Operations Order 3.13.5.B.(1)** - Department employees will not make false reports or knowingly enter or cause to be entered into any Department book, record, or report any inaccurate or false information; **Operations Order 3.13.5.V** Reporting to Supervisors - (1) All employees will keep their supervisors informed of any unusual activity, situation, or problem where the Department would be concerned. (2) Employees **will** notify their supervisor when: There is any neglect of duty or misconduct, either on or off duty, on the part of any other employee of this Department; **Operations Order 3.13.6.A.(2)** - Employees will not lie during any Department criminal and/or administrative investigation or in matters of legitimate concern to the Department, which includes but is not limited to: submission of DR's, testifying in court, responses to questions by Department employees, questions about operations issues, employee initiated statements; **Operations Order 3.13.6.B.(1)** - Employees will not verbally and/or physically abuse, intimidate, or harass City employees; **Operations Order 3.13.6.B.(2)** – Employees will not engage in actions that amount to harassment towards a citizen beyond police presence; **Operations Order 3.13.6.B.(5)** - Employees will not commit acts where the elements of felony or misdemeanor crimes are met; **A.R.S. 13-1204.A.4,** Aggravated Assault - If the person commits the assault while the victim is bound or otherwise physically restrained or while the victim's capacity to resist is substantially impaired; and **The City of Phoenix Ethics Policy** - It is the policy of the City of Phoenix to uphold, promote and demand the highest standards of ethics from all of its employees and officials, whether elected, appointed or hired. Accordingly, all City employees and members of City boards, commissions, committees and the City Council should maintain the utmost standards of personal integrity, truthfulness, honesty and fairness in carrying out their public duties, avoid any improprieties in their roles as public servants, and never use their City position or powers for improper personal gain.

On January 6, 2013, between the hours of 3:00 a.m. and 3:30 a.m., you and two other officers were inside a holding cell at the Southern Command Station when multiple knee and hand strikes were administered to a prisoner. At the time the strikes were administered, the prisoner was seated inside the holding cell, restrained in handcuffs, and being physically held by officers. The investigation confirmed that the prisoner's behavior while in custody did not provoke these actions or justify the use of force.

The results of the internal investigation revealed that you demonstrated unprofessional conduct and elements of a felony (Aggravated Assault), by hitting the prisoner multiple times using hand strikes while he was restrained and held by other officers. During the incident, you also committed elements of a misdemeanor (Criminal Damage) by purposely breaking the prisoner's prescription glasses by stepping on them. As defined by departmental policy, you failed to report this incident to your supervisor, you failed to complete a

departmental report, you failed to provide justification for your use of force, and you did not report the use of force by any of the other officers.

During the investigation of this matter, you gave false and misleading statements to Special Investigations Detail investigators and Professional Standards Bureau investigators by denying your involvement in the incident despite the evidence presented and in contradiction with multiple witness statements.

Furthermore, you demonstrated unprofessional conduct by sending another officer multiple text messages between January 7 and March 1, 2013, related to the incident. The content of most of the text messages related to the active criminal and administrative investigations after learning he had implicated you in the assault. On March 1, 2013, you sent the following threatening, harassing and intimidating text, "Especially when people aren't even involved. Just remember karmas a bitch and what goes around comes around." On the same day, you were sent a text from the officer asking you to refrain from calling or texting and he indicated that he considered your texts to be harassing. You responded with the following message, "Again you wouldn't know what a threat was. Keep your warning tough guy."

These violations are considered extreme policy violations and violate the basic values of the Police Department. The Police Department, in determining your discipline, considered your disciplinary and performance history. Details of the investigation are available to the employee by written report, **PSB 13-0002**. The entire investigation is hereby incorporated into this Discipline Notice by reference.

