1  Michael C. Manning (#016255)
   Larry J. Wulkan (#021404)
2  Stefan M. Palys (#024752)
   Jennifer L. Allen (#027941)
3  Blair H. Moses (#027991)
   **STINSON LEONARD STREET LLP**
4  1850 North Central Avenue, Suite 2100
   Phoenix, Arizona 85004-4584
5  Tel: (602) 279-1600
   Fax: (602) 240-6925
6  Email: Michael.Manning@stinsonleonard.com
   Email: Larry.Wulkan@stinsonleonard.com
7  Attorneys for Plaintiffs

8  **UNITED STATES DISTRICT COURT**

9  **DISTRICT OF ARIZONA**

| | |
|---|---|
| 10  Ernest Joseph Atencio, surviving father of Ernest Marty Atencio, individually and on behalf of the following statutory beneficiaries of Ernest Marty Atencio; Rosemary Atencio, surviving mother of Ernest Marty Atencio; Joshua Atencio, surviving son of Ernest Marty Atencio; Joseph Atencio, surviving son of Ernest Marty Atencio; M.A., a minor and surviving son of Ernest Marty Atencio; Michael Atencio, Personal Representative of the Estate of Ernest Marty Atencio; Rosemary Atencio, individually; Joshua Atencio, individually; Joseph Atencio, individually; and M.A., through his Next Friend, Eric Atencio, | NO. 2:12-CV-02376-PHX-PGR **RESPONSE TO DEFENDANTS ARPAIO, CARRASCO, DOMINGUEZ, FOSTER, KAISER, SCHEFFNER, WEIERS AND VAZQUEZ'S STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs,

v.

Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County, a public entity; Jaime Carrasco and Olivia Carrasco, husband and wife; Adrian Dominguez and Samantha Dominguez, husband and wife; Christopher Foster and Michelle Foster, husband and wife; Anthony Hatton and Jaclyn Hatton, husband and wife; Craig Kaiser and Karen Kaiser, husband and wife; Anthony Scheffner and Rhealea Scheffner, husband and wife; Jose Vazquez and Alma Vazquez, husband and wife; Jason Weiers and Melissa Weiers, husband and wife; Ian Cranmer, an unmarried man; William McLean and Kelly Clark, husband and wife; Monica Scarpati and Ariel Scarpati, wife and husband; City of Phoenix, a public entity; Patrick Hanlon, an unmarried man; Nicholas French, an unmarried man.

Defendants.

Pursuant to Local Rule of Civil Procedure 56.1, Plaintiffs controvert Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser, Scheffner, Weirs, and Vazquez's Statements of Facts in Support of Their Motion for Summary Judgment (Doc 348) as follows:

## Atencio's Arrival at the Jail on December 16, 2011

1.     Ernest Marty Atencio ("Atencio") was placed in a medical holding area after he came into the jail with other detainees. Atencio repeatedly ignored orders to sit down and eventually had to be handcuffed to the bench. [September 9, 2013 Deposition of Patrick Hanlon ("Hanlon Depo."), attached as Ex. 1, at 28; Declaration of Jason Weiers ("Weiers' Decl.") attached as Ex. 4, at ¶ 4; CD containing video clips of Atencio in Central Intake ("Intake Video"), attached as Ex. 11, N Hold Area NE.]

**UNDISPUTED WITH A QUALIFICATION**.     Marty not was intentionally disobeying anyone's commands, but rather Marty appeared very confused or "lost."  *See* Plaintiffs' Statement of Facts Applicable to All Defendants ("PSOF(AD)") ¶ 26 (Doc 359). Ofc. Walston, who transported Marty to the jail and was with him through the officers' use of force against him in the LineScan Room, testified that Marty's demeanor was humorous and jovial while interacting with law enforcement and that demeanor did not change.  Similarly, Ofc. Legere testified that Marty was "jovial" when he was in the jail.  Officers testified that Marty was neither threatening nor aggressive while being brought to the LineScan Room. During his entire time in the LineScan Room, Marty did not: "display violent or aggressive behavior" towards anyone. *Id.* at ¶¶ 66-69.

2.     Phoenix Police Officer ("PPO") Hanlon removed Atencio from a cell with other prisoners after observing Atencio get face-to-face with another prisoner. PPO Hanlon got the impression from Atencio's body language that he was trying to agitate the other prisoners. [Hanlon Depo., Ex. 1, at 76-77].

**UNDISPUTED**.

3.     During the intake process, Atencio was held in an isolation cell. [Weiers Decl., Ex. 4, at ¶ 6; Hanlon Depo., Ex. 1, at 77-78.]

**UNDISPUTED**.

2

4.     It is typical to have a supervisor present if a detainee is causing problems during intake. Atencio had demonstrated behavior that made Weiers more worried about him doing something than the average inmate. For instance, he broke an outlet in the wall at the medical screening with his foot, and he was yelling constantly and failing to follow orders. [October 23, 2013 Deposition of Jason Weiers ("Weiers Depo."), attached as Ex. 6, at 57, 71-72.]

**UNDISPUTED WITH A QUALIFICATION.** *See* ¶ 1.

5.     Atencio seemed to intentionally break the wall outlet. He seemed agitated, turned toward the wall, and then directly kicked the outlet. [Weiers Depo., Ex. 6, at 72.]

**DISPUTED**. *See* ¶ 1.

6.     During the medical intake screening in the jail, Ernest Marty Atencio ("Atencio") was asked, "Are you thinking of hurting yourself?" and he answered, "Yes." [December 4, 2013 Deposition of William McLean ("McLean Depo.") attached as Ex. 2, at 53; Hanlon Depo., Ex. 1, at 70.].

**UNDISPUTED WITH A QUALIFICATION.**  When Marty was brought to the jail, he was asked a series of questions that are included in a receiving screening form.  Although Marty may have answered specific questions, Marty was in psychosis and incapable of focusing on, or evaluating his answers to, the questions.  Officers observed Marty acting strangely and babbling incoherently, having difficulty focusing on the questions, and displaying confused and inconsistent behavior, and saying "a bunch of ridiculous stuff" during the process.  PSOF(AD) at ¶¶23-24, 31, 33.

7.     Correctional Health Services ("CHS") Nurse McLean determined that Atencio should be placed in a safe cell for his own safety. Defendant Scheffner did not order that Atencio be placed into a safe cell. [McLean Depo., Ex. 2, at 54; October 21, 2013 Deposition of Monica Scarpati, attached as Ex. 3, at 77; May 13, 2014 Deposition of Anthony Scheffner ("Scheffner Depo."), attached as Ex. 13, at 65.]

**UNDISPUTED.**

8.     Detention supervisors Defendant Weiers and Defendant Kaiser were aware that CHS staff had determined that Atencio was to be placed into a safe cell. Defendant Weiers was

3

aware that it was because Atencio had made suicidal comments. [Weiers Decl., Ex. 4, at ¶ 5; Declaration of Craig Kaiser ("Kaiser Decl."), attached as Ex. 5, at ¶ 8.]

**UNDISPUTED WITH A QUALIFICATION.** *See* ¶ 6.

9.     When a detainee is to be placed in a safe cell, medical staff writes "safe cell" on the booking slip so that detention staff knows that after the detainee is searched and accepted into the jail, he or she should be placed in a safe cell. The reason for the placement is not usually written there. [Weiers Depo., Ex. 6, at 78.]

**UNDISPUTED.**

10.     Typically more officers are present during the booking process when someone is going into a safe cell because the inmate has to be placed into the safe cell at the end of the process. Officers never know how strong someone is going to be, what their actions will be, or how unpredictable they will be. [Weiers Depo., Ex. 6, at 26-27, 79.]

**UNDISPUTED.**

## Events in the Line Scan Room/Search Area

11.     The search area of Central Intake is where detainees are searched before they are accepted into the jail. The search is the last step in the intake procedure and is done to check for weapons and other contraband, such as drugs. [Declaration of Adrian Dominguez ("Dominguez Decl."), attached as Ex. 7, at ¶ 5.]

**UNDISPUTED WITH A QUALIFICATION.** Defendants draw a distinction to when a detainee is "accepted" (*i.e.*, before they pass through the LineScan Room). However, detainees are in the care, custody and control of Maricopa County as soon as they enter its facilities, interact with its law enforcement officers, and follow procedures set up by the County for their admission into the jail. Only those permitted by the MCSO enter the intake area and LineScan Room. This is part of the Fourth Avenue Jail that is not open to the public. *See* Sheridan Dep. 15:1-16:20, July 22, 2014, attached as **Exhibit A**.

12.     As part of the search process, detainees are required to remove their jackets, shoes, and socks, so that these articles of clothing can be run through an x-ray machine. The detainee is also physically searched. [Dominguez Decl., Ex. 7, at ¶ 5.]

4

**UNDISPUTED.**

13.     It is a standard corrections practice to search all detainees that are processed into a jail facility, including a search of their shoes and clothing, to ensure that they do not bring any contraband into the facility, such as drugs or weapons. Such a search is done for the safety of the detainee, other detainees, and detention staff, and for the security of the facility. [Declaration of Roy T. Gravette ("Gravette Decl."), attached as Ex. 8, at ¶ 7.]

**UNDISPUTED.**

14.     The importance of searching shoes and other clothing worn into the jail is paramount to having a safe and secure jail. Shoes have been used to hide razor blades, knives, other weapons, handcuff keys, and drugs. [Gravette Decl., Ex. 8, at ¶ 8].

