Exhibit M



**KUENSEL ONLINE**
*Bhutan's daily news site*

Create an account | Home | Editorial | Features | K2 | Search | Surveys | Forum | Contact | Links | Logout

**London Education**
Inviting Bhutanese for admission to
London at Special Fees






**Sponsors**






# The tent jails of Maricopa county in Arizona



4

**Outdoors: Four meter high barbed wire fences surround these tent jails**

**July, 2011 -** They endure the broiling Arizona desert temperatures of more than 120 degrees F in summer and below freezing temperatures in winter.

He keeps his crime-enforcing sniffer dogs in air-conditioned luxury cells.

This is how 2,000 inmates at the tent city jail in Maricopa county, are treated by legendary lawman Joseph M. Joe Arpaio, 79, the toughest sheriff in the United States of America.

For the Maricopa County sheriff, who opened the tent jail in 1993 to teach an exemplary lesson to criminals and at the same time save taxpayers money after he was elected as sheriff, his sniffer dogs are more important than comforting inmates.

"They are criminals and why should I provide them cooling in summer and heating devices in winter," sheriff Arpaio told a group of visitors from China, Philippines, South Korea, Pakistan, Bhutan and some countries from Europe recently. "Dogs are

**Related Links**
· More about home
· News by samdrup

**Most read story about home:**
Last option ?

**Article Rating**
Average Score: **3.75**
Votes: **16**

★★★★☆

Please take a second and vote for this article:

○ ★★★★★
○ ★★★★☆
○ ★★★☆☆
○ ★★☆☆☆
○ ★☆☆☆☆

[ Cast my Vote! ]

**Options**

🖨 Printer Friendly

ATENCIOS00203

















**Who's Online**

There are currently, 403 guest(s) and 11 member

innocent, therefore, we must treat them softly than criminals."

"I spend a dollar a day to feed my sniffer dogs and only 50 cents for prisoners," said Arpaio who makes his prisoners to wear old fashioned prison stripes and pink underwear.

He brags about how he created the tent jail and the harsh treatment of inmates, and defies critics to argue with Maricopa voters who have returned him to office for 19 years running.

"My intention is to make this place so unpleasant that they won't even think about doing something that could bring them back," he said to the group of international journalists in Phoenix. The voters of Maricopa county, re-elected him in 1996, 2000, 2004 and 2008.



However, majority of inmates within the tent city have not been convicted, rather, they are merely awaiting trial. According to jail officer Miller, inmates were detained for drug abuse, probation violation, drink driving and violation of traffic rules, and immigrant laws. "We, however, don't keep criminals involved in serious crimes like murder or rape," Miller said.

Surrounded by 4-m high barbed wire fences, about 20 to 30 inmates in a tent lie on their narrow bunks, reading, talking and dozing. It is one of the country's most controversial prisons of the more than 3,000 counties and sheriffs who run the local jail system in the United States and is infamous for its treatment of prisoners, including hundreds of illegal immigrants.

In 2010, the State legislature of Arizona, which shares a long border with Mexico, enacted a new immigration law empowering police and other security agencies to question anyone who looks like an illegal immigrant and demand they show identification.

However, Arpaio's practices have drawn fire from rights organizations like national council of La Raza, one of the country's largest Latino civil rights groups, and American civil liberties union (ACLU) for violating US constitutional guarantees of fundamental rights and civil liberties to everyone in the US.

According to a CNN report, although Arpaio has lowered the prison budget, his unorthodox prison management style has led to some high legal

ATENCIOS00204

(s) that are online.

You are an Anonymous
user. You can register for
free by clicking here

expenses. The country has been hit with hundreds
of inmate related lawsuits, and ordered to pay
millions in legal damages.

**By Rinzin Wangchuk, Phoenix, Arizona**

Sorry, Comments are not available for this article.

Copyright © 2010 Kuensel Corporation

(Original PHP-Nuke Code Copyright © 2004 by Francisco Burzi)
Page Generation: 0.12 Seconds

ATENCIOS00205

Exhibit N

1        IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF ARIZONA

3

        Ernest Joseph Atencio, et       )
4       al.,                            )
                                        )
5                   Plaintiffs,         )
                                        ) No.
6       vs.                             ) 2:12-cv-02376-PHX-PGR
                                        )
7       Sheriff Joseph Arpaio, et       )
        al.,                            )
8                                       )
                    Defendants.         )
9                                       )

10

11

12        VIDEOCONFERENCE DEPOSITION OF KEN KATSARIS

13

                    Phoenix, Arizona
14             Asheville, North Carolina
                    June 24, 2014
15                    6:41 a.m.

16

17

18

        REPORTED BY:
19      MARISA L. MONTINI, RPR
        Certified Reporter
20      Certificate Number 50176

21

22      PREPARED FOR:

23

24

25      (Certified Copy)

1   behaviors that he exemplified that were criminal in nature

2   but that were believed reasonably by the Phoenix police to

3   be a result of mental illness.

4       Q.   Okay.  So Mr. Atencio was arrested; right?

5       A.   Yes.

6       Q.   Okay.  And let me go back to my original

7   question.  What evidence have you seen in this case that

8   any of the individual detention officers who had contact

9   with Mr. Atencio had information that he was mentally ill?

10      A.   I wasn't hired to determine whether he was or

11  wasn't mentally ill.  I said I had reviewed at least

12  sufficient information to know he was brought in for that,

13  that there was at least an initial assessment done that

14  certainly indicated there was mental illness.  I reviewed

15  the video which certainly showed an individual that didn't

16  appear to be responsive, but I didn't have any other

17  information, and I'm not rendering the opinion that

18  Mr. Atencio was or wasn't mentally ill, was or wasn't

19  handled with excessive force.  I am rendering an opinion

20  about the leadership and the qualities of the leader and

21  how, when they continue over a period of time to be

22  contrary to the training and perspective of what a jail

23  should be run like, has an influence on the personnel that

24  work for the leader.

25      Q.   So --

1    presents himself in the manner that he does indicating how

2    he believes that punishment is what the jail is about,

3    that the prisoners are all morons, that if I had all the

4    money in the world, I would not do it any differently,

5    that that has an impact.  That is my opinion, and I have a

6    tenure history of nothing changing.  In fact, the Sheriff

7    said nothing will change with me, and that's exactly

8    right, and I wrapped it up, I think, by saying that

9    nothing changes, and the thing that needs to change is his

10   attitude that his employees can understand.

11            When Sheriff Arpaio shows up in court and he

12   testifies, he seems to want to say that, in my opinion

13   because I've read it, that he delegates.  I delegate.  I

14   delegate.  I delegate.  You can't go into court when

15   you're being sued and now you're on the line and you're

16   under oath and just simply say, "I don't know anything

17   about this.  I delegate," and then go out in the public

18   and tell everybody how you want it done because that means

19   that he is delegating those statements to his employees in

20   a way that I think has impacted them for years.

21            MS. WAHLIN:  I'm going to object to that as

22   nonresponsive.

23   BY MS. WAHLIN:

24        Q.   Mr. Katsaris, I was not asking you if it had an

25   impact.  My question is:  What facts or evidence have you

1    seen that the Sheriff's Office employees are actually

2    aware of his public statements?

3        A.    Well, I've read depositions in the past where

4    they are obviously aware of what the Sheriff is saying.

5    Now, I did not go to those because I -- I simply can't

6    imagine that most anybody in Maricopa County knows who

7    Sheriff Arpaio is and what he believes.  I couldn't

8    imagine that his employees have not heard him.  Now, that

9    is my opinion that I believe they know what he is saying.

10   I don't think that's a stretch to believe that employees

11   hear what the Sheriff says.  They always heard what I

12   said.  I believe they hear what he says.  That's from my

13   experience, training and education of having been a

14   sheriff and evaluating sheriff's all over the country.

15       Q.    How many employees did you have when you were

16   sheriff?

17       A.    Several hundred.  I don't know the exact number.

18       Q.    What was the population of the county that you

19   were sheriff over?

20       A.    I don't know.  It's just under 400,000 now.  I'm

21   not sure what it was then.  Could be half that.

22       Q.    You're critical of Sheriff Arpaio's statements

23   that jail should be a place of punishment?

24       A.    Yes.

25       Q.    And you understand that the Maricopa County jails

1  Sheriff Arpaio has in place in the jails?

2      A.    Yes.

3      Q.    Which ones did you consider?

4      A.    I looked at all of the programs in the jail,

5  education, job skills, drug counseling.  I looked at

6  everything that is there.  What I specifically was opining

7  on was the Sheriff's rhetoric that can supplant

8  professional standards given the opportunity where an

9  inmate may not be totally compliant, and instead of going

10 for options and professional standards with a sheriff who

11 speaks as Joe does, it can carry with it, I think, adverse

12 consequences, which I have opined that over the years we

13 haven't seen any changes in those adverse consequences.

