1
2
3
4
5
6
7
8

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest Joseph Atencio, et al., | No. CV-12-02376-PHX-PGR |
| Plaintiffs, | **ORDER** |
| v. | |
| Joseph M. Arpaio, et al., | |
| Defendants. | |

The Court has before it Plaintiffs' Motion to Exclude Testimony of Kathryn Wild on the Reasonableness of Defendant McLean's Care Under Arizona Law (Doc. 277), Plaintiffs' Motion to Exclude Testimony of William Gause on the Reasonableness of Defendant P.A. Cranmer's Care (Doc. 287), City Defendants' Motion to Strike/Exclude Plaintiffs' Untimely Disclosed Rebuttal Expert Dr. Trepeta (Doc. 288), City Defendants' *Daubert* Motion to Exclude the Testimony of Ron Bruno and Eldon Vail (Doc. 291), City Defendants' *Daubert* Motion to Exclude the Causation Opinions of Plaintiffs' Expert Dr. Wilcox and a Portion of His Untimely Rebuttal Report (Doc. 294), Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Use of Force Expert Ron Bruno (Doc. 297), Motion to Exclude the Testimony of Plaintiffs' Expert Ken Katsaris and Alternative Motion for *Daubert* Hearing (Doc. 306), Motion to Exclude Plaintiffs'

Expert Todd Wilcox (Doc. 308), Plaintiffs' Motion to Exclude Testimony of Joan Cairns (Doc. 322), City Defendants' Motion to Strike Portions of Plaintiffs' Response (Doc. 329, 341), Plaintiffs' Motion to Exclude Testimony of Tim Gravette (Doc. 352), Motion to Exclude the Testimony of Plaintiffs' Expert Eldon Vail and Alternative Motion for *Daubert* Hearing (Doc. 354), Defendants Maricopa County and Monica Scarpati's Motion to Disqualify/Exclude Plaintiffs' Standard of Care Expert Robert J. Wimmer (Doc. 391).[1]

The Court has considered the parties' extensive briefing on these pending motions as well as the experts' reports, depositions, and other evidence presented by the parties, and finds the record adequate to support the Court's inquiry into and conclusion regarding the admissibility of the experts' opinions without the necessity of holding separate *Daubert* hearings.  *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009) (district court not required to hold separate *Daubert* hearing before ruling on admissibility of expert testimony).  The Court will therefore deny the pending motions to the extent they seek a *Daubert* hearing.  However, the parties will have an opportunity, during *voir dire* at trial, to explore the relevance and reliability of proposed expert testimony not previously excluded by the Court and, if *voir dire* turns up any issues, to conduct further questioning outside the presence of the jury.  *See United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000).

---

[1] The Court finds that oral argument would not assist in resolving the various motions and accordingly finds the pending motions suitable for decision without oral argument. *See* LRCiv 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

**A.**     <u>Standard of Care Expert Motions under State Law</u>

Under A.R.S. § 12-2604, an individual may provide expert testimony on the appropriate standard of practice or care only if the witness is "licensed as a health professional in this state or another state," and, during the year immediately preceding the event giving rise to the lawsuit, the witness devoted a majority of their professional time to "[t]he active clinical practice of the same health profession as the defendant" or "[t]he instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant." A.R.S. 12-2604(A)(2). These requirements are intended to ensure that health care professionals "testifying as experts have a sufficient expertise to truly assist the fact-finder on issues of standard of care and proximate causation." *Cornerstone Hosp. of Southeast Arizona, LLC v. Marner ex rel. County of Pima*, 290 P.3d 460, 465 (Ariz. Ct. App. 2012) (quotation marks and citation omitted).

    1.    <u>Plaintiffs' Motion to Exclude Testimony of Kathryn Wild on the Reasonableness of Defendant McLean's Care Under Arizona Law (Doc. 277)</u>

Defendants Maricopa County and William McLean, R.N., have disclosed Kathryn Wild, R.N., as an expert on the reasonableness of Defendant McLean's care. Plaintiffs seek to exclude Wild's testimony, arguing that she is not qualified to testify under A.R.S. § 12-2604. Specifically, Plaintiffs contend that Wild did not spend the majority of her professional time during the year prior to December 16, 2011, engaging in "active clinical practice" or instructing students. *See* A.R.S. § 12-2604(A)(2)(a). Defendants do not dispute that Wild did not engage in the instruction of students. However, they

contend that Wild spent the majority of her professional time engaged in "active clinical practice."

Arizona courts have not interpreted the meaning of "active clinical practice." However, several other jurisdictions have addressed the issue under statutes that are, in relevant part, the same as Arizona's.

In *Hinkley v. Koehler*, 606 S.E.2d 803 (Va. 2005), the expert had been actively engaged in teaching and consulting with residents, medical students, and interns at a university;[2] performed consultative work with partners in his six-person medical practice; had recently joined the editorial review board of a journal; and conducted "peer review work" for a medical society. *Id.* at 805. Noting that one of the primary purposes of the statutory "active clinical practice" requirement was to "prevent testimony by individuals who do not provide healthcare services in the same context in which it is alleged that a defendant deviated from the standard of care," the court held that the expert did not qualify to testify as an expert. *Id.* at 808. Specifically, the expert had not, within the one-year period prior to the incident (which involved a pregnancy), directly cared for, provided treatment or management to, or made delivery decisions for any pregnancy, and "did not evaluate, manage, or treat problems in pregnancies in the context of direct patient care as did the defendant doctors," and thus did not engage in "active clinical practice" as required by the statute. *Id.* at 807-08.

In *Moore v. Hooper*, 726 S.E.2d 812 (N.C. 2012), the court found that "clinical" in

_____

[2] Virginia's statute requires an expert to have been engaged in "active clinical practice"; it does not include a provision allowing an expert to qualify based on time spent instructing students. *See* V.C.A. § 8.01-581.20A

the term "active clinical practice" meant "actual experience in the observation and treatment of patients" and not merely "activities simply relating to the health profession, such as administration or continuing education." *Id.*  Noting that the doctor, although "retired," had continued to practice as a "fill-in" for a substantial number of hours in the profession, the court held that the doctor likely would be deemed to have been in "active" practice because all of the hours he spent in the profession were "spent engaged in clinical practice," and therefore it appeared the expert would be qualified to testify. *Id.* at 820.

In *Gay v. Select Specialty Hosp.*, 813 N.W.2d 354 (Mich. Ct. App. 2012), the expert served as director of education at a hospital and oversaw education for all support staff, including the nursing staff. *Id.* at 359.  The expert testified that she spent twenty five percent of her professional time orienting nurses to their units by instructing, explaining, and coordinating nurses about the proper care of patients, which the court deemed to be indirect treatment of patients. *Id.* at 361.  Because the expert spent an additional fifty percent of her professional time teaching at the hospital for an accredited residency program, the court found the expert fulfilled the requirement of spending a majority of her professional time either in active clinical practice or instructing students. *Id.* at 362.

In *Wright v. United States*, 2008 WL 820557 (D. Ariz. 2008), the court excluded the expert for failure to comply with the statutory requirement that the expert have devoted a majority of professional time to active clinical practice. *Id.* at *7.  In so ruling, the court rejected the expert's statement in her affidavit that she devoted the majority of

her professional time to active clinical practice because the statement was unsupported and contradicted the expert's earlier deposition testimony.  *Id.* at *2.

In the present case, Wild stated the following during her deposition:  She began working at the Orange County Jail on October 25, 2010, and spent the next two-and-one-half years working with the health care agency reorganizing the program at the Orange County Jail.  (Doc. 298-1 at 8-10.)  She testified that she was hired to essentially do a system overhaul at the Orange County Jail, and that she spent the majority of time, particularly in her first year there, "in the trenches with the staff, you know, trying to understand . . . the flow, the delivery system, and from staff perspective what those issues were and what we needed to do to resolve that."  (Doc. 298-1 at 10.)  She testified that she "spent a lot of time with sheriff's staff trying to understand their perspective, their issues and complaints, and then working to pull together a leadership team to make some significant changes."  (Doc. 298-1 at 10-11.)  In response to the question of whether it was "fair to say that the majority of your time wasn't spent in a clinical setting practicing nursing," Wild responded, "Absolutely.  My job there was to reorganize a delivery system that made sense and provided care that met the standards," and that she "wasn't seeing patients all day long in a clinical sense."  (Doc. 298-1 at 11.)  When asked again if it was "fair to say you weren't spending the majority of your time seeing patients the first year in Orange County," Nurse Wild again responded, "You're right, correct."  (Doc. 298-1 at 12.)  Finally, when asked what percentage of her time in the year prior to December 16, 2011, was devoted to an active clinical practice, Nurse Wild responded that during that time, she was "working in Orange County as their director of correctional

health, so I wasn't in active clinical practice."  (Doc. 298-1 at 13.)  Thus, Nurse Wild made clear during her deposition that she engaged in primarily administrative activities in connection with her position as director of clinical health, and focused on reorganizing and overhauling the health care delivery system, and that she did not engage in "active clinical practice" during the year prior to December 16, 2011.

In Wild's affidavit, submitted in opposition to the motion to exclude her testimony, she stated that she "spent more than two and a half years, including 2011, observing, monitoring, overseeing and improving the healthcare delivered by nurses, including mentoring and training nurses" in the Orange County Jail; that she spent 2010-2011 "working in the trenches directly with staff nurses . . . including nurses assessing inmates and detainees coming into the jail, in an effort to better understand the flow and delivery of nursing care in the jail, and to mentor and train the nurses and improve upon the delivery of nursing care"; that she "worked in the trenches with the staff nurses at the Orange County Jail in 2010/2011, three to four days per week of a five day week, and provided direct care to inmate and detainee patients while also observing, monitoring, overseeing, mentoring and training staff nurses who were also providing direct care to inmate and detainee patients, and discussed with staff nurses patient assessments and nursing treatment plans for the inmate and detainee patients"; and, finally, that she misunderstood the questions asked during her deposition and that her "answer should have been that in 2010/2011, I spent a majority of my time . . . in an 'active clinical practice' observing, monitoring, overseeing, mentoring, training, and improving the delivery of healthcare provided by correctional nurses."  (Doc. 285-1 at 3-4.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Wild's statement in her affidavit that she spent a majority of her time in an "active clinical practice" during 2010/2011 is not supported with explanations as to how her interactions with nursing staff at the jail constituted "active clinical practice" rather than merely or primarily administrative activities in connection with her position as director of clinical health, as indicated in her deposition.  Moreover, to the extent Wild spent time directly training and mentoring staff nurses regarding patient care, and providing direct care to inmates and detainees, she does not provide any information as to how much of her professional time was spent in these activities, let alone demonstrate that she spent a majority of her professional time in these activities.

