1
2
3
4
5
6            **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8

9    Ernest Joseph Atencio, et al.,           No. CV-12-02376-PHX-PGR

10                    Plaintiffs,              **ORDER**

11   v.

12   Joseph M. Arpaio, et al.,

13                    Defendants.

14

15            The Court has before it City Defendants' Motion for Summary Judgment (Doc.

16   299); Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez, and

17
     Weiers' Motion for Summary Judgment (Doc. 347); Hatton Defendants' Motion for
18
     Summary Judgment (Doc. 350); Defendants William McLean, Monica Scarpati, and Ian
19
     Cranmer's Motion for Partial Summary Judgment (Doc. 355); Plaintiffs' Motion for
20
     Partial Summary Judgment against Maricopa County (Doc. 358); Defendant Maricopa
21
22   County's Motion to Strike Plaintiffs' Statement of Facts Applicable to All Defendants

23   (Doc. 384); and City Defendants' Motion for Leave to File Under Seal Reply in Support

24   of Motion to Strike Portions of Plaintiffs' Response (Doc. 388).[1]

25

26

27   ---
     [1] The Court finds that oral argument would not assist in resolving these matters and
28   accordingly finds the pending motions suitable for decision without oral argument. *See*
     LRCiv 7.2(f); Fed.R.Civ.P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

## A.     Background[2]

On December 15, 2011, Marty Atencio first came into contact with law enforcement at a 7-Eleven store.  Phoenix police officers had been dispatched there based on a report of a suspicious person in the parking lot.  That person turned out to be Atencio.  Upon interacting with Atencio, the officers noted that Atencio was acting erratically, would easily become distracted, and would speak of random and odd things, but concluded that the cause of his behavior was mental illness, not drugs or alcohol.  The officers concluded that Atencio did not show signs of being a danger to himself or others, but was simply acting "goofy" and appeared to be off his medication.  The officers told Atencio to go home, which he did.

A short time later, a woman called dispatch, reporting that Atencio was kicking at her apartment door and had also approached her and yelled at her, which scared her.  The same officers that responded to the 7-Eleven store responded to the apartment complex.  Upon coming into contact with Atencio, the officers noted that Atencio's demeanor had remained the same as it was previously, and was consistent with someone experiencing mental health issues.  He was arrested on misdemeanor assault charges and taken to Phoenix's Cactus Precinct.

Atencio was then transported to Maricopa County's Fourth Avenue Jail to be booked into custody.  Atencio had difficulty getting into the transport vehicle due to what

---

[2] For purposes of addressing the pending motions, the Court "draw[s] all reasonable inferences in favor of the non-moving party and, where disputed issues of material fact exist, assume[s] the version of the material facts asserted by the non-moving party to be correct."  *Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1165 (9th Cir. 2012).

the officers concluded was mental illness.  After approximately ten minutes of talking with Marty, the officers successfully got him into the vehicle and transported him to the Maricopa County Fourth Avenue Jail for booking.  By this point, Atencio had been searched by officers at least three times without incident, and he was searched again without incident upon arriving at the Fourth Avenue Jail, including removing his shoes.

Upon arrival at the Fourth Avenue Jail, Atencio was turned over to Defendant Hanlon, a Phoenix City police officer who was in charge of processing Phoenix City detainees through the booking process for admission into the jail.  During the initial screening process, Hanlon observed  Atencio acting strangely and babbling incoherently, making "bizarre statements," "talking to peanut butter" as if it was a person present in the room, and offering to give his jacket to "peanut butter."  (Doc. 343-1 at 98-99, 100, 101; Doc. 343-2 at 6.)  Defendant French, a Phoenix City police officer, and Defendant Weiers, a Maricopa County deputy, also observed some of Atencio's behavior.   French overheard Atencio's conversation regarding "peanut butter." (Doc. 343-2 at 14.)  Weiers noted that Atencio "said a bunch of ridiculous stuff."  (Doc. 343-2 at 26.)

Hanlon believed that Atencio "was in an altered state of some kind emotionally or mentally."  (*Id.* at 101, 103.)  Hanlon noticed that Atencio appeared unable to focus on questions that were asked of him, and that when Atencio responded to questions, he did not appear to be giving much thought to his answers.  Hanlon also noticed that Atencio appeared to be confused and "inconsistent."  (*Id.* at 103, 104, 105.)  Another officer that observed Atencio during the screening process noted that Atencio did not appear to

1    intentionally disobey officers' orders, but instead appeared merely to be confused and to

2    not understand what was going on.  (Doc. 343-2 at 9-10.)

3

4         Atencio was eventually seen by Defendant McLean, a nurse, who conducted a

5    cursory evaluation of Atencio.  (Doc. 343-2 at 36.)  McLean determined that Atencio was

6    alert, but did not clarify his orientation, meaning that he did not ask Atencio questions to

7    determine whether Atencio knew what day it was or what time it was.  (*Id.* at 36-37.)

8    Atencio denied being suicidal, but McLean noted on the intake sheet that Atencio may be

9    suicidal based on his understanding that Atencio had indicated he was suicidal earlier in

10   the screening process.  McLean asked Defendant Scarpati, a Mental Health Professional,

11   to evaluate Antencio.

12

13        Scarpati observed Atencio for a period of forty-two seconds while standing behind

14   him.  (Doc. 343-2 at 78, Ex. N.)  Scarpati asked Atencio what was going on, and whether

15   he was suicidal, and he did not respond appropriately, instead talking in "word salad,"

16   and yelling words "spark plug" and "fire truck."  (Doc. 343-2 at 55-56.)  Scarpati did not

17   ask Atencio any questions about his social, legal, or criminal history, or whether he was

18   having hallucinations, or had a plan to commit suicide.  However, she recognized that

19   Atencio was psychotic and "in crisis at the time," and may not have had the ability to be

20   cooperative with her or with the officers.  (Doc. 343-2 at 56, 58, 82.)  Despite these

21   observations, Scarpati did not inform any law enforcement officers of Atencio's mental

22   state or that Atencio might not have the ability to cooperate with them because of his

23   psychosis.  (*Id.* at 63-64.)

After Scarpati's evaluation of Atencio, she and McLean consulted, and McLean gave the okay to admit Atencio into the jail and set in motion the process to have him placed in a safe cell.

After Atencio had his mug shot taken, Hanlon escorted him from a holding cell into the linescan room, accompanied by numerous officers. Once Atencio reached the linescan room, he was fingerprinted and his handcuffs were removed by Hanlon. Atencio was described as humorous and jovial, and had not displayed any violent or aggressive behavior towards anyone. (Doc. 343-1 at 91, 109-110; Doc. 343-2 at 20; Doc. 353-5 at 4; City Defendant's Ex. 16.) Hanlon did not believe Atencio was a threat to himself or to the other officers or he would not have removed Atencio's handcuffs. (Doc. 343-1 at 108.) Hanlon also did not feel time pressured to complete the booking process. (Doc. 343-1 at 108, 111-12.)

After Hanlon removed Atencio's handcuffs, he had an approximately thirty second back and forth conversation with Atencio regarding Atencio taking off his shoes so that they could be put through an x-ray machine. (Doc. 343-1 at 109.) Atencio removed one shoe, but did not immediately remove his other shoe, instead pointing at Hanlon and stating, "You can take my shoe off for me?" Atencio, who had a wall at his back and was facing a semi-circle of officers, then merely crossed his arms over his chest. (Doc. 343-1 at 90, 109; City Defendants' Ex. 16.) In response, Hanlon immediately grabbed Atencio by the wrist, and twisted Atencio's arm behind his back as the other officers, including French, immediately engaged. A struggle ensued, with Atencio standing but bent over by the officers and passively resisting. After approximately thirty-five seconds, French used

what appears to be a choke hold or carotid hold on Atencio, and took Atencio to the ground with the assistance of the other officers. Numerous officers then held Atencio down on the ground in what has been characterized as a "dog pile." (City Defendant's Ex. 16.) While Atencio was being held down, one of the officers – Defendant Weiers – tased Atencio and another officer – Defendant Hatton – administered numerous strikes to Atencio's facial region. At no point was Atencio actively aggressive towards the officers, nor did Atencio display any violent or aggressive behavior towards anyone. (*See* Doc. 343-1 at 91, 109-110; Doc. 343-2 at 20; Doc. 353-5 at 4; City Defendant's Ex. 16.)