# Exhibit D

1

1              UNITED STATES DISTRICT COURT
                    DISTRICT OF ARIZONA
2
    Ernest Joseph Atencio, surviving    ) No. 2:12-cv-02376-
3   father of Ernest Marty Atencio,     )     PHX-PGR
    individually and on behalf of the   )
4   following statutory beneficiaries   )
    of Ernest Marty Atencio: Rosemary   )
5   Atencio, surviving mother of Ernest )     VIDEOTAPED
    Marty Atencio; Joshua Atencio,      )
6   surviving son of Ernest Marty       )     DEPOSITION OF
    Atencio; Joseph Atencio, surviving  )
7   son of Ernest Marty Atencio; M.A., a )  GERARD A. SHERIDAN
    minor and surviving son of Ernest   )
8   Marty Atencio; and Michael Atencio, )
    Personal Representative of the Estate)
9   of Ernest Marty Atencio; and Rosemary)
    Atencio, individually; Joshua Atencio)
10  individually; Joseph Atencio,       )     JULY 22, 2014
    individually; and M.A., through his )
11  Next Friend, Eric Atencio,          )     PHOENIX, ARIZONA
                                        )
12              Plaintiffs,             )
                                        )
13        vs.                           )
                                        )
14  Sheriff Joseph Arpaio and Ava Arpaio,)
    husband and wife; Maricopa County, a )
15  public entity; Jaime Carrasco and   )  REPORTED BY:
    Olivia Carrasco, husband and wife;  )
16  Adrian Dominguez and Samantha       )  JONI HILL, RPR, CSR
    Dominguez, husband and wife;        )  Certified Reporter
17  Christopher Foster and Michelle     )  Certificate #50836
    Foster, husband and wife; Anthony   )
18  Hatton and Jaclyn Hatton, husband and)
    wife; Craig Kaiser and Karen Kaiser, )  PREPARED FOR:
19  husband and wife; Anthony Scheffner  )
    and Rhealea Scheffner, husband and  )
20  wife; Jose Vazquez and Alma Vazquez, )
    husband and wife; Jason Weiers and  )
21  Melissa Weiers, husband and wife; Ian)
    Cramner, an unmarried man; William  )
22  McLean and Kelly Clark, husband and )
    wife; Monica Scarpati and Ariel     )
23  Scarpati, wife and husband; City of )
    Phoenix, a public entity; Patrick   )
24  Hanlon, an unmarried man; Nicholas  )
    French, an unmarried man,           )
25                                      )
    _____Defendants._____)

15

```
 1          Q.    Is the main Intake area of the MCSO Jail system

 2    now located at the Fourth Avenue Jail?

 3          A.    Yes, it is.

 4          Q.    And is that where Marty was brought on

 5    December 16th, 2011?

 6          A.    Yes.

 7          Q.    Is the Fourth Avenue Jail a facility that's

 8    owned by Maricopa County?

 9          A.    Yes.

10          Q.    Is the Fourth Avenue Jail a facility that's

11    operated by Maricopa County?

12          A.    Yes, it is.

13          Q.    Is the Fourth Avenue Jail a facility that is

14    maintained by Maricopa County?

15          A.    Yes.

16          Q.    Does the Maricopa County Sheriff's Office have

17    policies that govern the law-enforcement activities that

18    occur in the Fourth Avenue Jail?

19          A.    Yes.

20                MS. WAHLIN:  Object to the form.

21    BY MR. WULKAN:

22          Q.    And does the Maricopa County Sheriff's Office

23    have procedures that govern the law-enforcement activities

24    that occur in the Fourth Avenue Jail?

25                MS. WAHLIN:  Object to the form.
```

1            THE WITNESS:  Yes.

2    BY MR. WULKAN:

3        Q.    And who determines who is allowed in and out of

4    portions of the Intake facility at the Maricopa County

5    Jail?

6        A.    It would be the officers that are working

7    that -- during that shift.

8        Q.    And when you refer to "the officers," are you

9    referring to Maricopa County Sheriff's Detention Officers?

10       A.    Yes, sir.

11       Q.    Okay.  Is it fair to say that the Intake area

12   of the Jail is supervised by members of the Maricopa

13   County Sheriff's Office?

14       A.    Yes, sir.

15       Q.    Compared to the rest of the Jail system, has

16   the main Intake area at the Maricopa County Jail

17   historically been a location where there have been a

18   higher number of use of force incidents?

19            MS. WAHLIN:  Object to foundation.

20            THE WITNESS:  Yes, sir.

21   BY MR. WULKAN:

22       Q.    And turning your attention, please, to Page 6

23   of the report, under Section III, "Overall Use of Force,"

24   the report reads, "I conclude (sic) that there was a

25   pattern of excessive force in three facilities, i.e.,