**UNDISPUTED WITH A QUALIFICATION.** While detainees must be searched before entering a jail, it is important to note that all detainees are searched, sometimes several times, before entering the LineScan Room. *See* e.g. PSOF(AD) ¶¶ 12, 15, 17, 19-20.

15.     PPO Patrick Hanlon escorted Atencio to the search area, line scan room. [Hanlon Depo., Ex. 1, at 45.]

**UNDISPUTED**.

16.     Atencio was not cooperative. The Phoenix officers were trying to move Atencio toward the search area and he didn't want to walk. PPO Hanlon had to push him along. There were at least eight other detainees seated on the bench just outside the search area. [Hanlon Depo., Ex. 1, at 78; Declaration of Christopher Foster ("Foster Decl."), attached as Ex. 9, ¶ 5; Intake Video, Ex. 11, clips Prebooking S View from 2:32:16 – 2:33:11, Prebooking N View from 2:32:16 – 2:33:05, Acceptance Door.]

**UNDISPUTED WITH A QUALIFICATION.** *See* ¶ 1.

17.     Defendant Weiers followed the Phoenix officers and Atencio through the pre-booking area. It appeared that Atencio was resisting walking by leaning back. On the way to the search area, Atencio also dropped his jacket on the floor. Weiers picked it up and carried it into the search area. [Weiers Decl., Ex. 4, at ¶¶ 6, 7; Intake Video, Ex. 11, Prebooking S View from 2:32:16 – 2:33:11, Prebooking N View from 2:32:16 – 2:33:05, Acceptance Door.].

**UNDISPUTED WITH A QUALIFICATION.** *See* ¶ 1.

18.     In the line scan room, PPO Hanlon instructed Atencio to take his shoes off. Atencio initially cooperated, but when they told him to take his socks off, he turned to one of the Phoenix officers and said, "You take my socks off." The Phoenix officers again instructed Atencio to take his shoes off, and instead Atencio put his shoe back on. [Hanlon Depo., Ex. 1, at 48; Kaiser Decl., Ex. 5, at ¶ 11; Weiers Decl., Ex. 4, at ¶ 9; Declaration of Jaime Carrasco ("Carrasco Decl."), attached as Ex. 10, at ¶ 8; Foster Decl., Ex. 9, at ¶ 6.]

**UNDISPUTED WITH A QUALIFICATION.** *See* ¶ 1.

19.     After several requests to take his shoes off, Atencio tensed his arms. PPO Hanlon was concerned that Atencio was becoming aggressive. At approximately 2:34:39 a.m., PPO Hanlon took control of one of Atencio's wrists. [Hanlon Depo., Ex. 1, at 48, 78; Intake Video, Ex. 11, clip Linescan SW from 2:34:24 - 2:34:44.]

**DISPUTED**.   During his entire time in the LineScan Room, Marty did not: "display violent or aggressive behavior" towards anyone; punch anyone; strike anyone; kick anyone; bite anyone; or spit on anyone. *See* PSOF(AD) ¶ 69.  An annotated video of the entire use of force in the LineScan Room is contained on PSOF(AD) Exhibit N, Clip 2.

20.     Atencio began actively resisting as soon as the Phoenix officers went hands on. [Dominguez Decl., Ex. 7, at ¶ 9; Intake Video, Ex. 11, Linescan SW from 2:34:40 – 2:34:46.]

**DISPUTED**. *See* ¶ 19.

21.     The Phoenix officers tried to get Atencio's arms behind his back. Atencio was forcibly resisting to the point that even though there was one officer on each of Atencio's arms, they were not able to get his arms behind his back. Atencio was overpowering the Phoenix officers. [Weiers Decl., Ex. 4, at ¶ 10; Foster Decl., Ex. 9, at ¶¶ 7, 8; Intake Video, Ex. 11, Linescan SW from 2:34:40 – 2:34:46.]

**DISPUTED**. *See* ¶ 19.

22.     When the Phoenix officers grabbed Atencio and tried to get his arms behind his back, Atencio was resisting to the point that, even though there was one officer on each of Atencio's arms, they were not able to get his arms behind his back. Atencio was overpowering

6

the Phoenix officers so Weiers took Atencio's left arm to help them get his arms behind his back. [Weiers Decl., Ex. 4, ¶ 10; Intake Video, Ex. 11, Linescan SW from 2:34:40 – 2:34:46.]

**DISPUTED**. *See* ¶ 19.

23. After the Phoenix police officers went hands-on, and had Atencio against the wall, Defendant Foster was able to remove Atencio's right shoe and right sock. He then tried to remove Atencio's left shoe but couldn't get it off because Atencio was overpowering the officers who were trying to control him. [Foster Decl., Ex. 9, at ¶¶ 7-8; Kaiser Decl., Ex. 5, at ¶ 13; Intake Video, Ex. 11, Linescan SW from 2:34:48 – 2:35:11.]

**DISPUTED**. *See* ¶ 19.

24. PPO Hanlon made the decision to try to take Atencio to the ground. [Hanlon Depo., Ex. 1, at 80.]

**UNDISPUTED**.

25. Even with several officers helping, they had difficulty taking him to the ground. It was not a hard takedown. [Carrasco Decl., Ex. 10, at ¶¶ 10-11; Foster Decl., Ex. 9, at ¶ 9; Kaiser Decl., Ex. 5, at ¶ 15; Intake Video, Ex. 11, Linescan SW from 2:35:17 – 2:35:25.]

**DISPUTED**. *See* ¶ 19.

26. Atencio ended up partially on his right side on the floor. The officers were unable to get Atencio flat on his stomach because he was fighting. [Carrasco Decl., Ex. 10, at ¶¶ 10-11; Foster Decl., Ex. 9, at ¶ 9; Intake Video, Ex. 11, Linescan SW from 2:35:17 – 2:35:25.]

**DISPUTED**. *See* ¶ 19.

27. Once Atencio was on the ground, one of Atencio's arms was under his body. Defendant Weiers knelt down on the floor next to Atencio and leaned over, trying to hold onto Atencio's arm. Atencio clawed at Defendant Weiers, trying to grab Weiers' hand. Atencio scratched Weiers. [Weiers Decl., Ex. 4, ¶ 12.]

**DISPUTED**. *See* ¶ 19.

28. Once Atencio was on the ground, Defendant Foster removed Atencio's left shoe and left sock. Atencio continued to fight. Defendant Foster and Defendant Kaiser were trying

to control Atencio's legs but Atencio pushed them off like they were paper weight. [Foster Decl., Ex. 9, at ¶ 11.]

**DISPUTED**. *See* ¶ 19.

29.    Once Atencio was on the ground, Defendant Kaiser knelt beside him and used his hands to control Atencio's right leg and foot, and get Atencio's legs crossed to better control them. [Kaiser Decl., Ex.5, at ¶¶ 16, 21, Att. C. ]

**DISPUTED**. *See* ¶ 19.

30.    Defendant Kaiser was trying to hold Atencio's legs but he was unable to because Atencio kept pushing him off. So, Defendant Carrasco knelt down on the floor and assisted Defendant Kaiser with holding Atencio's legs. [Carrasco Decl., Ex. 10, ¶¶ 12, 24, Att. E; Kaiser Decl., Ex. 5, ¶¶ 16, 17.]

**DISPUTED**. *See* ¶ 19.

31.    Defendant Foster yelled that they should get Atencio handcuffed, and he removed his handcuffs from his duty belt. He stood next to Atencio and reached in to try to handcuff him. The detention officers collectively tried to get Atencio handcuffed. [Foster Decl., Ex. 9, at ¶¶ 12, 29, Att. C; Hanlon Depo., Ex. 1, at 80; Intake Video, Ex. 11, Linescan SW from 2:35:45 – 2:35:55.]

**UNDISPUTED**.

32.    Defendant Foster was able to get a handcuff on Atencio's left wrist, but then lost control of it. Atencio continued to struggle. Loose handcuffs are very dangerous and can be used as a weapon. [Foster Decl., Ex. 9, at ¶ 13; June 17, 2013 Deposition of Blas Gabriel, attached as Ex. 17, at 72, 73.]

**DISPUTED**. *See* ¶ 19.

33.    Atencio was already on the ground on his stomach when Defendant Dominguez moved to assist in restraining him. Dominguez was at the right upper quadrant of Atencio's body. He grabbed Atencio's right arm and tried to control it while other officers tried to get Atencio handcuffed. [Dominguez Decl., Ex. 7, at ¶¶ 10, 21, Att. F.]

**DISPUTED**. *See* ¶ 19.

8

34. Defendant Dominguez used only soft hands in trying to control Atencio's right arm to get him handcuffed. [Dominguez Decl., Ex. 7, ¶ 11].

**DISPUTED**. *See* ¶ 19.

35. The officers were trying to get control of Atencio's hand but he kept getting free. The officers were trying to grab different parts of Atencio's wrists and hands, but Atencio was breaking away with no problem. [August 6, 2013 Deposition of Nicholas French ("French Depo."), attached as Ex. 42, at 89-90.]