14     Q.    So you agree that Sheriff Arpaio does have

15 rehabilitation programs in his jails?

16     A.    Yes, I do.

17     Q.    Based on -- well, let me just ask you this

18 question:  Did you see any evidence that the individual

19 detention officers in this case who had contact with

20 Mr. Atencio were trying to punish him?

21     A.    I already answered the question that I can't

22 opine on the individual officers because it would be

23 unfair without having read their statements or their

24 depositions to know what it was that they were doing or

25 who they were or what their specific role was.

1    differentiate it because it was affecting his jail

2    operations, then he needed to do something to change the

3    rhetoric because the one thing he could change is him, and

4    if he thinks he can change what he believes by simply

5    telling them, don't do as I do, just do as I say, that's

6    very difficult, I think, for personnel to follow.  What

7    they hear every day is not the video that they spent

8    15 minutes on, but the overwhelming coverage and the news

9    television and all the written forms that are possible

10   from around the country that cover him and his rhetoric.

11        Q.   Okay.  First of all, again, you don't know that

12   the jail staff hears Sheriff Arpaio's public statements.

13   You can't -- correct?  That's an assumption; correct?

14        A.   I have read in previous depositions that they are

15   aware of what the Sheriff is saying, and I recall a video

16   clip that I also reviewed, which we may be able to find

17   again, where his media person actually states something

18   similar to the fact that they do, that it does impact the

19   jail personnel.

20        Q.   That wasn't my question, whether it impacts the

21   jail personnel at all.  So let's go back to this.

22             There's a deposition that you read where you

23   believe that a detention officer testified that he or she

24   was aware of the Sheriff's public statements.  Is that

25   your testimony?

1          A.   I believe there's numerous depositions from the

2     past, certainly in cases I have evaluated, where they have

3     been asked about various comments that the Sheriff has

4     made and whether they were aware of them.  I think that to

5     somehow believe that they don't read the newspapers, don't

6     watch television, are not interested in what the public is

7     saying about the place they work is inconsistent with the

8     human soul at best.  I mean, I just don't see that.

9          Q.   But that's an assumption?

10         A.   It is my opinion.

11         Q.   That's an assumption that you're making?

12         A.   It's not an assumption.  It's an opinion that

13    I've made based on the fact that I have reviewed

14    depositions in the past from personnel who have concluded

15    that.  I also saw a video clip relating to the media

16    person for the Sheriff who actually was commenting on the

17    Sheriff and indicated that the personnel, I believe, do

18    hear these things.

19         Q.   So -- but you didn't tell me what case either of

20    those came from; correct?

21         A.   I don't know.  It would have been cases I was

22    involved in specifically, so either Owens, Braillard,

23    Agster or any number of others over the years that I don't

24    even remember.

25         Q.   You made the statement in your opinions before

Katsaris, Ken

Exhibit O

# MARICOPA COUNTY SHERIFF'S OFFICE      *Memorandum*



Joseph M. Arpaio, Sheriff

| To: Lieutenant K. Rustenburg #1266<br>General Investigations Division | From: Sergeant G. Lugo #1480<br>General Investigations<br>Division - Jail Crimes Unit |
|---|---|
| Subject: Memorandum of Concern<br>4th Avenue Jail Intake Facility | Date: December 22nd 2011 |

The purpose of this memorandum is to present an issue of concern which surfaced during the investigation of various cases at the Maricopa County Sheriff's Office 4th Avenue Jail Facility. On 12/16/2011 the Maricopa County Sheriff's Office Jail Crimes Unit was called out to a sick/injured inmate incident which later ended up being a deceased inmate incident documented under MCSO DR# 11-214875. MCSO DR# 11-214875 was initially investigated by the MCSO Jail Crimes Unit but then assumed by the Maricopa County Sheriff's Office Homicide Unit due to possible concerns over force being utilized immediately prior to the inmate being found unresponsive inside of a cell. The following detention officers were identified as having possible involvement with the physical altercation of the inmate who has since deceased.

Lieutenant C. Kaiser #A3436
Sergeant J. Weiers #A8715
Sergeant A. Scheffner #A7888
Officer A. Hatton #B1615
Officer D. Kocur #B1807
Officer C. Foster #B0574
Officer J. Carrasco #A9163
Officer A. Dominguez #B1361
Officer J. Vazquez #B0063
Officer B. Gabriel #A9951
Officer S. Salinas #B0640
Officer J. Sanders #B0545
Officer J. Gallagher #B1685

With the knowledge and potential concerns of the above described incident, the Jail Crimes Unit began to link some of the same detention officers being involved in another incident where an inmate allegedly sustained a broken arm as a result of force utilized against him by detention staff. This incident was identified as MCSO DR# 11-144735. I requested all Jail Crimes detectives to check all their current open cases for anything similar in nature or involving the same detention officers. Three additional cases were identified as MCSO DR# 11-175281, 11-191551, and 11-202948. Below is a summary of the incidents based upon review of the NICE video footage and the incident report documentation/investigation which was conducted.

MCSO DR# 11-144735:
This incident was reported as an injured/sick inmate incident transpiring on 08/19/2011 at the Lower Buckeye Jail Facility. The report was generated by Officer P. Rain #A8991 after inmate Jimmy Hll (P794269) had been sent to the Maricopa County Medical Center to rule out a broken arm and a jaw

ARPAIO-RFP3 0094

fracture. When initially questioned by MCSO Detention Officers in regard to how he sustained the injuries, the inmate reported his injuries were caused by detention staff at central intake during fingerprinting. Lower Buckeye Jail Facility Detention Officers drafted the injured/sick inmate report due to the medical transport and forwarded it to the Jail Crimes Unit for review. No records of an incident report being generated by the 4th Avenue Jail Intake Facility for this physical confrontation have been located at this time. Booking records indicate Hill was booked into the 4th Avenue Jail on 08/18/11 at approximately 2144 hours. On 12/19/2011 detectives located the inmate who had since been released from custody and conducted an interview. During the interview Hill alleges he sustained not only a broken left arm, but possibly a dislocated left shoulder, a cut chin, and a chipped tooth after being assaulted by detention staff at the 4th Avenue Jail Intake Facility. Hill alleges the "sergeant" popped his arm and his chin was injured when he was later slammed on the concrete. Hill also indicated he was disabled prior to this incident, his left arm mobility was limited, he had a prior neck injury, and a prior chest injury. Hill signed medical release forms for both the Maricopa County Medical Center and Correctional Health. These medical records are not available for pick up as of this date. The information regarding this incident has been provided to the chain of command for administrative review and additional investigation. The Jail Crimes Unit inactivated their investigation at this time pending this administrative review. Hill's interview was video recorded and a DVD containing the video is attached to this report. During the investigation process of this incident, the NICE video footage was obtained and reviewed. A summary of the NICE video footage is as follows:

This inmate in question is walked into the search area which contains the x-ray machine by a Phoenix Police Officer. The inmate is visibly verbal and then is surrounded by MCSO Detention Officers. Sergeant Scheffner can be seen speaking with the inmate who takes off his shoes and then lies down on the floor. Several other officers surround the inmate on the floor and work to restrain him. The inmate, without being handcuffed is then picked up and carried into the next search area by MCSO Detention Officers. The inmate is stood up against the search wall, searched, and then moved to another cell. The inmate is then stood up against a wall and then forcibly taken to the ground and brief struggle ensues. The inmate's clothing is removed from his body and he remains on the ground naked inside of this cell. As soon as detention officers leave this cell, it appears the inmate's left arm does not visibility appear to have a normal range of motion and he appears to favor his left arm. The inmate is then moved by MCSO SRT to a safe cell walking on his own while handcuffed behind his back. Once inside the safe cell, the inmate if given an injection by medical staff in the buttocks and his face/chin can be noticeably bleeding. The inmate is then left in the safe cell naked and with no items for approximately 7 hours.

It should be noted at one point following the confrontation with detention staff, the MCSO SRT assists by moving Hill out of one cell and into a safe cell. A separate video camera is utilized during this interaction and Hill repeatedly tells officers that he had a broken arm. A copy of this video footage is also included with this memorandum.

The officers who have been identified as being involved with this incident include:

Sergeant A. Scheffner #A7888
Officer A. Hatton #B1615

There were also at least seven (7) other detention officers who appear to be involved and/or witnesses to portions of this incident but have not been identified to date including medical staff, and two Phoenix Police Officers .

There is also a notation in the booking records which indicate inmate Hill needed his booking photograph taken prior to his release. A copy of the booking photograph is attached to this report and shows Hill wearing a brace.