Finally, Wild's affidavit directly contradicts her deposition testimony in which she specifically denied that she spent a majority of her time in active clinical practice, and made clear that she acted primarily as an administrator working on reorganizing and overhauling the health care delivery system.  *See Van Asdale v. International Game Technology*, 577 F.3d 989, 998 (9th Cir. 2009).  The Court also is unpersuaded by Wild's explanation in her affidavit that she answered the question regarding active clinical practice incorrectly in her deposition because she did not understand those questions to seek information about her experience working in the Orange County Jail.  *See id.; see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (setting forth general rule that parties may explain or attempt to resolve contradictions with an explanation that is sufficiently reasonable).

In sum, the Court finds that Wild has not demonstrated that she spent the majority of her professional time in active clinical practice during the year prior to December 16,

2011.  Accordingly, the Court will grant the motion to exclude Wild from testifying as to the standard of care under Arizona law.  The Court will, however, provide Defendant McLean with the opportunity to disclose a substitute expert regarding the standard of care under Arizona law.

2.  Plaintiffs' Motion to Exclude Testimony of William Gause on the Reasonableness of Defendant P.A. Cranmer's Care (Doc. 287)

Defendant Cranmer, a physician assistant, has disclosed William Gause, a nurse practitioner, as an expert on the reasonableness of Cranmer's care.  Plaintiffs seek to exclude Gause from testifying, contending that a nurse practitioner ("NP") is not engaged in "the same health profession" as a physician assistant ("PA").  *See* A.R.S. § 12-2604(A)(2) (requiring a standard of care expert be engaged in "the active clinical practice of the same health profession as the defendant").

Although there are differences in both the education and the licensing requirements for a NP and a PA, both are defined under Arizona law as a "primary care practitioner."  A.R.S. § 36-2901(15).  Moreover, both have similar skills and responsibilities, both are considered to be "physician extenders," and both will often have substantially equal duties in their employment.  *See Alverson v. United States*, 88 Fed. Cl. 331, 332 (Fed. Cl. 2009); *Beck-Wilson v. Principi*, 441 F.3d 353, 361 (6th Cir. 2006) (noting substantial evidence that NPs and PAs perform similar jobs); *see also Fridena v. Evans*, 622 P.2d 463, 467 (Ariz. 1980) (expert testimony admissible where the difference in the type of training of expert and type of training of defendant did not make any difference in procedure used); A.R.S. §§ 32-1601 *et seq*.; A.R.S. § 32-2531.  The Court

concludes that, under the circumstances of this case, Gause, a NP, is engaged in the "same health profession" as defendant Cranmer, a PA.

Plaintiffs also seek to exclude the testimony of Gause under Federal Rule of Evidence 702, arguing that Gause does not have the "knowledge, skill, experience, training, or education" to qualify him to opine on the standard of care for a PA.  For the reasons already discussed in relation to state law, the Court makes a preliminary finding, subject to the presentation at trial of the witness's qualifications and experience, and Plaintiffs' opportunity to conduct *voir dire* of the witness, that Gause has sufficient knowledge, skill, experience, training, and/or education to render an opinion on the standard of care for a PA.  The Court will therefore deny the motion to exclude Gause as an expert.  In so ruling, the Court is not making a definitive determination as to the admissibility of this expert's testimony, nor is the Court absolving Defendants of their obligation at trial of establishing foundation for the admissibility of the expert/expert's testimony.

3.      Plaintiffs' Motion to Exclude Testimony of Joan Cairns (Doc. 322)

Defendant Scarpati has disclosed Joan Cairns as an expert on the reasonableness of Scarpati's care.  Plaintiffs seek to exclude Cairns, contending she was not engaged in "active clinical practice" for a majority of her professional time during the year prior to December 16, 2011.  *See* A.R.S. § 12-2604(A)(2).[3]

---

[3] To the extent County Defendants contend that Cairns can testify as an expert on the standard of care based on her qualification under Federal Rule of Evidence 702 even if she does not qualify under A.R.S. § 12-2604(A), their contention is foreclosed by *Seisinger v. Siebel*, 203 P.3d 483, 488 (Ariz. 2009) ("The expert therefore must both

At her deposition, Cairns testified that during the relevant time period, she was the director of Jail Psychiatric Services in San Francisco.  (Doc. 364-1 at 7.)  In that position, she "basically ran the program," which involved "program development, policy and procedures" and supervising staff.  (*Id.*)  She also worked one day per week in the booking and intake facility providing actual direct services.  (*Id.* at 7-8.)  When asked specifically about the one year period prior to December 16, 2011, Cairns confirmed that during that time, she performed eight hours a week of direct clinical work, and thirty-two hours a week of administrative work.  (Doc. 322-2 at 3-4; Doc. 364-1 at 8.)  Thus, Cairns' deposition testimony makes clear that she did not spend the majority of her professional time during the year prior to December 16, 2011, engaging in active clinical practice.

Defendants' reliance on *Gay*, 813 N.W.2d 354, and *Hinkley*, 606 S.E.2d 802, is misplaced.  As discussed above, in *Gay*, the expert was deemed to meet the requirements because she spent fifty percent of her professional time engaged in providing instruction in a qualified educational program, and twenty-five percent of her professional time indirectly treating patients.  *See Gay*, 813 N.W.2d at 361.  Here, in contrast, Cairns spent only eight hours of a forty hour work week in direct clinical practice, and the remaining thirty-two hours of her professional time each week as an administrator, engaging in "program development, policy and procedures," and "supervising staff."

In *Hinkley*, the expert did not meet the statutory requirements for admissibility

possess the qualifications required by Rule 702 and satisfy the additional requirements of § 12–2604(A).").

because, although he had been actively engaged in performing consultative work with partners in his six-person medical practice, he had not evaluated, managed, or treated "problems in pregnancies in the context of direct patient care as did the defendant doctors," and thus did not engage in "active clinical practice."  *Hinkley*, 606 S.E.2d  at 807-08.  Similarly, here, Cairns' thirty-two hours of administrative activities per week did not involve the evaluation, management, or treatment of patients in the context of direct patient care, and thus do not qualify as hours spent in "active clinical practice."

The Court finds that Cairns did not spend the majority of her professional time during the year prior to December 16, 2011, engaged in active clinical practice.  The Court will therefore exclude Cairns from testifying as to the standard of care under Arizona law.  The Court will, however, provide Plaintiffs with the opportunity to disclose a substitute expert regarding the standard of care under Arizona law.

4.   Motion to Disqualify/Exclude Plaintiffs' Standard of Care Expert Robert J. Wimmer (Doc. 391)

Plaintiffs have disclosed Robert Wimmer as an expert on the reasonableness of the care provided by Defendant Scarpati.  Defendants Maricopa County and Scarpati move to exclude Wimmer, contending he does not satisfy the requirements of A.R.S. § 12-2604(A)(2) because he is not in the "same health profession" as Scarpati and does not meet the "licensing" requirement.

a.   "Same Health Profession"

Defendants argue that Wimmer, who is a licensed clinical social worker, is not in

the "same health profession" as Scarpati, who is a licensed professional counselor.[4]  The

Court disagrees.

Both licensed professional counselors ("LPC") and licensed clinical social

workers ("LCSW") fall under the broader category of licensed mental health

professionals, and are employed as such at the jail.  *See Graves v. Arpaio*, -- F. Supp. 3d -

-, 2014 WL 4898717, *28 (D. Ariz. 2014) ("Mental health professionals [at the jail] are

licensed professional counselors or licensed social workers.");  *cf. Fitzgerald v.

Commonwealth of Va.*, 643 S.E.2d 162, 165 (Va. 2007) (comparing a LCSW and a LPC,

noting that both "are governed by a similar statutory scheme," both are authorized to

diagnose mental disorders, and both may render expert testimony).  Moreover, both LPCs

and LCSWs are licensed as "health professionals" by Arizona and Utah; are required in

both states to have a masters or higher degree in the applicable field of practice; and are

required in both states to have completed significant post masters-level experience.  *See*

A.R.S. §§ 32-3274(B)(1), (2); A.R.S. § 32-3293(1)(a), (b); A.R.S. § 32-3301(B), (C);

U.C.A. § 58-60-205(1)(d), (e), (g), (h).  The Court finds that a LCSW licensed in Utah is

in the "same health profession" as a LPC licensed in Arizona.

b.    Licensing Timing

Defendants do not dispute that Wimmer is licensed in Utah as a clinical social

worker but contend that Wimmer is not qualified to testify under § 12-2604 because he

---

[4] The Court declines to address arguments raised for the first time in the reply brief that a master social worker should not be permitted to opine as to the standard of care applicable to a licensed professional counselor because a licensed professional counselor "has more expertise, education, and experience."

was not licensed at the time of the incident but instead obtained his license several months afterwards.

Section § 12-2604 does not explicitly require licensure at the time of the *incident*, but instead merely requires that the expert is licensed in order to actually testify.  *See* A.R.S. § 12-2604 (providing that "a person shall not give expert testimony on the appropriate standards of practice or care unless the person is licensed as a health professional in this state or another state . . . .").  Thus, under the plain language of the statute, Wimmer meets the "license" requirement because he is now licensed as a health professional in Utah.

This does not, however, render the timing of Wimmer's licensing irrelevant.  To the contrary, the Court finds that the license timing is relevant to the determination of whether Wimmer spent a majority of his professional time during the year immediately prior to December 16, 2011, in the "active clinical practice of the same health profession as the defendant." A.R.S. § 12-2604(A)(2)(a).  This is because, although the Court has determined that a *licensed* clinical social worker is in the "same health profession" as a licensed professional counselor, the Court finds that an *unlicensed* social worker is not.