After Atencio was tased, the officers were able to get handcuffs back on him. Defendant Cranmer, a Physician Assistant, had been called to the scene. Cranmer merely asked Atencio, "Are you okay?" and looked at Atencio's eyes, but did not take Atencio's pulse or check any other vital signs. (Doc. 343-4 at 43.)

Atencio was then carried by officers into a safe cell. Once in the safe cell, Atencio was placed on the floor and numerous officers held him down in a "dog pile" while his clothes were removed. While the officers were removing Atencio's clothing, Hatton delivered a knee strike by dropping his full weight with his knee onto Atencio's back. (*Id.*) By the time the officers finished removing his clothes, Atencio appeared to be unconscious. However, no medical assessment of Atencio was completed and all personnel exited the safe cell, closing the door and leaving Atencio on the floor of the safe cell, naked and apparently unconscious. (Doc. 343-4 at 50, 51; .) Both Cranmer and McLean observed Atencio through the window of the safe cell door, but neither of them

entered the safe cell at that time.  (Doc. 343-4 at 51.)

Several minutes later, Cranmer and a nurse were in a room with video monitoring of the safe cell.  The nurse, who was watching Atencio on a monitor, said to Cranmer, "Ian, I don't think he's breathing."  Cranmer responded, "Yeah he is.  He's just intoxicated.  He's okay.  They tased him.  He's alright."  The nurse responded, "Um no, I don't think so.  He's not breathing."  (Doc. 343-4 at 47-48.)  Cranmer then walked back to the safe cell.  (*Id.* at 48-49.) When Cranmer reentered the safe cell, Atencio was not breathing and did not have a pulse, and life-saving efforts began.  A total of nine minutes had elapsed between the time Atencio was left in the safe cell and life-saving efforts were started.  (*See* Doc. 343-3 at 50-51 (noting that at 0243 hours all personnel left the safe cell; that between 0243 hours and 0252 hours, Atencio "remained in the same position and made no movements except for an unspecified abdominal movement"; and at 0252 hours, law enforcement personnel reentered the safe cell and noticed Atencio "to be unresponsive, apneic and without pulse" at which point chest compressions were started).)  These efforts were unsuccessful and Atencio ultimately died.

**B.    City Defendants' Motion for Summary Judgment (Doc. 299)**

City Defendants argue that Plaintiffs have failed to present any evidence that Officers Hanlon or French violated Atencio's constitutional rights and that they are therefore entitled to summary judgment.  (Doc. 299 at 4-5.)  The Court disagrees and will deny the City Defendants' motion for summary judgment.

1.    Standard to Apply

City Defendants first argue that there is a split in the circuits as to whether the

Fourth or Fourteenth Amendment governs the use of force by the officers. However, the Ninth Circuit has already decided the issue, holding "that the Fourth Amendment sets the 'applicable constitutional limitations' for considering claims of excessive force during pretrial detention." *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002) (quoting *Pierce v. Mulnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996)). Under this standard, determining whether an officer's use of force was "reasonable" "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In making this determination, the factfinder must pay "careful attention to the facts and circumstances" of the particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Finally, although officers are not required to use the least intrusive amount of force possible, "the existence of less forceful options to achieve the governmental purpose is relevant" in determining whether the force used was reasonable. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012).

The reasonableness of the force used against a pretrial detainee is based on the totality of the circumstances. *See Plumhoff v. Richard*, 134 S. Ct. 2012, 2020 (2014). Where multiple officers are involved in an alleged use of excessive force, a "team effort" approach that simply lumps all defendants together, rather than examining each individual officer's own conduct, is prohibited. *See Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002). On the other hand, an individual officer's conduct cannot be viewed in

isolation from the conduct of other officers involved in the incident. *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). Rather, the relevant inquiry is (1) whether *any* excessive force was used against the detainee and, if so, (2) whether the individual officer was either personally involved in, or was an "integral participant in," the use of that excessive force. *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996); *see also Jones*, 297 F.3d at 936. Further, "integral participation" does not "require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd*, 374 F.3d at 780.

In the present case, if *any* excessive force was used against Atencio, liability could be imposed on any of the other officers that were either personally involved in, or were integral participants in, the use of that excessive force, even if that officer's conduct does not itself rise to the level of a constitutional violation. *See id.*; *Chuman*, 76 F.3d at 294.

2.      Officer Hanlon's Escort of Atencio from holding cell to linescan room

Hanlon escorted Atencio from a holding cell to the linescan room of the jail. Hanlon contends that he used minimal and reasonable force in doing so, and that he merely had his hands on Atencio's shoulder and back during the escort.

City Defendants have submitted videos, which the Court has viewed, of Hanlon's escort of Atencio to the linescan room. City Defendants also have submitted Hanlon's deposition testimony, during which Hanlon testified that he escorted Atencio only by placing his hand on Atencio's upper back by his shoulders, and denies that he led Atencio by his arms. (*See* City Defendants' Ex. 10; Doc. 300-2 at 46.) City Defendants contend that the video clips they have submitted "clearly show[] that Officer Hanlon's two hands were on Marty's back and shoulders to guide him without once manipulating Marty's

hands" and that Atencio "voluntarily bent and freely moved his cuffed hands between his front waist and a position on his left shoulder," and that any pain or discomfort caused by the manner in which Hanlon escorted Atencio is not actionable.

The evidence shows that during the escort to the linescan room, Atencio never became aggressive, nor did he resist. (Doc. 343-1 at 40.) Matthew Layman, who was present during the escort, states in his affidavit that the "guards" were escorting Atencio "by leading him with his hands and arms bent in what looked to be a very painful position"; that Atencio stated "Your making Tony angry, your making Tony angry," which Layman interpreted to be Atencio telling the guards that they were hurting him; and that at that point, Atencio looked right at Layman, like he was asking for help. (Doc. 343-3 at 10.)

Viewing the evidence in the light most favorable to Atencio, there is a genuine factual dispute regarding whether the escort of Atencio from the holding cell to the linescan room involved an unreasonable use of force against Atencio.

3.     <u>Use of force by Hanlon and French in the linescan room</u>

Genuine factual disputes also remain as to whether Hanlon or French used excessive force against Atencio. First, it is far from clear that Atencio's conduct would be construed by a reasonable officer at the scene as an act of defiance or resistance justifying the immediate use of force, particularly in light of evidence that the officers knew Atencio was having trouble following directions, was in a state of psychosis – whether it was mental psychosis or drug-related psychosis – and did not appear to be intentionally disobeying commands but rather was just very confused.

Second, Plaintiffs' expert, Ron Bruno, opined that the use of force by Hanlon in the linescan room was unreasonable. (*See* Doc. 300-3 at 78.) Third, the video shows French using what appears to be a choke hold/carotid hold on Atencio, and both Hanlon and French actively engaged in taking Atencio down to the ground and holding him down. (*Id.*) While Atencio was being held down, Hatton delivered strikes to Atencio's facial region, and Weiers used the Taser on Atencio, both of which Bruno opined to be unreasonable uses of force. (Doc. 300-3 at 78.) Finally, even if Hanlon and French were no longer physically engaged when the facial strikes were delivered or the Taser was used, there is a genuine factual dispute as to whether one or both of them were integral participants in the use of excessive force. *See Boyd*, 374 F.3d at 780; *Chuman*, 76 F.3d at 294.