**DISPUTED**. *See* ¶ 19.

36. Defendant Vazquez entered the search area after Atencio was already on the ground. Shortly after Vazquez entered, Vazquez heard Defendant Weiers say "Taser Taser" and then Weiers deployed the Taser. [Declaration of Jose Vazquez ("Vazquez Decl."), attached as Ex. 12, ¶¶ 6, 7 Intake Video, Ex. 11, Linescan SW from 2:35:35 – 2:36:15]

**UNDISPUTED**.

37. At approximately 2:36:10 a.m., Defendant Weiers straightened up, still on his knees, and deployed the Taser at Atencio's upper stomach. Defendant Weiers deployed the Taser in one of the only places he could safely do so without harming any of his fellow officers. [Weiers Decl., Ex. 4, at ¶ 14; Weiers Depo., Ex. 6, at 115; Intake Video, Ex. 11, Linescan SW from 2:36:05 – 2:36:18.]

**DISPUTED**. Sgt. Weiers accidentally tased Ofc. Hatton. *See* PSOF(AD) ¶ 98.

38. Weiers deployed the Taser to try to get the situation resolved as quickly as possible and with the least amount of force possible. [Weiers Depo., Ex. 6, at 107-108.]

**OBJECTION**, violates LRCiv 56.1(a). Sgt. Weiers' intentions are immaterial. As set forth in Plaintiffs' response to Sgt. Weiers' motion for summary judgment, his conduct was objectively unreasonable.

39. Weiers got a narrow or limited spread with the probes, which has reduced effectiveness. So Defendant Weiers leaned forward to attempt to drive stun Atencio's thigh. [Weiers Decl., Ex. 4, at ¶ 14; Intake Video, Ex. 11, Linescan SW from 2:36:12 – 2:36:16.]

**UNDISPUTED**.

40. At some point during Weiers' attempts to drive stun Atencio, Weiers received the effects of the Taser and fell backwards and away from Atencio. When Weiers regained his balance he again attempted to drive stun Atencio. At that point, other officers were able to handcuff Atencio. [Weiers Decl., Ex. 4, ¶ 15; Intake Video, Ex. 11, Linescan SW from 2:36:12 – 2:36:26.]

**UNDISPUTED**.

41. The Taser did not have any effect on Atencio. Atencio continued to struggle and kick and kept going like nothing had happened. It also didn't appear as though the drive stun had any effect on Atencio. Indeed, it appeared to make Atencio mad. [Hanlon Depo., Ex. 1, at 85-86; French Depo., Ex. 44, at 72, 90.]

**DISPUTED**. *See* ¶ 19.

42. After Atencio was tased, Defendant Vazquez moved from Atencio's side to near his head and knelt on the floor beside him. Atencio was laying partially on his side with his arms underneath him. [Vazquez Decl., Ex. 12, at ¶¶ 8, 17, Att. E.]

**DISPUTED**. After Marty was tased, his hands were brought straight out in front of him, in what has been called the "Superman position." *See* PSOF(AD) ¶ 101.

43. There was already one handcuff on Atencio, and Defendant Vazquez was able to get a cuff on Atencio's other hand. Instead of handcuffing Atencio behind his back, Vazquez handcuffed him in front. [Vazquez Decl., Ex. 12, at ¶ 10.]

**UNDISPUTED**.

44. Once Atencio was handcuffed, Defendant Weiers stood up and other officers also disengaged. [Weiers Decl., Ex. 4, ¶ 15; Intake Video, Ex. 11, Linescan SW from 2:36:56 - 2:37:36.]

**UNDISPUTED**.

45. After Atencio was restrained, Defendant Foster stayed by Atencio's legs while he was checked by medical staff and photographs were taken of the Taser puncture wounds. Dominguez and Vazquez stayed by Atencio's upper body. [Foster Decl., Ex. 9, ¶¶ 16, 29, Att. E; Dominguez Decl., Ex. 7, ¶ 21, Att. H; Carrasco Decl., Ex. 10, ¶ 24, Att. F.]

**UNDISPUTED**.

46. After Atencio was restrained, Defendant Kaiser had no further contact with him. [Kaiser Decl., Ex. 5, ¶ 19.]

**UNDISPUTED**.

47. Atencio was fighting during the entire effort to restrain him in the search area. Atencio was holding his arm under his body. Officers were unable to get Atencio's arm out from under his body to get him handcuffed. Officers were giving Atencio commands like, "Give me your hand. Give me your arm." [Carrasco Decl., Ex. 10, ¶ 13.]

**DISPUTED**. *See* ¶ 19.

48. Atencio was not just resisting. He was combative and actively fighting. He was kicking and squirming. He was flailing, and trying to roll over. He was lifting himself up. [Dominguez Decl., Ex. 7, ¶ 12; Hanlon Depo., Ex. 1, at 82, 85-86.]

**DISPUTED**. *See* ¶ 19.

49. Atencio was 5 feet, 9 inches, weighed 208 pounds, and exhibited unusual strength. [Foster Decl., Ex. 9, ¶ 10; Carrasco Decl., Ex. 10, ¶ 11; Hanlon Depo., Ex.1, at 53; Dominguez Decl., Ex. 7, ¶ 12; Kaiser Decl., Ex. 5, ¶ 14; Medical Examiner's Report, attached as Ex. 41, at 5.]

**DISPUTED**. *See* ¶ 19.

50. Atencio had no appreciable response to pain compliance techniques that were used on December 16, 2011. [Hanlon Depo., Ex. 1, at 53.]

**DISPUTED**. *See* ¶ 19.

51. Atencio was not restrained and under control—he was not handcuffed and was still struggling—when Sergeant Weiers deployed the Taser. [Carrasco Decl., Ex. 10, ¶ 14; Dominguez Decl., Ex. 7, ¶ 13; Foster Decl., Ex. 9, ¶ 14; Kaiser Decl., Ex. 5, ¶ 18; Hanlon Depo., Ex. 1, at 51.]

**DISPUTED**. *See* ¶ 19.

52. Even when the Taser was deployed, the officers were unable to gain compliance from Atencio. Atencio rolled and was able to break the Taser leads. [Foster Decl., Ex. 9, ¶ 14.]

**DISPUTED**. *See* ¶ 19.

53.     After the Taser was deployed, Atencio wasn't complying with commands to give up his hands and let the officers handcuff him. Atencio was pushing with his legs and wouldn't let the officers pull his arms out to be handcuffed. Defendant Vazquez was eventually able to get a handcuff on Atencio's other hand. [Vazquez Decl., Ex. 12, at ¶¶ 9, 10; Foster Decl., Ex. 9, at ¶ 15.]

**DISPUTED**. *See* ¶ 19.

54.     Atencio was under control and being handcuffed at approximately 2:37:07 p.m. [Scheffner Depo., Ex. 13, at 61.]

**UNDISPUTED**.

55.     Approximately two and a half minutes passed from the time that Phoenix Officer Hanlon grabbed Atencio's wrist to the time that Atencio was under control and being handcuffed. [Intake Video, Ex. 11, Linescan SW from 2:34:36 - 2:37:09.]

**DISPUTED**. *See* ¶ 19.

56.     Defendant Scheffner responded to the search area after hearing a commotion. He entered the line scan room at 2:36:37. [Declaration of Anthony Scheffner ("Scheffner Decl."), Ex. 16, at ¶¶ 5, 20. Att. A; Scheffner Depo., Ex. 13, at 50; Intake Video, Ex. 11, Linescan SW from 2:36:35 – 2:36:42.]

**UNDISPUTED**.

57.     When he entered the room he saw Atencio on the ground, surrounded by a group of officers. He couldn't see much of what was going on. Atencio was struggling with the officers. [Scheffner Decl., Ex. 16, at ¶ 6; Scheffner Depo., Ex. 13, at 50.]

**DISPUTED**. *See* ¶ 19.

58.     Defendant Scheffner did not see Atencio being taken to the floor and he did not know how it occurred. [Scheffner Depo., Ex. 13, at 81.]

**UNDISPUTED**.

59.     Defendant Scheffner had no idea what was going on, or what had occurred prior to his arrival. He saw that two supervisors were already present, Sergeant Weiers and

Lieutenant Kaiser. He stood by and observed. He noted that Atencio had been tased. Shortly after he entered the room, Atencio was handcuffed and under control. [Scheffner Decl., Ex. 16, at ¶¶ 7, 8.]

**DISPUTED**. *See* ¶ 19. As the video demonstrates, Sgt. Scheffner observed his subordinates use force in the LineScan Room.

60. After Atencio was handcuffed, he made comments to the effect of, "Don't mess with me. I'm an armed forces sniper." He also stated something like, "Wait until I catch my breath. I'm going to fuck you guys up." [Carrasco Decl., Ex. 10, ¶ 16; January 17, 2014 Deposition of Sergio Salinas ("Salinas Depo."), attached as Ex. 14, at 47.]

**DISPUTED**. *See* ¶ 19.

61. When Physician Assistant Ian Cranmer asked Atencio if he was okay, Atencio responded, "Anybody that touches me, I'm going to fucking kill you." Cranmer heard a stream of profanities, and saw Atencio struggling. Cranmer was concerned for his safety. [November 21, 2013 Deposition of Ian Cranmer ("Cranmer Depo."), attached as Ex. 27, at 48-49.]

**DISPUTED**. *See* ¶ 19.

62. In their efforts to gain control of Atencio in the search area, none of the MCSO detention officers were on top of Atencio. They did not lay on Atencio, sit on Atencio, kneel on Atencio, or press on Atencio's back. [Salinas Depo., Ex. 14, at 58; May 19, 2014 Deposition of Bradd Walston ("Walston Depo."), attached as Ex. 15, at 45; Scheffner Depo., Ex. 13, at 51; Intake Video, Ex. 11, Linescan SW.]