MCSO DR# 11-175281:

This incident was reported as an assault on detention staff incident transpiring on 10/08/2011 at the 4th Avenue Jail Intake Facility. The report was generated by Officer B. Rauch #B1799. The victim in this case was listed as Correction Health Nurse McLean #CS261 and he did not sustain any injuries as a result of this incident. The report indicates inmate Willie Mitchell (P808985) attempted to assault the nurse by attempting to bite his gloved hand during treatment. The investigation into this incident found the nurse was unaware of this alleged attempted assault until some unknown detention officer moved his hand away and told the nurse that the inmate tried to bite his hand. The report also indicates this attempted bite caused the glove the nurse was wearing to be torn. The nurse was interviewed and informed the investigator that his glove was not damage and he did not sustain any injury. As a result, there is no evidence to substantiate a criminal act on behalf of the inmate and the assault case has been closed. During the investigation process of this incident, the NICE video footage was obtained and reviewed. A summary of the NICE video footage is as follows:

The inmate is brought into the 4th Avenue Jail Intake Facility by the Phoenix Police Department and is visibility verbal with the Phoenix Police Officer. The inmate (Willie Mitchell (P808985)) is eventually brought to the search area which contains the x-ray machine where his shoes are removed. While placing his shoes on the x-ray machine a struggle ensues and the inmate is held down over a portion of the x-ray machine by a combination of Phoenix Police Officers and MCSO Detention Officers. Three MCSO Detention Officers then take control of the inmate and take him to the room with the search wall. The inmate is placed on the search wall with both hands on the wall and his feet on the floor. There is one detention officer on each side of the inmate and another officer behind him. The inmate begins to take his hands off the wall and is immediately pushed from behind while the officers on each side grab the inmate's arms. The inmate's head hits the wall and he is taken to the ground where he obviously sustains an injury to his head/face. Medical staff wipes the inmate's face and there appears to be blood on the floor area. The inmate is subsequently brought to his feet and escorted to the medical clinic at the 4th Avenue Intake Facility where he is placed on a stretcher. After being treated, the stretcher is then wheeled out of the medical clinic and to the entrance of a safe cell door. The inmate is then stood from the stretcher, placed on the floor of a safe cell where his clothing is removed and he is left.

It should be noted on 12/21/2011 at approximately 1238 hours I received telephone contact from Lieutenant J. McGlone #A7394 advising they had possible information regarding accusations of use of force regarding this incident in the form of an inmate grievance. Lieutenant McGlone provided me a copy of the documentation they had reference this incident which alleges excessive force. This documentation was collected at approximately 1355 hours is attached to this memorandum for reference.

The officers who have been identified as being involved with this incident include:

Sergeant J. Weiers #A8715
Officer A. Hatton #B1615
Officer B. Rauch #B1799
Officer C. Foster #B0574

There were also other detention officers who appear to be involved and/or witnesses to portions of this incident but have not been identified to date along with medical staff, and three Phoenix Police Officers.

There is also a notation in the booking records which indicate inmate Mitchell needed his booking photograph taken prior to his release. A copy of the booking photograph is attached to this report and shows Mitchell with an obvious head injury.

MCSO DR# 11-191551:
This incident was reported as an assault on detention staff incident transpiring on 11/04/11 at the 4th Avenue Jail Intake Facility. The report was generated by Officer C. Foster #B0574. The victim in this case was listed as MCSO Detention Sergeant A. Scheffner #A7888 and his injuries consisted of a knee injury and an injury to his eyebrow sustained during a physical struggle with inmate Steven Herman (P816920) beginning in the medical area of the 4th Avenue Jail Intake Facility. The victim in this case, Sergeant Scheffner declined to aid in the prosecution of this case and the case was subsequently cleared/closed. However, during the investigation process of this incident, the NICE video footage was obtained and reviewed. A summary of the NICE video footage is as follows:

The inmate in question is walking under his own power being escorted through the medical clinic at the 4th Avenue Jail Intake Facility when the inmate pulls his arm away from one of the escort officer as he approaches the medical holding cells. Prior to this time, the inmate is not being physically touched by any of the officers as he walks. Sergeant Scheffner then immediately jumps on the back of the inmate with his arms around the inmate's neck/throat and takes him to the floor. Due to the camera angles, the physical confrontation which takes place on the floor is not captured. The inmate is eventually stood up and then then physically escorted to a small cell in the intake facility while handcuffed behind his back. The inmate is then placed on the floor of the cell and while the handcuffs are removed a physical confrontation continues. The officers, without ever leaving this cell, then escort the inmate to out of this cell and toward a safe cell where various towels are utilized to apparently address some type of facial/head injury to the inmate. Towels are also utilized to wipe something up on the floor and the inmate is subsequently escorted out of camera range never being placed inside the safe cell. According to OJ logs, the inmate was escorted back to the medical clinic where he received seven stiches for his injuries.

The officers who have been identified as being involved with this incident include:

Sergeant J. Weiers #A8715
Sergeant A. Scheffner #A7888
Officer A. Hatton #B1615

There were also at least four (4) other detention officers who appear to be involved and/or witnesses to this incident but have not been identified to date.

MCSO DR# 11-202948:
This incident was reported as an assault on detention staff incident transpiring on 11/26/2011 at the 4th Avenue Jail Intake Facility. The report was generated by Officer S. Salinas #B0640. The victim in this case was listed as MCSO Detention Sergeant J. Weiers #A8715 and his injuries consisted of a right knee injury and an abrasion to his forehead during a physical struggle with inmate Adam Jones (P822393) in

the search areas with the x-ray machine. The victim in this case, Sergeant Weiers declined to aid in the prosecution of this case and the case was subsequently cleared/closed. However, during the investigation process of this incident, the NICE video footage was obtained and reviewed. A summary of the NICE video footage is as follows:

Inmate Adam Jones (P822393) was being booked into the Maricopa County Sheriff's Office 4th Avenue Jail Facility by the Gilbert Police Department. In the search area of the jail facility where the x-ray machine is placed the inmate is escorted against a wall with Sergeant Scheffner, Sergeant Weiers, Officer Hatton, and Officer Salinas present along with the Gilbert Police Transportation Officer. The inmate is noticeable verbal with the officers and eventually removes his socks from his feet. The inmate is then escorted toward the ink pad table for apparent fingerprinting and during this movement Sergeant Weiers has a hold on the inmate's right arm/wrist. The right arm/wrist can be seen moving and then one of the detention officers, possibly Sergeant Scheffner, grabs the inmate from behind around the neck/throat and wrestles the inmate to the ground. A struggle ensues on the floor with several other detention officers coming to assist. During this struggle, the video appears to show Officer Hatton making several movements to what would be the upper body/head area of the inmate. Due to the number of officers present and the video quality it cannot be ascertained exactly what is taking place, but it is visibly a repeated significant downward motion on the inmate made by Officer Hatton. The inmate is eventually subdued, brought to his feet, and escorted into the jail facility past the search area by MCSO personnel. After the inmate is subdued, several towels can be seen utilized to wipe up something on the floor area where the struggle had just taken place. An important note is a digital photograph was taken of the inmate sometime after this struggle and is attached to this report for reference. The photograph shows extensive facial/head injuries sustained by the inmate which are not visible in the booking photograph which is also attached for reference.

The officers who have been identified as being involved with this incident include:

Sergeant J. Weires #A8715
Sergeant A. Scheffner #A7888
Officer A. Hatton #B1615
Officer S. Salinas #B0640

There were also at least the (10) other detention officers who appear to be involved and/or witnesses to this incident but have not been identified to date, one Gilbert Police Officer, and it appears two Phoenix Police Officers. Several medical staff personnel were also on scene to assist with the situation.

In conclusion, from October 2011 thru November 2011 there have been at least four documented incidents at the Maricopa County Sheriff's Office 4th Avenue Jail Facility where during the course of investigations, inmates have sustained injuries at the hands of MCSO Detention Officers. During the investigative process it appears on the surface with the information that has been gathered to date, the actions of involved MCSO Detention Officers may have not been appropriate in all instances. It also appears the same group of detention officers is involved with a majority of these incidents. Given the totality of the circumstances present in the above outlined incidents and MCSO DR# 11-214875 it is the recommendation of this supervisor that additional examination/review of these incidents is warranted.

Copies of all three Maricopa County Sheriff's Office Incident Reports (11-175281, 11-191551, and 11-202948) along with CD's containing the video footage are attached to this memorandum for reference.

This memorandum is forwarded via chain of command for review.