As discussed above, Wimmer is licensed in Utah.  Under Utah's licensing statute, to become licensed, a clinical social worker must not only have obtained a minimum of a master's degree in social work, but also must have, among other things, completed at least 4,000 hours of clinical social work training; completed a qualifying case work, group work, or family treatment course sequence with a clinical practicum; and passed an examination.  U.C.A. § 58-60-205(1)(e), (g), (h).   Arizona's licensing statute imposes

similar requirements for both clinical social worker licensing and professional counselor licensing.  *See* A.R.S. § 32-3293(1)(a), (b) (clinical social worker licensing); A.R.S. § 32-3301(A), (B) (professional counselor licensing).

Thus, licensing as a clinical social worker or as a professional counsel is not merely a formality, but instead demonstrates that the individual has completed certain education, has received substantial additional training and experience, and has successfully passed a professional examination.  The Court finds that, until a clinical social worker has successfully completed these steps and become licensed, he or she is not engaging in the "same health profession" as a licensed professional counselor.  Accordingly, although Wimmer spent the majority of his professional time engaged in active clinical practice as a mental health professional during the year prior to December 16, 2011, he was not, during that time, licensed as a clinical social worker and thus was not engaged in the "same health profession" as Scarpati, a licensed professional counselor.  The Court will thus grant the motion to exclude Wimmer as an expert on the standard of care applicable to Scarpati.  The Court will, however, provide Plaintiffs with the opportunity to disclose a substitute expert regarding the standard of care under Arizona law.

**B.**   **City Defendants' Motion to Strike/Exclude Plaintiffs'' Untimely Disclosed Rebuttal Expert Dr. Trepeta (Doc. 288).**

Dr. Trepeta was disclosed by Plaintiffs as a rebuttal expert.  Defendants seek to strike and exclude the testimony of Trepeta (Doc. 288, 289, 290, 292) on the ground that he was untimely disclosed by Plaintiffs.  Defendants do not deny that if Trepeta is a

proper rebuttal witness, Plaintiffs' disclosure was timely.  Instead, Defendants' argument is that disclosure of Trepeta was untimely because he "cannot properly be considered a rebuttal expert."  (Doc. 288 at 6.)

Defendants contend that Trepeta cannot properly be considered a rebuttal expert because Plaintiffs have the burden of proving causation, and "their causation expert cannot be a rebuttal expert."  (Doc. 288 at 6-7.)  However, Plaintiffs clarify that they will not be calling Trepeta in their case-in-chief, and will only call him on rebuttal in response to the anticipated testimony of Defendants' pathologists, Stone and/or Di Maio.  Plaintiffs further explain that they have disclosed a different expert, Wilcox, to establish causation in their case-in-chief, and disclosed Trepeta only in response to, and to rebut, the opinions of defense experts Stone and Di Maio.

The Court does not find that Plaintiffs should have anticipated these opinions, and further finds that Plaintiffs' disclosure of Trepeta as a rebuttal witness was proper. Further, contrary to Defendants' contention, Trepeta was not required to specifically state in his report the names of the experts to which he was responding.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (D)(ii).

Defendants contend that Trepeta's report is insufficient because it is not clear what documents Trepeta actually reviewed in forming his opinions.  (Doc. 288 at 8-9.)  Under Rule 26(a)(2)(B)(ii), an expert report is to include "the facts or data considered by the witness in forming" their opinion.  Trepeta's report states that he reviewed all of the materials provided to him by Plaintiffs' counsel, including "police reports, video discs, medical records, autopsy materials, disclosures and expert reports."   Trepeta also

provided Defendants with a detailed list of the information he reviewed in response to Defendants' subpoena.  (Doc. 314-5 at 18-19.)  This information sufficiently apprised Defendants of the information Trepeta reviewed and considered in forming his opinions.

Defendants also argue that Trepeta's report is insufficient because it does not provide any information about his qualifications as an expert as required by Rule 26(a)(2)(B)(iv). Plaintiffs do not dispute that Trepeta's report did not include information regarding his qualifications or his CV.  However, Plaintiffs indicate that they believed Trepeta had disclosed his CV in response to Defendants' subpoena and that Plaintiffs were not aware that Trepeta had not done so, presumably first learning of this deficiency during the briefing on this motion.  Notably, Defendants do not challenge in their motion the qualifications of Dr. Trepeta as an expert.

The Court finds that Plaintiffs' failure to disclose Trepeta's qualifications with the report was in violation of Rule 26(a)(2)(B)(iv).  The Court does not, however, find this violation a sufficient basis on which to exclude Trepeta's expert testimony.  The Court further notes that, although it is Plaintiffs' obligation to ensure compliance with the disclosure requirements, communication between counsel would likely have resolved this problem without the necessity of Court intervention.

The Court will grant in part and deny in part the motion to strike/exclude Trepeta's testimony.  Trepeta's testimony will be limited to rebuttal, and will be allowed only if Defendants present testimony from the defense pathologists.  To the extent Plaintiffs have not yet disclosed to Defendants Trepeta's CV or otherwise provided Defendants information regarding Trepeta's qualifications, the Court will require Plaintiffs to do so.

The motion to exclude will otherwise be denied.[5]  In so ruling, the Court is not making a definitive determination as to the admissibility of this expert's testimony, nor is the Court absolving Plaintiffs of their obligation at trial of establishing foundation for the admissibility of the expert/expert's testimony.

**C.     City Defendants' Motion to Strike Portions of Plaintiffs' Response (Doc. 329, 341).**

In conjunction with its reply in support of its motion to strike/exclude the testimony of Trepeta, City Defendants filed a motion seeking to strike portions of Plaintiffs' response.  The Court will deny the motion as without merit.

**D.     City Defendants' *Daubert* Motion to Exclude the Testimony of Ron Bruno and Eldon Vail (Doc. 291); Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Use of Force Expert Ron Bruno (Doc. 297); and Motion to Exclude the Testimony of Plaintiffs' Expert Eldon Vail and Alternative Motion for *Daubert* Hearing (Doc. 354).**

Defendants seek to exclude the testimony of Ron Bruno and Eldon Vail (Doc. 291, 293, 296, 297, 311, 354, 378).

1.     Ron Bruno:  City Defendants' *Daubert* Motion to Exclude the Testimony of Ron Bruno and Eldon Vail (Doc. 291)

a.     "Training" Claim

Defendants contend that Bruno should be excluded from testifying because there is no training claim against the City.  A review of Bruno's expert report and deposition testimony provided by the parties does not indicate any intent by Plaintiffs to have Bruno

---

[5] The Court declines to address additional grounds for exclusion of Trepeta's testimony raised by Defendants for the first time in their reply brief.  *See Lane v. Dept. of  Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (a district court can, in its discretion, decline to consider arguments raised for the first time in a reply brief).

render an opinion on the adequacy of the City's training, and Plaintiffs confirm that they are not intending to have Bruno testify on the adequacy of the City's training.  Further, the Court disagrees that the "natural inference" of Bruno's testimony regarding how a reasonably trained officer would have responded is that the officer's training was somehow deficient.  The Court also disagrees that Plaintiffs are attempting, through Bruno's testimony, to "thwart" the Court's denial of Plaintiffs' motion to add a training claim against the City.

b.  *Daubert* Claim

Defendants contend that Bruno's opinions fail to meet the standards set forth in *Daubert* or Federal Rules of Evidence 702 and 703.  The Court disagrees.

Contrary to Defendants' arguments, in determining the reliability of non-scientific expert testimony, such as Bruno's, "the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."  *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citation and quotation marks omitted).

Moreover, a review of Bruno's training and experience convinces the Court that he is qualified as an expert on the reasonableness of the use of force.  (*See* 317-1 at 3-4.) Bruno has more than nineteen years of experience in law enforcement, and is currently certified as a Utah Law Enforcement Officer.  His duties over his nineteen year career have included reserve police officer, patrol officer, field training officer, community support officer, bicycle unit officer, special weapons and tactics operator, property crimes

investigator, gang suppression detail officer, Crisis Intervention Team[6] ("CIT") Officer, CIT Utah Coordinator, and his current assignment of CIT Investigator and CIT Utah Program Director.  (*Id.*)

In addition, Bruno was assigned to the Utah Olympic Public Safety Command, which provided him with experience in planning all public safety aspects for the 2002 Winter Olympics; working as part of a committee to train the public safety personnel working in the various venues throughout Utah; and acting as project manager of the 2002 Winter Olympics Public Safety Handbook.  (Doc. 317-1 at 3.)  Bruno also has provided training to other officers as an instructor in arrest control tactics, self-defense tactics, ASP Baton tactics, Verbal Judo tactics, verbal de-escalation tactics, mobile field force tactics, active shooter response tactics, special weapons and tactics operations, crisis intervention tactics, and CIT Certification.

As to his CIT background and experience, Bruno was trained as a CIT Officer at the Memphis Police Department's CIT Academy in 2000, after which he returned to his agency to put his training into practice as a patrol officer responding to mental health calls and as a CIT Coordinator, working with local assets and partners to develop a statewide CIT Utah Program.  Bruno acted as the CIT coordinator until 2002, when he was appointed as CIT Utah Program Director.  (Doc. 317-1 at 3.)  As CIT Program Director, Bruno's responsibilities include instructional involvement and oversight of

---

[6] The Crisis Intervention Team "is a program that assists with building community partnerships to train law enforcement officers in tactics when interacting with persons with mental illness," and, through the partnerships it builds, "provides opportunities to develop more appropriate criminal justice/mental health systems of care for members of the community with mental illness."  (Doc. 317-1 at 3.)

testing in all CIT Academies for patrol conducted in the eight regions of Utah, and a statewide CIT Academy for corrections.  He is "responsible for oversight of curriculum development, program fidelity adherence, program expansion, and assisting with the development of more appropriate criminal justice/mental health services."  (*Id.*) As CIT Utah Program Director, also Bruno has been and continues to be a resource for communities throughout the United States interested in developing better integration of criminal justice/mental health services.

When he was appointed to the position of CIT Program Director, Bruno also was assigned as an investigator for his department's CIT Investigative Unit.  His responsibilities thus include administration of the CIT Utah Program as well as investigation of department cases involving mental health issues.  (Doc. 317-1 at 4.) Bruno's assignment as an investigator allowed him to continue as a "first responder to mental health calls for service," and work with "members of the community who have a mental illness and an involvement with the criminal justice system."  (*Id.*)

Bruno is also a founding board director of CIT International, which promotes appropriate law enforcement response to situations involving persons with mental illness, conducts conferences to assist communities with development of CIT programs, and advocates for more effective interaction between the criminal justice and the mental health systems.  His last term as a director with CIT International expired at the end of 2013, but he continues to be involved in the organization through committee work.