City Defendants' reliance on *Gibson*, 290 F.3d 1175, is misplaced. In that case, the officers came across psych meds when searching Gibson's car and suspected that Gibson had not been taking his medication. *Gibson*, 290 F.3d at 1182. Gibson, who suffered from manic-depressive disorder, was verbally aggressive both before and after being placed under arrest, and became physically combative immediately after being placed into the patrol car, "kicking the partition between the car's front and back seats." *Id.* Once they arrived at the jail, Gibson refused to get out of the patrol car and four officers pulled Gibson from the car and carried him into the jail's sally port. *Id.* Gibson was restrained with a waist chain, wrist chains, and leg irons, and, after being processed, placed into a cell. Twice during the night, Gibson slipped out of his waist chain. The first time, officers were able to enter his cell and replace the chain without difficulty. The

second time, Gibson was repeatedly using the chain to hit the window in his cell's door, and the officer in charge decided Gibson should be further restrained and, as several deputies got ready to enter the cell, Gibson assumed a "fighting stance with his fists up and shouted obscenities at them." *Id.* Gibson was pepper sprayed in the face, then three officers entered the cell and held Gibson down while more officers came in to help. The officers dragged Gibson to the special watch cell and placed him onto the bench. *Id.* at 1182-83. As Gibson was laying face down on the bench, he continued to struggle, he was "kicking and screaming and fighting and everything and yelling at us," and two officers climbed onto his back and legs, while the other officers helped restrain his arms and legs. *Id.* at 1183. Suddenly, Gibson did not have a pulse, and efforts to revive him failed. *Id.*

The Ninth Circuit affirmed the grant of summary judgment in favor of the officers in that case, holding that the officers' conduct was reasonable. *Id.* at 1198. The Court noted that, "[f]rom the moment Gibson arrived at the jail, he was struggling against the deputies, hurling invective, and generally behaving very strangely and violently." *Id.* There was no proof the officers on duty at the jail were aware that Gibson's behavior was connected to his mental illness, and thus the officers could not be held "accountable for having treated Gibson as a dangerous prisoner rather than a sick one." *Id.* Further, the "decision to enter Gibson's cell and restrain him" was reasonable because the officer in charge was concerned Gibson might shatter the window in his cell door, thereby placing himself and any officers entering the cell at risk of harm. *Id.* Finally, once the officers "began to restrain Gibson and move him to the special watch cell, he fought back

vigorously." *Id.* "[T]he deputies' decisions under these difficult circumstances resulted in restraining Gibson no more forcefully than was reasonably necessary." *Id.*

In contrast to the situation in *Gibson*, here, viewed in the light most favorable to Plaintiffs, Atencio was not being combative, violent, or threatening; he did not display any violent or aggressive behavior towards anyone; and he did not punch, strike, bite, spit, or kick at anyone. Although he was acting oddly, for instance talking to "peanut butter" as if it was a person, and talking in "word salad," his overall demeanor was described as "humorous," "jovial," and non-aggressive. (Doc. 343-1 at 86-87; Doc. 343-2 at 8.) When he did not obey an officer's orders to do something, this disobedience did not appear to be intentional, but instead appeared to be because he was confused, and the officers were aware that Atencio was in some form of psychotic state. (Doc. 343-2 at 69.) Even when Atencio failed to take his second shoe off in the linescan room, he merely said to Hanlon, "You can take my shoe off for me?" and pointed at Hanlon, then merely crossed his arms over his chest.

City Defendant's reliance on *Forrest*, 620 F.3d 739, is similarly misplaced. Forrest was uncooperative from the beginning of his encounter with law enforcement. He struck an officer in the face, and the officers deployed a taser several times. *Id.* at 741. After reaching the jail, he was escorted to a holding cell for a strip search. Forrest removed most of his clothing, but refused to remove his underwear. *Id.* An officer warned Forrest that if he did not comply with the strip search commands, the officer would use the taser on him. *Id.* Forrest called the officers "faggots" and used other expletives. He eventually removed his underwear but would not comply with the rest of

- 13 -

the officer's strip search commands. *Id.* Forrest shouted obscenities and with fists clenched, began pacing back and forth while facing the officer, but remained seven to ten feet away from the officer. The officer repeatedly told Forrest that if he did not comply with the strip search commands, the taser would be used on him. The officer did eventually deploy the taser, which, although aimed at either Forrest's upper back or torso area, ended up striking Forrest in the face and arm due to Forrest's sudden movement. *Id.* at 742.

The Seventh Circuit held that the use of force by the officer was reasonable as a matter of law. The officer knew that Forrest had attacked another officer earlier in the evening, and that the prior attack had necessitated the use of a taser. *Id.* at 745. In addition, Forrest was a relatively large man in an enclosed area that was relatively small, and was pacing the cell, clenching his fists, and yelling obscenities. *Id.* "Forrest was not merely 'slow to comply with an order'; his conduct created a situation where the officers were 'faced with aggression, disruption, [and] physical treat.'" *Id.* "Clearly Mr. Forrest posed an immediate threat to safety and order within the jail" and thus, the use of the taser "constituted a permissible use of force." *Id.*

In the present case, in contrast to the situation in *Forrest*, Atencio was not acting aggressively. Instead, Atencio's response to Hanlon could be reasonably seen as merely slow compliance, the result of confusion or, at most, passive resistance. A reasonable jury could conclude that the use of force under these circumstances was unreasonable.

Finally, *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), does not assist City Defendants because, in contrast to *Billington,* here there was no violent response to which

the officers were responding. *See id.* at 1190 (holding that where officer's negligent act provokes a violent response, "that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation").

Because genuine factual disputes remain on whether Hanlon and French used excessive force in the linescan room, summary judgment on this issue will be denied.

### 4.    Punitive Damages

City Defendants contend that there is no basis for Plaintiffs' claim for punitive damages because there is no evidence either officer acted with an evil motive or intent, or with reckless or callous indifference to Atencio's constitutional rights. In support of this argument, City Defendants focus on the individual conduct of each of the officers. As discussed above, there is a genuine factual dispute as to whether one or both of the City officers individually engaged in, or were integral participants in, the use of excessive force. *See Boyd*, 374 F.3d at 780; *Chuman*, 76 F.3d at 294. A "jury could certainly infer that there was 'reckless or callous indifference'" based upon evidence that excessive force was used against Atencio. *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir. 1991), *overruled on other grounds, Davis v. City and County of San Francisco*, 976 F.2d 1536, 1556 (9th Cir. 1992). Moreover, it is the Court's policy, when a trial must be held, to resolve the issue of the propriety of punitive damages through the resolution of objections to jury instructions and/or through the resolution of a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Therefore, the Court will deny summary judgment on the issue of punitive damages.

### 5. Qualified Immunity

City Defendants contend that Hanlon and French are entitled to qualified immunity because "virtually every case supported their limited use of force in attempting to coerce the defiant and resisting Atencio to complete the booking process by removing his shoes." However, as discussed above, there are genuine disputes of fact regarding whether Hanlon and French used excessive force against Atencio, either individually or as integral participants. The determination of whether Hanlon and French "may be said to have made a 'reasonable mistake' of fact or law [will] depend on the jury's resolution of these disputed facts and the inferences it draws therefrom." *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002). If Plaintiffs' version of the facts prevails at trial, there is a reasonable likelihood that neither Hanlon nor French would be entitled to qualified immunity. *See Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003); *Felix v. McCarthy*, 939 F.2d 699, 701-02 (9th Cir. 1991) (the law of this circuit as of 1985 put reasonable officers on notice that an "unprovoked and unjustified attack by a prison guard" violated clearly established constitutional rights). Hanlon and French are not, therefore, entitled to summary judgment on the question of qualified immunity.

### C. Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser, Scheffner, Vazquez, and Weiers' Motion for Summary Judgment (Doc. 347)

#### 1. Carrasco, Dominguez, Foster, Kaiser, Vazquez, and Weiers

Defendants Carrasco, Dominguez, Foster, Kaiser, Vazquez, and Weiers (as to Weiers participation in the "dog pile" and use of "soft empty hands" techniques) contend that they did not use unreasonable force on Atencio, and that they are therefore entitled to

summary judgment. In support of their argument, they point only to their individual conduct, contending that the conduct in which they individually engaged was not unreasonable.

Even assuming that their conduct, when looked at individually, was not unreasonable, these officers are not entitled to summary judgment. While these officers were holding Atencio down in the linescan room, Hatton delivered strikes to Atencio's facial region, and Weiers used the Taser on Atencio, both of which Plaintiffs' expert opined to be unreasonable uses of force. Further, while these officers (except Kaiser and Weiers) held Atencio down in the safe cell, Hatton delivered a knee strike to Atencio, which Plaintiffs' expert opined to be an unreasonable use of force. There is a genuine factual dispute as to whether these officers were integral participants in the use of excessive force in the linescan room and/or the safe cell, as well as whether these officers violated a duty to intervene to prevent the use of excessive force. *See Estate of Booker*, 745 F.3d at 422; *Boyd*, 374 F.3d at 780; *Chuman*, 76 F.3d at 294. Summary judgment will therefore be denied as to Defendants Carrasco, Dominguez, Foster, Kaiser, Vazquez, and Weiers.