**DISPUTED**. *See* ¶ 19. Moreover, MCSO Sgt. Weiers, Lieutenant Kaiser, and Detention Officers Foster, Carrasco, Dominguez, and Hatton "dog piled" on top of Marty. *See* PSOF(AD) at ¶ 82-83.

63. After CHS staff responded and evaluated Atencio, Scheffner instructed officers to make sure Atencio was searched. During the pat down search before he was taken to the safe cell, Atencio was still struggling. He was kicking his feet out and not letting the officers roll him over to search him. [Scheffner Decl., Ex. 16, at ¶¶ 9, 11; Carrasco Decl., Ex. 10 at ¶ 17; Foster Decl., Ex. 9, at ¶ 17.]

**DISPUTED**. *See* ¶ 19.

**Events in the Safe Cell**

64.     After the officers searched Atencio, he was carried into a safe cell and placed on the ground. [Carrasco Decl., Ex. 10, at ¶ 18; Intake Video, Ex. 11, E Hall Safe Cell View from 2:41:13 – 2:41:20, Safe Cell from 2:41:18- 2:41:24.]

**UNDISPUTED**.

65.     Using an escort team of five officers to carry a detainee is a widely accepted practice in the field of corrections for the safe and humane transport of a restrained inmate. Typically, each member controls a certain body part: one member is responsible for the head and upper torso area, and each of the other four members is responsible for controlling an arm or a leg. [Gravette Decl., Ex. 8, at ¶ 16.]

**UNDISPUTED**.

66.     Removing clothing in a safe cell is a standard corrections practice where a detainee has made statements that he is or may be suicidal. Anything that a detainee could use to harm himself, including his clothing, must be removed. In Maricopa County, the inmate is given a suicide blanket for modesty. [Gravette Decl., Ex. 8, at ¶ 18; Weiers Decl., Ex. 4, ¶ 18; June 17, 2013 Deposition of Blas Gabriel ("Gabriel Depo."), attached as Ex. 17, at 59.]

**UNDISPUTED**.

67.     The isolation cell in the pre-intake area where Atencio was held before he was brought to the search room had hard benches, a stainless steel toilet, and a concrete floor and walls. The safe cell where Atencio was placed was constructed of a soft cushion material, and no other objects are in the cell for an inmate to harm himself with. [Gravette Decl., Ex. 8, ¶ 14.]

**UNDISPUTED**.

68.     Defendants Dominguez and Foster assisted in carrying Atencio to the safe cell. [Dominguez Decl., Ex. 7, at ¶¶ 16-17; Foster Decl., Ex. 9, at ¶ 18].

**UNDISPUTED**.

69.     Defendant Scheffner followed the officers and Atencio to the safe cell. After they had entered the safe cell, Scheffner stood at the doorway of the safe cell and briefly stepped inside, but then stepped right back out again. Scheffner did not see what occurred inside the safe cell. [Scheffner Decl., Ex. 16, ¶ 12; Scheffner Depo., Ex. 13, at 67, 81.]

**DISPUTED**.  Attachment C to the Sgt. Scheffner's declaration[1] shows that he had a front-row seat to the safe cell placement.

70.     Once the officers laid Atencio down in the safe cell and started removing his clothes, Atencio started wrestling with the officers. [Foster Decl., Ex. 9, at ¶ 18].

**DISPUTED**.  The video of the events, attached as PSOF(AD) Exhibit N, Clip 6, shows that Marty did not "wrestle" with anyone.

71.     Defendant Foster assisted in removing Atencio's pants and underwear and crossing his legs. [Foster Decl., Ex. 9, at ¶ 19].

**UNDISPUTED**.

72.     Defendant Carrasco entered the safe cell after other officers carried Atencio in. Once Defendant Carrasco was in the safe cell, he was on Atencio's left side near his feet. He bent over and helped Detention Officer Foster remove Atencio's pants and underwear. [Carrasco Decl., Ex. 10, ¶¶ 19, 24, Att. F-G.]

**UNDISPUTED**.

73.     Defendant Carrasco then knelt on the floor beside and held Atencio's legs, which were crossed and bent at the knees, while other officers were removing the rest of his clothing. [Carrasco Decl., Ex. 10, at ¶¶ 20, 24, Att. F-G.]

**UNDISPUTED**.

74.     While Defendant Carrasco was holding Atencio's legs in the safe cell, he was pushing hard against Carrasco. Atencio had a lot of strength in his legs and moved Carrasco back more than once. At one point Atencio was pushing so hard that he almost completely straightened out his right leg even though Carrasco was trying to keep it bent. [Carrasco Decl., Ex. 10, at ¶ 21.]

---

[1] Doc. 348-11 at p. 7 of 22.

**DISPUTED**. The video of the events, attached as PSOF(AD) Exhibit N, Clip 6, shows that Marty did not resist the officers' efforts.

75. After helping to remove Atencio's pants and underwear, Foster moved to Atencio's upper torso to help with the handcuffs because Officer Salinas was having trouble removing the handcuffs. Foster took Officer Salinas's handcuff key and was able to get the handcuffs off. [Foster Decl., Ex. 9, at ¶¶ 19, 29, Att. K-L.]

**UNDISPUTED**.

76. Defendant Vazquez was on Atencio's left side. Vazquez's knee was against Atencio's left side, to control him, but Vazquez's weight was not on him. Vazquez helped to remove Atencio's shirt. He lifted up Atencio's head so officers could get Atencio's shirt over his head. [Vazquez Decl., Ex. 12, at ¶¶ 14, 15, 17, Att. I-J.]

**UNDISPUTED**.

77. Defendant Dominguez held Atencio's right arm while Atencio's clothes were being removed. Dominguez's right hand was on Atencio's wrist, and his left hand was on Atencio's arm near the biceps area. Dominguez had one knee on the floor of the safe cell and one knee up. [Dominguez Decl., Ex. 7, at ¶¶ 18, 21, Att. I-K.]

**UNDISPUTED**.

78. Defendant Dominguez did not use any force other than soft hands to control Atencio's right arm in the safe cell while the officers removed Atencio's clothes and took off the handcuffs. [Dominguez Decl., Ex. 7, at ¶ 18.]

**DISPUTED**. MCSO Sgt. Weiers, Lieutenant Kaiser, and Detention Officers Foster, Carrasco, Dominguez, and Hatton "dog piled" on top of Marty. *See* PSOF(AD) at ¶ 82-83. Moreover, the video of the events, attached as PSOF(AD) Exhibit N, Clip 6, shows, at various times, all of the officers in the safe cell placed their weight on Marty and held Marty while Ofc. Hatton delivered a knee strike.

79. Defendant Dominguez also assisted with removing Atencio's shirt. [Dominguez Decl., Ex. 7, at ¶ 19.]

**UNDISPUTED**.

16

80. After the rest of Atencio's clothing and the handcuffs were removed, Defendant Carrasco and the rest of the detention officers exited the safe cell by backing out. [Carrasco Decl., Ex. 10, at ¶ 22; Intake Video, Ex. 11., Safe Cell from 2:42:46 – 2:43:17.]

**UNDISPUTED**.

81. After exiting the safe cell, Defendant Carrasco had no further contact with Atencio. [Carrasco Decl., Ex. 10, at ¶ 23.]

**UNDISPUTED**.

82. In the safe cell, the detention officers were telling Atencio to stay still, relax, and stop resisting. But Atencio was still moving around, squirming and not complying. Atencio was trying to get up, and rocking from side to side. [Dominguez Decl., Ex. 7, ¶ 17; Scheffner Decl., Ex. 16, at ¶ 13.]

**DISPUTED**. The video of the events, attached as PSOF(AD) Exhibit N, Clip 6, shows that Marty did not resist the officers' efforts.

83. Atencio was still pretty strong even after he was in the safe cell. Defendant Vazquez saw Atencio was pushing Defendant Carrasco back as Carrasco was trying to cross Atencio's legs. Defendant Vazquez also felt it because he was kneeling by Atencio's side. [Vazquez Decl., Ex. 12, at ¶ 15.]

**DISPUTED**. *See* ¶ 82.

84. The detention officers were having such a hard time removing Atencio's shirt in the safe cell that they asked Sergeant Weiers if they could cut it off. [Weiers Depo., Ex. 6, at 121, 124.]

**DISPUTED**. *See* ¶ 82.

85. Atencio continued to fight throughout the time the officers were trying to undress him and take the handcuffs off. [Foster Decl., Ex. 9, at ¶ 20.]

**DISPUTED**. *See* ¶ 82. *See also* PSOF(AD) at ¶ 109.

86. As officers exited the safe cell, Atencio was still talking. [Foster Decl., Ex. 9, at ¶ 21.]

**DISPUTED**. Marty did not talk after being placed in the safe cell. *See* McLean Dep. 110:24-111:5, December 4, 2013, attached as **Exhibit B**; Hanlon Dep. 59:15-18, September 9, 2013, attached as **Exhibit C**.

87. During Defendant Foster's entire contact with Atencio, he did not use any force other than soft empty hands in trying to control him, remove items of clothing, and get him handcuffed and un-handcuffed. [Foster Decl., Ex. 9, at ¶ 28.]

**DISPUTED**. See ¶ 78.

88. During Defendant Kaiser's entire contact with Atencio, he did not use any force other than soft empty hands. [Kaiser Decl., Ex. 5, at ¶ 20].