I have reviewed this
document and recommend
follow up investigation be
conducted by IA personnel.
Capt. SPC[signature] 611
12/27/11

Please investigate
each case and advise
G.A. Sheridan
Chief Deputy
12/27/11

ARPAIO-RFP3 0099

Exhibit P

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                          DISTRICT OF ARIZONA

 3
          ERNEST JOSEPH ATENCIO,        )
 4        surviving father of Ernest    )
          Marty Atencio, individually   )   Videotaped Deposition of:
 5        and on behalf of the          )
          following statutory           )   TODD RANDALL WILCOX, M.D.
 6        beneficiaries of Ernest       )
          Marty Atencio; Rosemary       )
 7        Atencio, surviving mother     )
          of Ernest Marty Atencio;      )   NO. 2:12-cv-02376-PHX-PGR
 8        Joshua Atencio, surviving     )
          son of Ernest Marty Atencio;)
 9        Joseph Atencio, surviving     )
          son of Ernest Marty Atencio;)       June 17, 2014
10        M.A., a minor and surviving   )
          son of Ernest Marty Atencio;)     1:00 p.m. to 8:06 p.m.
11        and MICHAEL ATENCIO,          )
          Personal Representative of    )
12        the estate of Ernest Marty    )
          ATENCIO; and ROSEMARY         )           Location:
13        ATENCIO, individually;        )
          JOSHUA ATENCIO,               )          CitiCourt LLP
14        individually; JOSEPH          )        236 South 300 East
          ATENCIO, individually; and    )       Salt Lake City, Utah
15        M.A., through his Next        )
          Friend, Eric Atencio,         )
16                                      )
               Plaintiffs,              )
17                                      )
          vs.                           )
18                                      )
          SHERIFF JOSEPH ARPAIO and     )           Reporter:
19        AVA ARPAIO, husband and       )
          wife; MARICOPA COUNTY, a      )   Susette M. Snider, CRR, RPR
20        public entity; JAIME          )
          CARRASCO and OLIVIA           )
21        CARRASCO, husband and wife;   )
          ADRIAN DOMINGUEZ and          )
22        SAMANTHA DOMINGUEZ, husband )
          and wife; CHRISTOPHER         )
23        FOSTER and MICHELLE FOSTER, )
          husband and wife; ANTHONY     )
24        HATTON and JACLYN HATTON,     )