Bruno also assisted in the development of recommended methods in a manual released in 2011 by the National Alliance on Mental Illness.  This manual is intended to

assist communities in understanding law "enforcement's involvement with early identification of mental health needs and appropriate collaborative efforts."  (*Id.*)

Further, Bruno sits on numerous local and national councils and committees that address criminal justice/mental health issues; has been invited to meet with individual members of Congress to discuss criminal justice/mental health programs and funding needs; and has presented numerous local and national conferences on criminal justice/mental health issues.  (*Id.*)

Finally, during his deposition, Bruno clarified that, in addition to his CIT work, he has been and continues to work as an active officer and responds to all kinds of calls for service, including those that involve mental health issues, and that he has used force against suspects too many times to count and, in fact, has to utilize force at some point during most of his shifts, with the most recent time in the month prior to his deposition. (Doc. 291-1 at 10-11, 13.)

Contrary to Defendants' contention, Bruno's inability to name applicable constitutional provisions and lack of familiarity with case law does not render his opinion unreliable.  Bruno does not need to be an expert on the law in order to qualify as an expert on the use of force.  *Cf. Wood v. Ostrander*, 879 F.2d 583, 604 (9th Cir. 1989) ("police officers are not held to the standards of legal scholars").

Further, that Bruno has not worked as a detention officer or in a correctional facility, but instead has training and experience as a law enforcement officer "on the street," does not render his opinion unreliable.  The standard for whether force was excessive is "whether the officers' actions [were] 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This standard is the same whether the force was used "on the street" or in a detention center.  *See id.* (investigatory stop); *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (arrest); *Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003) (pretrial detention). Moreover, Bruno's lack of experience in a jail or detention facility goes to the weight, not the admissibility, of his opinions.  *See Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) ("'Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'") (citation omitted); *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) ("lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert").

Finally, although law enforcement is not required to use the least intrusive amount of force possible, "the existence of less forceful options to achieve the governmental purpose is relevant" in a use-of-force case.  *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012).  Bruno's opinions are relevant to this use-of-force inquiry because "a rational jury may rely upon expert evidence in assessing whether an officer's use of force was unreasonable."  *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1225 (9th Cir. 2014) (citations omitted).

2.      Eldon Vail:  City Defendants' *Daubert* Motion to Exclude the Testimony of Ron Bruno and Eldon Vail (Doc. 291)

City Defendants seek to exclude Vail from testifying during the phase of trial involving the individual officers.  Plaintiffs make clear that Vail is being offered to opine only on issues involving Maricopa County and will not be offered against City Defendants.  The Court will therefore grant the motion to the extent it seeks to exclude Vail from testifying against City Defendants, but will otherwise deny the motion.

3.      Ron Bruno:  Joint Motion to Exclude Testimony of Plaintiffs' Use of Force Expert Ron Bruno (Doc. 297)

Defendants argue that Bruno's report fails to meet the legal standards for admissibility, including Bruno's lack of knowledge of relevant legal standards governing use of force, lack of experience in detention settings or use of force therein, and failure to focus on the relevant facts.  Defendants contend that Bruno is not qualified as an expert and that his opinions are not reliable or relevant.  Many of Defendants' arguments have been addressed above and will not be re-addressed here.  For the reasons previously discussed, and the following reasons, the Court will deny the motion to exclude Bruno from testifying.

Defendants contend that Bruno relies on 20/20 hindsight vision in rendering his opinions.  However, a review of the deposition testimony cited by Defendants does not convince the Court that Bruno actually relied on a 20/20 hindsight standard in forming his opinions.

During questions related to the use of the Taser on Atencio, Bruno expressed the opinion that the Taser should not have been used for numerous reasons.  These reasons

included the number of officers that were involved, the setting, and Atencio's lack of combativeness.  After agreeing that it is possible that the likelihood of injury increases the longer  a struggle, such as that with Atencio, continues, Bruno was asked:  "So, is it your opinion that it would have been more reasonable for the officers to continue to struggle to control Mr. Atencio rather than to use the taser?"  Bruno responded: "Absolutely, especially with 20/20 hindsight that the TASER was reported to not have any effect on Mr. Atencio.  So obviously the physical attempts by the officers were the things that brought him into restraints and custody."  (Doc. 297-1 at 42; Ex. 2 at  124.) At another point in the deposition, Bruno was asked "One . . . or two times you used the phrase '20/20 hindsight,' and my question is to you do you believe that officers are – officers' actions, when they use force, are to be judged using 20/20 hindsight?"  Bruno responded:  "If I've been asked to render my opinion, that's the only way I could render my opinion."  (Doc. 297-1 at 60; Ex. 2 at 195.)

These references to 20/20 hindsight do not convince the Court that Bruno has actually rendered his opinion based on an improper 20/20 hindsight legal standard. Instead, it appears to the Court that Bruno was merely expressing that, in rendering his opinion, he is forced to look in hindsight at what happened, including the officer's actions in employment of force.  The Court will not, therefore, exclude Bruno's testimony on this ground.

Defendants contend that Bruno based his opinion on what he personally would have done, rather than on the proper standard of what a reasonable officer on the scene would have done.  Again, a review of the deposition testimony cited by Defendants in

support does not convince the Court that Bruno's opinions are based on an improper legal standard.

Responding to questions regarding training materials and whether it was important to know an officer's training in determining whether the officer's use of force complies with their training, Bruno clarified that he was asked to base his opinion on his experience, his training, and his education and not on "somebody else's policy." (Doc. 297-1 at 61; Ex. 2 at 197.) Bruno was then asked: "So what you would have done if you were in that situation?" to which he responded, "Correct." (*Id.*) Then when asked, "Not whether it was reasonable for what that officer did based on what he perceived at the time?" Bruno responded, "No. From what a reasonably trained officer would have utilized." (*Id.*) Bruno then clarified further that his opinion was based on a reasonably trained officer, and that he "was not asked to base [his] opinion on law or policy. It was based on my experience as a law enforcement officer and my training as a law enforcement officer. However, I had applied what I believe a reasonably trained law enforcement officer would have reasonably done." (*Id.*)

The Court finds Bruno's deposition testimony, read in full and taken in context, demonstrates that Bruno did indeed apply the correct legal standard in rendering his opinions. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Defendants contend that Bruno is not qualified to testify as an expert due to his lack of experience and training in the use of force and mental illness. The Court has

already discussed above Bruno's extensive experience and qualifications.  Factors such as Bruno's lack of experience in a jail or detention setting, and lack of special knowledge and training in use of force, go to the weight, not the admissibility of his opinions.  *See Stilwell*, 482 F.3d at 1192; *Kennedy*, 161 F.3d at 1231; *Garcia*, 7 F.3d at 890.

Finally, Defendants contend that Bruno's opinions are not based on an independent review of the relevant information available in the case, but that he instead relied almost exclusively on the testimony of only two officers who did not have any hands-on contact with Atencio and were only briefly in the search area.  However, the list of materials reviewed by Bruno includes the deposition testimony and/or interviews of numerous officers, including Hatton and Weiers.  That Bruno may have discounted the statements of some officers and relied more heavily on statements of other officers, are issues that Defendants are free to explore on cross-examination of Bruno.  These issues, again, go to the weight, not the admissibility, of Bruno's opinions.

4.     <u>Eldon Vail:  Motion to Exclude the Testimony of Plaintiffs' Expert Eldon Vail and Alternative Motion for *Daubert* Hearing (Doc. 354)</u>

Defendants seek to exclude the testimony of Vail on the grounds that his opinions are irrelevant, unreliable, and/or constitute a legal conclusion.

a.     <u>Opinion Regarding "Planned" Uses of Force</u>

Defendants contend that Vail's opinion regarding "planned" use of force is irrelevant because the use of force in this case was not a planned use of force but was instead unplanned.  However, a review of Vail's deposition testimony demonstrates that his testimony is indeed relevant.  Specifically, although Vail admitted that the use of

force on Atencio was unplanned, he further expressed the opinion that the use of force should have been a planned use of force: "It's my opinion that if force needed to be used ultimately in order to get [Atencio] to do what the County needed him to do, that it should have been planned." (Doc. 354-1 at 10.) Vail further explained that it was his opinion that Atencio should have been moved back to the holding cell so that, if necessary, the use of force could have been planned. (*Id.*) Vail also explained in his report that the MCSO makes no reference to mental health intervention in a planned use of force event, and in fact makes no reference at all to planned use of force, and opined that the absence of such requirements "is likely to result in unnecessary harm to mentally ill prisoners." (Doc. 354-1 at 37-38.) Finally, Vail opined that the failure of MCSO to involve mental health staff in planned use of force events results in unnecessary and unavoidable use of force, subjecting mentally ill inmates to a significant risk of substantial physical and psychological harm. (Doc. 354-1 at 43.)

Defendants also contend that Vail's opinion regarding planned uses of force is unreliable because, in offering his opinion that MCSO was "out of step" with practices in other jurisdictions relating to planned uses of force and mental health intervention, Vail considered policies from only three other jurisdictions – Los Angeles County, the State of Washington Department of Corrections, and the Mississippi Department of Corrections. (Doc. 354 at 6; Doc. 354-1 at 42-43.) The Court finds that although the consideration of policies from only three other jurisdictions may go to the weight given to Vail's opinion, it does not render Vail's opinion inadmissible.

        b.    <u>Opinion on Adequacy of Training to Recognize Mental Illness</u>

1
2      Vail was retained by Plaintiffs to evaluate and offer an opinion regarding the
3   policy and operational practices of the MCSO on the use of force procedures for mentally
4   ill inmates.  Defendants seek to exclude Vail's opinion regarding the adequacy of MCSO
5   training on supervision and treatment of inmates known or suspected to have serious
6   mental illness, contending Vail is not qualified to render such an opinion.  The Court
7   disagrees and concludes that Vail is qualified to render his opinion based on his
8
9   background and experience.
10
11     Vail has almost thirty-five years of experience working in and administering
12   correctional institutions.   This experience includes rising through the ranks in the
13   Washington Department of Corrections (WDOC), serving as a superintendent of three
14   different correctional institutions, and reaching the level of Secretary of WDOC in 2007-
15   2011; working side by side with mental health professionals, including making sure that
16   policies work for those professionals and are designed to assist in managing the mentally
17   ill prison population; establishing an intensive treatment program for mentally ill inmates
18
19   with behavioral problems; pioneering extensive family based programs resulting in
20   reductions in use of force incidents and infractions; and engaging in a long-term
21   collaboration with the University of Washington focusing on the mentally ill in prisons
22
23   and the management of prisoners in and through solitary confinement. (Doc. 354-1 at 50-
24   53.)   Vail's background and experience is further detailed in his declaration, which
25   explains his experience dealing with the mentally ill population in a correctional setting.
26
27   (Doc. 291-1 at 106-08.)   To the extent Vail lacks particularized expertize in mental
28

health, this goes to the weight of his testimony, not its admissibility.  *See Stilwell*, 482

F.3d at 1192; *Kennedy*, 161 F.3d at 1231; *Garcia*, 7 F.3d at 890.