2. <u>Weiers</u>

Weiers contends that his use of the taser was reasonable given the safety and security concerns that Atencio's continued resistance presented, and that he is therefore entitled to summary judgment.

Viewing the evidence in the light most favorable to Plaintiffs, Atencio was on the ground with numerous officers on top of him. The struggle on the ground had continued

- 17 -

for less than a minute.  Although Atencio was not yet handcuffed and was passively resisting, he was not being aggressive toward the officers.  Weiers then deployed the taser a total of three times.  The first was in probe mode, and Weiers deployed the probes into Atencio's chest area, near his heart.  The second two deployments were in drive stun mode.  Data downloaded from the taser used by Weiers indicates that the taser was used on Atencio for a period of 22 seconds.  Plaintiffs' expert has opined that the use of the taser was unreasonable, and a reasonable juror could conclude that Weiers' use of the taser under these circumstances was excessive.  Accordingly, genuine factual disputes remain and summary judgment as to Weiers will be denied.

    3.    <u>Defendant Scheffner</u>

Scheffner argues that he is entitled to summary judgment because he did not participate in, or fail to intercede in, any use of excessive force.  (Doc. 347 at 3-4.) Plaintiffs respond that Scheffner – a sergeant with the Maricopa County Sheriff's Department – "supervised the officers in both the LineScan room and Safe Cell 4" and is liable for both his own acts and for the acts of his subordinates.  (Doc. 415 at 30-31.)

A supervisor can be liable "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation ...; or for conduct that showed a reckless or callous indifference to the rights of others."  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  Thus, a supervisor can be liable if he or she "knowingly refused to terminate a series of acts by others, which he [or she] knew or reasonably should have known, would cause others to inflict the constitutional injury."  *Id.* (citations and alterations omitted).

As to the linescan room, Scheffner contends, and the Court agrees, that he cannot be held liable conduct that occurred outside his presence and without his knowledge. A review of the video of the linescan room shows Scheffner arriving shortly after Weiser deployed the taser and Hatton delivered the strikes to Atencio. (Plaintiffs' Ex. D.) Scheffner testified that shortly after he entered the linescan room, the officers had Atencio under control and handcuffed. Although Plaintiffs contend that, even after this point, several officers continued to keep their weight on Atencio and that Scheffner should therefore be liable for failing to intervene, a review of the video does not indicate any excessive force was used in Scheffner's presence in the linescan room, and Plaintiffs have pointed to no evidence indicating that, to the extent officers did continue to place some weight on Atencio, that amount of force was unreasonable or that Scheffner had sufficient information on which to determine that it was unreasonable. Summary judgment will therefore be granted in favor of Scheffner as to the linescan room.

As to what occurred in the safe cell, although Scheffner contends that he did not see what occurred, the video of the hall outside the safe cell shows that Scheffner was standing just outside of and looking into the safe cell twenty seconds before Hatton delivered a knee strike to Atencio. (Atencio Defendants' Ex. 11.) The video of the hall provided to the Court cuts off prior to the time of the knee strike which, according to the video of the safe cell, occurred at 2:41:52. (*See id.*) Scheffner states in his affidavit that he could not see into the safe cell, and still photos from the video of the hall outside the safe cell does show Scheffner had moved slightly from his position immediately in front of the cell door at 2:41:47. (Doc. 348-11 at 3, 7-8.) However, this still photo does not

demonstrate that Scheffner was not still observing the activities of the safe cell, nor does it demonstrate that before and at the time the knee strike was delivered, Scheffner could not see what was happening.  Moreover, Scheffner stated in his affidavit that he could hear the officers telling Atencio to stop resisting.  (Doc. 348-11 at 3.)  It is reasonable to infer that he also heard Officer Blas Gabriel when he yelled out Hatton's name to get Hatton to stop using the knee strike on Atencio (*see* Doc. 343-4 at 11), and thus that Scheffner knew that the use of unreasonable force may have been in progress.

Viewing the evidence in the light most favorable to Atencio, the Court finds genuine factual disputes remain as to whether Scheffner knowingly refused to terminate or intervene to stop actions, or was an integral participant in actions, that he knew or reasonably should have known would cause others to inflict constitutional injury on Atencio after Atencio was placed into the safe cell.  *See Estate of Booker*, 745 F.3d at 422; *Boyd*, 374 F.3d at 780; *Chuman*, 76 F.3d at 294; *Larez*, 946 F.2d at 630.  Summary judgment will accordingly be denied as to the safe cell.

4.     Qualified Immunity

Arpaio Defendants contend that they are entitled to qualified immunity because a reasonable officer could believe that their conduct was appropriate as a matter of law. The Court disagrees.

As discussed above, there are genuine factual disputes regarding whether Weiers used excessive force on Atencio.   There also are genuine factual disputes as to whether Carrasco, Dominguez, Foster, Kaiser, Vazquez, and Weiers were integral participants in the use of excessive force in the linescan room and/or the safe cell, as well as whether

these officers violated a duty to intervene to prevent the use of excessive force.  Further, there are genuine factual disputes as to whether Scheffner knowingly refused to terminate or intervene to stop actions, or was an integral participant in actions, occurring in the safe cell that he knew or reasonably should have known would cause others to inflict constitutional injury on Atencio.  The determination of whether these Defendants "may be said to have made a 'reasonable mistake' of fact or law [will] depend on the jury's resolution of these disputed facts and the inferences it draws therefrom." *Santos*, 287 F.3d at 855.  If Plaintiffs' version of the facts prevails at trial, there is a reasonable likelihood that none of these Defendants would be entitled to qualified immunity.  *See Lolli*, 351 F.3d at 421; *Felix*, 939 F.2d at 701-02.  Arpaio Defendants are not, therefore, entitled to summary judgment on the question of qualified immunity.[3]

### 5.   State Law Claims

Plaintiffs' state law claim against Arpaio Defendants is brought under Arizona Revised Statute § 12-611, which provides for liability for the death of a person caused "by wrongful act, neglect or default."  A.R.S. § 12-611.  Arpaio Defendants contend they are entitled to summary judgment on Plaintiffs' state law claims because their use of force was justified and reasonable under Arizona law, citing A.R.S. § 13-413 and A.R.S.

---

[3] Arpaio Defendants contend that Atencio had not yet been searched.  However, the evidence viewed in the light most favorable to Plaintiffs shows that Atencio by this point had been searched at least four times, including removing his shoes.  First, he was searched when he was arrested.  (Doc. 343-1 at 28.)  He was searched again, including having his shoes removed and any shoelaces removed, upon reaching the Cactus Park Precinct.  (Doc. 343-1 at 29.)  Prior to be transported to the Phoenix's Central Booking station, Atencio was searched yet again, including a search of his shoes and socks.  (Doc. 343-1 at 31, 33.)  When he arrived at Phoenix Central Booking, he was searched again, including having his shoes removed.  (Doc. 343-1 at 84-85.)  All of these searches were without incident.  Moreover, if there was any concern regarding Atencio having weapons, it is highly unlikely that his handcuffs would have been removed.

§ 13-403(2).  The Court disagrees.

Section § 13-413 merely provides that no persons shall be "subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions" of Chapter 14 of the Arizona Revised Statutes.  Section 13-403(2) provides that  a "superintendent or other entrusted official of a jail, prison or correctional institution may use physical force for the preservation of peace, to maintain order or discipline, or to prevent the commission of any felony or misdemeanor."  A.R.S. § 13-403(2).