**DISPUTED**. *See* ¶ 78.

89. Defendant Scheffner had no physical contact with Atencio on December 16, 2011. [Scheffner Decl., Ex. 16, at ¶ 19; Scheffner Depo., Ex. 13, at 81; Plaintiffs' Responses to Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers' Requests for Admission ("Response to Officers' RFAs"), attached as Ex. 20, at 6].

**UNDISPUTED**.

90. During Weiers' contact with Atencio, the only force he used was the Taser and soft empty hands to try to control Atencio so that other officers could get him handcuffed. [Weiers Decl., Ex. 4, at ¶ 26.]

**DISPUTED**. *See* ¶ 78.

91. The actions of the individual detention officers, including Sergeant Weiers' use of the Taser, were justified and reasonable, and consistent with the policies of the Maricopa County Sheriff's Office, Arizona state law, and national standards of care as expressed by the American Correctional Association. The detention officers used only the force necessary, to control and secure Atencio. [Gravette Decl., Ex. 8, at ¶¶ 9-12.]

**OBJECTION**, violates LRCiv 56.1(a). This "statement of fact" is an argument and legal conclusion. As set forth in response to Sgt. Weiers' motion for summary judgment, his actions were objectively unreasonable.

## Plaintiffs' Excessive Force Claims

92. Plaintiffs contend that Defendants Carrasco, Dominguez, and Vazquez used excessive force and breached a duty of care to Atencio by "forming a 'dog pile' on top of Marty," in the line scan room and by holding Atencio down in the safe cell while another officer struck Atencio. [Plaintiffs' First Amended Complaint ("FAC") at ¶¶ 62, 70; Plaintiff Ernest Joseph Atencio's Response to Defendants Weiers, Vazquez, Scheffner, Kaiser, Foster, Dominguez and Carrasco's First Set of Interrogatories to Plaintiffs ("Responses to Officers' First Set of Interrogatories"), attached as Ex. 18, at 45, 7-9.]

**UNDISPUTED**.

93. Plaintiffs contend that Defendant Kaiser used excessive force and breached a duty of care to Atencio by "forming a 'dog pile' on top of Marty." [Responses to Officers' First Set of Interrogatories, Ex. 18, at 6-7.]

**UNDISPUTED**.

94. The term "dog pile" refers "to the time period where numerous individual defendants were on top of Marty Atencio in the line scan room." [Plaintiffs' Response to Defendant Arpaio's Second Set of Interrogatories to Plaintiffs, attached as Ex. 34, at 3.]

**UNDISPUTED**.

95. Other than participation in the "dog pile," Plaintiffs cannot identify any use of force by Defendants Carrasco, Dominguez, Foster, Kaiser, and Vazquez but they contend that they cannot rule out these officers' possible use of additional types of excessive force in the line scan room such as "kicking, kneeing, punching, hitting, slapping, or crushing." [Responses to Officers RFAs, Ex. 20, at 2-4, 7; Plaintiffs' Second Amended Responses to Defendants Weiers, Vazquez, Scheffner, Kaiser, Foster, Dominguez and Carrasco's First Set of Interrogatories ("Second Amended Responses to Officers' First Set of Interrogatories"), attached as Ex. 21, at 4-10.]

**UNDISPUTED**.

96. Plaintiffs contend that Defendant Scheffner violated Atencio's rights and the standard of care because he "observed the unreasonable use of force against Marty and failed

to intervene." He also "ordered Marty to be placed in MCSO's 'safe' cell." [Responses to Officers' First Set of Interrogatories, Ex. 18, at 5-6; FAC at ¶¶ 67, 68.]

**UNDISPUTED**.

97.     Plaintiffs admit that Defendant Scheffner did not use force against Atencio. [Plaintiffs' Responses to Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers' Requests for Admission ("Responses to Officers' RFAs"), attached as Ex. 20, at 6.]

**UNDISPUTED**.

98.     Plaintiffs contend that Defendant Weiers used excessive force and breached a duty of care to Atencio "by tasing him, multiple times, including, at least one time, in a manner close to Marty's heart. Sergeant Weiers knew, or should have known, that using a taser in this fashion created an unreasonable risk of harm." Plaintiffs also contend that Defendant Weiers used excessive force by his "general involvement in the 'dogpile.'" [Responses to Officers' First Set of Interrogatories, Ex. 18, at 3-4; Plaintiffs' Responses to Defendant Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez and Weiers' Second Set of Interrogatories ("Responses to Officers' Second Set of Interrogatories"), attached as Ex. 19, at 8.]

**UNDISPUTED**.

99.     Plaintiffs admit that Defendant Weiers did not use force against Atencio after Atencio was carried out of the line scan room. [Responses to Officers' RFAs, Ex. 20, at 8.]

**UNDISPUTED**.

100.     Plaintiffs cannot identify any other use of force by Defendant Weiers in the line scan room but contend that they cannot rule out Defendant Weiers's possible use of additional types of excessive force in the line scan room such as "kicking, kneeing, punching, hitting, slapping, or crushing." [Plaintiff Ernest Joseph Atencio's Second Amended Response to Defendants Weiers, Vazquez, Scheffner, Kaiser, Foster, Dominguez, and Carrasco's First Set of Interrogatories to Plaintiffs ("Second Amended Responses to Officers' First Set of Interrogatories") attached as Ex. 21, at 4.]

**UNDISPUTED**.

**Taser Use**

101.    Dr. Stano verified that the marks depicted in the photograph labeled as Exhibit 3 to Dr. Stano's deposition are the Taser probe wounds. They were below Atencio's heart. [November 27, 2013 Deposition of William Stano, M.D. and Exhibit 63 ("Stano Depo."), attached as Ex. 38, at 106].

**UNDISPUTED**.

102.    Probe deployment of a TASER electronic control device is designed to induce neuromuscular incapacitation. Effectiveness increases as a function of the spread of the probes. [Declaration of Michael Brave ("Brave Decl."), attached as Ex. 25, ¶ 9.]

**UNDISPUTED.**

103.    Three-point deployment is a combination of use of the electronic control device in both probe-deployment mode followed up by a simultaneous drive stun. Three-point deployment is used to gain neuromuscular incapacitation when, for whatever reason, a deployed probe is not succeeding in achieving the desired neuromuscular incapacitation. A three-point deployment is used to try to create a wide electrode spread to significantly increase the probability of achieving neuromuscular incapacitation. [Brave Decl., Ex. 25, ¶ 10.]

**UNDISPUTED**.

104.    According to the literature, TASER electronic control devices have a lower probability of injury than other force options, including hands-on physical force. [Brave Decl., Ex. 25, ¶ 11.]

**UNDISPUTED WITH A QUALIFICATION**.    Plaintiffs do not dispute that Defendants have accurately characterized the literature TASER has released, which touts the benefits of the use of the weapon.   The weapon's own manufacturer warns law enforcement users that the device

> causes physiologic and/or metabolic effects that may increase the risk of death or
> serious injury. These effects include changes in blood chemistry, blood pressure,
> respiration, heart rate and rhythm, and adrenaline and stress hormones, among
> others. . . . Some individuals may be particularly susceptible to the effects of
> [Taser] use. These susceptible individuals include . . . people suffering from
> excited delirium, profound agitation, severe exhaustion, drug intoxication or
> chronic drug abuse, and/or over-exertion from physical struggle. In a

physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death.

. . . .

Do not use multiple [Tases] or multiple completed circuits at the same time without justification. Multiple [Tases] or multiple completed circuits at the same time could have cumulative effects and result in increased risks.[2]

Sgt. Weiers was taught about the dangers of using the TASER prior to tasing Marty. *See* PSOF(AD) ¶¶ 90-92, 96-97.

105. The use of the electronic control device was the force option with the greater probability of being effective in controlling Atencio. [Brave Decl., Ex. 25, ¶ 12.]

**OBJECTION**, violates LRCiv 56.1(a). This paragraph does not contain a statement of fact. Rather, it is Defendants' expert opinion recast as a fact. As set forth in Plaintiffs' Omnibus Response to Law Enforcement Officers' Motions for Summary Judgment, Sgt. Weiers' use of the TASER against Marty was objectively unreasonable.

106. The TASER's quantum of force used on Atencio was very minimal due to the circumstances of the incident. Atencio was obese and had significant fat layers where the probes impacted. There was no risk of fall injury because Atencio was already on the ground. There was no risk of motion or momentum injury because Atencio was not in motion. [Brave Decl., Ex. 25, ¶ 13.]

**OBJECTION**, violates LRCiv 56.1(a). *See* ¶ 105.

107. Defendant Weiers' three-four point deployment had the highest probability of achieving control of Atencio. Defendant Weiers deployed the cartridge with the probes striking Atencio in the abdomen. Atencio's obesity, the limited probe spread, and the location of the probe impacts were not sufficient to likely induce neuromuscular incapacitation. Defendant Weiers' application of the TASER in drive-stun to the back of Atencio's left thigh had an increased probability of creating a completed circuit and allowing for neuromuscular incapacitation to attempt to control Atencio. [Brave Decl., Ex. 25, ¶ 15; Photographs of TASER probe marks, attached as Ex. 26.]

**OBJECTION**, violates LRCiv 56.1(a). *See* ¶ 105.

---

[2] Taser, Warnings, Instructions, and Information: Law Enforcement, at 2 (Mar. 1, 2013), http://www.taser.com/product-warnings/; follow Law Enforcement Warnings.