25        husband and wife; CRAIG       )
```

1  medical probability.

2      Q.    Did you consider whether Mr. Atencio would

3  have died even if the TASER had not been deployed?

4      A.    Well, I didn't parse out each one of the

5  uses of force because I don't think you really

6  realistically can.  It really is sort of a sum total

7  of the uses of force that caused his sympathetic

8  nervous system to go into overdrive, and that was

9  ultimately the cause of his sudden cardiac death.

10     Q.    So the answer to my question would be no,

11  you did not consider whether Mr. Atencio would have

12  died even if the TASER had not been used?

13     A.    Correct.

14     Q.    Did you consider whether Mr. Atencio would

15  have died if he would have submitted to being

16  handcuffed without struggling?

17     A.    No.

18     Q.    There's something I was going to ask you

19  about a long time ago, and I forgot it, so I'm going

20  to go back.

21          Earlier you talked about -- and I can't

22  even remember, frankly, what question I'd asked you,

23  but you gave some testimony about the idea that

24  Mr. Atencio could have been handled differently.  And

25  one of those things is he could have been -- I

1    death when we're talking about the fist strikes?

2         A.    Well, I think -- we're off in the middle

3    of a partially formed question.  Could you just ask

4    that whole thing again?

5         Q.    The question is what else besides pain did

6    the fist strikes do to cause injury contributing to

7    Mr. Atencio's death?

8         A.    Well, they induced --

9         Q.    In your opinion.

10        A.    They induced fear, and the combination of

11   pain and fear activated his sympathetic system, which

12   dumped epinephrine and norepinephrine into his system

13   and caused sudden cardiac death.

14        Q.    And how do you know that it caused fear?

15        A.    Because when you're restrained and you're

16   psychotic and you're being struck, that's a fearful

17   condition.

18        Q.    And have you ever been in that condition

19   yourself?

20        A.    No.  To my knowledge, I've never been

21   psychotic.

22        Q.    Ever been restrained?

23        A.    No.

24        Q.    Ever been struck while being restrained?

25        A.    No.

# Exhibit Q

IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

Ernest Joseph Atencio,              )
4     surviving father of Ernest          )
Marty Atencio, individually and     )
5     on behalf of the following          ) No.
statutory beneficiaries of          ) 2:12-cv-02376-PHX-PGR
6     Ernest Marty Atencio: Rosemary      )
Atencio, surviving mother of        )
7     Ernest Marty Atencio; Joshua        )
Atencio, surviving son of           )
8     Ernest Marty Atencio; Joseph        )
Atencio; surviving son of           )
9     Ernest Marty Atencio; M.A., a       )
minor and surviving son of          )
10    Ernest Marty Atencio; and           )  VIDEOTAPED DEPOSITION
MICHAEL ATENCIO, Personal           )  OF DR. WILLIAM STANO
11    Representative of the Estate of     )
Ernest Marty Atencio; and           )
12    ROSEMARY ATENCIO, individually;     )
JOSHUA ATENCIO, individually;       )     Phoenix, Arizona
13    JOSEPH ATENCIO, individually;       )    November 27, 2013
and M.A., through his Next          )       9:09 a.m.
14    Friend, Eric Atencio,               )
)
15                  Plaintiffs,           )
)
16    vs.                                 )
) REPORTED BY:
17    Sheriff Joseph Arpaio and Ava       ) MARISA L. MONTINI, RPR
Arpaio, husband and wife;           ) Certified Reporter
18    Maricopa County, a public           ) Certificate Number
entity; Jaime Carrasco and Jane     ) 50176
19    Doe Carrasco, husband and wife;     )
Adrian Dominguez and Jane Doe       ) PREPARED FOR:
20    Dominguez, husband and wife;        )
Christopher Foster and Jane Doe     )
21    Foster, husband and wife;           ) (Certified Copy)
Anthony Hatton and Jane Doe         )
22    Hatton, husband and wife; Craig     )
Kaiser and Jane Doe Kaiser,         )
23    husband and wife; Anthony           )
Scheffner and Jane Doe              )
24    Scheffner, husband and wife;        )
Jose Vazquez and Jane Doe           )
25    Vazquez, husband and wife;          )
)

1    A.    Yes, it's a possibility.  That's the -- yes or

2  no.  I don't know.  I think it's a possibility.  I think I

3  talked about when it's one of those risk factors that may

4  have been one of the -- may have been the risk factor to

5  have caused his cardiac arrest.

6    Q.    Is that your opinion to a reasonable degree of

7  medical certainty --

8    A.    Yes.

9    Q.    -- that it was the psychosis that caused his

10 heart to stop?

11   A.    No.

12   Q.    Let me rephrase that question.

13          Is it your opinion to a reasonable --

14          MS. ALLEN:  What's the saying?

15          MR. WULKAN:  Probability.

16          MS. ALLEN:  Reasonable degree of medical --

17 I'll get that right.

18 BY MS. ALLEN:

19   Q.    Is it your opinion to a reasonable degree of

20 medical probability that the psychosis caused Marty's

21 heart to stop?

22   A.    No.

23   Q.    Why not?

24   A.    Like I said, it's -- it's one of the risk

25 factors.  So if I'm understanding the questioning right,

Stano, Dr. William

1  you're saying if it's my opinion that the psychosis and

2  nothing else caused his cardiac arrest, then, no, that's

3  not my opinion.  It's a possibility that it could have,

4  but that's as far as I can get with certainty or

5  probability.

6      Q.   I'm going to ask the same question about the

7  clinical history of hyperlipidemia and hypertension that

8  you mention in section 5A of your report.

9           Is it your opinion to a reasonable degree of

10  medical probability that his clinical history of

11  hyperlipidemia and hypertension caused Marty's heart to

12  stop on December 16, 2011?

13           MS. FLAGGMAN:  Form, please.

14           THE WITNESS:  No.

15  BY MS. ALLEN:

16      Q.   And is it your opinion to a reasonable degree of

17  medical probability that Marty's cardiomegaly caused his

18  heart to stop on December 16, 2011?

19           MS. RETTS:  Foundation.

20           THE WITNESS:  No.

21  BY MS. ALLEN:

22      Q.   Why not?

23      A.   Similar to what we talked about with the

24  psychosis.  For -- for all of these, again, they're all

25  risk factors, and so, yes, I think it's -- it's possible

1    that his underlying heart disease may have caused his

2    cardiac arrest, but to exclude all the other risk factors

3    with certainty, I can't do.

4         Q.   Is it your opinion to a reasonable degree of

5    medical probability that Marty's arteriolar sclerosis of

6    the kidneys caused his heart to stop on December 16, 2011?

7         A.   No.

8         Q.   Why not?

9         A.   Same as the other.  Those -- you're doing them

10   individually, but to me those are all in sort of the realm

11   of -- of what we say atherosclerotic and hypertensive

12   cardiovascular disease or heart disease.  Those are all

13   sort of together.  I wouldn't separate one of them out

14   from the others.

15        Q.   So is it fair to say that with respect to

16   subsections D through J of section 5 of your medical

17   report, that you would give me the same answer with

18   respect to each of those conditions?

19                  MS. BARNES:  Form.

20                  MS. RETTS:  Foundation.

21                  THE WITNESS:  Yes.

22   BY MS. ALLEN:

23        Q.   As a risk of boring you all to death, I will do

24   them individually.

25                  Is it -- in your opinion, to a reasonable

1    degree of medical probability, did Marty's aortic

2    atherosclerosis cause his heart to stop on December 16,

3    2011?

4                    MS. RETTS:  Foundation.

5                    THE WITNESS:  No.

6    BY MS. ALLEN:

7        Q.   Why not?

8        A.   Again, I would -- I would lump that in with the

9    rest of the heart disease, and, again, it would be a

10   possibility that the heart disease led to his cardiac

11   arrest either alone or in conjunction with the other risk

12   factors, but to exclude that with reasonable probability

13   or certainty above all the other risk factors, I couldn't

14   do.

15       Q.   Is it your opinion that -- to a reasonable degree

16   of medical probability that Marty's coronary artery

17   atherosclerosis caused his heart to stop on December 16,

18   2011?

19                   MS. RETTS:  Foundation.

20                   THE WITNESS:  No.

21   BY MS. ALLEN:

22       Q.   Why not?

23       A.   Basically the same answer as the aortic

24   arthrosclerosis question, unless you need me to -- do you

25   want me to explain more?

1        Okay.  So, again, the coronary artery

2   atherosclerosis would be just a subset of his overall

3   heart disease, and I do think it's -- it's possible that

4   his heart disease, either alone or in conjunction with the

5   other risk factors, caused his cardiac arrest, but to

6   exclude that or to conclude that with certainty above all

7   the other risk factors, I couldn't do.

8        Q.   In your opinion, did Marty's clinical history of

9   past polysubstance abuse and dependence to a reasonable

10  degree of probability cause Marty's heart to stop on

11  December 16, 2011?

12            MS. RETTS:  Foundation.

13            THE WITNESS:  No.

14  BY MS. ALLEN:

15       Q.   Why not?

16       A.   This one is basically describing a history of

17  past substance abuse.  However, as we talked about, there

18  was no evidence of acute intoxication with those

19  substances.  So whether or not he had abused drugs in the

20  past, to me it doesn't really play a role in a possible --

21  in causing his possible cardiac arrest.

22       Q.   In your opinion to a reasonable degree of medical

23  probability, did Marty's hepatic steatosis cause his heart

24  to stop on December 16, 2011?

25            MS. RETTS:  Foundation.

1          THE WITNESS:  No.

2     BY MS. ALLEN:

3          Q.   Why not?

4          A.   There have been some case reports of fatty liver

5     alone being associated with cardiac arrest, but it's not a

6     well known entity in that realm of just having a fatty

7     liver and nothing else.  Most of the time in most of those

8     cases, like we talked about, it's more of a constellation

9     of alcohol abuse, chronic alcohol abuse that's leading to

10    the death.  So to me the -- the fatty liver, although one

11    of the risk factors within the multiple medical problems

12    subset is possible.  I don't -- I don't think -- and this

13    one, to a reasonable degree of medical probability, the

14    hepatic steatosis alone did not cause his cardiac arrest.

15         Q.   In your opinion, did Marty's clinical history of

16    antemortem electrocardiograms positive for prolonged QT

17    interval, to a reasonable degree of medical probability,

18    cause Marty's heart to stop on December 16, 2011?

19              MS. RETTS:  Foundation.

20              THE WITNESS:  No.

21    BY MS. ALLEN:

22         Q.   Why not?

23         A.   This one is -- it's similar to what I was talking

24    about with the heart disease, but all those others, the

25    subsets A through E, they're all sort of the anatomic

findings of the atherosclerotic and hypertensive

cardiovascular disease.  With the prolonged QT interval,

it's sort of a different type of heart disease.  It's more

of a -- like we were talking about the electrical, the --

the actual pumping of the heart rather than the heart