Defendants also contend that Vail's opinion is unreliable because it misstates the

opinion of another of Plaintiffs' experts, Katsaris.  In his deposition, Katsaris testified

that he was not rendering an opinion on force or mental illness in the case (Doc. 306-1 at

13), and that, instead, he looked at the history of the policies, practices, and procedures of

the MCSO, and the operation of MCSO under Arpaio's administration.  (Doc. 306-2 at

5.)  Katsaris's opinions were thus focused on the actual practices implemented, and the

culture influenced by, Arpaio's actions.  (*See id.*)  Katsaris clarified in his deposition that

he "did not attack the training in any way, shape or form," and noted that there "is even

some evidence of some praise that the training was in order," but that his focus was not

on the training but on "the posture of the Sheriff, what is the leadership of the Sheriff and

how does that leadership appear when reviewing a historical review of interviews, court

cases, Department of Justice investigations."  (Doc. 306-1 at 13-14.)  Katsaris further

testified that he did not "find the training given to detention officers regarding mental

illness to be deficient"; and that he was of the opinion that as of the mid 2000s, the

training at the MCSO "was well above the standard of care throughout the country," but

that he had not reviewed the recent information on training.  (Doc. 306-1 at 15, 47-48.)

Vail, in contrast to Katsaris, concludes that a review of the *incidents* listed in

Katsaris's report "establish, beyond a doubt that Maricopa County had notice . . . that it is

out of step with respect to its policies and the national standards and practices."  (Doc.

354-1 at 62.)  Thus, Vail did not "misstate" Katsaris's opinion, but instead merely relied

on information in Katsaris's report regarding incidents that have occurred over the years involving the MCSO, and opined that the County had notice it is "out of step." Moreover, Vail clarified that even if adequate training is being offered at MCSO, that training was not being reinforced and not followed up as required to make the training effective and make officer performance consistent with that training.  (Doc. 361 at 18-21.)

c.   <u>Opinion on Whether MCSO Policies, Procedures, and Practices were a "Moving Force" Contributing to Atencio's Death</u>

In his report, Vail states:  "Maricopa County's policies, procedures and practices are a moving force that contributed to Marty Atencio's death."   (Doc. 354-1 at 45.) Defendants seek to exclude this opinion, contending it is an inadmissible legal conclusion.

The Court agrees that, viewed in isolation, Vail's "moving force" statement appears to be excludable as a legal conclusion.  *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (expert may not "give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law"); *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (to impose liability a plaintiff must demonstrate that the policy at issue was "the moving force behind the constitutional violation").   However, in his deposition, when asked what he meant by the term "moving force," Vail explained: "That what was going on relative to the policy or lack of policy, to the training or lack of follow-through on the training or lack of actually being able to observe what was in the lesson plan, found its way to the shop floor, so to speak, that all of those contributed to an

environment that made possible Marty's death.  I mean, that's what I mean by moving force."  (Doc. 361 at 13.)

Vail's explanation makes clear that his "moving force" statement is not an inadmissible legal conclusion, but is instead merely his opinion regarding causation, which is admissible.  *Cf. City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (plaintiff must establish not only requisite fault on the part of the municipality, but also "the causal connection between the 'policy' and the constitutional deprivation").  However, to the extent Vail uses the term "moving force," that term shall be struck from his opinion, and use of such terminology, or any other terminology that expresses an opinion on an ultimate issue of law, prohibited.

Finally, Defendants contend that Vail's opinion is inadmissible because the sole basis for his opinion that the MCSO "facility culture" disregards the needs and challenges of mentally ill inmates is a single incident – the incident involving Atencio.  The Court disagrees.

When Vail was questioned during his deposition regarding his "facility culture" opinion, he stated that the video of Atencio demonstrated the result of that facility culture – the use of force that was likely unnecessary or, at minimum, used prematurely.  (Doc. 354-1 at 7-8.)  Vail clarified that the incident involving Atencio did not, in isolation, demonstrate the facility culture, but it did show the need for further examination.  (*Id.* at 9.)  Vail contends that his facility culture opinion is based on his extensive knowledge of the MCSO culture, gained through, among other things, his position as an expert in the *Graves* case and his review of the report of Plaintiffs' expert Katsaris, which listed

various historical incidents that have occurred at the jail.

Defendants contend that to the extent Vail relied on information obtained from the *Graves* case in reaching his opinion, Vail has violated the disclosure requirements of Fed. R. Civ. P. 26 because Vail did not indicate that he relied on such information in his report.  Vail did, however, list in his report the *Graves* case as a case in which he is retained as an expert witness.  (Doc. 354-1 at 53.)  To the extent Vail's disclosure regarding the *Graves* case could be deemed inadequate, the Court does not find exclusion of Vail's opinion to be the appropriate remedy.

In sum, to the extent Vail uses the term "moving force," that term shall be struck from his opinion, and Vail shall be prohibited from using such terminology, or any other terminology that expresses an opinion on an ultimate issue of law, in his testimony.  The motion to exclude Vail from testifying will be otherwise denied.  In so ruling, the Court is not making a definitive determination as to the admissibility of this expert's testimony, nor is the Court absolving Plaintiffs of their obligation at trial of establishing foundation for the admissibility of the expert/expert's testimony.

**D.**   **City Defendants' *Daubert* Motion to Exclude the Causation Opinions of Plaintiffs' Expert Dr. Wilcox and a Portion of His Untimely Rebuttal Report (Doc. 294); and Defendants' Motion to Exclude Plaintiffs' Expert Todd Wilcox (Doc. 308).**

Defendants seek to exclude Dr. Wilcox from testifying (Doc. 294, 302, 303, 308, 309, 312, 313).

1.   Wilcox's Qualifications

Defendants contend that Wilcox is not qualified to render opinions on the use of

force or on the cause of death.  As to the use of force, Defendants argue that Wilcox has never taken a physical, hands-on practical course on use of force, has never used or received instruction on the use of a Taser, has never received any instruction on defensive tactics, and has never taught defensive tactics.  Plaintiffs clarify that Wilcox is not offering a use of force opinion from the perspective of a police practices expert, but is instead opining that *any* use of force against Atencio was *per se* unreasonable, and that it was the County's procedures and culture that led to the force being used against Atencio. The Court will thus grant the Motion to Exclude only to the extent it seeks to exclude Wilcox from testifying as to the use of force from a police practices expert perspective.

As to the cause of death, Defendants argue that Wilcox does not possess the necessary skill and knowledge to give a reliable opinion on Atencio's cause of death because he is not a medical examiner, is not a forensic pathologist, and has never performed an autopsy.

Wilcox is a medical doctor with over seventeen years of experience in the design, administration, and delivery of correction health care, and actively practices in correctional healthcare as the Medical Director of the Salt Lake County Jail System. (Doc. 308 at 13.)  Wilcox is frequently called as a consultant to assist facilities nationally in improving delivery of care.  (*Id.*)  He is certified at the advanced level in correctional health care from the National Commission on Correctional Health Care and frequently presents on pertinent topics in this field of medicine to national audiences.  (*Id.*)

Wilcox also has a unique understanding of the environment at the Maricopa County Jails.  He was part of a management team hired in November 2004 to try to

reform the healthcare system within the Maricopa County Jails, served as Medical Director for the Maricopa County Jails from November 2004 to February 2006, and remained on staff as a consultant to Maricopa County until February 2008.  (*Id.*)  He had extensive exposure during that time to the decision makers within Maricopa County and had direct access to the underlying management decisions that occurred prior to the events that resulted in Atencio's death.  (*Id.*)

In addition, Wilcox has published extensively in various areas of medicine, including most recently in correctional health care.  (Doc. 308 at 38-40.)  He has been a member of expert panels on correctional healthcare, and has made numerous professional presentations, including presentations on effective correctional medical/mental health intake screening, correctional healthcare jail standards, and excited delirium and sudden in-custody death syndrome.  (*Id.* at 40.)  He also has testified as an expert witness in other cases, including testimony on the cause of death.  (*See* Doc. 308 at 42; Doc. 362-1 at 37.)

The Court finds Wilcox's background and experience sufficient to qualify him to opine on the cause of death in this case, with the lack of his particularized expertise going to the weight, not the admissibility, of his cause of death opinion.  *See Kennedy*, 161 F.3d at 1231 (disputes regarding the strength of an expert's credentials go to the weight, not the admissibility, of his testimony); *Garcia*, 7 F.3d at 890 (same).

2.   <u>Reliability of Wilcox's Opinions</u>

a.   <u>Autopsy Report and Stano Deposition</u>

Defendants contend that Wilcox's opinion is inadmissible because he did not review the autopsy report or deposition of the medical examiner – Stano – before writing

his initial report.  However, Wilcox's initial report actually cites to the autopsy report, and quotes from that report.  (Doc. 294-1 at 16.)  Wilcox also testified that he reviewed the autopsy report prior to preparing his initial report.  (Doc. 318-1 at 8, 10.)  Further, Plaintiffs' counsel confirmed to City Defendants' counsel through an email that the autopsy report was erroneously left off of the list of documents reviewed by Wilcox, but that Wilcox had, consistent with his deposition testimony, considered the autopsy report in preparing his initial report.  (Doc. 318-9 at 3; *see* Doc. 294-1 at 16.)  In addition, Wilcox's invoice to Plaintiffs' counsel lists time spent by Wilcox reviewing the Stano deposition – to which the autopsy report was attached – prior to the date of Wilcox's initial report.  (Doc. 318-1 at 19.)