Although, contrary to Plaintiffs' contentions,[4] it appears that both § 13-403(2) and § 13-413 apply here, this conclusion does not translate into a grant of summary judgment for the Arpaio Defendants.  To the contrary, these provisions only entitle Defendants to use the amount of force necessary to maintain order, and merely shield Defendants from civil liability under state law for using such force.  *See* A.R.S. §§ 13-403(2), 13-413; 13-403(2);  *Bojorquez*, 675 P.2d at 1317 (noting if the amount of force used exceeds that needed to maintain order in prison, an inmate is justified in using physical force to defend himself).  As discussed previously, there is a genuine factual dispute as to whether the force used by the Arpaio Defendants, individually or collectively as integral participants,

---

[4]  Plaintiffs contend that § 13-413 applies only to criminal cases and thus does not apply to the present case.  However, neither the language of the statute, nor the case law support their argument.  *See* A.R.S. § 13-413; *Pefil v. Smith*, 900 P.2d 12, 14 (Ariz. Ct. App. 1995) (noting that § 13-413 does no more than establish justification as an affirmative defense in civil lawsuits).  Further, § 13-414, relied on by Plaintiffs, is not applicable here because that section applies by its plain terms only to a "prisoner sentenced to the custody of the state department of corrections."  A.R.S. § 13-414.

Plaintiffs also contend that § 13-403(2) does not apply to the present case because the Arpaio Defendants are neither the "superintendent of" the jail, nor "entrusted official" of the jail.  Again, neither the plain language of the statute, nor the case law support their argument.  *See* A.R.S. § 13-403(2); *State v. Bojorquez*, 675 P.2d 1314, 1317 (Ariz. 1984) ("prison officials have the statutory right to use that amount of physical force necessary to maintain order within the prison").

was excessive and therefore unreasonable. Summary judgment will accordingly be denied as to the state law claim against Arpaio Defendants.

### 6. Causation

In both a § 1983 action, and a wrongful death action under Arizona state law, a plaintiff must "demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *see Grafitti-Valenzuela v. City of Phoenix*, 167 P.3d 711, 717 (Ariz. Ct. App. 2007).

Arpaio Defendants contend that Plaintiffs have not presented credible evidence that they caused Atencio's death and that they are therefore entitled to summary judgment on both the § 1983 claims and the state law wrongful death claims. In support of their contention, Defendants challenge the opinion of Plaintiffs' expert, Dr. Wilcox. The admissibility of Wilcox's expert testimony and opinions already have been extensively discussed by this Court in its Order denying the motions to exclude and/or limit Wilcox's testimony, and will not be readdressed here. (*See* Doc. 439.)

Wilcox's opinion regarding the cause of Atencio's death, set forth in his report and as explained and clarified during his deposition, is that a combination of pain and fear activated Atencio's "sympathetic system, which dumped epinephrine and norepinephrine into his system and caused sudden cardiac death." (Doc. 418-6 at 23.) He explained that it was "sort of a sum total of the uses of force that caused his sympathetic nervous system to go into overdrive, and that was ultimately the cause of his sudden cardiac death." (*Id.*) The forces Wilcox referred to include the choke hold or carotid hold, the "dogpile" on top of Atencio, the "beating" (the facial strikes by Hatton), the use of the taser, the knee

strike, and the resulting pain, decreased ability to breathe, and fear that the uses of force caused Atencio.

In addition to Wilcox, the medical examiner, Dr. Stano, opined in his report that Atencio "died of complications of a sudden cardiac arrest that occurred in the setting of acute psychosis, law enforcement subdual, and multiple medical problems." (Doc. 418-6 at 48.) Stano explained during his deposition that he did not believe it was merely Atencio's pre-existing condition of heart disease that caused his death, nor did he believe that Atencio's psychosis caused his heart to stop. (Doc. 418-6 at 26-29.) He further explained that the law enforcement subdual that he was referring to in his opinion included "the chokehold, the prone placement, the restraint, the use of the TASER and the use of handcuffs." (Doc. 418-6 at 37.)

This evidence raises genuine factual disputes regarding whether the acts of force used by the officers, including Arpaio Defendants, caused Atencio's death. Accordingly, summary judgment on the issue of causation will be denied.

7.  Arpaio

    a.  Individual Capacity

Arpaio contends that he is entitled to summary judgment in his individual capacity because Plaintiffs cannot present evidence to satisfy the supervisory liability standard.

Arpaio can be held liable in his individual capacity if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (alterations

omitted).  Supervisory liability can be imposed on Arpaio in his individual capacity for his "own culpable action or inaction in the training, supervision, or control of his subordinates"; for his "'acquiescence in the constitutional deprivations of which the complaint is made'"; or for his conduct that showed a "'reckless or callous indifference to the rights of others.'"  *Id.* (citations and alterations omitted).

Plaintiffs have submitted evidence that includes articles, a report, video clips of Arpaio making public statements, and the testimony of Plaintiffs' expert witness, Ken Katsaris.  (*See* Doc. 418-1 at 12-38; Doc. 418-2 at1-45; Doc. 418-3 at 1-2 (Ex. J); Doc. 418-4 at 1-3; Doc. 418-5 at 1-13; 418-6 at 1-49.)

Katsaris examined the history of the policies, practices, and procedures of the MCSO, and the operation of MCSO under Arpaio's administration.  He opined that Arpaio's rhetoric and leadership over a period of time, including his statements regarding his desire that jails be places of punishment, have had an influence on MCSO personnel and the operation of the jail and have created a culture of punishment.  Specifically, Katsaris opined that Arpaio's rhetoric was inconsistent with recognized and accepted jails practices and procedures, and that this rhetoric fostered a culture consistent therewith, causing employees to follow the rhetoric and disregard their training and official policies that are inconsistent with the rhetoric.  Katsaris explained that the historical circumstances of the jail, including depositions of MCSO employees in other cases, the lack of change and continued bad outcomes at the jail despite having what appeared to be appropriate training and policies in place, demonstrated both that employees knew of Arpaio's public rhetoric and that employees were influenced by that rhetoric.

A review of the other evidence submitted by Plaintiffs – the articles, report, and video clips – demonstrate that Arpaio has made public statements which, when viewed in the light most favorable to Plaintiffs, are consistent with Katsaris's opinion. Some of the statements made by or attributed to Arpaio include that he makes jails places of punishment; that he "educate[s] through punishment"; that he tries to make conditions for inmates as unpleasant as possible; that the guard dogs should be and are treated better than the inmates; that the tent city for the inmates is like concentration camps used by the Germans in the 1930s and 1940s; that he believes he has the "best-run jail in the country . . . [n]o one's died"; dismissing complaints that his approach is inhumane with the statement, "See anyone dying?"; that he knows "just how far I can go"; and that he doesn't care what the law says. (*See, e.g.*, Doc. 418-1 at 17, 23, 25, 29, 31, 37; Doc. 418-3 (Ex. J); Doc. 418-4 at 2; Doc. 418-4 at 1-13; 418-5 at 5.)

Arpaio also argues that he cannot be held liable in his individual capacity for the medical care provided or not provided to Atencio because the individuals that provided or did not provide that care are not Arpaio's subordinate but are instead medical professionals that work for an independent entity, Correctional Health Services ("CHS"). Arpaio has made this argument previously without success. The Court agrees with the holdings in those previous cases and, consistent with those holdings, declines to dismiss Plaintiffs' claims against Arpaio "merely because they are predicated on inadequate medical care." *See Payne v. Arpaio*, 2009 WL 3756679, *5-*6 (D. Ariz. 2009) (holding that Arpaio, as sheriff, can be held liable for inadequate medical care in the county jails); *Grevan v. Arpaio*, 2013 WL 6670296, *2 (D. Ariz. 2013) (following the holding in

*Payne*).

The evidence, viewed in the light most favorable to Plaintiffs, raises a genuine factual dispute as to whether Arpaio promoted a culture of punishment and cruelty in the jail and thereby set in motion a series of acts by others that he knew or reasonably should have known would cause others to violate the constitutional rights of inmates.[5]  Summary judgment on individual capacity will therefore be denied.

          b.    Official Capacity

As Arpaio correctly points out, an action against a municipal officer in his or her official capacity generally is simply another way of pleading an action against the municipality.  *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 n.55 (1978).  There is thus "no longer a need to bring official-capacity actions against local government officials" because, under *Monell*, "local government units can be sued directly for damages and injunctive or declaratory relief."  *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citation omitted).  Where, as here, "both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."  *Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 799 (9th Cir. 2008).

Plaintiffs have not objected to the dismissal of Arpaio in his official capacity. Accordingly, summary judgment will be granted to Arpaio as a redundant defendant, but

---

[5]  Additional challenges raised by Arpaio on this issue either have been previously considered by the Court in its Order addressing the admissibility of Katsaris's opinion (*see* Doc. 439), and will not be readdressed here, or have been considered and rejected by the Court as without merit.

only to the extent claims are brought against him in his official capacity.