108.    ECD trigger pulls or discharges do not indicate delivered electrical charge to the person. Although the data downloaded from Sergeant Weiers' ECD showed a total ECD discharge of 22 seconds, there are statements that the probes were dislodged during the incident. Once the probes are dislodged, the ability to maintain an electrical circuit capable of delivering an electrical charge would be negatively affected. (Brave Decl., Ex. 25, ¶ 14).

**OBJECTION**, violates LRCiv 56.1(a). *See* ¶ 105.

109.    The ECD drive stun marks on the back of Atencio's left thigh are consistent with Atencio's struggling and movements, intermittent ECD contact, and EVD bouncing and skipping from the contact and control attempts. The marks indicate that the contact between the ECD and Atencio's thigh were not continuous. (Brave Decl., Ex. 25, ¶ 16).

**OBJECTION**, violates LRCiv 56.1(a). *See* ¶ 105.

## **Defendant Arpaio**

110.    Defendant Scheffner has never heard that Sheriff Arpaio has a philosophy that the jail should be a place of punishment. He has never observed an MCSO deputy express to a detainee at the Fourth Avenue Jail or any jail that the jail is a place of punishment. [Scheffner Depo., Ex. 13, at 73-74.]

**DISPUTED**.  Sheriff Arpaio has made public statements about his philosophy since at least 1991, as evidenced by Exhibits D through N.  In June 1991, Arpaio boasted to Inquirer magazine that jail is "not supposed to be fun.  It's supposed to be punishment," and that he "educates through punishment."  *See* "America's Most Wanted" at DB00189, DB00190, attached hereto as **Exhibit D**.  In January 1995, in his publication, "Roundup," Arpaio said, "[w]hen I campaigned for office—more than two and a half years ago now—I stressed the need to toughen the fight against crime, and I repeatedly emphasized [what] I wanted to [do to] accomplish that end: make jails places of punishment . . . [and] I did what I said I'd do."  *See* Roundup January 1995, attached as **Exhibit E**.

In March 1995, speaking to the Arizona Daily Star, Arpaio proudly stated, "[m]y whole philosophy is, put more people in jail.  We've got a vicious crime problem out there, and the answer is to take them off the streets and educate them through punishment."  *See* "Arpaio's

tough style stirs praise and ire," at p. 1, attached as **Exhibit F**. Night and Day magazine reported in November 1996 that Arpaio had recently told to a group of women that he "put the tents close to the dog pound, where they cremate animal corpses," or "near the waste-disposal plants," to make the inmates' lives as unpleasant as possible. *See* "Women in Chains" at DB00195, attached as **Exhibit G.**

Arpaio claims that his culture of punishment has a legitimate purpose—to reduce recidivism. In May 1996, the Los Angeles Times reported him as saying, "my attitude is: They're gonna hate this place so much they'll never come back. That's rehabilitation, isn't it?" *See* "Breakdown Behind Bars" at p. 2, attached as **Exhibit H**. Arpaio learned that his unconstitutional approach was not supported by empirical evidence. In March 1998, several scholars from Arizona State University submitted to MCSO a report, "Jail Recidivism in Maricopa County," that debunked Arpaio's philosophy. *See* **Exhibit I**. The study looked at whether recidivism rates would drop under more severe conditions of confinement. *Id.* at p. 4. It concluded that "there is no indication here that the policies and programs recently initiated by the Sheriff's Office add to the deterrent effect of detention. The official rates of recidivism have not declined since their implementation." *Id.* at p. 40. Yet even when faced with evidence that his regime of punishment was ineffective, and in reality, mere gratuitous cruelty, Arpaio continued down this path.

In 2008, at an appearance at the Arizona Italian American Club, in response to a question from the audience wondering if Arpaio would start using concentration camps, Arpaio responded, "I already have a concentration camp. . . . It's called Tent City." Arpaio apparently found it amusing to compare his treatment of inmates, many of whom have yet to even face trial, to that of the Jewish people in Nazi Germany. *See* **Exhibit J, Clip 1;** *see also* "Joe Arpaio: Tent City a "Concentration Camp," attached as **Exhibit K**. In July 2009, speaking to The New Yorker magazine, Arpaio boasted, "It costs more to feed the dogs than it does the inmates." *See* "Sheriff Joe" at ATENCIOS00161, attached as **Exhibit L.**

And in July 2011, Kuensel Online reported Arpaio saying to a group of international reporters, "[m]y intention is to make this place so unpleasant that they won't even think about

24

doing something that could bring them back." *See* "The tent jails of Maricopa County in Arizona" at p. 2, attached as **Exhibit M.** He stated, "[the inmates] are criminals and why should I provide them cooling in summer and heating devices in winter. . . . Dogs are innocent, therefore we must treat them [more] softly than criminals." *Id.* at p. 1. Of course, Arpaio neglected to mention to his visitors that many of these so-called "criminals" have not yet been convicted, or even had a probable cause hearing.

Talking to a group of inmates in an excerpt from the movie, "The Joe Show," Arpaio further explained how to him, there is no difference between a convicted criminal and a pretrial detainee, even though the Constitution affords these two groups distinct rights. Speaking to one inmate in particular, Arpaio explained that the jail doesn't "have a first and second class airline service . . . . You eat the same food whether you haven't gone to trial or whether you've been convicted. . . . What am I supposed to do? Have two classes of people? It doesn't work that way." In response the inmate stated, "I don't know. What does the law dictate that you do?" Arpaio's retort? "I don't care about the law in that respect." *Id. See* **Exhibit J, Clip 2.**

Speaking in a meeting with the independent monitor appointed by the court in *Melendres v. Arpaio*, 2:07-cv-02513-GMS, Arpaio "made it clear that his responsibilities were to the citizens who elected him and not to . . . the courts." *Melendres*, Doc. 744 at p. 7. In an interview with Randy Murray for The Joe Show, Arpaio says, "I know how far I can go. It's amazing what I say, and what I do, and what I get away with." *See* **Exhibit J, Clip 3**.

In an Order dated October 7, 2014 in *Melendres*, Judge Snow admonished Arpaio that his staff "cannot be presumed to ignore what he says" when he makes his public statements *Melendres*, Doc. 746 at 3:1-8. And Plaintiffs' expert, Ken Katsaris, has testified in this lawsuit that "the leadership [of a jail] and the qualities of a leader . . . when they continue over a period of time to be contrary to training and perspective of what a jail should be run like, ha[ve] an influence on the personnel that work for the leader." *See* Deposition of Ken Katsaris, 30:19-24, attached as **Exhibit N**. Katsaris has also testified that Sheriff Arpaio's rhetoric, which is "inconsistent with recognized and accepted jail practices" is the reason there has been no

25

meaningful change in the jails over the years. *Id.* at 87:3-13. And he has testified that he has "read depositions in the past where [detention staff] are obviously aware of what the Sheriff is saying" and that he has seen video of the Sheriff's Director of Media Relations, Lisa Allen, stating that the Sheriff's public rhetoric "does impact the jail personnel" and is even intended to do so. *Id.* at 83:24-84:14; 147:11-148:18. *See also* Exhibit C to Doc. 366.

111. Defendant Weiers has never heard that Sheriff Arpaio has a philosophy that the jail should be a place of punishment. He has never observed an MCSO deputy express to a detainee in the Fourth Avenue facility that the jail is a place of punishment. [Weiers Depo., Ex. 6 at 161.]

**DISPUTED**. *See* ¶ 110.

112. Detention Officer Gabriel has never heard that Sheriff Arpaio has a philosophy that jail should be a place of punishment. He has never observed MCSO deputies express to detainees that the jail is a place of punishment. [Gabriel Depo., Ex. 17, at 31.]

**DISPUTED**. *See* ¶ 110.

113. Former Detention Officer Sergio Salinas never heard during his five years of working at Maricopa County that Sheriff Arpaio has a philosophy that the jail should be a place of punishment. He has not observed MCSO deputies express to detainees at the Fourth Avenue jail that the jail is a place of punishment. [Salinas Depo., Ex. 14, at 4142.]

**DISPUTED**. *See* ¶ 110.

114. Statistics from December 2008 to August 2010 show that only eight use of force reports were generated for Intake during that 21-month period. [June 8, 2011 Declaration of James P. Seibert, attached as Ex. 35, at ¶ 66, Exhibit O.]

**UNDISPUTED WITH A QUALIFICATION**. Plaintiffs do not dispute that Defendants have accurately characterized Mr. Seibert's affidavit. Notwithstanding the same, the affidavit serves as evidence that Maricopa County knew of concerns regarding force used by the officers in this case during a much shorter time period. For instance, a December 22, 2011 Memorandum of Concern [re:] Fourth Avenue Jail Facility reveals that, in connection with the investigation of Marty's death, MCSO Sergeant Lugo "began to link some of the same

detention officers being involved in another incident where an inmate allegedly sustained a broken arm as a result of force utilized against him by detention staff." *See* Memorandum of Concern dated December 22, 2011, 0094, attached hereto as **Exhibit O.** "The officers who have been identified as being involved with this [August 19, 2011] incident include: Sergeant A. Scheffner # A7888, Officer A. Hatton #B1615." *Id*. at 0095.  On October 8, 2011, force was used against another inmate by "Sergeant J. Weiers #A8715, Officer A. Hatton #B1615, Officer B. Rauch #B1799, and Officer C. Foster #B0574." *Id*. at 0095.  With the exception of Officer Rauch, all of these individuals are defendants in this case.  Force was used on yet another inmate on November 4, 2011.  "The officers who have been identified as being involved with this incident include: Sergeant J. Weiers #A8715, Sergeant A. Scheffner #A7888, Officer A. Hatton #B1615." *Id*. at 0097.  Force was used on yet another inmate on November 26, 2011.  "The officers who have been identified as being involved with this incident include: Sergeant J. Weiers #A8715, Sergeant A. Scheffner #A7888, Officer A. Hatton #B1615, Officer S. Salinas #B0640." *Id*. at 0098.  Indeed, if there were only eight uses of force during a 21-month period, and there were four uses of force, all involving the same officers that interacted with Marty, in a four month period, a jury could easily conclude that Maricopa County knew there was a problem.