tissue itself.  So, again, I do think that that one is a

possible -- it could be the possible risk -- risk factor

that led to his cardiac arrest, but to exclude that -- or

to exclude all the others above that, I could not do with

a reasonable degree of probability or certainty.

     Q.   In your opinion, did Marty's clinical history of

chronic right shoulder pain cause Marty's heart to stop on

December 16, 2011, to a reasonable degree of medical

probability?

     A.   No.

     Q.   Why not?

          MS. BARNES:  Really?

          THE WITNESS:  Basically it's just saying

that in the past he had had -- he had had -- it's just

including all of his medical history.  So he had had this

surgery on his rotator cuff, which is a part of the

shoulder joint.  I'm not aware of any cases of -- of a

cardiac arrest due strictly to shoulder pain.

BY MS. ALLEN:

     Q.   And last but not least on this list, is it your

1   opinion to a reasonable degree of medical probability that

2   Marty's clinical history of tobacco smoking caused his

3   heart to stop on December 16, 2011?

4      A.   No.

5      Q.   Why not?

6      A.   Tobacco smoking is sort of -- the best way I

7   would describe it is it's sort of a risk factor within a

8   risk factor.  So going back to my cause, the multiple

9   medical problems, that's a risk factor for his cardiac

10   arrest.  Part of the multiple medical problems is his

11   heart disease.  Tobacco smoking itself is a risk factor

12   for heart disease, but as far as a direct line between

13   tobacco smoking and cardiac arrest, I'm not aware of any

14   direct -- it's usually the smoking is a risk factor for

15   the heart disease and the heart disease is the risk factor

16   for the cardiac arrest.

17      Q.   Earlier on you testified that you thought it was

18   unlikely that Marty was going to have a heart attack or a

19   cardiac arrest, I should say, on December 16, 2011, even

20   if he hadn't been in the jail that night.

21           Do you recall testifying to that?

22      A.   Yes.

23      Q.   Tell me all the reasons why you believe it would

24   be unlikely to happen.

25      A.   Well --

1          MS. BARNES:  Foundation.

2          MS. FLAGGMAN:  Join.

3          THE WITNESS:  -- the -- the heart -- the

4    cardiac arrest in the setting of heart disease alone, it's

5    really hard to predict when someone may have that sudden

6    cardiac arrest.  One of the things we rely on is the

7    symptoms, you know, someone having chest pain, are they

8    having other issues that may be a trigger for a cardiac

9    arrest in the setting of that heart disease.  In this

10   case, there wasn't really any ability to discern that.

11   There wasn't a lot of information about what Marty was

12   doing the days before this event, and also during the

13   event because of the psychosis, I don't think he was able

14   to sort of portray that he -- if he was having chest pain,

15   I don't know if there was any way to sort of garner that.

16          So -- but we do see -- I mean, I do have a

17   lot of cases where someone with heart disease is just

18   found down with their cardiac arrest, but it's sort of

19   random, and without having that sort of history of chest

20   pain or any sort of signs that a cardiac arrest is -- is

21   imminent, it's really hard to sort of just say, well, at

22   that particular moment, that's when he was going to have

23   his -- his cardiac arrest due strictly to his heart

24   disease, but there is literature out there about physical

25   exertion and stress sort of being triggers for cardiac

1    arrest in people with heart disease.  So that, again,

2    would make -- is why I answered unlikely in that -- to

3    your an original -- to your original question.  Sorry.

4    BY MS. ALLEN:

5        Q.   Do you have any reason to believe that Marty

6    experienced any chest pain on or about December 16, 2011?

7                MS. WAHLIN:  Object to foundation.

8                THE WITNESS:  No.

9    BY MS. ALLEN:

10       Q.   What is your opinion about what caused Marty's

11   heart to stop on December 16, 2011?

12       A.   My opinion is that I don't know exactly why his

13   heart stopped.  He has multiple risk factors for -- that

14   may have caused his heart to stop, but they're all

15   occurring at the same time.  Some of them have been shown

16   to amplify each other.  So my official opinion is I don't

17   know why his heart stopped, but there are several

18   possibilities.  I just don't think it's possible to sort

19   of take one above the others and say this is the one that

20   caused his heart to stop.

21       Q.   Do you believe that Marty's heart would have

22   stopped on or about December 16 if he had not had his

23   interaction with law enforcement?

24                MS. BARNES:  Form; foundation.

25                MS. FLAGGMAN:  Join.

1          THE WITNESS:  Do I believe if it would have?

2     I -- I don't know what I would believe in that situation.

3     Like I -- all I can really say is that it would be

4     possible, like when we talked about the heart disease and

5     the cardiac arrest, but unlikely for the reasons I've

6     already described.

7     BY MS. ALLEN:

8          Q.   Do you know what an AED is?

9          A.   Yes.

10         Q.   What is that?

11         A.   It stands for -- well, let me go back to my

12    report.  I think -- I hope I put it in there.

13              Automated external defibrillator, and it's

14    similar to what you see in the airports.  It's basically

15    another -- sort of a high tech version of CPR where you

16    put the leads on and it sort of detects the rhythm of the

17    heart at that point, and then it advises whether you need

18    to cardiovert or give the shock to try to get the heart

19    back into its regular rhythm.

20         Q.   And are you aware that the AED that was used on

21    Marty on December 16, 2011, did not deliver a shock?

22              MS. FLAGGMAN:  Form and foundation.

23              THE WITNESS:  Going to my report of

24    circumstances, I'm aware that it advised no shock, but I

25    don't know if it actually ever did do a shock or not.

Stano, Dr. William

1     A.   I don't recall.  If you showed me the records, I

2     could look through them again, but I don't remember.

3     Q.   Cause and manner of death are opinions --

4     A.   Yes.

5     Q.   -- correct?

6            On page 1 of Exhibit 57, your autopsy

7     report, you may have -- pardon me.  You may have been

8     asked this, but I'm not sure that I got your answer if you

9     did.

10           Under cause of death, you refer to law

11    enforcement subdual.  What specific actions are you

12    encompassing in that term law enforcement subdual?

13    A.   What's being encompassed in that term is

14    everything under number four under the pathologic

15    diagnoses, not -- not letters A through D.  Those are just

16    the injuries, but history of law enforcement subdual

17    including, so I'm including the chokehold, the prone

18    placement, the restraint, the use of the TASER and the use

19    of handcuffs.  Basically it's a -- a broad encompassing

20    of -- of all of them.

21    Q.   How many autopsies have you done of a decedent

22    who has been tased or who was tased?

23    A.   Six.  Although to clarify, are you saying tased

24    in the setting of law enforcement subdual?

25    Q.   I'm saying -- that's -- thank you for asking.

Exhibit R



## OFFICE OF THE MEDICAL EXAMINER
### 701 W. Jefferson St.
### Phoenix, AZ 85007

## REPORT OF AUTOPSY

**DECEDENT:** Ernest Marty Atencio        **CASE:** 11-07638

**DATE OF EXAMINATION:** 12/21/2011        **TIME:** 0806 Hours

**PERSONS PRESENT AT EXAMINATION:**
**Maricopa County Sheriff's Office:** Detective Cluff #S0961

---

### PATHOLOGIC DIAGNOSES

I.    Clinical history of cardiac arrest.

II.   Complications of above.
     A.    Acute hypoxic/ischemic encephalopathy, with diffuse cerebral edema, cerebellar tonsillar herniation, acute hemorrhages, and clinical history of brain death.
     B.    Clinical history of hyperglycemia and thrombocytopenia.
     C.    Clinical history of multisystem organ failure including acute respiratory failure and subsequent development of acute bronchopneumonia.

III.  Circumstantial evidence consistent with acute psychosis.
     A.    Clinical history of cognitive disorder, not otherwise specified (NOS), schizoaffective disorder, depression, and prior suicidal ideation/attempt.

### PATHOLOGIC DIAGNOSES CONTINUED ON NEXT PAGE

---

**CAUSE OF DEATH:** Complications of cardiac arrest in the setting of acute psychosis, law enforcement subdual, and multiple medical problems
      **MANNER:** Undetermined

05/30/12
**Date Signed**

_W—T—P III, MD_

**WILLIAM T. STANO III, MD**
**MEDICAL EXAMINER**

OMEPR00127

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

## PATHOLOGIC DIAGNOSES CONTINUED

    B.    Clinical history of prior prolonged inpatient hospitalizations for acute psychosis.

IV.    History of law enforcement subdual, including apparent carotid chokehold, prone placement and restraint, use of conducted electrical device, and use of handcuffs.
    A.    Skin lesions of chest and left posterior thigh (consistent with conducted electrical device contact points).
    B.    Focal soft tissue hemorrhage of laryngeal prominence.
    C.    Ecchymosis of left shoulder.
    D.    Abrasions of abdomen, left wrist, right posterior thigh, and left cheek.

V.    Multiple medical problems.
    A.    Clinical history of hyperlipidemia and hypertension.
    B.    Cardiomegaly (500 grams), mild, with myocyte hypertrophy and mild patchy interstitial and perivascular fibrosis.
    C.    Arteriolar sclerosis of kidneys.
    D.    Aortic atherosclerosis, moderate to severe.
    E.    Coronary artery atherosclerosis, mild to moderate.
    F.    Clinical history of past polysubstance abuse and dependence (alcohol, cannabis, methamphetamine).
    G.    Hepatic steatosis, severe.
    H.    Clinical history of antemortem electrocardiograms positive for prolonged QT interval.
    I.    Clinical history of chronic right shoulder pain; status post remote rotator cuff surgery.
    J.    Clinical history of tobacco smoking.

VI.    Clinical history of prolonged perimortem CPR, including chest compressions performed by multiple individuals.
    A.    Multiple bilateral anterior rib fractures.
    B.    Liver laceration.
    C.    Focal mesenteric hemorrhage of small intestine.

VII.    Toxicology and postmortem vitreous fluid electrolyte analysis non-contributory.

## REPORTED CIRCUMSTANCES OF DEATH

The decedent, a 44 year old military veteran, had a long and complicated medical history that included hypertension, hyperlipidemia, evidence of a heart arrhythmia (prolonged QT interval), chronic right shoulder pain (status post remote rotator cuff surgery), tobacco smoking, and polysubstance dependence with prior episodes of alcohol and methamphetamine abuse. He also had multiple mental health problems, including schizoaffective disorder, cognitive disorder, NOS, depression, and prior

OMEPR00128

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

suicidal ideation/attempt. The decedent had also had two separate inpatient hospitalizations for psychiatric care. In May 2009 he was hospitalized due to hallucinations, hearing voices, alcohol, cannabis, and methamphetamine abuse, and medication non-compliance. His admitting diagnosis at that time was schizoaffective disorder, manic type. He was discharged to home in June 2009. In July 2010, he was again hospitalized, this time due to an acute psychosis that included hearing voices telling him to kill himself. During that hospitalization, he was also described as being homeless and depressed secondary to his wife leaving him. He was treated with medication and therapy, and responded well enough to the point of being discharged to home in October 2010.