This evidence indicates that Wilcox reviewed the autopsy report prior to his initial report, and perhaps also reviewed the Stano deposition prior to the initial report. Moreover, even assuming that Wilcox did not review the Stano deposition prior to drafting his initial report, that factor would go to the weight rather than the admissibility of his opinions.  *See Kennedy*, 161 F.3d at 1231.

> b.    <u>"Suffocation" and Choke Hold/Carotid Hold Opinion</u>

Defendants contend that Wilcox's opinion that Atencio was "suffocated" is inadmissible because he does not discuss how the suffocation occurred and what physical evidence suggests suffocation.  Defendants further contend that to the extent Wilcox opines that the use of a carotid hold or choke hold caused the suffocation, such opinion was untimely/not properly disclosed and lacks scientific, factual, and medical support.

In his report, Wilcox opined that Atencio was "suffocated, beaten and shocked to

death."  (Doc. 294-1 at 23.)  Plaintiffs have clarified that Wilcox will not testify that Atencio was beaten to death, or that Atencio was suffocated to death, but will instead testify that it was a combination of factors that led to Atencio's death, including the "suffocation" and "beating."

Wilcox also opined in his report that, but for Atencio's interaction with law enforcement and his subsequent "violent subdual by law enforcement, there is no evidence that he had any prodromal condition, symptom, or exam finding consistent with impending cardiac failure or anoxic brain injury."  (Doc. 294-1 at 23.)  Wilcox also notes in the report that the medical examiner had determined the cause of death to be "Complications of Cardiac Arrest in the setting of acute psychosis, law enforcement subdual, and multiple medical problems."  (Doc. 294-1 at 16.)  Wilcox notes that in the linescan room, there was a "dogpile" of officers on top of Atencio, and that there were eleven officers on or around Atencio; and that in the safe cell, officers are on top of Atencio.  (*Id.* at 14-15.)

During his deposition, Wilcox explained that his opinion was not that there was a "single, solitary cause of death," but that there were several factors that contributed to the death.  (Doc. 318-1 at 6.)  He believed that Atencio was suffocating during the incident based on his observation of the videos showing the events that occurred.  (Doc. 294-2 at 15.)  Wilcox testified that his review of the videos led him to believe a choke hold or a carotid hold was applied to Atencio, and that the autopsy report also indicated that Atencio suffered injuries to the neck area, but that the bruising found on Atencio's neck was not conclusive.  (Doc. 294-2 at 8-9, 11-12.)  Wilcox also opined that there may have

been some weight force placed on Atencio, although he could not quantify the exact poundage of weight placed on him.  (*Id.* at 16.)

Wilcox testified that "decreased ability to breathe instills fear" and "activates the fight-or-flight mechanism which activates the sympathetic nervous system"; and that his opinion that suffocating was a contributing factor to Atencio's death was based on both his observation of the videos and his knowledge that "air hunger causes an activation of the sympathetic nervous system."  (Doc. 318-1 at 8.)  Wilcox explained that he believed Atencio's ability to breath was only "partially" impacted and that he did not know whether this caused Atencio to actually lose consciousness.  (*Id.* at 15-16.)

Wilcox further opined that the "situation is one of a sudden death" and that he ruled out other alternative possible causes of death based on the medical records, Atencio's vital signs, his past history, and what Wilcox saw on the videos.  (Doc. 318-1 at 12-13.)  Wilcox explained that he did not parse out each of the forces used against Atencio as to causation because he did not believe that you could realistically do that because it "really is sort of a sum total of the uses of force that caused his sympathetic nervous system to go into overdrive, and that was ultimately the cause of his sudden cardiac death."  (*Id.* at 14.)  Wilcox testified that he believed a combination of pain and fear activated Atencio's "sympathetic system, which dumped epinephrine and norepinephrine into his system and caused sudden cardiac death."  (*Id.* at 15.)

Although Wilcox's report was not entirely clear regarding his "suffocation" opinion, and did not explicitly mention a choke hold or carotid hold, Defendants had the opportunity to and did explore these topics during Wilcox's deposition.   Wilcox's

deposition testimony expanded on, clarified, and adequately explained the bases of his suffocation opinion. The Court will therefore decline to exclude the suffocation opinion and will further decline to exclude the opinion regarding the choke hold or carotid hold.

### c.   Lack of Reliance on Literature/Independent Research

Defendants contend that Wilcox's opinion is inadmissible because he does not rely on any literature and has not conducted independent research to support his suffocation opinion. There is not, however, any requirement that an expert qualified based on his background and experience rely on literature or conduct independent research to support his opinions. *See U.S. v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) ("The Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."); *see also Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) ("Given that, unlike scientific or technical testimony, the reliability of [the expert's] testimony was not contingent upon a particular methodology or technical framework, the district court did not abuse its discretion in finding [the expert's] testimony reliable based on his knowledge and experience.").

### d.   "Beating" Opinion

Defendants contend that Wilcox's opinion is inadmissible because his "beating" opinion is without support. The Court disagrees.

In his report, Wilcox noted that in the linescan room, a detention officer appeared to strike Atencio several times, and that officers had formed a "dogpile" on top of

Atencio.  (Doc. 294-1 at 14-15.)  Further, Wilcox testified during his deposition that his opinion regarding Atencio being beaten was based on his review of the videos and "the evidence from the officers" that indicated the use of force and strikes against Atencio. (Doc. 318-1 at 7.)  Wilcox testified that there were two incidents on the videos to which he was referring to.  One was in the linescan room where an officer strikes Atencio three times and the second was in the safe cell where an officer "appears to drop his weight through his knee onto" Atencio.  (*Id.*) This information provides adequate support to Wilcox's statement that Atencio was beaten.

### e.     Failure to Specify Responsible Defendants

Defendants contend that Wilcox's opinion is inadmissible because he does not delineate which of the defendants allegedly suffocated, electrocuted, or beat Atencio to death and instead grouped all defendants together.   The Court disagrees.   The admissibility of Wilcox's cause of death opinion is not contingent on Wilcox forming or expressing an opinion regarding which defendants used the forces he opines caused Atencio's death.

### f.     Failure to Review Certain Evidence

To the extent Defendants challenge the admissibility of Wilcox's opinions because he did not review certain other evidence prior to rendering his opinions, or consider different alternative theories or hypotheticals, such arguments go to the weight, not the admissibility of his opinions.  *See Kennedy*, 161 F.3d at 1231.  Further, to the extent Defendants challenge the conclusions reached by Wilcox, these are issues of credibility reserved for the jury rather than the judge.   *See Daubert v. Merrell Dow*

1  *Pharmaceuticals, Inc.*, 509 U.S. 579, 595-96 (1993).

2          g.      "Culture of Punishment" Opinions

4          Wilcox opined that the culture created by Arpaio in the Maricopa County Jail is

5  "one of the moving forces" behind Atencio's death.  (Doc. 308 at 20-21.)  Defendants

6  contend that Wilcox bases his "culture of punishment" opinions on unreliable and

7  misleading data.   Specifically, Defendants challenge Wilcox's reliance on lawsuits

8  against Maricopa County and "dated news articles."

10         Defendants' reliance on *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir.

11  2005) in support of their contention that Wilcox's opinion should be excluded is

12  misplaced.  In *Thomas*, the expert inferred that the defendant police department "had an

13  unwritten policy condoning excessive force" based solely on the number of complaints

14  filed against the police department, and without conducting any qualitative analysis of the

15  cases or how those cases were similar to the case before the court.  *Id.* at 430-32.

18         In contrast, in the present case, Wilcox did not rely solely on the number of

19  conditions of confinement lawsuits filed against Maricopa County.   To the contrary,

20  Wilcox relied on his comparison of the number of conditions of confinement lawsuits in

21  Maricopa County with the number of similar lawsuits in jails in New York City, Los

22  Angeles, Chicago, and Houston, which showed that Maricopa County had one-sixth the

23  number of prisoners but over forty times the number of lawsuits filed.  Wilcox also relied

25  on a staffing study complete for Maricopa County Correctional Health Services ("CHS"),

26  which noted the amount of money paid by Maricopa County to claimants to settle health

27  care claims and lawsuits and the bases for those lawsuits; Wilcox's own experience and

- 41 -

observations while working with Maricopa County as medical director and as a senior consultant in the jails, including the abuses he had to address while in those positions and his day-to-day observations; and the "very well-known opinion of the sheriff that he wants the jails to be a place of punishment," found in the materials Wilcox reviewed and which Wilcox personally heard the sheriff express at high-level staff meetings.  (Doc. 308 at 32-33; Doc. 362-1 at 14, 17-19, 29-30.)

Further, although the materials Wilcox relied on include news articles and other information dating back to 1995, he also relied on more recent information, including articles, reports, cases, and news releases dated as recently as November 2013.[7]  Wilcox reasonably relied on this type of information in assessing whether there was a "culture of punishment" at the Maricopa County Jails.  *See, e.g., Walden v. City of Chicago*, 755 F. Supp. 2d 942, 953 (N.D. Ill. 2010) (approving expert's methodology, including reliance on newspaper articles, in conducting historical research regarding police department practices or customs); *Katt v. City of New York*, 151 F. Supp. 2d 313, 356-57 (S.D.N.Y. 2001) (finding interviews, commission reports, research articles, scholarly journals, books, and newspaper articles to be the types of data reasonably relied upon by social science experts).

In sum, the Court does not find Wilcox's "culture of punishment" opinion to be excludable on the grounds raised by Defendants in their motion.  In so ruling, the Court is not, however, making a definitive determination as to the admissibility of Wilcox's

---

[7] To the extent Defendants challenge whether Wilcox actually read the *Phoenix New Times* article, this is a subject Defendants can explore on cross-examination.

"culture of punishment" opinion.  *Cf. Richard v. Hinshaw*, 2013 WL 6632122, *4 (D. Kan. 2013) (excluding as speculative opinion that there "was a prevailing 'culture' of bias against inmates in general and mentally impaired inmates in particular throughout the jail 'chain of command'" because it opines "on what was, or was not, known by others and therefore amount[s] to speculation").  Moreover, this and the Court's other rulings regarding this expert do not absolve Plaintiffs of their obligation at trial of establishing foundation for the admissibility of the expert/expert's testimony.