8.   Fourteenth Amendment Claim

Plaintiffs' Fourteenth Amendment claim alleges that Arpaio Defendants violated their due process right to familial association.  "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

> In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical."  Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Wlkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 546) (citations omitted).

Although the situation in the present case was rapidly evolving, viewing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that some or all of the Defendants had the opportunity to deliberate before they acted or failed to intervene, and that they acted or failed to intervene with deliberate indifference.  Alternatively, a reasonable juror could conclude that although there was no time to deliberate, one or more of the Defendants acted or failed to intervene with a purpose to harm unrelated to legitimate law enforcement objectives.  Summary judgment on this issue will therefore be denied.

9.   Punitive Damages

Plaintiffs are seeking punitive damages against Arpaio Defendants only on their

§ 1983 claims; they are not seeking punitive damages based on their state law claims.

Arpaio Defendants contend that they are entitled to summary judgment on the issue of punitive damages for the § 1983 claims because the record lacks evidence of any evil motive or intent, or a reckless or callous indifference to Atencio's constitutional rights. As discussed above, there is a genuine factual dispute as to whether Arpaio Defendants individually engaged in and/or were integral participants in the use of excessive force, as well as whether these officers violated a duty to intervene to prevent the use of excessive force. The evidence, viewed in the light most favorable to Plaintiffs, shows multiple instances of unreasonable and excessive force, including the use of a choke hold or carotid hold, "dog piles" during which multiple officers held Atencio down by placing their full or partial weight on him while he was in a prone position, facial strikes, taser, and knee strike. A "jury could certainly infer that there was 'reckless or callous indifference'" based upon the evidence. *Davis*, 927 F.2d at 1485. Moreover, it is the Court's policy, when a trial must be held, to resolve the issue of the propriety of punitive damages through the resolution of objections to jury instructions and/or through the resolution of a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Therefore, the Court will deny summary judgment on the issue of punitive damages.

**D.      Hatton Defendants' Motion for Summary Judgment (Doc. 350)**

1.      Hatton's Uses of Force

Hatton contends that he is entitled to summary judgment because his uses of force were "reasonable and justified." As to the linescan room, he contends he delivered the strikes on Atencio because Atencio had grabbed Hatton's hand and was twisting it.

However, the evidence, viewed in the light most favorable to Plaintiffs, shows that Hatton delivered the three to four strikes to Atencio at about seventy percent of his full strength, with two to three of those strikes to Atencio's facial region, after Atencio had been tased and at a time when Atencio was "defenseless," with his hands out in front of him in a "superman position." (Doc. 343-4 at 19-14; Doc. 416 at 11 (Ex. A); Doc 416 at 16.) According to Officer Salinas, who was on the scene and witnessed Hatton's actions, these strikes were unreasonable, unjustifiable, and excessive. (*Ibid.*) When asked specifically about Hatton's assertion that he delivered the strikes because Atencio had grabbed and was twisting Hatton's hand, Salinas said that Hatton's assertion was not true and was a lie. (Doc. 416 at 11 (Ex. A); Doc 416 at 16.) Salinas also said that it would be a lie if Hatton said he delivered the strikes in self-defense. (*Id.*). Officer Blas also testified that he believed Hatton's use of the face strikes on Atencio was "inappropriate" and "unreasonable." (Doc. 343-4.) Plaintiffs' expert witness Bruno similarly opined the strikes by Hatton in the linescan room to be unreasonable uses of force.[6] (Doc. 300-3 at 78.)

As to the safe cell, there is evidence that Hatton delivered a knee strike, dropping his full weight on Atencio, while Atencio was on the ground and restrained by multiple officers. Officer Gabriel, who was present and witnessed the strike, reacted by yelling out Hatton's name to get him to stop. (Doc. 343-4 at 11.) Gabriel testified that he believed the knee strike to be unnecessary and unreasonable. (*Id.*) Maricopa County's

---

[6] The admissibility of Bruno's expert testimony and opinions already have been extensively discussed by this Court in its Order denying the motions to exclude Bruno's testimony, and will not be readdressed here. (*See* Doc. 439.)

expert, Tim Gravette, also testified that in his opinion, the knee strike by Hatton was unnecessary and unreasonable.  (Doc. 343-4 at 56-57.)

There is, in sum, genuine factual disputes regarding whether Hatton's actions constituted excessive force.  Summary judgment will therefore be denied.

### 2.    Causation

Hatton contends that Plaintiffs cannot prove that his actions caused Atencio's death.  As discussed above in relation to the Arpaio Defendants, there are genuine factual disputes regarding whether the acts of force used by the officers, including Hatton's use of the strikes, the knee drop, and participation in the subdual and restraint of Atencio, caused Atencio's death.  Accordingly, summary judgment on the issue of causation will be denied.

### 3.    Qualified Immunity

Hatton contends that he is entitled to qualified immunity because "it cannot be said that no reasonable officer would have acted as Hatton did in these circumstances." The Court disagrees.

As discussed above, there are genuine factual disputes regarding whether Hatton used excessive force on Atencio.  The determination of whether Hatton "may be said to have made a 'reasonable mistake' of fact or law [will] depend on the jury's resolution of these disputed facts and the inferences it draws therefrom."  *Santos*, 287 F.3d at 855 n.12. If Plaintiffs' version of the facts prevails at trial, there is a reasonable likelihood that Hatton would not be entitled to qualified immunity.  *See Lolli*, 351 F.3d at 421; *Felix*, 939 F.2d at 701-02.  Hatton is not, therefore, entitled to summary judgment on the

question of qualified immunity.

    4.    <u>State Law Claim</u>

Hatton contends that his use of force was justified under Arizona law. As discussed in relation to the Arpaio Defendants, although it appears that both A.R.S. § 13-403(2) and A.R.S. § 13-413 apply here, this conclusion does not translate into a grant of summary judgment for Hatton. To the contrary, these provisions only entitle Hatton to use the amount of force necessary to maintain order, and shield Hatton from civil liability under state law for using such force. *See* A.R.S. §§ 13-403(2), 13-413; 13-403(2); *Bojorquez*, 675 P.2d at 1317. There are genuine factual disputes as to whether the force used by Hatton was excessive and therefore unreasonable. Summary judgment will accordingly be denied on the state law claim.

    5.    <u>Fourteenth Amendment Claim</u>

Hatton contends that there is no evidence that his uses of force were applied with an intent to harm Atencio, outside of the goal of forcing compliance. He argues that he is therefore entitled to summary judgment on Plaintiffs' Fourteenth Amendment familial association claim.

As discussed in relation to the Arpaio Defendants, although the situation in the present case was rapidly evolving, viewing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that Hatton had the opportunity to deliberate before he acted, and that he acted with deliberate indifference. *See Wlkinson*, 610 F.3d at 554. Alternatively, a reasonable juror could conclude that although there was no time to deliberate, that Hatton acted with a purpose to harm Atencio unrelated to legitimate law

enforcement objectives.[7] *See id.* Summary judgment on the Fourteenth Amendment claim will therefore be denied.

      6.    Punitive Damages

Hatton contends that Plaintiffs cannot recover punitive damages against him in his official capacity because government officials are immune from punitive damages under § 1983. However, Plaintiffs are not seeking punitive damages against the individual defendants in their official capacity.

Hatton also contends that Plaintiffs cannot meet their burden to support an award of punitive damages against him in his individual capacity under § 1983. He contends that Plaintiffs have not produced any evidence demonstrating he was motivated by an evil motive or intent, or acted with reckless or callous indifference to Atencio's constitutional rights. However, viewing the evidence in the light most favorable to Plaintiffs, Hatton used unreasonable and excessive force when he delivered the facial strikes and the knee strike on Atencio. A "jury could certainly infer that there was 'reckless or callous indifference'" based upon the evidence. *Davis*, 927 F.2d at 1485. Moreover, it is the Court's policy, when a trial must be held, to resolve the issue of the propriety of punitive damages through the resolution of objections to jury instructions and/or through the resolution of a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Therefore, the Court will deny summary judgment on the issue of punitive damages.