115.    MCSO policy requires a use of force report when a force option is used that has a probability of causing injury, such as an intermediate control technique or an intermediate weapon. [MCSO Use of Force Policy, attached as Ex. 23, at p. 4, ¶ 9.]

**UNDISPUTED**.

116.    Intermediate control techniques include the use of joint locks, wristlocks, and come-alongs. Intermediate weapons include batons, and oleoresin capsicum spray, and electronic control devices such as a Taser. [MCSO Use of Force Policy, Ex. 23, at p. 3].

**UNDISPUTED**.

117.    In 2011, on average, more than 300 detainees were booked each day in Intake. [Declaration of Gerard Sheridan ("Sheridan Decl."), attached as Ex. 36, at ¶ 5.]

**UNDISPUTED**.

118.  The Fourth Avenue Jail opened in April 2005. Central Intake, or Intake, is located in the Fourth Avenue Jail. [Sheridan Decl., Ex. 36, at ¶ 6.]

**UNDISPUTED**.

119.  Detention policies and procedures in general, including in Intake, have changed and evolved since 1999 when I became Chief of Custody. New procedures regarding booking have been put into place since Intake was moved from the Madison Street Jail to the Fourth Avenue Jail in 2005. [Sheridan Decl., Ex. 36, at ¶ 7.]

**UNDISPUTED**.

120.  MCSO's use of force policy has also changed and evolved since 1999. For example, in the early 2000s, MCSO policy authorized the use of restraint chairs. By 2011, restraint chairs were no longer allowed by policy, and they are no longer used in the Maricopa County jails. [Sheridan Decl., Ex. 36, at ¶ 8.]

**UNDISPUTED**.

121.  Jeffrey Alvarez, M.D., the Correctional Health Services ("CHS") medical director, is the responsible physician for the jail system in Maricopa County. [February 7, 2014 Deposition of Jeffrey Alvarez ("Alvarez Depo."), attached as Ex. 28, at 9].

**UNDISPUTED WITH A QUALIFICATION**.  A.R.S. § 11-441(A)(5) mandates that the Sheriff "[t]ake charge of and keep the county jail, . . . and the prisoners in the county jail," which encompasses the provision of medical care.  As the Courts explained in *Payne v. Arpaio*, 2009 WL 3756679, at *5-6 (D. Ariz. Nov. 4, 2009) and *Grevan v. Arpaio*, 2013 WL 6670296, at *2 (D. Ariz. Dec. 18, 2013), it is the Sheriff's responsibility to ensure that the inmates in his jail receive proper medical care.

122.  The CHS medical director supervises the medical providers in all the different jail facilities. [Alvarez Depo., Ex. 28, at 9.]

**UNDISPUTED WITH A QUALIFICATION**.  *See* ¶ 121.

123.  The CHS Director is responsible for staffing of personnel, including medical doctors, psychiatrists, nurse practitioners, physician assistants, dentists, and psychologists. [September 18, 2013 Declaration of Thomas J. Tegeler, attached as Ex. 31, at ¶¶ 4, 5.]

**UNDISPUTED WITH A QUALIFICATION**.  *See* ¶ 121.

124.    CHS's Mental Health Director is responsible for supervising mental health staff, including psychiatrists, midlevel psychiatric providers, psychologists, and mental health professionals. [September 23, 2013 Declaration of Dawn Noggle, Ph.D. ("Noggle Decl."), attached as Ex. 32, ¶ 5.]

**UNDISPUTED WITH A QUALIFICATION**.  *See* ¶ 121.

125.    The Mental Health Director is also responsible for mental health programming across a range of settings including screening and intake, and acute and subacute mental health units. [Noggle Decl., Ex. 32, ¶ 3.]

**UNDISPUTED WITH A QUALIFICATION**.  *See* ¶ 121.

126.    Dawn Noggle is the mental health director for Correctional Health Services. She is the final policymaker for Correctional Health Services with respect to mental health care. [March 31, 2014 Deposition of Dawn Noggle ("Noggle Depo."), attached as Ex. 30, at 10, 112, 114-115.]

**UNDISPUTED WITH A QUALIFICATION**.  *See* ¶ 121.

127.    Sheriff Arpaio doesn't have the budget that manages healthcare in the jails. Maricopa County's budget covers medical care in the jails, and the County's budget doesn't mix with the Sheriff's budget. [Alvarez Depo., Ex. 28, at 113-114.]

**UNDISPUTED WITH A QUALIFICATION**.  *See* ¶ 121.

128.    In 2004, Sheriff Arpaio wrote to Maricopa County Administrator David Smith, requesting that Correctional Health Services be transferred to the Sheriff's Office. [October 7, 2004 letter to David Smith, attached as Ex. 29.]

**UNDISPUTED**.

129.    In 2010, Sheriff Arpaio unsuccessfully sued Maricopa County for control of Correctional Health Services. [April 6, 2010 Article from Arizona Republic, "Judge Denies Arpaio's Attempts to Take Over Jail Health Care," attached as Ex. 37]

**OBJECTION**, violates LRCiv 56.1(a).  This paragraph does not contain a statement of fact.  Rather, it is Defendants' characterization of lawsuit and the resolution of the same.  As

the Courts pointed out in the *Payne* and *Grevan* cases, *see* ¶ 121, Sheriff Arpaio has the responsibility to ensure that proper medical care is provided in his jail.

130.   Sheriff Arpaio's statements about jails as places of punishment do no refer to the jail being a place of physical punishment. When he uses the word "punishment" it's in the sense of taking things away from people, not physically punishing people. [July 22, 2014 Deposition of Gerard Sheridan, attached as Ex. 33, at 26-28.

**DISPUTED.**  Sheriff Arpaio's public rhetoric includes comparisons of his facilities to "concentration camps" and statements that he places inmate facilities near dog pounds and waste disposal plants so as to make things as unpleasant as possible for inmates.  Sheriff Arpaio's use of the term "punishment" is neither as narrow nor as benign as he claims.  *See* ¶ 110.

131.   Out of Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez, and Weiers, only Defendant Kaiser was employed with MCSO before 2000. The others were all hired in 2002 or later. [Carrasco Decl., Ex. 10 at ¶ 3; Dominguez Decl., Ex. 7, at ¶ 3; Foster Decl., Ex. 9, at ¶ 3; Kaiser Decl., Ex. 5, at ¶ 3; Scheffner Depo., Ex. 13, at 18-19; Vazquez Decl., Ex. 12, at ¶ 3; Weiers Decl., Ex. 4, at ¶ 3.]

**UNDISPUTED**.

132.   Plaintiffs contend that Defendant Arpaio is liable in his individual capacity because: (1) he was aware of a long history of deliberate indifference to the provision of medical care to those in the County jails; and (2) he stated that he wanted his jails to be "places of punishment." [Plaintiff Ernest Joseph Atencio's Amended Response to Arpaio's First Set of Interrogatories, attached as Ex. 22, at 4-9.]

**UNDISPUTED**.

133.   Plaintiffs contend that Defendant Arpaio is liable in his official capacity because he is a policymaker and he ratified the acts of the individual defendants because he knew of and specifically approved of their acts. [Plaintiff Ernest Joseph Atencio's Amended Response to Arpaio's First Set of Interrogatories, Ex. 22, at 9.]

**OBJECTION**, violates LRCiv 56.1(a).  This paragraph does not contain a statement of fact.  Rather, it is Defendants' characterization of Plaintiffs' municipal liability claims, which, to the extent they are based on ratification, arise from multiple policymaker's ratification of the conduct which gives rise to this matter.

134.   Plaintiffs also contend that Defendant Arpaio created a custom, policy, or practice of excessive use of force in the Maricopa County jails. [Plaintiff Ernest Joseph Atencio's Amended Response to Arpaio's First Set of Interrogatories, Ex. 22, at 9-11.]

**UNDISPUTED**.

135.   Plaintiffs' Interrogatory Response cites to twenty-seven documents in support of their contention that Defendant Arpaio created a custom, policy, or practice of excessive use of force in the Maricopa County jails. Two of them are duplicates. Eliminating the duplicates, nineteen of the twenty-five documents are dated before 2001, and thus reflect events and circumstances more than ten years prior to the events involving Atencio. Thirteen of them are dated between 1995 and 1997. Eleven documents are news articles. The most recent document cited is the Second Amended Judgment and Findings of Fact and Conclusions of Law and Order in Graves v. Arpaio, CV77-0479-PHX-NVW, dated October 22. 2008 (Docs. 1635 and 1634, respectively). [Atencio's Amended Response to Arpaio's First Set of Interrogatories, Ex. 22, at 10-11.]