His last known documented medical information was from an unscheduled visit to a Veterans Administration (VA) care facility for a medication update in August 2011. At that time he was described as living at an assisted living facility (ALF), and his medications were updated.

From August 2011 to December 15, 2011, all information regarding the decedent is unknown. There were no received medical records from that time frame, and it is unclear where he was living, whether he was employed or homeless, whether he was compliant with his medications, and whether he was experiencing any new or recurrent medical or psychotic symptoms. On December 21, 2011, an investigator with the Office of the Medical Examiner (OME) spoke with the decedent's next of kin (NOK), and the only information obtained at that time was that the decedent had had "heart medications", that he "smoked cigarettes", and that he had had "personal issues." Further contact with NOK to inquire information about the decedent from August to December 2011 was precluded by legal proceedings.

During the evening hours of December 15, 2011, a woman noticed the decedent aggressively kicking the outside door to an apartment. It was unclear if the woman knew the decedent, and it was unclear who lived in that particular apartment. The woman walked into the apartment's parking lot and called emergency 911 using her cell phone. The decedent then walked up behind her aggressively and began yelling at her with his face inches away from hers. At that point the woman felt the decedent was going to hit her, but she stated he became distracted by a passing car and began chasing it. When Phoenix Police Department officers arrived at the scene, they observed the decedent aggressively pointing his cell phone at the woman. They immediately recognized the decedent as the same man they had made contact with earlier the same day at a location not far from the apartment complex. At 2110 hours, the officers arrested the decedent for assault.

From 2110 hours on December 15, 2011 to 0101 hours on December 16, 2011, the decedent was in Phoenix Police custody while being transported to various locations. According to several other arrested witnesses who were being transported with the decedent, he was showing signs of acute psychosis at that time.

OMEPR00129

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

At 0101 hours on December 16, 2011, the decedent arrived at the 4th Avenue Jail in Phoenix. He walked into the jail at 0104 hours, and was placed in a holding area with other arrested persons. He remained standing while all the other arrested persons sat down, and eventually he was handcuffed in order to remain seated. He remained in the holding area until 0134 hours, when he was removed. At 0139 hours, he was placed into an isolation room, and from that time until 0157 hours, he remained in the room and continued to show signs of acute psychosis. At approximately 0200 hours, he underwent a premedical intake. At that time, he again showed signs of acute psychosis, expressed suicidal ideation, and was thought to possibly be under the influence of drugs. He also stated at that time that he had used methamphetamine at approximately 1700 hours on December 15, 2011. His blood pressure at that time was 159/66, and he was deemed to have the need for a safe cell. At 0205 hours, he was placed back into the isolation room. At 0233 hours, he was taken to a booking area. At that point, law enforcement subdual began and included an apparent carotid chokehold, prone placement and restraint, and the use of a conducted electrical device, both directly to his skin and via barbs. This struggle lasted until 0240 hours, and at that time the decedent remained non-compliant and was cleared by medical personnel. At 0241 hours, he was carried in a prone position into a safe cell, where he continued to have prone restraint. His clothes were removed in the safe cell, and all law enforcement personnel left the cell by 0243 hours. From 0243 hours to 0252 hours, he remained in the same position and made no movements except for an unspecified abdominal movement. At 0252 hours, law enforcement personnel entered the safe cell and noticed the decedent to be unresponsive, apneic, and without pulse. Chest compressions were begun, and an automated external defibrillator (AED) was brought in. It advised no shock, and to continue chest compressions. Chest compressions were continued by various law enforcement personnel until 0303 hours, when the Phoenix Fire Department arrived to the safe cell. Upon their arrival, the decedent's initial heart rhythm was noted to be asystole, and initial treatment included the administration of epinephrine, narcan, and subsequent intubation. He was also defibrillated, with no initial change. At 0319 hours, the decedent was taken from the 4th Avenue Jail to St. Joseph's hospital, where he arrived at approximately 0325 hours. He arrived in full cardiac arrest with cardiopulmonary resuscitation (CPR) ongoing. His code arrest lasted for approximately 35 minutes, and eventually a pulse was obtained. He remained intubated and was transferred from the emergency department to the intensive care unit (ICU) at approximately 0342 hours. His initial rectal temperature was 35.6 degrees Celsius, and a prehospital glucose reading was 251 mg/dL. A CT scan of his head was negative for fractures or intracranial hemorrhage, and positive for probable diffuse cerebral edema. Two urine drug screens performed shortly after his admission were negative, and a third one, performed on December 18, 2011 was also negative. His initial diagnoses included cardiac arrest, hyperglycemia, severe anoxic brain insult, and multisystem organ failure. The decedent remained in critical condition throughout his hospital course, and on December 20, 2011, a brain study indicated no flow, i.e., brain death. He was subsequently pronounced dead at 1537 hours.

OMEPR00130

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

## EXTERNAL EXAMINATION

Received in a plastic body pouch secured by a seal bearing the number 0013628, the body is that of a 69-inch, 208-pound, well-developed, well-nourished, adult male who appears compatible with the reported age of 44 years. The scalp is covered by up to 1-1/2 inch black hair. Complete shaving of the scalp demonstrates round folds in the scalp itself and no external marks of significance. Facial hair consists of a mustache and goatee. The eyes have brown irides and equal size pupils. The left lower bulbar area of the eye has focal petechiae. The remainder of the bulbar and palpebral conjunctivae has no petechiae. The nose has no injuries or significant abnormalities, and the nasal septum is free of perforation. The external ears have no acute injuries, and the earlobes have bilateral and obliquely oriented linear creases. The oral cavity is free of foreign objects. The oral and palatal mucosa has no visible lesions. The frenulum is intact. The inner surface of the lower lip has a monochromatic tattoo that depicts the phrase "FUCK U." Native upper and lower dentition is in good repair.

The neck and chest are symmetrical, and the breasts have no gynecomastia. A 1 inch linear scar is on the posterior aspect of the right side of the neck. The far lateral aspect of the chest has a 1-3/4 inch linear scar. The left side of the chest has a 5 x 5 inch monochromatic tattoo that depicts mime skulls. The abdomen is mildly rounded and has a 1/4 inch round and hyperpigmented macule on the left lower quadrant. The far right lower quadrant has a 1-1/2 inch multichromatic tattoo that depicts a mushroom. The posterior aspect of the neck has a monochromatic tattoo that depicts a cross. This tattoo blends into a multichromatic tattoo on the right side of the upper back that depicts a panther, an animal figure, and blue and red lines. The buttocks and anus have no acute injuries or other significant abnormalities. The atraumatic external genitalia are those of an adult male who appears circumcised. Both testes are palpable within the scrotum. The perineum has no gross abnormalities.

The upper and lower extremities have no visible bony abnormalities or palpable fractures. The anterior aspect of the right shoulder has a 4 inch linear scar. The medial aspect of the right arm has a 3 x 4 inch multichromatic tattoo that depicts a right hand with the middle finger raised and an animal like head. The lateral aspect of the right arm has a 4 x 4 inch monochromatic tattoo that depicts an eagle, the capital letter "A", and the decedent's last name. The dorsal aspect of the right forearm has a 4-3/4 inch cluster of hypopigmented and irregular scars. A 2 inch faint dark red mark is on the medial aspect of the right forearm. The left shoulder has a 3-1/2 x 4 inch multichromatic tattoo that depicts a cobra with a skull. A 0.1 cm healing skin lesion is on the dorsal aspect of the left hand. The dorsal aspect of the left hand also has a 0.5 cm healing skin lesion between the second and third fingers. Faint black foreign material is scattered across the fingertips and thumbs, and the intact and clean fingernails are otherwise unremarkable.

The lateral aspect of the right knee has a 2 inch obliquely oriented and linear scar. A 3 inch cluster of irregular scars is on the left lower leg. Patterned areas of lighter skin pigmentation are on the dorsal aspects of the feet. The sole of the right foot has a

OMEPR00131

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

3/4 inch red mark that extends onto the right second toe. The intact and clean toenails are otherwise unremarkable.

A gross thickening of the posterolateral aspect of the right rib is visualized on whole body postmortem radiographs. No other grossly visible bony abnormalities are visualized, and apparent medical hardware is in the right shoulder.

## CLOTHING AND PERSONAL EFFECTS

The body is received unclad. Received with the body is a hospital style gown. See also separate property inventory list.

## EVIDENCE OF MEDICAL INTERVENTION

An identification band is around the right wrist. Vascular access lines are in the right hand, the left wrist and forearm, and the right inguinal fold. A urinary catheter extends through the penile urethra and into the bladder. A collection container on the distal end of the catheter contains approximately 60 mL of slightly cloudy yellow urine. A single electrocardiogram lead is on the abdomen.

## EVIDENCE OF INJURY

A 3/4 inch superficial abrasion is on the far lateral aspect of the left cheek below the left ear. A 2-1/2 inch linear and red ecchymosis is on the left shoulder. A 1 inch superficial and healing linear abrasion is on the right upper quadrant of the abdomen. The medial aspect of the left wrist has a 1 x 2 inch cluster of multiple linear abrasions that are associated with focal underlying subcutaneous hemorrhage.

The posterior aspect of the right thigh has a 1/4 inch cluster of superficial and irregular abrasions. The posterior aspect of the left upper thigh has a 1 x 5 inch cluster of similar appearing abrasions.

A healing skin wound on the left upper quadrant of the abdomen is centered at a point 3-1/4 inches to the left of the midline of the abdomen and 19-1/2 inches from the top of the head. This wound consists of a 0.5 x 0.5 cm irregular puncture/abrasion. A 5 cm linear abrasion extends to the right and downwards from the wound itself. A similar appearing healing skin wound on the left lateral aspect of the chest is centered at a point 6 inches to the left of the midline of the chest and 18 inches from the top of the head. This wound consists of a 0.5 x 0.5 cm puncture/abrasion with an eccentric surrounding ecchymosis.