       3.    <u>Disclosure Requirements of Federal Rule of Civil Procedure 26</u>

Defendants contend that Wilcox's rebuttal opinions are not proper rebuttal, but instead are simply an attempt to bolster Plaintiffs' case in chief and that his rebuttal report was thus untimely and must be excluded.  Defendants' contention relates to the references in the rebuttal report to the Stano deposition and/or autopsy report, and the timing of Wilcox's review of that evidence.  The issues relating to Wilcox's review of the Stano deposition and the autopsy report already have been addressed above.  To the extent Defendants seek to limit to rebuttal testimony from Wilcox regarding the autopsy report and/or information from the Stano deposition, the Court will deny the motion.

       4.    <u>Court's Bifurcation Order</u>

Finally, Defendants argue that if Wilcox is permitted to testify during the first phase of trial, there is a high danger of a mistrial or unfair prejudice to the individual Defendants.  Pursuant to the Court's Bifurcation Order (Doc. 93), Plaintiffs' claims against the individual officers will be tried first; if the trier of fact finds one or more of the individual defendants violated Atencio's constitutional rights, then the municipal

liability claims will proceed to trial before the same jury.  At this time, there is no indication that Plaintiffs would not be able to limit Wilcox's testimony to those issues relevant to individual defendant liability during the first phase of the trial.  The Court will therefore deny the motion to exclude on this ground, but notes that Defendants may raise the issue again prior to trial through a motion *in limine*.

**E.**     **Motion to Exclude the Testimony of Plaintiffs' Expert Ken Katsaris and Alternative Motion for *Daubert* Hearing (Doc. 306).**

Defendants move to exclude the testimony of Plaintiffs' expert Ken Katsaris and alternatively move for a Daubert hearing.  (Doc. 306.)

Defendants argue that Katsaris's opinion should be excluded because it is based on non-authoritative sources and because Katsaris did not do independent research. Specifically, Defendants argue that rather than conducting any independent research, Katsaris relied on newspaper articles and the research and reports of others in forming his opinions, and that many of the documents Katsaris relies upon were more than fifteen years old, yet he did nothing to confirm whether the conditions reported in those documents still existed in 2011.

A review of Katsaris's report and deposition testimony demonstrates that Katsaris relied not only on newspaper articles, but also on such things as press releases, newsletters, letters, memoranda, reports, and documents from various legal proceedings in conducting his historic research and forming his opinions.  The Court finds Katsaris's reliance on this type of information, in reviewing the historical impact of the "leadership" of Arpaio on the custom, practice, culture, and operation of the Maricopa County Jails

and its employees, to be reasonable.  *See, e.g., Walden*, 755 F. Supp. 2d at 953; *Katt*, 151 F. Supp. 2d at 356-57.  Further, the documentary information relied on by Katsaris spanned the years 1995 through 2013, and thus did address the circumstances that existed in 2011.

Defendants argue that Katsaris's theory – that Arpaio's rhetoric and leadership over a period of time has had an influence on personnel and the operation of the jail and has caused employees to follow the rhetoric rather than the official policy and training – has not been tested or subject to peer review, and is thus unreliable.  However, Katsaris's opinion is based on his knowledge and experience, and *Daubert* factors of peer review and independent testing do not necessarily apply to this kind of testimony.  *See Hankey*, 203 F.3d at 1169; *see also Hangarter*, 373 F.3d at 1018.

Defendants point to numerous things that Katsaris did not review in support of their contention that Katsaris did not engage in intellectual rigor and that his opinions should therefore be excluded.  For example, Defendants argue that Katsaris did not determine whether detention officers emphasize loyalty to Arpaio over the rules, policies, and procedures they are trained to follow; did not review training the detention officers receive; and did not interact with, observe, or read the deposition or interview of a single MCSO officer in formulating his opinions.

Plaintiffs explain that Katsaris's opinion does not relate to the particular defendants who had contact with Atencio, but instead relates to whether Arpaio's statements regarding his desire that the jails be places of punishment "have fostered a culture consistent therewith" and cause MCSO employees to disregard their training and

written policies.  (Doc. 366 at 2.)  Specifically, Plaintiffs explain that Katsaris's opinion relates to the actual practices at the jail, and the culture that he opines has been influenced by Arpaio's "posturing for a public image" that is inconsistent with "recognized and accepted jails practices and procedures."  Katsaris opines that MCSO employees disregard their training due to the culture in the jails and Arpaio's comments and leadership style, which conflict with their training.  Katsaris explained that in forming his opinions he relied, among other things, on the historical circumstances of the jail, including depositions of MCSO employees in other cases that demonstrated both knowledge of Arpaio's public rhetoric and that employees were influenced by that rhetoric, and the lack of change and continued bad outcomes at the jail despite having what appeared to be appropriate training and policies in place.

Mindful that the questions of whether an expert is credible, and whether his theories are correct under the circumstances of a particular case, are factual ones left for the jury, *see Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014), the Court will deny the motion to exclude Katsaris's opinion on the grounds raised in the motion.  In so ruling, the Court is not, however, making a definitive determination as to the admissibility of Katsaris's opinion.  *Cf. Richard*, 2013 WL 6632122 at *4 (excluding as speculative Katsaris's opinion that there "was a prevailing 'culture' of bias against inmates in general and mentally impaired inmates in particular throughout the jail 'chain of command'" because it opines "on what was, or was not, known by others and therefore amount[s] to speculation").  Moreover, the Court's ruling does not absolve Plaintiffs of their obligation at trial of establishing foundation for the

admissibility of the expert/expert's testimony.

**F.**     **Plaintiffs' Motion to Exclude Testimony of Tim Gravette (Doc. 352).**

Plaintiffs seek to exclude the opinions of defense expert Tim Gravette on several grounds.  Arpaio Defendants clarify that they disclosed Gravette as an expert on, and that his opinions are limited to, the actions of Defendants Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez, and Weiers ("Detention Defendants").  (Doc. 393 at 2.)

1.     Collective Analysis of Use of Force

Plaintiffs seek to exclude Gravette's opinion regarding the reasonableness of the use of force on Atencio because Gravette analyzed the use of force collectively rather than individually.   Detention Defendants do not deny that, with the exception of Defendant Weier, discussed below, Gravette's report does not make any effort to state an opinion regarding the reasonableness of the use of force by any individual defendant. They argue that Gravette is not required to analyze each Defendant's use of force separately, and that Gravette's opinions are appropriate and admissible in light of Plaintiffs' theory that Detention Defendants are liable by virtue of their group participation in a "dogpile" on top of Atencio.[8]

---

[8]   Plaintiffs allege Defendants Carrasco, Dominguez, Foster, and Vazquez each used excessive force on Atencio by forming a "dog pile" on top of Atencio with other officers; by holding Atencio down while Defendant Weiers used excessive force on Atencio by tasing him multiple times; and, after Atencio was placed in the safe cell, by holding Atencio down, making it so that Atencio was unable to move, while Defendant Hatton struck Marty several times with his knee.  (Doc. 393 at 60-61, 62-65, 76, 79-83.)

Plaintiffs allege Defendant Kaiser used excessive force on Atencio by forming a "dog pile" on top of Atencio with other officers; and by holding Atencio down while Defendant Weiers used excessive force on Atencio by tasing him multiple times. (*Id.* at 62, 78-79.)

Gravette explained during his deposition that he did not make any effort to look at, or form an opinion regarding, the actions of the individual officers, but instead looked at the Detention Defendants collectively.  (Doc. 352-1 at 28.)  He did not focus on what individual officers did, but instead focused on "the overall totality of the event," the "totality of the situation," or "totality of the circumstances" in concluding that the collective action of the detention officers was reasonable and justified, and that "they did a wonderful job."  (Doc. 352-1 at 32, 39, 40, 41.)  Gravette admitted, however, that Defendant Hatton's use of a knee strike and placing of weight on Atencio's back the way that he did was not necessary and was not a reasonable use of force, and that in forming his opinions, Gravette did not consider the actions of Defendant Hatton.  (Doc. 352-1 at 16-17, 32, 33-34.)  Further, Gravette testified that even if one or more of the officers used excessive force, his opinion was that under the totality of the circumstances, the officers did a "wonderful job," and that taking an "overall" view (and excluding the actions of Defendant Hatton), the force used on Atencio was reasonable and consistent with the policies of the MCSO, Arizona law, and the American Correctional Association's

---

Plaintiffs allege Defendant Scheffner used excessive force on Atencio, after Atencio was placed in the safe cell, by looking on while Defendants Carrasco, Dominguez, Foster, and Vazquez held Atencio down, making it so that Atencio was unable to move, while Defendant Hatton struck Marty several times with his knee.  (*Id.* at 61-62, 77-78.)

Plaintiffs allege Weiers used excessive force against Atencio by tasing Atencio multiple times during the time that Defendants Carrasco, Dominguez, Foster, Vazquez, and Kaiser used excessive force by forming a "dog pile" on top of Atencio, and after which Defendant Hatton used excessive force by striking Atencio in the face, with a closed fist; and, after Atencio was placed in the safe cell, by looking on while Defendants Carrasco, Dominguez, Foster, and Vazquez held Atencio down, making it so that Atencio was unable to move, while Defendant Hatton used excessive force by striking Marty several times with his knee. (*Id.* at 59-60, 75.)

standard of care.  (Doc. 352-1 at 16-17, 32, 33-34, 39, 40-41, 41-42.)

The Court finds that Gravette's testimony and report reflect a fundamental misunderstanding of the law and, accordingly, the Court will exclude Gravette from testifying.

Although the reasonableness of the force used against a pretrial detainee is based on the totality of the circumstances, *see Plumhoff v. Richard*, 134 S. Ct. 2012, 2020 (2014), this does not mean that individual officer action is ignored in favor of an analysis of the overall action of the group.  To the contrary, where multiple officers are involved in an alleged use of excessive force, a "team effort" approach that simply lumps all defendants together, rather than examining each individual officer's own conduct, is prohibited.  *See Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002).  This prohibition against the lumping of defendants together for liability purposes generally comes into play when a plaintiff is seeking to impose group liability based on one or more individual defendant's conduct.  However, the prohibition is just as applicable here, where a group of defendants is seeking to avoid liability based on the theory that their conduct, viewed "overall," was reasonable or justified, even if another defendant's conduct that was occurring at the same time was unreasonable and not justified.