---

[7] Hatton's self-serving statement that he had no ill will does not entitle him to summary judgment on this issue because a reasonable jury could choose to not believe him and conclude that his actions were instead motivated by something other than legitimate law enforcement objectives.

## E. Defendants William McLean, Monica Scarpatir, and Ian Cranmer's Motion for Partial Summary Judgment (Doc. 355)

Defendants McLean, Scarpati, and Cranmer (collectively, "CHS Defendants") move for summary judgment, contending that Plaintiffs' evidence at most supports nothing more than a medical malpractice claim and is insufficient to give rise to § 1983 liabliity or to support an award of punitive damages.[8]  CHS Defendants make clear that they are not seeking, through this motion, summary judgment on Plaintiffs' malpractice claims.

### 1. Applicable Standard

Plaintiffs contend that because Atencio was merely an arrestee, his claims against medical personnel are governed by the Fourth Amendment.  The Court disagrees.

"Although the Fourth Amendment provides the proper framework for [Atencio's] excessive force claim[s], it does not govern his medical needs claim." *Lolli*, 351 F.3d at 418.  Instead, claims for "failure to provide care for serious medical needs, when brought by a detainee such as [Atencio] who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment."

---

[8] The courtesy copy provided to Chambers of the exhibits to Defendants William McLean, Monica Scarpatir, and Ian Cranmer's Statement of Facts in Support of Their Motion for Partial Summary Judgment (Doc. 356) were untabbed and unbound.  Not only does this make it extremely difficult for the Court to find the necessary exhibits, it also violates the Court's Electronic Case Filing Administrative Policies and Procedures Manual.  *See* Elec. Case Filing Admin. Policies & Proc. Manual § II(D)(3)(requiring party to provide Chambers with a courtesy copy of any electronically filed document "exceeding 10 pages in length, including exhibits and attachments" and that such courtesy copy comply with LRCiv 7.1); LRCiv 7.1(b)(1) (requiring all paper documents must be either stapled or, if too large for stapling, bound with a metal clasp).

*Id.* (citation omitted). Thus, to defeat summary judgment on his medical needs claims, Atencio must show that the CHS Defendants knew of and disregarded an excessive risk to his health and safety. *Id.* "[I]t is not enough that the person merely 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [he or she] must also draw that inference.'" *Id.* (citation omitted). However, "'if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction.'" *Id.* (citation omitted).

2.    Initial Assessment

McLean and Scarpati contend that Atencio has failed to present evidence that they acted with deliberate indifference to his serious medical needs in relation to his initial intake and assessment and that they are therefore entitled to summary judgment on this issue.

In assessing Atencio, McLean did not follow the standard process that is to be used to determine whether Atencio was alert (meaning he was awake and talking) and oriented. Specifically, although McLean determined that Atencio was oriented as to "person," i.e., Atencio knew who he himself was, McLean did not ask the questions to determine whether Atencio was oriented to where he was, when it was, or his current situation. (Doc. 343-2 at 36.) Atencio denied to McLean any intention to hurt himself, but because Atencio had previously indicated that he did have such an intention, McLean formed the opinion that Atencio was a danger to himself. (Doc. 343-2 at 38.) McLean also formed the opinion that Atencio was under the influence of drugs based on Atencio's

behavior and because Atencio had previously admitted that he had used methamphetamine at 5:00 p.m. the previous evening. McLean requested a drug recognition expert (DRE) to examine Atencio, and also requested that Scarpati, a mental health professional, evaluate Atencio. It does not appear that the DRE ever examined Atencio.

Scarpati's assessment of Atencio lasted only forty-five seconds, was conducted in McLean's presence, and apparently was conducted while she stood behind Atencio. (Doc. 343-2 at 78, Ex. N; Doc. 343-2 at 42, 64.) Scarpati testified that she approached where Atencio was seated, at a desk in front of the nursing station, and asked him what was going on. (Doc. 343-2 at 55.) Atencio did not answer "appropriately" and was instead "yelling word salad, spark plug, firetruck." (*Id.*) She then asked Atencio if he was suicidal, but he didn't respond. (*Id.*) Atencio also made the statement, "Tony goes to heaven," and "he's a spark plug." (*Id.* at 56; Doc. 414-2 at 3.) During this exchange, McLean also was present.

Scarpati testified that Atencio appeared to be psychotic, and she formed the opinion that Atencio was in crisis. She noted that Atencio was uncooperative with her assessment, but also acknowledged Atencio may not have had the ability to be cooperative due to the mental state of psychosis he was in. (Doc. 343-2 at 58-59.) Scarpati further acknowledged that it is not unusual for mental health professionals to communicate with MCSO officers about a patient, but that she did not inform any of the officers that Atencio was in a state of psychosis, that he was in crisis, or that he might not have the ability to be cooperative or follow directions due to his mental state. (Doc. 343-

2 at 64.) Instead, Scarpati merely determined that Atencio should be placed into a safe cell, and conferred with McLean regarding the same. McLean, then started the process necessary for Atencio's placement into a safe cell.

Scarpati thus knew that Atencio was in a state of psychosis and in a crisis. She also knew that he was uncooperative, and may not have had the ability to cooperate due to his state of psychosis. Atencio's state of psychosis was so obvious that officers – who did not have medical training – were able to recognize it. Despite her knowledge, she neither recommended that Atencio be transferred to a facility for treatment of his psychosis, nor informed the officers who would take control of Atencio for placement into the safe cell of Atencio's state of psychosis.

Similarly McLean, who witnessed Atencio's behavior both during his own assessment and during Scarpati's assessment, did not recommend Atencio be transferred for treatment of his psychosis, nor did he inform the officers who would take control of Atencio for placement into the safe cell of Atencio's mental state

Based on this and other evidence in the record, a jury could find that Scarpati and McLean were deliberately indifferent to Atencio's serious medical needs. *See Gibson*, 290 F.3d at 1194. Specifically, viewed in the light most favorable to Plaintiffs, the evidence shows that Scarpati and McLean knew that Atencio was in the throes of a psychotic crisis; that, as a result, he did not have the ability to cooperate with them or the officers; that hospitalization could have relieved Atencio's condition; and that if Atencio remained in the jail, he presented a danger to both himself and others. *See id.* Summary judgment will therefore be denied.

3. <u>Post-Use-of-Force Treatment</u>

Both McLean and Cranmer responded to the linescan room after a call was made for medical personnel. They both knew that Atencio had been subjected to the use of force that included being held down in a prone position by the weight of multiple officers and being tased. After Atencio was handcuffed and subdued, Cranmer knelt next to him, observed where the taser points had come into contact with him, and asked him if he was okay. Atencio, who was still being held down by officers, said, "Anybody that touches me, I'm going to fucking kill." Cranmer, concerned for his safety, backed away from Atencio, but continued to observe him. He determined Atencio to be well enough to be placed into a safe cell because Atencio verbally responded to his question of, "Are you okay?" with the threat. No vital signs were taken by Cranmer, nor was any other assessment of Atencio completed before Atencio was carried to and placed into the safe cell by the officers.

After the officers removed Atencio's clothes and handcuffs, Atencio was left alone, naked, and lying motionless on the floor of the safe cell and the cell door was closed. Again, no vital signs were taken, nor was any other assessment performed on Atencio. Instead, Cranmer and McLean merely observed Atencio briefly through the cell door window. Cranmer then went into a room that allowed Atencio to be monitored via video camera. Although Cranmer testified at his deposition that while he was watching Atencio through the window, he thought he saw Atencio move and take a breath, a review of the video of the safe cell shows that after the officers left Atencio in the safe cell, Atencio never made any movement and, moreover, there is not any visible breathing

by Atencio. (*See* Doc. 343-2 at 78, Ex. N, Clip 7.)

Based on this and other evidence in the record, a jury could find that Cranmer and McLean were deliberately indifferent to Atencio's serious medical needs. *See Estate of Booker*, 645 F.3d at 431-32. Specifically, viewed in the light most favorable to Plaintiffs, the evidence shows that McLean and Cranmer knew that Atencio had been tased multiple times as well as held down in a prone position by the weight of multiple officers, yet never took any vital signs nor completed any other assessment of Atencio (other than a quick observation of the taser puncture wounds); and that after Atencio was left naked on the floor of the safe cell, McLean and Cranmer knew that he was motionless and not visibly breathing. In light of McLean's and Cranmer's training, a reasonable jury could conclude that McLean and Cranmer inferred that Atencio was or may have been unconscious and in need of immediate medical attention. If a jury made that inference, it could further infer that McLean and Cranmer were deliberately indifferent in failing to respond sooner to determine Atencio's condition.[9] *See id.* Summary judgment will therefore be denied.