**UNDISPUTED**.

## Causation

136.   In reaching his opinions, Todd Wilcox, M.D. reviewed only Atencio's medical records from December 16, 2011 from CHS and the Phoenix Fire Department, and his St. Joseph's Hospital Records from December 16-20, 2011. [Todd Wilcox's February 12, 2014 Expert Report ("Wilcox Report"), attached as Ex. 39, at 2-6.]

**OBJECTION**, violates LRCiv 56.1(a).   For purposes of a statement of facts in connection with a motion for summary judgment, it is immaterial what materials an expert has reviewed.  This is an argument.

137. Dr. Wilcox's Report expresses his causation opinion in one sentence of one paragraph :

> "The death of Mr. Atencio was completely preventable and unnecessary. He was a psychotic non-violent patient who was suffocated, beaten and shocked to death. He needed treatment and understanding, not punishment for being mentally ill. At the time of his admission into jail his vital signs were normal. But for his interaction with law enforcement and his subsequent violent subdual by law enforcement, there is no evidence that he had any prodromal condition, symptom, or exam finding consistent with impending cardiac failure or anoxic brain injury."

[Wilcox Report, Ex. 39, at 22.]

**OBJECTION**, violates LRCiv 56.1(a). This is an argument and mischaracterizes the evidence in this case. Plaintiffs' expert, Dr. Wilcox, has opined that, because of the force used, Marty experienced a rush of catecholamines that caused Marty's heart to stop. Dr. Wilcox explained this at his deposition that he "didn't parse out each one of the uses of force because I don't think you realistically can. It really is sort of a sum total of the uses of force that caused his sympathetic nervous system to go into overdrive, and that was ultimately the cause of his sudden cardiac death." *See* Wilcox Dep. 256:4-9, June 17, 2013, attached as **Exhibit P**. The use of force against Marty "induced fear, and the combination of pain and fear activated [Marty's] sympathetic system, which dumped epinephrine and norepinephrine into his system and caused sudden cardiac death." *Id*. at 292:10-13.

138. Dr. Wilcox's February 12, 2014 report does not list the autopsy report as a material reviewed and considered in reaching his opinions. [Wilcox Report, Ex. 39, at 26.]

**OBJECTION**, violates LRCiv 56.1(a). This is an argument and mischaracterizes the evidence in this case. As set forth in Plaintiffs' Response to the City Defendants' *Daubert* Motion to Exclude the Causation Opinions of Plaintiffs' Expert Dr. Wilcox and a Portion of His Untimely Rebuttal Report (Doc. 318), Dr. Wilcox's initial report expressly mentions Dr. Stano's autopsy, and his time records – which were produced long before Defendants began misrepresenting the materials that Dr. Wilcox has reviewed – reflect he did review Dr. Stano's deposition (which included the autopsy report) before publishing his initial report. And the defendants know this because Dr. Wilcox testified:

Q. You did not review the autopsy report in preparation for reaching your initial opinion?

MR. WULKAN: Objection. Misstates the evidence.

THE WITNESS: I disagree with that. I did review the autopsy report.

Q. (By Mr. Campbell) It's not listed as one of the materials you reviewed in our report, correct?

A. It is listed.

Q. Where is it listed? There's a reference to it?

A. Yes.

139. Dr. Wilcox did not review any of Atencio's extensive medical records from other providers prior to 2011. [Wilcox Depo., Ex. 40, at 246.]

**OBJECTION**, violates LRCiv 56.1(a). This is an argument attempting to impeach Dr. Wilcox's credibility. Such determinations are clearly matters for a jury to determine.

140. Dr. Wilcox practices correctional health care medicine. He is not a medical examiner and he has never worked as one. [Wilcox Depo., Ex. 40, at 248, 251.]

**OBJECTION**, violates LRCiv 56.1(a). *See* ¶ 139.

141. Dr. Wilcox did not parse out each use of force. He did not consider whether Atencio would have died even if the TASER had not been used, or if Atencio would have submitted to being handcuffed. [Wilcox Depo., Ex. 40, at 252-253, 256.]

**OBJECTION**, violates LRCiv 56.1(a). This is an argument attempting to impeach Dr. Wilcox's credibility. Such determinations are clearly matters for a jury to determine.

Dr. Wilcox has opined that, because of the force used, Marty experienced a rush of catecholamines that caused Marty's heart to stop. Dr. Wilcox explained this at his deposition that he "didn't parse out each one of the uses of force because I don't think you realistically can. It really is sort of a sum total of the uses of force that caused his sympathetic nervous system to go into overdrive, and that was ultimately the cause of his sudden cardiac death." *See* Wilcox Dep. 256:4-9, June 17, 2013, attached as **Exhibit P**. The use of force against Marty "induced fear, and the combination of pain and fear activated [Marty's] sympathetic

system, which dumped epinephrine and norepinephrine into his system and caused sudden cardiac death." *Id*. at 292:10-13.

142. Dr. Wilcox ruled out causes of death that he believed were not relevant, such as diabetic ketoacidosis, subdural hematoma, and sepsis. [Wilcox Depo., Ex. 40, at 254.]

**UNDISPUTED**.

143. Dr. William Stano is the deputy chief medical examiner for the Maricopa County Medical Examiner's office and performed Atencio's autopsy and has been a medical examiner since August of 2006. Dr. Stano is board certified in anatomic pathology and forensic pathology. [Stano Depo., Ex. 38, at 7, 10-11.]

**UNDISPUTED**.

144. The cause of Atencio's death was cardiac arrest, but the reason why the cardiac arrest occurred is unknown. Atencio's psychosis, the law enforcement subdual, and Atencio's multiple medical problems are all risk factors, but not contributory causes. [Stano Depo., Ex. 38, at 54.]

**DISPUTED**. Dr. Stano's used the term law enforcement subdual to apply to "history of law enforcement subdual" which was "broad [and] encompassing," and "include[ed]" the chokehold, prone placement, restraint, taser, and handcuffs. *See* Stano Dep. 92:3-20, November 27, 2013, attached as **Exhibit Q**. Dr. Stano, opined that Marty's "cause of death" was due to "complications of cardiac arrest in the setting of acute psychosis, law enforcement subdual and multiple medical problems." Report of Autopsy at p. 1 (OMEPR00127), attached as **Exhibit R.** Dr. Stano testified that it was "unlikely" that Marty would have gone into cardiac arrest but for the "physical exertion" resulting from the use of force against Marty. *See* **Exhibit Q** at 68:19-78:6.

145. The immediate electrical shock by the TASER did not have anything to do with Atencio's death. [Stano Depo., Ex. 38, at 57.]

**DISPUTED**. *See* ¶ 144.

146. Atencio had an enlarged heart and coronary artery disease, both of which can cause sudden cardiac arrest. [Stano Depo., Ex. 38, at 100.]

**UNDISPUTED**.

147.    Atencio had a clinical history of abuse and dependence on more than one substance, including alcohol, marijuana, and methamphetamine. Drug abuse is a risk factor for cardiac arrest. [Stano Depo., Ex. 38, at 100-101.]

**UNDISPUTED**.

148.    Of the medical problems listed in the autopsy report, any one of several of the problems listed under section 5 of page 2 in the autopsy report would be enough to cause Atencio's death. [Stano Depo., Ex. 38, at 102; Medical Examiner's Report, attached as Ex. 41, at page 2, section 5.]

**UNDISPUTED WITH QUALIFICATION**.  Dr. Stano testified that it was "unlikely" that Marty would have gone into cardiac arrest but for the "physical exertion" resulting from the use of force against Marty.  *See* ¶ 144.  Moreover, Dr. Wilcox has testified that the law enforcement officers' use of force against Marty caused his death.  *See* ¶ 141.

149.    Atencio was diagnosed with schizoaffective disorder. Studies show that patients with schizophrenia have been reported to be three times more likely to experience sudden cardiac arrest than individuals from the general population. [Stano Depo., Ex. 38, at 103-104.]

**UNDISPUTED**.

RESPECTFULLY SUBMITTED this 6th day of November, 2014.

**STINSON LEONARD STREET LLP**

By:  /s/ Larry J. Wulkan
        Michael C. Manning
        Larry J. Wulkan
        1850 North Central Avenue, Suite 2100
        Phoenix, Arizona 85004-4584
        Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2014, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the District of Arizona by using the CM/ECF System. Participants in the case who are registered CM/ECF uses will be served by the CM/ECF system:

Kathleen L. Wieneke
Christina G. Retts
STRUCK WIENEKE & LOVE, P.L.C.
*Attorneys for Defendants City of Phoenix, Patrick Hanlon, and Nicholas French*

Lisa S. Wahlin
RYLEY CARLOCK & APPLEWHITE
*Attorneys for Defendants Arpaio, Carrasco, Dominquez, Foster, Kaiser, Scheffner, Vazquez, and Weiers*

Sarah L. Barnes, Esq.
BROENING, OBERG, WOODS & WILSON, PC
*Attorney for Defendant Hatton*

J. Daniel Campbell
Daniel J. O'Connor
Gary L. Popham, Jr.
O'CONNOR & CAMPBELL, P.C.
*Attorneys for Defendants Maricopa County, Cranmer, Scarpati, and McLean*

By:  /s/ Kathleen Kaupke

DB04/0832418.0002/11387903.1  DD02