The right side of the laryngeal prominence has focal soft tissue hemorrhage. The superficial skeletal muscles of the left upper back have focal hemorrhage.

Ribs 2 through 7 on the right have displaced anterior fractures that are associated with focal chest wall hemorrhage. Ribs 5 and 6 on the right have similar appearing fractures

OMEPR00132

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

in the parasternal location. Ribs 3 through 7 on the left have displaced parasternal fractures that are associated with focal chest wall hemorrhages, and ribs 5 through 7 on the left have similar appearing fractures in the anterior location.

The liver has a 5 cm laceration of the left lobe near its junction with the right lobe. Associated with this laceration is 100 mL of purely liquid blood present in the peritoneal cavity. The mesenteric root of the small intestine has focal infiltrating hemorrhage.

## INTERNAL EXAMINATION

## HEAD AND NECK

After complete shaving, the outer surface of the scalp has the previously mentioned lack of gross defects or injuries. The inner surface of the scalp has uniformly smooth tissue with no contusions or other significant gross abnormalities. The subgaleal space has no acute or chronic areas of hemorrhage. The intact dura mater has no epidural or subdural collections of fresh or clotted blood. Several dural sinuses contain well formed thrombi. The superior sagittal sinus is filled with organizing thrombi. The skull has no fractures. The 1350-gram brain has no subarachnoid hemorrhage. The meninges are thin and clear. The cerebral and cerebellar hemispheres are symmetrical, and the gyri and sulci have no atrophy.

The cerebral vasculature of the base of the brain is normally formed, has no visible aneurysms, and has no significant gross atherosclerosis. The bony and soft tissue connections between the head and neck are palpably stable.

For additional brain information, see also separate neuropathology report.

A layered posterior neck dissection demonstrates no soft tissue or skeletal muscle hemorrhages. The cervical segment of the spinal cord is soft and friable with no areas of hemorrhage or significant defects. The bony and ligamentous connections between the head and neck are stable as previously mentioned. The left vertebral artery has a focal thrombus formation.

A layered anterior neck dissection demonstrates symmetrical strap muscles with no acute injuries. The tongue has no intramuscular hemorrhage or other gross abnormalities. Reflection and removal of the hyoid bone demonstrates no acute fractures, bony abnormalities, or surrounding soft tissue hemorrhage. The thyroid cartilage, including the well formed horns, has no acute fractures or other significant gross abnormalities. The thyroid gland is in the appropriate anatomic position and has no cyst or masses. The parathyroid glands are inconspicuous. The larynx and trachea are clear of foreign objects. The laryngeal and tracheal mucosa is tan-white and has no visible lesions. There is no evidence of gross laryngeal or tracheal edema.

OMEPR00133

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

## BODY CAVITIES

All of the organs of the body cavities are in their usual anatomic locations. The diaphragm is well formed and intact. Right and left pleural effusions consist of 25 mL and 100 mL of serous fluid, respectively. The pericardial cavity has no adhesions, blood, or excess fluid accumulations. The peritoneal cavity has the previously mentioned liquid blood and no adhesions. The adipose tissue of the anterior abdominal wall has a maximal thickness of 2.5 cm.

## CARDIOVASCULAR SYSTEM

The 500-gram heart has a smooth epicardial surface and a usual amount of subepicardial adipose tissue. The coronary arteries arise from the aorta in a usual fashion, and the normally situated coronary ostia are patent. The right coronary artery is short in course, has a grossly pinpoint lumen distally, and has between 25 and 50 percent eccentric luminal narrowing by non-calcified atherosclerotic plaque in its proximal segment. The anterior descending branch of the left main coronary artery has between 25 and 50 percent eccentric luminal narrowing by non-calcified atherosclerotic plaque in its proximal segment, and the middle segment appears to travel through the myocardium itself. The circumflex branch of the left main coronary artery supplies the posterior interventricular septum and has up to 25 percent eccentric luminal narrowing by non-calcified atherosclerotic plaque. All other smaller branches of coronary arteries have no significant gross abnormalities. The brown myocardium has no gross lesions. All four chambers of the heart are normally formed, and the interatrial and interventricular septa have no defects. The foramen ovale is closed. The free walls of the right and left ventricles have maximal thicknesses of 0.3 cm and 1.5 cm, respectively. The interventricular septum has a maximal thickness of 1.6 cm. The heart valves are structurally intact, soft, and have no vegetations or significant calcifications.

The aorta has moderate to severe atherosclerosis characterized by multiple calcified and complicated plaques that are most prominent in the abdominal segment distal to the branches of the renal arteries. The aorta is free of gross aneurysms.

## RESPIRATORY SYSTEM

The right and left lungs are 1290 grams and 1230 grams, respectively. Both lungs have scattered gray-black anthracoses on their pleural surfaces. The lungs are diffusely congested and edematous. The lung parenchyma has diffuse mucinous consolidation and no cysts, granulomas, or visible neoplasms. The major bronchial branches are clear of foreign objects. The pulmonary arteries contain no thromboemboli.

## HEPATOBILIARY SYSTEM

The liver is 2910 grams. The light brown hepatic parenchyma (non-injured areas) has no cysts, fibrosis, infarcts, or visible neoplasms. The gallbladder contains green-brown

OMEPR00134

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

bile and no stones. The gallbladder mucosa is green with a velvety texture and has no visible lesions. The portal tract structures are grossly normal.

## DIGESTIVE SYSTEM

The esophageal mucosa is white-gray, smooth, and otherwise unremarkable. The gastroesophageal junction is clearly demarcated and has no ulcers, varices, or tears. The gastric lumen contains 800 mL of tan fluid. The gastric mucosa has no hemorrhages, ulcers, or visible neoplasms. The pancreas is lobular and tan and has no cysts or masses. The small and large intestines (non-injured areas) have no serosal lesions or palpable masses. The appendix is in its usual anatomic location and has no gross abnormalities.

## GENITOURINARY SYSTEM

The kidneys are 210 grams each and have mildly granular cortical surfaces. The red-gray renal parenchyma has no cysts, infarcts, or visible neoplasms. The corticomedullary junctions are clearly demarcated, and the renal pelves and calyces are unremarkable. The ureters are normal in course and caliber. The urinary bladder is empty. The bladder mucosa has no visible lesions.

The prostate gland is not enlarged. The testes are symmetrical and have no palpable cysts or masses.

## ENDOCRINE ORGANS

The adrenal glands are normally situated and have no masses or hemorrhages. The golden yellow cortices are clearly demarcated from the gray-tan medullae. The pituitary gland is grossly unremarkable.

## RETICULOENDOTHELIAL SYSTEM

The 230-gram spleen has an intact, smooth, and gray capsule. The splenic parenchyma has no visible infarcts, neoplasms, or other lesions. Lymph nodes throughout the body are not enlarged.

## MUSCULOSKELETAL SYSTEM

The non-injured areas of the bony framework, supporting musculature, and soft tissues are grossly normal except for rib 9 on the right, which has an area of callus thickening along the posterior lateral aspect. Within this area is no acute fracture or hemorrhage.

OMEPR00135

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

## TOXICOLOGY

Samples of hospital derived blood and serum, cardiac blood, iliac vein blood, bile, gastric contents, liver tissue, skeletal muscle (thigh), and vitreous fluid are collected and submitted for analysis (see also separate toxicology report).

## MICROSCOPIC EXAMINATION

Multiple representative sections of heart, including the conduction system, demonstrate myocyte hypertrophy, patchy and mild interstitial and perivascular fibrosis, and no other significant histopathologic changes.

Representative cross sections of the left anterior descending coronary artery demonstrate mild to moderate atherosclerosis.

Multiple representative sections of lung demonstrate diffuse alveolar damage, multifocal acute bronchopneumonia, and no other significant histopathologic changes.

Multiple representative sections of liver demonstrate marked passive congestion and severe steatosis (macrovesicular and microvesicular). In addition, a focal area of subcapsular hemorrhage has evidence of organization and surrounding acute inflammation.

A representative section of kidney demonstrates hyperplastic type arteriolar sclerosis, occasional sclerotic glomeruli, and no other significant histopathologic changes.

Four representative sections of skin are taken. Section "A" represents the lateral barb mark on the chest. Section "B" represents the medial barb mark on the chest. Sections "C" and "D" represent contact points of the conducted electrical device to the back of the left thigh. All four sections demonstrate focal epidermal disruption and contraction, with overlying coagulation and no significant dermal change.

## FINAL SUMMARY

Based on the autopsy findings and all other investigative information, including 1000 + pages of medical records from the VA and St. Joseph's Hospital, a Phoenix Fire Department run sheet, surveillance videos, a Phoenix Police Department arrest report, transcripts from interviews conducted with a Lieutenant, a detention sergeant, and 10 detention officers with the Maricopa County Sheriff's Office (MCSO), transcripts from interviews conducted with 9 Phoenix Police Department officers, transcripts from interviews conducted with 9 inmate witnesses, a phone conversation with the decedent's NOK, and a completed neuropathology report from Stanford Neuropathology Consultants, received to date and as available to be, it is my opinion that the decedent, a 44 year old male, died of complications of a sudden cardiac arrest that occurred in the setting of acute psychosis, law enforcement subdual, and multiple medical problems.

OMEPR00136

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)

It is further my opinion that the manner of death is undetermined.

*The Maricopa County Medical Examiner's Office is an independent county agency required by statute (A.R.S. § 11-594(A), (2), and (4)) to certify the cause and manner of death following completion of the death investigation of each case over which it assumes jurisdiction, and to promptly execute a death certificate, on a form provided by the state registrar of vital statistics, indicating the cause and manner of death. The form provided by the state registrar of vital statistics includes five manners of death: homicide, suicide, accident, natural, and undetermined. The determination of manner of death is a forensic determination by the pathologist predicated upon the totality of all then-known forensic evidence and other circumstances surrounding the cause of death; it is not a legal determination of criminal or civil responsibility of any person(s) for the death.*

WTS/svp
D: 12/21/11
T: 12/27/11
WTS 05/30/12

OMEPR00137

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (Dkt. 34)