The proper inquiry in cases, such as this one, where multiple officers are involved in the alleged use of excessive force is (1) whether *any* excessive force was used against and, if so, (2) whether an individual officer was either personally involved in, or was an "integral participant in," the use of that excessive force.  *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996); *see also Jones*, 297 F.3d at 936.  Further, "integral participation"

does not "require that each officer's actions themselves rise to the level of a constitutional violation."  *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).  Thus, if one or more of the individual officer's conduct constituted excessive force against Atencio, liability could be imposed on any of the other officers that were either personally involved in, or were integral participants in, the use of that excessive force, even if that officer's conduct does not itself rise to the level of a constitutional violation.  *See id.*; *Chuman*, 76 F.3d at 294.  For example, officers who provide armed backup or act as armed guards during an unconstitutional search can be considered to be full, active participants in the search and thus be subject to liability.  *See Boyd*, 374 F.3d at 780; *see also Jones*, 297 F.3d at 937 (supervisor may be held liable if (1) he or she is personally involved in the constitutional deprivation or (2) there is "'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation'") (citation omitted); *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (supervisor who either encourages or allows the use of excessive force by subordinates can be held liable); *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (same).

Gravette's opinions that, "overall," the Detention Defendants' conduct was "wonderful," "justified," and/or "reasonable," without an analysis of the actions of individual officers involved in the incident, and explicitly not considering the actions of Defendant Hatton, is not relevant and accordingly will be excluded.  The Court will, however, provide Defendants with the opportunity to disclose a supplemental report in which Gravette expresses an opinion consistent with this Court's decision.

2.      Opinions based on "subjective analysis of the officers' beliefs and

motivations about the force used"

Because Gravette's opinions regarding the reasonableness of Detention Defendants' conduct will be excluded, the Court finds it unnecessary to address Plaintiffs' argument that the opinions should also be excluded because the opinions are based on a subjective, rather than objective, analysis.

### 3. Opinions regarding Weier's use of the Taser

Plaintiffs seek to exclude Gravette's opinions regarding the reasonableness of Weier's use of the Taser on Atencio, arguing that Gravette is not qualified to render that opinion. Arpaio Defendants respond that Gravette is qualified to opine on whether Weiers properly considered and employed an "intermediate level of force," such as a Taser, based on his twenty years of corrections experience, and that Gravette should not be precluded from offering opinions regarding the reasonableness and feasibility of using various force options as long as he does not specifically opine on whether Weiers correctly deployed the Taser. The Court disagrees and will exclude Gravette from testifying as to the reasonableness of Weiers' use of the Taser.

During his deposition, Weiers testified that he is not a Taser expert, that he has had no training on the use of a Taser, that he has never used a Taser on a person, and that has never taught Taser use to officers. (Doc. 352-1 at 35, 36-37; Doc. 404 at 14.) Gravette further testified that the only information he has regarding the Taser was gained from working on this case. Specifically, Gravette testified that, from going through the materials in this case, he knows that correctional officers carry Tasers and that it was "another tool" that a detention officer "would have in his tool kit to control a disruptive

inmate." (Doc. 404 at 13.)  Finally, Gravette testified that he is not "qualified to opine on whether a Taser is used properly or improperly in any context." (*Id.* at 14.)

Although Gravette is clearly qualified under Federal Rule of Evidence 702 as an expert on the general topic of the use of force in correctional settings, the Court finds he is not qualified to render an opinion on the reasonableness of Weier's use of the Taser. *Cf. Lee v. Metropolitan Gov't of Nashville and Davidson County*, 596 F. Supp. 2d 1101, 1121 (M.D. Tenn. 2009) (finding expert's substantial experience as a Taser instructor and as a deputy sheriff qualified him to opine on whether Taser use was reasonable in excessive force case); *Engman v. City of Ontario*, 2011 WL 2463178, *7 (C.D. Cal. 2011) (same).  The Court will therefore exclude Gravette's opinion regarding the reasonableness of Weiers' use of the Taser on Atencio.  The Court will, however, provide Defendants with the opportunity to disclose a substitute expert to address the reasonableness of Weier's use of the Taser.

IT IS ORDERED that Plaintiffs' Motion to Exclude Testimony of Kathryn Wild on the Reasonableness of Defendant McLean's Care Under Arizona Law (Doc. 277) is Granted.

IT IS FURTHER ORDERED that discovery is reopened as follows:  Defendant McLean may disclose a substitute expert witness regarding the standard of care under Arizona law.  Defendant McLean shall disclose such substitute expert witness, if any, and their report in compliance with Fed. R. Civ. P. 26(a)(2)(B), by **February 20, 2015**.  A rebuttal expert witness, if any, and their report, must be disclosed by **March 20, 2015.**

Expert witness depositions related to such disclosures must be completed by **May 15, 2015**.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Exclude Testimony of William Gause on the Reasonableness of Defendant P.A. Cranmer's Care (Doc. 287) is Denied.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Exclude Testimony of Joan Cairns (Doc. 322) is Granted.

IT IS FURTHER ORDERED that discovery is reopened as follows:  Defendant Scarpati may disclose a substitute expert witness regarding the standard of care under Arizona law.  Defendant Scarpati shall disclose such substitute expert witness, if any, and their report in compliance with Fed. R. Civ. P. 26(a)(2)(B), by **February 20, 2015**.  A rebuttal expert witness, if any, and their report, must be disclosed by **March 20, 2015.** Expert witness depositions related to such disclosures must be completed by **May 15, 2015**.

IT IS FURTHER ORDERED that Defendants Maricopa County and Monica Scarpati's Motion to Disqualify/Exclude Plaintiffs' Standard of Care Expert Robert J. Wimmer (Doc. 391) is Granted.

IT IS FURTHER ORDERED that discovery is reopened as follows:  Plaintiffs may disclose a substitute expert witness regarding the standard of care under Arizona law.  Plaintiffs shall disclose such substitute expert witness, if any, and their report in compliance with Fed. R. Civ. P. 26(a)(2)(B), by **February 20, 2015**.  Defendants Maricopa County and Scarpati shall disclose its expert witness in response to this

substitute expert witness, if any, and their report in compliance with Fed. R. Civ. P. 26(a)(2)(B), by **March 20, 2015**.  A rebuttal expert witness, if any, and their report, must be disclosed by **April 17, 2015.**  Expert witness depositions related to such disclosures must be completed by **May 15, 2015**.

IT IS FURTHER ORDERED that City Defendants' Motion to Strike/Exclude Plaintiffs' Untimely Disclosed Rebuttal Expert Dr. Trepeta (Doc. 288) is Granted in part and Denied in part as follows:

1. Dr. Trepeta's testimony will be limited to rebuttal, and will be allowed only if Defendants present testimony from the defense pathologists.

2. To the extent Plaintiffs have not yet disclosed to Defendants Dr. Trepeta's Curriculum Vitae or otherwise provided to Defendants information regarding Dr. Trepeta's qualifications, Plaintiffs shall do so by **January 30, 2015**.

3. City Defendants' Motion to Strike/Exclude Plaintiffs' Untimely Disclosed Rebuttal Expert Dr. Trepeta (Doc. 288) is otherwise Denied.

IT IS FURTHER ORDERED that the City Defendants' Motion to Strike Portions of Plaintiffs' Response (Doc. 329, 341) is Denied.

IT IS FURTHER ORDERED that City Defendants' *Daubert* Motion to Exclude the Testimony of Ron Bruno and Eldon Vail (Doc. 291) is Granted in Part and Denied in Part.  The motion is Granted to the extent it seeks to prevent Vail from testifying against City Defendants.  The Motion is otherwise Denied.

IT IS FURTHER ORDERED that the Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Use of Force Expert Ron Bruno (Doc. 297) is Denied.

IT IS FURTHER ORDERED that the Motion to Exclude the Testimony of Plaintiffs' Expert Eldon Vail and Alternative Motion for *Daubert* Hearing (Doc. 354) is Granted in Part and Denied in Part as follows:

     1.    To the extent Vail uses the term "moving force" in his opinion, that term is ordered stricken.

     2.    Vail is prohibited from using the term "moving force," or any other terminology that expresses an opinion on an ultimate issue of law, in any testimony.

     3.    The Motion to Exclude the Testimony of Plaintiffs' Expert Eldon Vail and Alternative Motion for *Daubert* Hearing (Doc. 354) is otherwise Denied.

IT IS FURTHER ORDERED that the City Defendants' *Daubert* Motion to Exclude the Causation Opinions of Plaintiffs' Expert Dr. Wilcox and a Portion of His Untimely Rebuttal Report (Doc. 294) is Denied.

IT IS FURTHER ORDERED that the Motion to Exclude Plaintiffs' Expert Todd Wilcox (Doc. 308) is Granted in part and Denied in part as follows:

     1.    The motion is Granted to the extent it seeks to exclude Wilcox from testifying as to the use of force from a police practices expert perspective.

     2.    The Motion to Exclude Plaintiffs' Expert Todd Wilcox (Doc. 308) is otherwise Denied.

IT IS FURTHER ORDERED that the Motion to Exclude the Testimony of Plaintiffs' Expert Ken Katsaris and Alternative Motion for *Daubert* Hearing (Doc. 306) is Denied.

1    IT IS FURTHER ORDERED that Plaintiffs' Motion to Exclude Testimony of Tim

2  Gravette (Doc. 352) is Granted.

3    IT IS FURTHER ORDERED that discovery is reopened as follows:   Arpaio

4  Defendants may disclose a supplemental report from Gravette consistent with the Court's

5  decision regarding the analysis required on the use of force.   Arpaio Defendants shall

6  disclose such supplemental report, if any, in compliance with Fed. R. Civ. P. 26(a)(2)(B),

7  by **February 20, 2015**.   A rebuttal expert witness, if any, and their report, must be

8  disclosed by **March 20, 2015.**   Expert witness depositions related to such disclosures

9  must be completed by **May 15, 2015**.

10    IT IS FURTHER ORDERED that discovery is reopened as follows:   Arpaio

11 Defendants may disclose a substitute expert regarding the reasonableness of the use of

12 the Taser by Weiers.  Arpaio Defendants shall disclose such substitute expert witness, if

13 any, and their report in compliance with Fed. R. Civ. P. 26(a)(2)(B), by **February 20,**

14 **2015**.  A rebuttal expert witness, if any, and their report, must be disclosed by **March 20,**

15 **2015.**   Expert witness depositions related to such disclosures must be completed by

16 **May 15, 2015**.

17    Dated this 15th day of January, 2015.

Paul G. Rosenblatt
United States District Judge