> 4.    Punitive Damages

As discussed above, a reasonable jury could find that McLean and Cranmer acted with deliberate indifference to Atencio's serious medical needs. Consequently, a reasonable jury could also find recklessness or callous indifference for the purpose of

---

[9] McLean testified that he expected the clinic nurse to follow-up with Atencio and take his vital signs within the time required by CHS policy. This assertion does not, however, assist McLean because a reasonable jury could find that if Atencio was unconscious and/or not breathing, waiting for someone else to check on him at all, let alone within the fifteen minutes required under CHS policy, exhibited deliberate indifference.

assessing punitive damages. *See Larez v. City of Los Angeles,* 946 F.2d 630, 648-49 (9th Cir. 1991) (noting that the standard for individual liability for compensatory damages for deliberate indifference under § 1983 "largely overlaps the standard for punitive damages" in that both look to a defendant's "reckless or callous disregard or indifference to" the plaintiff's constitutional rights); *see also Smith v. Wade*, 461 U.S. 30, 53 (1983) (approving overlapping standard for compensatory and punitive damages in § 1983 cases involving reckless or callous indifference and noting that common law has never required a higher threshold for punitive damages). Moreover, it is the Court's policy, when a trial must be held, to resolve the issue of the propriety of punitive damages through the resolution of objections to jury instructions and/or through the resolution of a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Therefore, the Court will deny summary judgment on the issue of punitive damages.

## F. Plaintiffs' Motion for Partial Summary Judgment against Maricopa County (Doc. 358)

Plaintiffs contend that they are entitled to summary judgment on their *Monell* claims against Maricopa County on the issues of whether the County has a policy of deliberate indifference towards the medical care provided to incoming detainees in their jails, and whether the County knew its policy of deliberate indifference posed significant risks to those detainees.

In support of their contention, Plaintiffs cite to and rely on orders issued in *Graves v. Arpaio*, No. 77-CV-00479-NVW, as well as evidence submitted in that case. Plaintiffs argue that the County is collaterally estopped by *Graves* from denying that it was

violating pretrial detainees' constitutional rights by depriving them of adequate receiving screenings and ready access to care for their serious mental health needs. (Doc. 342 at 7-11.) The Court disagrees and holds that the doctrine of collateral estoppel does not apply.

First, the *Graves* case was initially settled through a 1981 consent decree, and the 1995 first amended judgment in that case was entered through stipulation and explicitly provided that it did "not represent a judicial determination of any constitutionally mandated standards applicable to the jails." *Graves v. Arpaio*, 2008 WL 4699770, *1 (D. Ariz. 2008).

Second, the *Graves* court's 2008 order denying in part and granting in part the defendants' motion to terminate judicial oversight was based on evidence of conditions at the jail presented at an August 2008 evidentiary hearing. *See id.* at *2, 27-*28, *52. The conditions at the jail as of August 2008 do not necessarily reflect conditions in December 2011. *See Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (to have preclusive effect, issue necessarily decided at previous proceeding must be identical to the one sought to be relitigated).

Third, the *Graves* court's statements in its April 7, 2010, order regarding the lack of progress as of that date regarding mental health treatment at the jail, also do not necessarily reflect the conditions that existed in December 2011, and, further, the statements are not a judgment on the merits. The April 2010 order thus does not provide a basis for estopping the County from contesting conditions in the jail in December 2011. *See id.* (to have preclusive effect, must not only have identical issue, but also the prior proceeding must have ended with a final judgment on the merits).

Fourth, the *Graves* third amended judgment entered in May 2012 simply restated the portions of the 2008 second amended judgment that remained in place and continued in effect. (*See* Case No. 77-CV-00479, Doc. 2093, 2094.) This order was entered in response to the defendants' unopposed motion to terminate certain of the conditions set forth in the 2008 second amended judgment. Thus, the third amended judgment is not a determination on the merits, and does not provide a basis for estopping the County from contesting conditions in the jail in December 2011. *See id.*

Finally, prudential concerns also convince the Court that nonmutual collateral estoppel should not be applied against the County. *See United States v. Mendoza*, 464 U.S. 154, 161 (1984) (holding nonmutual collateral estoppel does not apply to the federal government). As the Court explained in *Mendoza*, the government's "litigation conduct in a case is apt to differ from that of a private litigant." *Id.* "Unlike a private litigant who generally does not forgo an appeal if he believes he can prevail," the government considers various prudential concerns in determining whether to authorize an appeal, such as the limited government resources and the courts' crowded docket. *Id.* Thus, although the County would be bound by principles of res judicata from relitigating the same issue with the same party, the Court declines to hold that the County is "further bound in a case involving a litigant who was not a party to the earlier litigation." *Id.* at 162.

Plaintiffs' remaining grounds for summary judgment rely, directly or indirectly, on orders issued in the *Graves* case. Accordingly, Plaintiffs' motion for partial summary judgment will be denied.

**G.** **Defendant Maricopa County's Motion to Strike Plaintiffs' Statement of Facts Applicable to All Defendants (Doc. 384)**

Defendant Maricopa County moves to strike Plaintiffs' Statement of Facts Applicable to all Defendants (PSOFAD), found at Doc. 359, on the ground that if fails to comply with the local rules. Assuming that the PSOFAD does violate the local rules, the Court declines to strike it. Plaintiffs could have filed the information contained in the PSOFAD with their various responses to Defendants' motions for summary judgment, and Plaintiffs' early filing of this information, and combining of the information, did not prejudice Defendants. Although the preferable approach would have been for Plaintiffs to permission from the Court prior to filing the PSOFAD, the Court will deny the motion to strike it.

**H.** **City Defendants' Motion for Leave to File Under Seal Reply in Support of Motion to Strike Portions of Plaintiffs' Response (Doc. 388)**

In this motion, City Defendants seek leave to file under seal their Reply in Support of Motion to Strike Portions of Plaintiffs' Response. The motion does not reference a docket number, and the only motion to strike portions of plaintiffs' response that the Court has located is found at Docs. 329, 340, and 341. The Court has already ordered sealed the unredacted versions of the Motion to Strike Portions of Plaintiffs' Response (*see* Docs. 339, 340, 341), and Doc. 329 is the redacted copy of 340/341. The Court will therefore deny the current motion as moot.

IT IS ORDERED that City Defendants' Motion for Summary Judgment (Doc. 299) is Denied.

IT IS FURTHER ORDERED that Defendants Arpaio, Carrasco, Dominguez, Foster, Kaiser Scheffner, Vazquez, and Weiers' Motion for Summary Judgment (Doc. 347) is Granted in part and Denied in part as follows:

Defendant Scheffner is granted summary judgment only as to conduct that occurred in the line scan room.

Defendant Arpaio is granted summary judgment only as to claims brought against him in his official capacity.

Summary judgment as to Arpaio, Carrasco, Dominguez, Foster, Kaiser Scheffner, Vazquez, and Weiers' is otherwise denied.

IT IS FURTHER ORDERED that Hatton Defendants' Motion for Summary Judgment (Doc. 350) is Denied.

IT IS FURTHER ORDERED that Defendants William McLean, Monica Scarpati, and Ian Cranmer's Motion for Partial Summary Judgment (Doc. 355) is Denied.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment against Maricopa County (Doc. 358) is Denied.

IT IS FURTHER ORDERED that Defendant Maricopa County's Motion to Strike Plaintiffs' Statement of Facts Applicable to All Defendants (Doc. 384) is Denied.

IT IS FURTHER ORDERED that City Defendants' Motion for Leave to File Under Seal Reply in Support of Motion to Strike Portions of Plaintiffs' Response (Doc. 388) is Denied as moot.

/ / /

IT IS FURTHER ORDERED that the caption of all further documents filed in this action shall comply with the party name capitalization requirement of LRCiv 7.1(a)(3).

Dated this 10th day of February, 2015.

Paul G. Rosenblatt
United States District Judge